



EXHIBIT
A

**South Atlantic Regional Center**

## Palm House F.A.Q.
### 棕榈渡假屋项目的常见问题

**Q1. Where is the Project Located?**

The project is located on the prestigious Palm Beach Island in South Florida at 160 Royal Palm Ave, Palm Beach, Florida, USA.

**项目位于哪个地区？**

项目是位于南佛罗里达州著名的棕榈滩岛上，皇家棕榈大道第 160 号。

**Q2. How much money will the project seek to raise?**

The Project will use a total of $91,000,000 USD.   The Developer has already invested $22,000,000 USD of his own equity.  There is also a Bridge Loan funding as $29,500,000 to ensure the continuation of the construction of the project as the EB5 Funding is being raised.  A total of $39,500,000 USD will be sought in EB5 Funding.  A summary Source of Funds can be found in the table below or in the Investment Portfolio on page 171.

**项目需要筹集多少资金？**

项目需要用到 91,000,000 美元。开发商已经运用了私人财产投资了 22,000,000 美元。此外，项目还有一个 29,500,000 美元的过桥贷款，以确保在筹集 EB5 资金的同时，项目建设的可以正常进行。 项目方希望通过 EB5 筹集到共 39,500,000 美元。有关资金来源的概要，请参阅以下列表或投资组合中的第 171 页。

| Source of Funds | Amount | Percentage |
|---|---|---|
| EB-5 Capital: | $39,500,000 | 43.4% |
| Developer Equity: | $22,000,000 | 24.2% |
| Bank Financing: | $29,500,000 | 32.4% |
| TOTAL: | $91,000,000 | 100% |

**Q3. When will the Palm House Project be open for business?**

Current projects have the finishing of the Palm House Hotel for "Season" of 2013.  Generally "Season" in Palm Beach begins just after the Christmas Holiday.  The Building also has received Permanent Certificate of Occupancy for the East and West Wings of the Hotel.  This means that the project will proceed with the City of Palm Beach's approval to be open for Season 2013/2014.



## South Atlantic Regional Center

棕榈渡假屋项目么时候会开始营业？

棕榈渡假屋酒店将于 2013 年的"季节"开始营业。一般而言，在棕榈滩所指的"季节"是指圣诞假期过后。这建筑东翼与西翼的酒店已得到永久使用证书。意味着项目会在棕榈滩市政府的批准下将于 2013/2014 年季节开始营业。

**Q4. Does the Palm House Project have a TEA Approval?**

Yes, please see the attached Palm House TEA Approval Letter or click here.

棕榈渡假屋项目是否有目标就业区的批准？

是，请参阅附件棕榈渡假屋项目的目标就业区批准书或点击这里。



**Q5. Is the Palm House Project Approved by the USCIS?**

Yes the Palm House Project is approved by the USCIS through South Atlantic Regional Center's NAICS Code approvals.  The Palm House Project falls under these listings.  *Evidence of this can be discovered at USCIS.gov and searching SARC.  NAICS Codes for the Palm House Project can be found by opening the attached Econometric Analysis file or beginning at page 414 of the Investment Portfolio.*

棕榈渡假屋项目是否已通过美国移民局的批准？

是，棕榈渡假屋项目已透过南大西洋区域中心的北美行业分类系统 NAICS 行业代码而通过美国移民局的批准。棕榈渡假屋项目是属于以下的分类。相关证据可于 USCIS.gov 网站搜索 SARC 南大西洋区域中心找到。而有关棕榈渡假屋项目的北美行业分类系统 NAICS 代码详情请参阅附件中的经济分析报告或投资组合的第 414 页。

| Table B-1.  NAICS Codes for Each Type of Activity | |
|---|---|
| 2362 | Nonresidential Building Construction |
| 5413 | Architectural, Engineering, and Related Services |
| 7211 | Traveler Accommodation |

197 S. Federal Highway | Boca Raton | Florida | 33432
561.900.7077 | 561.282.6102
Sarceb5.com



South Atlantic Regional Center

Many NEW REGIONAL CENTERS in the market claim Project Approval by the UCSIS. What this truly means is that the USCIS approved the Regional Center to offer projects in a particular NAICS Code. Being that these Regional Centers have never marketed an EB5 Project before, they claim Project Approval to make themselves seem stronger in the market place. What this really means is that they are newly approved and most likely inexperienced in EB5 Project Management.

在市场上，有许多新的区域中心指出他们的项目得到美国移民局的批准。其实，真正的意思是代表美国移民局批准该区域中心在北美行业分类系统 NAICS 行业代码的批准范围下推出某些特定的项目。所以这代表那些区域中心之前并没有于市场上推过 EB5 项目，可是他们坚称项目已被审批，使项目在市场上看似更稳健。其实真正的意思是代表他们是新被批准及很有可能是欠缺管理 EB5 项目的经验。

Whereas, South Atlantic Regional Center has among the highest number of approved NAICS Codes for any USCIS Approved Regional Center, and has already successfully sold out their Royal Palm Town Center IV Project. With 92% of their clients approved and 8% still undergoing USCIS Processing.

然而，南大西洋区域中心是拥有美国移民局批准最多北美行业分类系统 NAICS 行业代码的区域中心，并已经成功地出售完皇家棕榈镇中心 IV 项目。当中有 92%的客户已获批准和 8%的客户仍于美国移民局处理当中。

**Q6. Can a copy of the Appraisal Report that values the Palm House Hotel at $137,500,000 USD be provided?**
A copy of the Appraisal Report, completed by Callaway & Price, INC., can be found on page 248 of the Investment Portfolio.

**可否提供棕榈渡假屋值137,500,000美元的评估报告？**
有关 Callaway & Price, INC.完成的评估报告可参阅投资组合的第 248 页。

It is important to note that the building at present is worth over $110,000,000 USD before completion. This makes the Palm House Hotel one of the safest EB5 offerings from a Job Creation and Investment position.

重要注意事项：以目前建设（未完成整个建设）的市价已值经超过 110,000,000 美元。这使棕榈渡假屋酒店是其中一个最安全的 EB5 项目，能创造足够的就业机会和稳健的投资状况。

INDC_0000040



South Atlantic Regional Center

**Q7. How many jobs will the Palm House create?**
Dr. Michael Evans completed the Rims II Economic Analysis of the Palm House Project. His findings resulted in a total of 953 Jobs created. The full report can be viewed on page 414 of the Investment Portfolio.

棕榈渡假屋项目会创造了多少个就业机会？
迈克尔·埃文博士运用了 RIMS II"区域投入支出模型系统"对棕榈渡假屋项目完成了经济分析。他的研究显示项目可创造 953 个职位。详细报告请参阅投资组合的第 414 页。

| Table A. Summary of Employment and Revenue Estimates | | | |
|---|---|---|---|
| Activity | Expenditure/ Revenues ($ million) | Final Demand Multiplier | Total Jobs |
| Hard Construction Costs | 32.293 | 17.5636 | 567.2 |
| Soft Costs | 6.188 | 16.315 | 101.0 |
| Purchases of FF&E * | 2.5 | 7.9957 | 20.0 |
| Hotel Operations | 14.36 | 17.5069 | 251.4 |
| Membership Fees * | 2.0 | 7.046 | 14.1 |
| Total | 75.413 | | 953.7 |

\* Indirect and Induced effects only
All figures calculated from unrounded numbers

**Q8. How many rooms are there in the Palm House Hotel? What are the sizes of the Hotel?**
There are a total of 79 Hotel Condo Rooms in Palm House Hotel. Their sizes range from 379 SqFt to 1,054 SqFt, as indicated in the table below. Additional information on room sizes can be found on pages 157 – 159 of the Investment Portfolio.

棕榈渡假屋酒店有多少个房间？酒店房间的大小是？
棕榈渡假屋酒店共有 79 间公寓客房。正如下表所显示，它们的大小由 379 平方英尺到 1,054 平方英尺不等。房间大小的详细资料请参阅投资组合的第 157 - 159 页。



## South Atlantic Regional Center

**Hotel Units SF**

| Unit # | QT | Unit Description | SF per Unit | Total SF |
|---|---|---|---|---|
| | | **First floor** | | |
| A | 1 | Large One Bedroom | 949 | 949 |
| B | 1 | Studio | 475 | 475 |
| C L | 1 | One Bedroom | 734 | 734 |
| C R | 1 | One Bedroom | 689 | 689 |
| D | 1 | One Bedroom | 870 | 870 |
| E | 5 | Studio | 475 | 2,375 |
| E1 | 1 | Studio | 475 | 475 |
| | | One Bedroom plus den | 960 | 960 |
| F | 2 | One Bedroom | 792 | 1,584 |
| F1 | 1 | One Bedroom | 782 | 782 |
| G | 8 | Studio | 379 | 3,032 |
| G1 | 2 | Studio | 379 | 758 |
| G2 | 1 | Studio | 415 | 415 |
| | | **Second floor** | | |
| A | 1 | Large One Bedroom | 949 | 949 |
| B | 1 | Studio | 475 | 475 |
| C L | 1 | One Bedroom | 734 | 734 |
| C R | 1 | One Bedroom | 689 | 689 |
| | | One Bedroom plus den | 960 | 960 |
| E | 5 | Studio | 475 | 2,375 |
| E1 | 1 | Studio | 475 | 475 |
| N | 1 | One Bedroom plus den | 960 | 960 |
| F | 3 | One Bedroom | 792 | 2,376 |
| F1 | 1 | One Bedroom | 782 | 782 |
| G | 8 | Studio | 379 | 3,032 |
| G1 | 2 | Studio | 379 | 758 |
| H | 1 | Studio | 576 | 576 |
| | | **Third floor** | | |
| J | 1 | Studio | 605 | 605 |
| K | 6 | Large Studio | 579 | 3,474 |
| M1 | 1 | One Bedroom | 676 | 676 |
| | | One Bedroom | 833 | 833 |
| M3 | 1 | One Bedroom | 843 | 843 |
| G | 8 | Studio | 379 | 3,032 |
| G1 | 2 | Studio | 379 | 758 |
| F | 3 | One Bedroom | 792 | 2,376 |
| F1 | 1 | One Bedroom | 796 | 782 |
| F2 | 1 | One Bedroom | 722 | 722 |
| Total SQ. FT | | | | 44,438 |
| | | Indicates lockout room to create two hotel rooms | | |

*Breakdown of guestroom types and square footage*

### Q9. What would happen if the Palm House Project couldn't raise 79 investors?

The agreements submitted to the USICS allow for a minimum of 2 investors and a maximum of 79. Therefore if less than 79 investors become a part of the project before the offering is closed there will be no effect on the immigration of the clients.

### 如果棕榈渡假屋项目不能筹集79个投资者将会发生什么事情？

在已递交至美国移民局的协议当中，清楚列明这个项目允许最少2名至最多79名的投资者。因此，即使这个项目在停止接受EB5申请时不能筹集到79名投资者，对客户的移民申请是没有影响。

Depending on the amount of funds raised through EB5 Investment, other domestic sources can be used to supply any additional funds needed. These funds can be acquired through Private Equity or Bank Loans against the already increased value of the project. The near completed state of the project offers great flexibility to find other sources of investment beyond EB5 Investment should it be required. This is not currently sought after to project the Return of Investment Position of the EB5 Investors.

197 S. Federal Highway | Boca Raton | Florida | 33432
561.900.7077 | 561.282.6102
Sarceb5.com

INDC_0000042



South Atlantic Regional Center

项目会根据 EB5 筹集资金的进度和情况，可以寻求其他的本地资金来源应付额外的费用。其他的资金来源可以透过私人投资或银行贷款的方法应付已增值的项目。在项目接近完成的阶段，寻找 EB5 投资之外的资金来源应该是有更大的灵活性。但这不是目前项目所追求用来归还给 EB5 投资者投资款项的方法。

**Q10. What is the evidence that the Developer has invested the $22,000,000 USD?**

A detailed listing of the Developers' investment into the project can be found in the following Developer's Funds attachment or from pages 392-413 of the Investment Portfolio.  Note that there is a total of over $22,000,000 USD represented.  The total invested into the Project by the Developer cannot all count towards Job Creation.  Therefore, only the funding that can be attributed to actual work on the Project is represented in the $22,000,000 to ensure an accurate Job Creation result.

**有任何的证明文件显示开发商已投资22,000,000美元吗？**

开发商投资到项目的详细清单，请参阅以下的开发商资金附件或参阅投资组合的第 392-413 页。请注意，开发商已投资超过 22,000,000 美元。由于不能把所有由开发商投资到项目的金额全部计入创造就业人数当中。所以只计算当中 22,000,000 美元这笔真正能归纳为项目可创造就业人数的资金，以确保计算出准确就业人数的结果。

As demonstrated in the Valuation Report, the EB5 Money and Private Equity Loan account for 50% of the present valuation of the Palm House Hotel ($110,000,000 USD Present Valuation). This means that the EB5 Investor is very secure from a monetary standpoint.

从估值报告中显示出，EB5 的资金与私人直接投资占整个棕榈渡假屋项目的 50% （现时估值 110,000,000 美元）。从估值立场来看，这意味着 EB5 投资是非常安全的。

**Q11. The Palm House Hotel utilizes a Bridge Loan Financing in the Business Plan.  Who provided this Bridge Loan, and how will the loan repaid?**

The USCIS Adjudication Policy Memorandum details how an EB5 Project may receive Bridge Loan Financing in order to ensure the progress a project makes while raising EB5 Funding (See excerpt from the USCIS website page 15 below). So long as the EB5 Funds are used to repay the Bridge Financing there is no effect on Job Creation.

INDC_0000043



## South Atlantic Regional Center

棕榈渡假屋项目在商业计划中显示采用了银行过桥贷款。请问谁提供过桥贷款，以及如何偿还贷款？

美国移民局评审政策备忘录详细介绍了 EB5 项目可以透过过桥贷款，以确保在筹集 EB5 资金的同时，项目建设的可以正常进行。（请看在美国移民局网站下载第 15 页摘要）。只要 EB5 资金会用于偿还给过桥贷款，这对创造就业机会是没有影响。

---

4 8 C.F.R § 204.6(j)(4)(i).

Since it is the commercial enterprise that creates the jobs, the developer or the principal of the new commercial enterprise, either directly or through a separate job-creating entity, may utilize interim, temporary or bridge financing – in the form of either debt or equity – prior to receipt of EB-5 capital. If the project commences based on the interim or bridge financing prior to the receipt of the EB-5 capital and subsequently replaces it with EB-5 capital, the new commercial enterprise may still receive credit for the job creation under the regulations. Generally, the replacement of bridge financing with EB-5 investor capital should have been contemplated prior PM-602-0083: EB-5 Adjudications Policy Page 16 to acquiring the original non-EB-5 financing. However, even if the EB-5 financing was not contemplated prior to acquiring the temporary financing, as long as the financing to be replaced was contemplated as short-term temporary financing which would be subsequently replaced, the infusion of EB-5 financing could still result in the creation of, and credit for, new jobs. For example, the non EB-5 financing originally contemplated to replace the temporary financing may no longer be available to the commercial enterprise as a result of changes in availability of traditional financing. Developers should not be precluded from using EB-5 capital as an alternative source to replace temporary financing simply because it was not contemplated prior to obtaining the bridge or temporary financing.

USCIS Policy Memorandum; May 30, 2013; pp. 15-16.

---

The Palm House elected to proceed in this manner due to the safety and security that it afforded the EB5 Investor.  A Bridge Loan of $29,500,000 USD was obtained from a Wealthy Private Equity Source.  These funds along with Mr. Matthews' Equity Investment were used to bring the Palm House Hotel to the present and continuous development position.  A portion of the $39,500,000 EB5 Investment will be used as repayment of this Bridge Loan.

棕榈渡假屋项目选用这种方式以确保 EB5 投资者的安全性。29,500,000 美元的过桥贷款是来自一个富裕者的私人投资。这过桥贷款与马修斯先生的私人投资共同用在过去、现在及未来棕榈渡假屋的建设，使项目得以持续进行。 部份来自 EB5 的 39,500,000 美元的投资将用作偿还这桥贷款。

### Q12. When does the USCIS allow for Job Count to begin?

Utilizing the Rims II Economic Analysis, as performed by Dr. Michael Evans, a final demand multiplier was created for Expenditure and Revenue applied to each NAICS Industry Code.  The Final Demand Multiplier figure generated by Rims II represents a combined Direct and Indirect number of jobs created per $1,000,000 USD in Project Expenditure or Revenues Generated depending on

INDC_0000044



## South Atlantic Regional Center

the NAICS Code.  As a result of the Bridge Loan and Developer Equity, the USCIS allows for any funds spent on actual work performed on the building to be accounted towards these numbers.  Therefore, Job Count begins from the date that funds were first spent on work towards the development of the project. Details for these amounts can be found in the attached Econometric Study, or beginning at page 414 in the Investment Portfolio.

### 美国移民局什么时候开始计算项目所创造的就业人数？
迈克尔·埃文博士利用 RIMS II"区域投入支出模型系统"的经济分析，一个以最终需求乘数开支及收入的算式，应用于每个北美行业分类系统 NAICS 行业代码的模式计算出项目所创造的就业人数。RIMS II"区域投入支出模型系统"计算每人 1,000,000 美元的项目支出或收入，乘以北美行业分类系统 NAICS 行业代码计算出成直接和间接创造合并起来的就业人数。所以，美国移民局容许以透过过桥贷款和开发商私人投资花费在实际建设项目上任何的资金作为计算就业人数。因此，计算就业人数是于这些资金花费在项目兴建时开始。有关运用这些资金的详细信息，请参阅附件的经济分析报告，或投资组合中第 414 页开始。

**Q13. Can we provide documentation showing the Project owns the land?**
Current titling of the property is registered to 160 Royal, LLC.  This is the company registered to the Private Equity Lender who made the Bridge Loan available.  Official Public Record can be found at PCBGOV.com with a satellite picture of the property.

### 能够提供文件显示项目拥有该土地权吗？
目前物业是以皇家160,有限责任公司注册。这家公司是以私人投资形式向项目提供过桥贷款的贷方。官方公共记录可于网站PCBGOV.com查看。当中还有配备了卫星图片的功能,可显示到棕榈渡假屋。

Further evidence can be found in the Business Plan located on page 171 of the Investment Portfolio.
进一步的证据,可以参阅商业计划书中投资组合的第 171 页。

**Land Acquisition Cost**

The land was purchased by a company owned by the Developer in August 2006 for $29,000,000; the transfer was recorded in OR Book 20776, Page 1540 of the Palm Beach County land records as a non-real estate transaction with a $10 consideration. (See Palm House Hotel & Private Club Appraisal, by Callaway & Price, Inc., attached as Attachment B, page 31.)



## South Atlantic Regional Center

As well as in the Appraisal Report located on page 285 of the Investment Portfolio.

以及在投资组合中第 285 页的评估报告。

### Property History

The current owner, Royal 160 LLC acquired the property in August 2006 for $29,000,000; the transfer was recorded in OR Book 20776, Page 1540 of the Palm Beach County land records as a non-real estate transaction with a $10 consideration.

### Q14. How will the Palm House Project Make Money?

Highly conservative revenue estimation for the operation of the Hotel forecasts a 5-year combined generated revenue of $76,888,165 USD at only 61% occupancy rate.  Details can be found in the attached proforma income statements table below or in the Investment Portfolio from pages 176 – 180.

### 棕榈渡假屋项目将如何赚钱？

根据经营该酒店的保守估计，以只有 61% 的入住率计数预测到 5 年会有 76,888,165 美元的收入。详情可参阅以下的利润表或投资组合的第 176 - 180 页。

| Palm House Hotel Proforma Income Statements 79 Keys (Rooms) | Year 1 2014 | Year 2 2015 | Year 3 2016 | Year 4 2017 | Year 5 2018 |
|---|---|---|---|---|---|
| **Operating Statistics** | | | | | |
| Available Room Nights (ARN) | 28,835 | 28,835 | 28,835 | 28,835 | 28,835 |
| Occupied Room Nights (ORN) | 16,724 | 17,589 | 18,166 | 18,743 | 18,454 |
| Occupancy % | 58.0% | 61.0% | 63.0% | 65.0% | 64.0% |
| Average Daily Rate (ADR) | $500.00 | $522.50 | $551.24 | $573.29 | $590.49 |
| RevPAR | $290.00 | $318.73 | $347.28 | $372.64 | $377.91 |
| RevPAR Growth | NA | 9.91% | 8.96% | 7.30% | 1.42% |
| **Revenue** | | | | | |
| Rooms | $ 8,362,150 | $ 9,190,435 | $10,013,808 | $10,744,975 | $10,897,058 |
| Food & Beverage | 3,762,968 | 4,135,696 | 4,506,214 | 4,835,230 | 4,903,676 |
| Spa / Salon / Fitness Center | 668,972 | 735,235 | 801,105 | 859,598 | 871,765 |
| Other Income | 271,770 | 298,689 | 325,449 | 349,212 | 354,154 |
| **Total Revenue** | 13,065,859 | 14,360,055 | 15,646,575 | 16,789,023 | 17,026,653 |
| Total Revenue Growth | NA | 9.91% | 8.96% | 7.30% | 1.42% |
| **Departmental Expenses** | | | | | |
| Rooms | 1,254,323 | 1,352,141 | 1,431,428 | 1,513,792 | 1,527,765 |
| Food & Beverage | 3,010,374 | 3,225,843 | 3,379,660 | 3,529,724 | 3,726,794 |
| Spa / Salon / Fitness Center | 434,832 | 463,198 | 488,674 | 550,143 | 575,365 |
| Other Income | 135,883 | 140,383 | 146,452 | 153,653 | 152,286 |
| **Total Departmental Expenses** | 4,835,413 | 5,181,606 | 5,446,214 | 5,747,312 | 5,982,210 |
| Departmental Expense Ratio | 37% | 36% | 35% | 34% | 35% |
| **Undistributed Operating Expenses** | | | | | |
| Administration & General | 720,875 | 753,314 | 787,214 | 822,638 | 859,657 |
| Sales & Marketing | 576,700 | 602,652 | 629,771 | 658,111 | 687,725 |
| Energy Costs / Utilities | 250,865 | 275,713 | 297,567 | 320,829 | 330,108 |
| Maintenance | 432,525 | 451,989 | 472,328 | 493,583 | 515,794 |
| **Total Undist. Oper. Expenses** | 1,980,965 | 2,083,668 | 2,186,879 | 2,295,160 | 2,393,285 |
| **Gross Operating Profit** | 6,249,482 | 7,094,782 | 8,013,482 | 8,746,551 | 8,651,158 |
| Gross Operating Profit Margin | 48% | 49% | 51% | 52% | 51% |
| **Total Management Fees** | 391,976 | 466,702 | 521,031 | 549,643 | 510,800 |
| **Other Deductions** | | | | | |
| Property Taxes | 216,263 | 224,913 | 233,910 | 243,266 | 252,997 |
| Insurance Expense | 173,010 | 181,661 | 190,744 | 200,281 | 210,295 |
| **Total Other Deductions** | 389,273 | 406,574 | 424,653 | 443,547 | 463,291 |
| **Net Operating Profit** | 5,468,233 | 6,221,506 | 7,067,798 | 7,757,361 | 7,677,067 |
| Net Operating Profit Margin | 42% | 43% | 45% | 46% | 45% |
| **Reserve for Replacement** | 326,646 | 359,001 | 391,164 | 419,726 | 425,666 |
| **Projected EBITDA / NOI** | **$ 5,141,587** | **$ 5,862,505** | **$ 6,676,634** | **$ 7,337,635** | **$ 7,251,401** |

*Palm House Hotel 5-year pro forma financial projections*

197 S. Federal Highway | Boca Raton | Florida | 33432
561.900.7077 | 561.282.6102
Sarceb5.com

INDC_0000046



South Atlantic Regional Center

In addition to Hotel Revenue the Palm House Club will generate revenue through Club Membership. These fees will be between $200,000 USD and $250,000 USD to become a member. An exclusive limited offering of 500 memberships will be made available. Resulting in a $100,000,000 USD to $125,000,000 USD to be collected for Membership Positions.

除了酒店收入外，棕榈渡假屋项目的会员具乐部将在收取会员费用上亦可产生收益。每位会员的会员费用将会收取 200,000 美元至 250,000 美元，会籍将限量发售 500 名。因此，在收取会籍上有高达 100,000,000 美元至$125,000,000 美元的收入。

Due largely in part to Mr. Matthews' strong connections with the City of Palm Beach Officials, the Palm House Project received special approval to sell portions of the Palm House Hotel as condos. With a total Valuation of $137,500,000 USD there is a range of profits that can be earned from the sale of parts of the Hotel as condos. This flexibility has already peaked the interested of some individuals in Palm Beach, including Clothing Mogul Tommy Hilfiger who has been in talks with the Developer regarding turning the Palm House Hotel into a Tommy Hilfiger Branded Hotel.

此外，由于在马修斯先生与棕榈滩市的官员有良好的关系，棕榈渡假屋项目获得特别批准，容许出售棕榈滩酒店作为公寓。根据137,500,000 美元的估值，部分的收益可从出售酒店作为公寓所获得。这种灵活性的批准已经引起一些在棕榈滩上的人士及单位感到兴趣，当中包括 Tommy Hilfiger 的服装大亨品牌，他们一直与开发商谈判，希望把酒店转成 Tommy Hilfiger 的品牌酒店。

**Q15. What is the security offered by the Palm House for the investment?**
Investor members become a Limited Partner ("LP") when they invest into the Palm House Project. The Project and the LP have binding agreements stipulating the intended return of invested capital after 5 years time.

**棕榈渡假屋项目为投资者提供了什么投资保障？**
当投资者投资到棕榈渡假屋项目时，会成为有限合伙人（"LP"）。项目方和有限合伙人之间是有约束力的协议，规定项目方在 5 年之后有意向地归还其资本。

In addition to these agreements each LP will receive an UCC-3 Filing stating that in the event that funds are not returned beyond the 5 years, the LP has a right to all assets of the Palm House Hotel. This document only registers the terms of the Investment Agreements found in the Investment Portfolio with the State of Florida. This is done to place the LP in a secure position for their investment. Much like a US Bank would do when lending money for a Home Mortgage in the USA. Please see the attached sample copy of the UCC-3 Filing.

197 S. Federal Highway | Boca Raton | Florida | 33432
561.900.7077 | 561.282.6102
Sarceb5.com

INDC_0000047



## South Atlantic Regional Center

除了协议外，每位有限合伙人都会收到一份 UCC-3 的文件，说明投资若在超过 5 年内未经归还，有限合伙人有权取得棕榈渡假屋项目的所有资产。这份文件是根据投资组合中同意的投资条款，于佛罗里达州注册。提供 UCC-3 文件是为了把投资者安置在一个安全的位置，确保他们投资安全。就像在美国，当你向银行借贷款时，银行会以房屋作抵押贷款的道理一样。请参阅附件 UCC-3 文件的样板。



### Q16. Can a list of names be provided for the future members of the Palm House Club?

Due to the exclusive nature of the Palm House Club no list of names can be furnished.  The Rich and Famous want privacy and we must facilitate their desire as such.

### 可提供棕榈渡假屋项目未来会员具乐部的名单列表吗？

由于关乎富商和名人的隐私问题，棕榈渡假屋项目必须要尊重他们，不能对外提供会员具乐部的名单列表。

However, we do know that such luminaries as Multi-Billionaire Bill Koch, of Koch Industries; Eric Schmidt, Chairman of Google; Tony Bennett, of song and stage; Celine Dion, one of the most famous signers in the world; and President Bill Clinton will be a part of the club.

不过，我们知道亿万富翁科克工业集团－ 比尔科赫；谷歌董事长－ 埃里克·施密特，著名舞台歌手－ 托尼·贝内特； 在世界上最有名歌手之一－ 席琳·迪翁; 前总统－ 比尔克林顿；都将成为具乐部的会员。

INDC_0000048



## South Atlantic Regional Center

This is due in part to the Fame of Mia Matthews, the Developer Bob Matthews' wife. Mia Matthews is a Famous Signer and Entertainer in the USA. Attached is a photo of the Billboard of Mia Matthews in Times Square, New York City, when she was in town performing.

能吸引这么多名人想成为具乐部会员的部分原因是因为开发商－鲍勃·马修斯的妻子－米娅马修斯的关系。她在美国是一位著名歌手和艺人。以下为米亚·马修斯在纽约时代广场的广告牌，当时她在纽约市镇作表演。



**Q17. If the Investor's I-526 Application is denied, when does the Investor receive their funds back?**

In the case that an I-526 Application is denied without cure, the Investor will receive their Investment, Administrative Fees, and Legal Fees within 90 days from the time the official denial notice is received from the USCIS.

**如果投资者I-526申请被拒绝，投资者会在什么时候取回资金？**

若投资者 I-526 申请在经过团队努力的情况下依然被拒绝，投资者将在收到美国移民局官方通知申请被拒的 90 天内取回投资款项、行政费用和法律费用。

197 S. Federal Highway | Boca Raton | Florida | 33432
561.900.7077 | 561.282.6102
Sarceb5.com



## South Atlantic Regional Center

NOTE: Currently South Atlantic Regional Center has maintained higher than 99% approval rating for I-526 Submissions of it's projects.

注意：目前南大西洋区域中心提交 I-526 的申请一直保持高于 99%的批准率。

### Q18. What occurs if an Investor does not pass the I-829 Stage?

Before becoming a participant in the EB5 Program each potential Investor must understand the every project has an amount of risk to it. There can be no guarantee offered on any project if that project is to meet the strict standards set forth by the US Congress and USCIS. To offer such a guarantee would mean immediate failure of the I-526 Application.

### 如果投资者不通过I-829阶段，将会发生什么事情？

每个潜在投资者在参与 EB5 计划前都必须要明白，每个项目都有一定程度的投资风险。如果该项目是达到由美国移民局设定的严格标准，任何项目都不能提供任何保证。如提供保证，即意味着 I-526 的申请会立即失败 。

With this understanding in place, a potential Investor can analyze the level of risk they take with their chosen project. In the case of the Palm House Hotel the project is very near completion, due in part to the Developer's Investment and Bridge Loan Financing put in place. The Project also has received Permanent Certificate of Occupancy for the East and West Wings of the Hotel. This means that the project will proceed with the City of Palm Beach's approval to be open for Season 2013/2014.

明白了以上的概念，潜在投资者可以自行对所选择的项目作出分析，评估项目的风险水平。现时，棕榈渡假屋项目距离完成十分接近，部分原因是由于开发商的私人投资和过桥贷款融资落实到位。项目的东翼与西翼的酒店亦已得到永久使用证书。意味着项目会在棕榈滩市政府的批准下将于 2013/2014 年季节开始营业。

All of this means that an Investor does not have to worry about potential delays in building or regulator issues. These unique Palm House Hotel strengths coupled with a current 2013 national average of 95% I-829 approvals by the USCIS mean that there is very little risk of an I-829 denial.

以上所有事情意味着，投资者不必担心项目会因为建筑或监管问题导致延误的潜在可能性。这些独特棕榈渡假屋酒店的优势，再加上现时美国移民局 2013 年全国 I-829 批准平均水平是 95%，投资者只有十分少的风险会在 I-829 阶段被拒绝。

INDC_0000050

Attachment 1
UCC-3 Sample Form

INDC_0000051

# STATE OF FLORIDA UNIFORM COMMERCIAL CODE FINANCING STATEMENT AMENDMENT FORM

**A. NAME & DAYTIME PHONE NUMBER OF CONTACT PERSON**
Joseph Walsh 561.282.6102

**B. SEND ACKNOWLEDGEMENT TO:**
Name PALM HOUSE HOTEL, LLLP.

Address 197 South Federal Highway, Suite 200

City/State/Zip        Boca Raton, FL 33432

FLORIDA SECURED TRANSACTION REGISTRY

**FILED**

2012 Oct 01 08:00 AM

****** 201207621836 ******

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

| **1a. INITIAL FINANCING STATEMENT FILE #** | **1b.** | | This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. |
|---|---|---|---|

**2. CURRENT RECORD INFORMATION – DEBTOR NAME** – INSERT ONLY ONE DEBTOR NAME (2a OR 2b)

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| PALM HOUSE HOTEL, LLLP | | | |
| **2b. INDIVIDUAL'S LAST NAME** | **FIRST NAME** | **MIDDLE NAME** | **SUFFIX** |

**3. CURRENT RECORD INFORMATION – SECURED PARTY NAME** – INSERT ONLY ONE SECURED PARTY NAME (3a OR 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Palm House Hotel, LLLP | | | - |
| **3b. INDIVIDUAL'S LAST NAME** | **FIRST NAME** | **MIDDLE NAME** | **SUFFIX** |

| 4. [ ] | **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination Statement. |
|---|---|

| 5. [ ] | **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to security interest(s) of the Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law. |
|---|---|

| 6. [✓] | **ASSIGNMENT** (full or partial): Give name of assignee in item 9a or 9b and address of assignee in item 9c; and also give name of assignor in item 11. |
|---|---|

| 7. [ ] | **AMENDMENT** (PARTY INFORMATION): This Amendment affects [ ] Debtor or [ ] Secured Party of record. Check only one of these two boxes. |
|---|---|

**Also check one of the following three boxes and provide appropriate information in items 8 and/or 9.**

| **CHANGE** name and/or address: Give current record name in item 8a or 8b; Also give new name (if name change) in item 9a or 9b and/or new address (if address change) in item 9c. | **DELETE** name: Give record name to be deleted in item 8a or 8b. | [ ] **ADD** name: Complete item 9a or 9b, and 9c; also complete items 9d-9g (if applicable). |
|---|---|---|

**8. CURRENT RECORD INFORMATION** – INSERT ONLY ONE NAME (8a OR 8b) – Do Not Abbreviate or Combine Names

| 8a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| **8b. INDIVIDUAL'S LAST NAME** | **FIRST NAME** | **MIDDLE NAME** | **SUFFIX** |

**9. CHANGED (NEW) OR ADDED INFORMATION:** – INSERT ONLY ONE NAME (9a OR 9b) – Do Not Abbreviate or Combine Names

| 9a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| **9b. INDIVIDUAL'S LAST NAME** ●●●● ● | **FIRST NAME** ●●● ●●●● | **MIDDLE NAME** | **SUFFIX** |
| 9c. MAILING ADDRESS Line One | | This space not available. | |
| MAILING ADDRESS Line Two | **CITY** ●●●●● ●●●●● ●●●●● | **STATE** ●●● | **POSTAL CODE** ●●●● | **COUNTRY** ●●●● ● |

| **9d. TAX ID#** | **REQUIRED ADD'L INFO RE: ORGANIZATION DEBTOR** | **9e. TYPE OF ORGANIZATION** | **9.f JURISDICTION OF ORGANIZATION** | **9.g ORGANIZATIONAL ID#** NONE |
|---|---|---|---|---|

**10. AMENDMENT (COLLATERAL CHANGE):** check only one box.
Describe collateral [ ] deleted or [ ] added, or give entire [ ] restated collateral description, or describe collateral [✓] assigned.

ERAL:
"All assets of the debtor, now owned or hereinafter acquired, and all products thereof, wherever located.

**11. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT** (name of assignor, if this is an Assignment). If this is an Amendment authorized by a Debtor, which: adds collateral or adds the authorizing Debtor, or if this is a Termination authorized by a Debtor, check here [ ] and enter name of DEBTOR authorizing this Amendment.

| 11a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Palm House Hotel, LLLP | | | |
| 11b. INDIVIDUAL'S LAST NAME | **FIRST NAME** | **MIDDLE NAME** | **SUFFIX** |

**12. OPTIONAL FILER REFERENCE DATA**

STANDARD FORM - FORM UCC-3 (REV.01/2009)        Filing Office Copy        Approved by the Secretary of State, State of Florida

INDC_0000052

Attachment 2
Certificate of Occupancy

INDC_0000053

INDC_0000054

Inspectors Sign Off

The Palm House

2/1/2013

1st Floor East

First Floor East Wing

| Inspections | 101E | 102E | 103E | 104E | 105E | 106E | 107E | 108E | 109E | 110E | 111E | 112E | Entire Floor |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Framing | | | | | | | | | | | | | *Finals* 2/4/13 W.O. Kyle |
| Drywall | | | | | | | | | | | | | |
| Electrical | | | | | | | | | | | | | |
| Low Voltage | | | | | | | | | | | | | |
| Fire Alarm | | | | | | | | | | | | | |
| Sprinklers | | | | | | | | | | | | | |
| Mechanical | | | | | | | | | | | | | 2/4/13 R.O. Kyle |
| Plumbing | | | | | | | | | | | | | |
| Building | | | | | | | | | | | | | |

Inspectors Sign off    The Palm House Hotel                                                                            2/1/2013

Second Floor East Wing  160 Royal Palm Way, Palm Beach, FL  33480

| Inspections | 201E | 202E | 203E | 204E | 205E | 206E | 207E | 208E | 209E | 210E | 211E | 212E | 214E | Entire Floor |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Framing | | | | | | | | | | | | | | 3/10/13 RG |
| Drywall | | | | | | | | | | | | | | |
| Electrical | | | | | | | | | | | | | | |
| Fire Alarm | | | | | | | | | | | | | | |
| Sprinklers | | | | | | | | | | | | | | |
| Mechanical | | | | | | | | | | | | | | |
| Plumbing | | | | | | | | | | | | | | |
| Building | | | | | | | | | | | | | | 3/9/13 da |

INDC_0000055

INDC_0000056

# Inspectors Sign off    The Palm House Hotel    2/1/2013

## Second Floor East Wing   160 Royal Palm Way; Palm Beach, FL  33480

2nd floor East

| Inspections | 201E | 202E | 203E | 204E | 205E | 206E | 207E | 208E | 209E | 210E | 211E | 212E | 214E | Entire Floor |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Framing | | | | | | | | | | | | | | Finals 2/4/13 |
| Drywall | | | | | | | | | | | | | | |
| Electrical | | | | | | | | | | | | | | |
| Low Voltage | | | | | | | | | | | | | | |
| Fire Alarm | | | | | | | | | | | | | | |
| Sprinklers | | | | | | | | | | | | | | |
| Mechanical | | | | | | | | | | | | | | |
| Plumbing | | | | | | | | | | | | | | 2/4/13 |
| Building | | | | | | | | | | | | | | |

Case 9:16-cv-81871-KAM    Document 1-34    Entered on FLSD Docket 11/14/2016    Page 20 of 55

INDC_0000057

## Inspectors Sign off

## The Palm House Hotel

## Third Floor East Wing

160 Royal Palm Way, Palm Beach, FL  33480

3rd floor East

2/1/2013

| Inspections | 301E | 302E | 303E | 304E | 305E | 306E | 307E | 309E | 311E | 313E | 315E | Entire Floor |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Framing | | | | | | | | | | | | 2/4/13 |
| Drywall | | | | | | | | | | | | |
| Electrical | | | | | | | | | | | | |
| Low Voltage | | | | | | | | | | | | |
| Fire Alarm | | | | | | | | | | | | Rwr |
| Sprinklers | | | | | | | | | | | | |
| Mechanical | | | | | | | | | | | | |
| Plumbing | | | | | | | | | | | | 2/4/13 |
| Building | | | | | | | | | | | | |

2/1/2013

## Inspectors Sign Off

## The Palm House

## Third Floor West Wing

160 Royal Palm Way, Palm Beach, FL 3340

| Inspections | 301W | 302W | 303W | 304W | 305W | 306W | 307W | 308W | 309W | 310W | 312W | 311W | 313W | 315W | 317W | Entire Floor |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Framing | | | | | | | | | | | | | | | | *signature* 3/6/13 |
| Drywall | | | | | | | | | | | | | | | | |
| Electrical | | | | | | | | | | | | | | | | |
| Low Voltage | | | | | | | | | | | | | | | | |
| Fire Alarm | | | | | | | | | | | | | | | | |
| Sprinklers | | | | | | | | | | | | | | | | |
| Mechanical | | | | | | | | | | | | | | | | |
| Plumbing | | | | | | | | | | | | | | | | *signature* |
| Building | | | | | | | | | | | | | | | | |

INDC_0000058

1/28/2013

INDC_0000059

# Inspectors Sign Off
## The Palm House
### First Floor West Wing
160 Royal Palm Way, Palm Beach, FL  33480

| Inspections | 101W | 102W | 103W | 104W | 105W | 106W | 107W | 108W | 109W | 110W | 111W | 113W | 115W | 117W | Entire Floor |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Framing** | | | | | Tamper Switch / Flow | | | | | | | | | 7 locations | sub 3/10/13 |
| **Drywall** | | | | | Corridor | | | Fire Alarm | | | | | (B) | 8 loc. | |
| **Electrical** | | | | | Heat Detector @ Elevator | | | | | | | | (B) | | |
| **Fire Alarm** | | | | | Shut Trip to Elev | | | | | | | | | 2 Elev | |
| **Sprinklers** | | | | | | | | | | | | | | | |
| **Mechanical** | | | | | | | | | | | | | | | |
| **Plumbing** | | | | | | | | | | | | | | | |

# Inspectors Sign Off   The Palm House

## Second Floor West Wing 160 Royal Palm Way, Palm Beach FL 33480

2/1/2013

| Inspections | 201W | 202W | 203W | 204W | 205W | 206W | 207W | 208W | 209W | 210W | 211W | 213W | 215W | 217W | Entire Floor |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Framing | | | | | | | | | | | | | | | *206* 3/10/13 |
| Drywall | | | | | | | | | | | | | | | |
| Electrical | | | | | | | | | | | | | | | |
| Fire Alarm | | | | | | | | | | | | | | | |
| Sprinklers | | | | | | | | | | | | | | | |
| Mechanical | | | | | | | | | | | | | | | |
| Plumbing | | | | | | | | | | | | | | | *206* |

INDC_0000060

INDC_0000061

2/1/2013

# Inspectors Sign Off

## The Palm House

### Third Floor West Wing

160 Royal Palm Way, Palm Beach, FL 3340

| Inspections | 301W | 302W | 303W | 304W | 305W | 306W | 307W | 308W | 309W | 310W | 312W | 311W | 313W | 315W | 317W | Entire Floor |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | | | | ove 3/19/13. |
| **Framing** | | | | | | | | | | | | | | | | |
| **Drywall** | | | | | | | | | | | | | | | | |
| **Electrical** | | | | | | | | | | | | | | | | |
| **Fire Alarm** | | | | | | | | | | | | | | | | |
| **Sprinklers** | | | | | | | | | | | | | | | | |
| **Mechanical** | | | | | | | | | | | | | | | | Don |
| **Plumbing** | | | | | | | | | | | | | | | | |

Attachment 3
T.E.A Approval Letter

INDC_0000062



**Rick Scott**
GOVERNOR

**FLORIDA DEPARTMENT** *of*
**ECONOMIC OPPORTUNITY**

**Hunting F. Deutsch**
EXECUTIVE DIRECTOR

November 14, 2012

Mr. Charles Hutton
Wright Johnson
205 Worth Avenue, #201
Palm Beach, Florida 33480

Dear Mr. Hutton:

In response to your request, the Labor Market Statistics Center has verified that 160 Royal Palm Way in Palm Beach County, Florida is located in Census tract 35.02. The area consisting of contiguous Census tracts 23 and 35.02 qualifies as a high unemployment area under the provisions of the EB-5 Investor Visa Program. The 2011 annual average unemployment rate for the combined area was 18.5 percent, above the qualifying rate of 13.4 percent for that time period (see enclosed table).

The method used to estimate the unemployment rate in this area is called Census-share disaggregation, a standard U.S. Department of Labor, Bureau of Labor Statistics procedure used to calculate rates for small subcounty areas.

Since this area is located in the Miami-Fort Lauderdale-Pompano Beach Metropolitan Statistical Area, it is not considered a rural area. The area does qualify as a Targeted Employment Area however, due to its high unemployment rate.

Please call Susanna Patterson at 850-245-7268, if you have any questions.

Sincerely,

Rebecca Rust
Director
Labor Market Statistics Center

RR/to

Enclosure

Florida Department of Economic Opportunity | The Caldwell Building | 107 E. Madison Street | Tallahassee, FL | 32399-4120
866.FLA.2345 | 850.245.7105 | 850.921.3223 Fax | www.FloridaJobs.org | www.twitter.com/FLDEO | www.facebook.com/FLDEO

An equal opportunity employer/program. Auxiliary aids and services are available upon request to individuals with disabilities. All voice
telephone numbers on this document may be reached by persons using TTY/TDD equipment via the Florida Relay Service at 711.

**LABOR FORCE ESTIMATES FOR SELECTED CENSUS TRACTS**
**PALM BEACH COUNTY, FLORIDA**
**2011 ANNUAL AVERAGES**

| Tract | Labor Force | Employment | Unemployment Level | Rate (%) |
|---|---|---|---|---|
| 23 | 1,462 | 997 | 465 | 31.8 |
| 35.02 | 1,686 | 1,570 | 116 | 6.9 |
| Total | 3,148 | 2,567 | 581 | 18.5 |

Source: Florida Department of Economic Opportunity, Labor Market Statistics Center, Local Area Unemployment Statistics program (unpublished data).

INDC_0000064

Attachment 4
USCIS Policy Memo

INDC_0000065

**U.S. Department of Homeland Security**
U.S. Citizenship and Immigration Services
*Office of the Director* (MS 2000)
Washington, DC 20529-2000



**U.S. Citizenship
and Immigration
Services**

May 30, 2013                                        PM-602-0083

## Policy Memorandum

SUBJECT:  EB-5 Adjudications Policy

PURPOSE:  The purpose of this policy memorandum (PM) is to build upon prior policy guidance for adjudicating EB-5 applications and petitions. Prior policy guidance, to the extent it does not conflict with this PM, remains valid unless and until rescinded.

SCOPE:  This PM is applicable to, and is binding on, all USCIS employees.

AUTHORITY:

- Immigration and Nationality Act (INA) sections 203(b)(5) and 216A
- Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriation Act, Pub. L. No. 102-395, § 610, 106 Stat 1828, 1874 (1992)
- 8 C.F.R. §§ 204.6 and 216.6

### I.  Introduction

**The purpose of the EB-5 Program is to promote the immigration of people who can help create jobs for U.S. workers through their investment of capital into the U.S. economy.**

Congress established the EB-5 Program in 1990 to bring new investment capital into the country and to create new jobs for U.S. workers. The EB-5 Program is based on our nation's interest in promoting the immigration of people who invest their capital in new, restructured, or expanded businesses and projects in the United States and help create or preserve needed jobs for U.S. workers by doing so.

In the EB-5 Program, immigrants who invest their capital in job-creating businesses and projects in the United States receive conditional permanent resident status in the United States for a two-year period. After two years, if the immigrants have satisfied the conditions of the EB-5 Program and other criteria of eligibility, the conditions are removed and the immigrants become unconditional lawful permanent residents of the United States. Congress created the two-year conditional status period to help ensure compliance with the statutory and regulatory

www.uscis.gov

PM-602-0083: EB-5 Adjudications Policy
Page 2

requirements and to ensure that the infusion of investment capital is sustained and the U.S. jobs are created.

The 1990 legislation that created the EB-5 Program envisioned lawful permanent resident status for immigrant investors who invest in and engage in the management of job-creating commercial enterprises. In 1993, the legislature enacted the "Immigrant Investor Pilot Program" that was designed to encourage immigrant investment in a range of business and economic development opportunities within designated regional centers. In 2012 Congress reaffirmed its commitment to the regional center model of investment and job creation by removing the word "Pilot" from the now twenty-year old program, and by providing a three-year reauthorization of the regional center model through September 2015.

Our goal at U.S. Citizenship and Immigration Services (USCIS) is to make sure that the potential of the EB-5 Program, including the Immigrant Investor Program, is fully realized, and that the integrity of the EB-5 Program is protected. Through our thoughtful and careful adjudication of applications and petitions in the EB-5 Program, we can realize the intent of Congress to promote the immigration of people who invest capital into our nation's economy and help create jobs for U.S. workers.

## II.    The Preponderance of the Evidence Standard

As a preliminary matter, it is critical that our adjudication of EB-5 petitions and applications adhere to the correct standard of proof. In the EB-5 program, the petitioner or applicant must establish each element by a preponderance of the evidence. *See Matter of Chawathe*, 25 I&N Dec. 369, 375-376 (AAO 2010). That means that the petitioner or applicant must show that what he or she claims is more likely so than not so. This is a lower standard of proof than both the standard of "clear and convincing," and the standard "beyond a reasonable doubt" that typically applies to criminal cases. The petitioner or applicant does not need to remove all doubt from our adjudication. Even if an adjudicator has some doubt as to the truth, if the petitioner or applicant submits relevant, probative, and credible evidence that leads to the conclusion that the claim is "more likely than not" or "probably true", the petitioner or applicant has satisfied the standard of proof.

## III.    Ensuring Program Integrity

It is critical to our mission to ensure that we administer the EB-5 program with utmost vigilance to program integrity. Our operational teams work in collaboration with the Fraud Detection and National Security directorate and cases presenting issues relating to fraud, national security, or public safety should be referred as appropriate to law enforcement and regulatory authorities.

## IV.    The Three Elements of the EB-5 Program

The EB-5 Program is based on three main elements: (1) the immigrant's investment of capital, (2) in a new commercial enterprise, (3) that creates jobs. Each of these elements is explained below in the context of both the original EB-5 Program and the Immigrant Investor Program.

PM-602-0083: EB-5 Adjudications Policy
Page 3

### A.    The Investment of Capital

The EB-5 Program is based in part on the fact that the United States economy will benefit from an immigrant's contribution of capital. It is also based on the view that the benefit to the U.S. economy is greatest when capital is placed at risk and invested into a new commercial enterprise that, as a result of the investment, creates at least ten jobs for U.S. workers. The regulations that govern the EB-5 Program define the terms "capital" and "investment" with this in mind.

#### 1.    "Capital" Defined

The word "capital" in the EB-5 Program does not mean only cash. Instead, the word "capital" is defined broadly in the regulations to take into account the many different ways in which an individual can make a contribution of financial value to a business. The regulation defines "capital" as follows:

> Capital means cash, equipment, inventory, other tangible property, cash equivalents, and indebtedness secured by assets owned by the alien entrepreneur [immigrant investor], provided that the alien entrepreneur [immigrant investor] is personally and primarily liable and that the assets of the new commercial enterprise upon which the petition is based are not used to secure any of the indebtedness. All capital shall be valued at fair market value in United States dollars. Assets acquired, directly or indirectly, by unlawful means (such as criminal activities) shall not be considered capital for the purposes of section 203(b)(5) of the Act.

8 C.F.R. § 204.6(e).

The definition of "capital" has been clarified in regulations and in precedent decisions that our Administrative Appeals Office (AAO) has issued:

- First, the definition of "capital" is sufficiently broad that it includes not only such things of value as cash, equipment, and other tangible property, but it can also include the immigrant investor's promise to pay (a promissory note), as long as the promise is secured by assets the immigrant investor owns, the immigrant investor is liable for the debt, and the assets of the immigrant investor do not for this purpose include assets of the company in which the immigrant is investing.

  In our AAO's precedent decision *Matter of Hsiung*, 22 I&N Dec. 201, 204 (Assoc. Comm'r 1998), we reflected the fact that the immigrant investor's promissory note can constitute "capital" under the regulations if the note is secured by assets the petitioner owns. We also determined that:

  (1) The assets must be specifically identified as securing the promissory note;

  (2) Any security interest must be perfected to the extent provided for by the jurisdiction in which the asset is located; and,

INDC_0000068

PM-602-0083: EB-5 Adjudications Policy
Page 4

       (3) The asset must be fully amenable to seizure by a U.S. note holder.

- Second, all of the capital must be valued at fair market value in United States dollars. 8 C.F.R. § 204.6(e) (definition of "capital"). The fair market value of a promissory note depends on its present value, not the value at any different time. *Matter of Izummi,* 22 I&N Dec. 169, 186 (Assoc. Comm'r 1998). Moreover, to qualify as capital for EB-5 purposes, "nearly all of the money due under a promissory note must be payable within two years, without provisions for extensions." *Id.* at 194.

- Third, the immigrant investor must establish that he or she is the legal owner of the capital invested. *Matter of Ho,* 22 I&N Dec. 206 (Assoc. Comm'r 1998).

- Fourth, any assets acquired directly or indirectly by unlawful means, such as criminal activity, will not be considered capital. The immigrant investor must demonstrate by a preponderance of the evidence that the capital was obtained through lawful means. According to the regulation, to make this showing the immigrant investor's petition must be accompanied, as applicable, by:

       (1) Foreign business registration records; or,

       (2) Corporate, partnership (or any other entity in any form which has filed in any country or subdivision thereof any return described in this list), and personal tax returns including income, franchise, property (whether real, personal, or intangible), or any other tax returns of any kind filed within five years, with any taxing jurisdiction in or outside the United States by or on behalf of the immigrant investor; or,

       (3) Evidence identifying any other source(s) of capital; or,

       (4) Certified copies of any judgments or evidence of all pending governmental civil or criminal actions, governmental administrative proceedings, and any private civil actions (pending or otherwise) involving monetary judgments against the immigrant investor from any court in or outside the United States within the past fifteen years.

8 C.F.R. § 204.6(j)(3)(i)-(iv).

## 2.    "Invest" Defined

The immigrant investor in the EB-5 Program is required to invest his or her capital. The petitioner must document the path of the funds in order to establish that the investment was his or her own funds. *Matter of Izummi*, 22 I&N Dec. at 195. The regulation defines "invest" as follows:

> Invest means to contribute capital. A contribution of capital in exchange for a note, bond, convertible debt, obligation, or any other debt arrangement between the alien entrepreneur [immigrant investor] and the new commercial enterprise

PM-602-0083: EB-5 Adjudications Policy
Page 5

> does not constitute a contribution of capital  . . . .

8 C.F.R. § 204.6(e).

The regulation also provides that, in order to qualify as an investment in the EB-5 Program, the immigrant investor must actually place his or her capital "at risk" for the purpose of generating a return, and that the mere intent to invest is not sufficient.  The regulation provides as follows:

> To show that the petitioner has invested or is actively in the process of investing the required amount of capital, the petition must be accompanied by evidence that the petitioner has placed the required amount of capital at risk for the purpose of generating a return on the capital placed at risk.  Evidence of mere intent to invest, or of prospective investment arrangements entailing no present commitment, will not suffice to show that the petition is actively in the process of investing.  The alien must show actual commitment of the required amount of capital.

8 C.F.R. § 204.6(j)(2).

The EB-5 Program is seeking to attract individuals from other countries who are willing to put their capital at risk in the United States, with the hope of a return on their investment, to help create U.S. jobs.  The law does not specify what the degree of risk must be; the entire amount of capital need only be at risk to some degree.

If the immigrant investor is guaranteed the return of a portion of his or her investment, or is guaranteed a rate of return on a portion of his or her investment, then that portion of the capital is not at risk. *Matter of Izummi,* 22 I&N Dec. at 180-188.  For the capital to be "at risk" there must be a risk of loss and a chance for gain.  In our precedent decision *Matter of Izummi,* 22 I&N Dec. at 183-188, the AAO found that the capital was not at risk because the investment was governed by a redemption agreement that protected against the risk of loss of the capital and, therefore, constituted an impermissible debt arrangement under 8 C.F.R. § 204.6(e) as it was no different from the risk any business creditor incurs.  *Id.* at 185.  Furthermore, a promise to return any portion of the immigrant investor's minimum required capital negates the required element of risk.  Thus, if the agreement between the new commercial enterprise and immigrant investor, such as a limited partnership agreement or operating agreement, provides that the investor may demand return of or redeem some portion of capital after obtaining conditional lawful permanent resident status (*i.e.,* following approval of the investor's Form I-526 and subsequent visa issuance or, in the case of adjustment, approval of the investor's Form I-485), that portion of capital is not at risk.  Similarly, if the investor is individually guaranteed the right to eventual ownership or use of a particular asset in consideration of the investor's contribution of capital into the new commercial enterprise, such as a home (or other real estate interest) or item of personal property, the expected present value of the guaranteed ownership or use of such asset does not count toward the total amount of the investor's capital contribution in determining how much money was truly placed at risk. *Cf. Izummi* at 184 (concluding that an investment cannot be considered a qualifying contribution of capital at risk to the extent of a guaranteed return).  Nothing, however, precludes an investor from receiving a return on his or her capital (*i.e.,* a

INDC_0000070

PM-602-0083: EB-5 Adjudications Policy
Page 6

distribution of profits) during or after the conditional residency period, so long as prior to or
during the two-year conditional residency period, and before the requisite jobs have been
created, the return is not a portion of the investor's principal investment and was not guaranteed
to the investor.

An investor's money may be held in escrow until the investor has obtained conditional lawful
permanent resident status if the immediate and irrevocable release of the escrowed funds is
contingent only upon approval of the investor's Form I-526 and subsequent visa issuance and
admission to the United States as a conditional permanent resident or, in the case of adjustment
of status, approval of the investor's Form I-485.  An investor's funds may be held in escrow
within the United States to avoid any evidentiary issues that may arise with respect to issues such
as significant currency fluctuations[1] and foreign capital export restrictions. Use of foreign
escrow accounts however is not prohibited as long as the petition establishes that it is more likely
than not that the minimum qualifying capital investment will be transferred to the new
commercial enterprise in the United States upon the investor obtaining conditional lawful
permanent resident status.  At the Form I-829 stage, USCIS will require evidence verifying that
the escrowed funds were released and that the investment was sustained in the new commercial
enterprise.

### 3.     The Amount of Capital That Must be Invested

The statute governing the EB-5 Program provides that the immigrant investor must invest at least
$1,000,000 in capital in a new commercial enterprise that creates not fewer than ten jobs.  As
discussed above, this means that the present fair market value, in United States dollars, of the
immigrant investor's lawfully-derived capital must be at least $1,000,000. 8 U.S.C. §
1153(b)(5)(C)(i).

An exception exists if the immigrant investor invests his or her capital in a new commercial
enterprise that is principally doing business in, and creates jobs in, a "targeted employment
area."  In such a case, the immigrant investor must invest a minimum of $500,000 in capital.  8
U.S.C. § 1153(b)(5)(C)(ii); 8 C.F.R. § 204.6(f)(2).  *See* Section 3.a below for the definition of
where the new commercial enterprise is "principally doing business."

An immigrant investor may diversify his or her total EB-5 investment across a portfolio of
businesses or projects, so long as the minimum investment amount is placed in a single
commercial enterprise.  For immigrant investors who are not associated with a regional center,
the capital may be deployed into a portfolio of wholly-owned businesses, so long as all capital is
deployed through a single commercial enterprise and all jobs are created directly within that
commercial enterprise or through the portfolio of businesses that received the EB-5 capital
through that commercial enterprise.  For example, in an area in which the minimum investment

---

[1] It should be noted that when funds are held in escrow outside the United States, USCIS will review currency
exchange rates at the time of adjudicating the I-526 petition to determine if it is more likely than not that the
minimum qualifying capital investment will be made.  At the I-829 stage, USCIS will review the evidence in the
record, including currency exchange rates at the time of transfer, to determine that when the funds were actually
transferred to the United States, the minimum qualifying capital investment was actually made.

INDC_0000071

PM-602-0083: EB-5 Adjudications Policy
Page 7

amount is $1,000,000, the investor can satisfy the statute if the investor invests in a commercial enterprise that deploys $600,000 of the investment toward one business that it wholly owns, and $400,000 of the investment toward another business that it wholly owns. *See* 8 C.F.R. § 204.6(e). (In this instance, the two wholly-owned businesses would have to create an aggregate of ten new jobs between them.) An investor cannot qualify, on the other hand, by investing $600,000 in one commercial enterprise and $400,000 in a separate commercial enterprise.

In the regional center context, where indirect jobs may be counted, the commercial enterprise may create jobs indirectly through multiple investments in corporate affiliates or in unrelated entities, but the investor cannot qualify by investing directly in those multiple entities. Rather, the investor's capital must still be invested in a single commercial enterprise, which can then deploy that capital in multiple ways as long as one or more of the portfolio of businesses or projects can create the required number of jobs.

a.    **"Targeted Employment Area" Defined**

The statute and regulations governing the EB-5 Program defines a "targeted employment area" as, at the time of investment, a rural area or an area that has experienced unemployment of at least 150 percent of the national average rate. A "rural area" is defined as any area not within either a metropolitan statistical area (as designated by the Office of Management and Budget) or the outer boundary of any city or town having a population of 20,000 or more (based on the most recent decennial census of the United States). 8 U.S.C. § 1153(b)(5)(B)(ii), (iii); 8 C.F.R. § 204.6(e). In other words, a rural area must be both outside of a metropolitan statistical area and outside of a city or town having a population of 20,000 or more.

Congress expressly provided for a reduced investment amount in a rural area or an area of high unemployment in order to spur immigrants to invest in new commercial enterprises that are principally doing business in, and creating jobs in, areas of greatest need. In order for the lower capital investment amount of $500,000 to apply, the new commercial enterprise into which the immigrant invests or the actual job creating entity must be principally doing business in the targeted employment area.

For the purpose of the EB-5 Program, a new commercial enterprise is "principally doing business" in the location where it regularly, systematically, and continuously provides goods or services that support job creation. If the new commercial enterprise provides such goods or services in more than one location, it will be deemed to be "principally doing business" in the location that is most significantly related to the job creation. Factors to be considered in making this determination may include, but are not limited to, (1) the location of any jobs directly created by the new commercial enterprise; (2) the location of any expenditure of capital related to the creation of jobs; (3) where the new commercial enterprise conducts its day-to-day operation; and (4) where the new commercial enterprise maintains its assets that are utilized in the creation of jobs. *Matter of Izummi,* 22 I&N Dec. at 174.

As discussed fully below, investments through the Immigrant Investor Program can be made through regional centers and the new commercial enterprise may seek to establish indirect job creation. In these cases, the term "principally doing business" will apply to the job-creating

PM-602-0083: EB-5 Adjudications Policy
Page 8

enterprise rather than the new commercial enterprise. *See* 8 C.F.R. § 204.6(j)(6); *Matter of Izummi,* 22 I&N Dec. at 171-73 (discussing the location of commercial enterprises to which the new commercial enterprise made loans).

The immigrant investor may seek to have a geographic or political subdivision designated as a targeted employment area. To do so, the immigrant investor must demonstrate that the targeted employment area meets the statutory and regulatory criteria through the submission of: (1) evidence that the area is outside of a metropolitan statistical area and outside of a city or town having a population of 20,000 or more; (2) unemployment data for the relevant metropolitan statistical area or county; or (3) a letter from the state government designating a geographic or political subdivision located outside a rural area but within its own boundaries as a high unemployment area. 8 C.F.R. § 204.6(j)(6).

### b.   A State's Designation of a Targeted Employment Area

The regulation provides that a state government may designate a geographic or political subdivision within its boundaries as a targeted employment area based on high unemployment. Before the state may make such a designation, an official of the state must notify USCIS of the agency, board, or other appropriate governmental body of the state that will be delegated the authority to certify that the geographic or political subdivision is a high unemployment area. The state may then send a letter from the authorized body of the state certifying that the geographic or political subdivision of the metropolitan statistical area or of the city or town with a population of 20,000 or more in which the enterprise is principally doing business has been designated a high unemployment area. 8 C.F.R. § 204.6(i).

Consistent with the regulations, USCIS defers to state determinations of the appropriate boundaries of a geographic or political subdivision that constitutes the targeted employment area. However, for all TEA designations, USCIS must still ensure compliance with the statutory requirement that the proposed area designated by the state in fact has an unemployment rate of at least 150 percent of the national average rate. For this purpose, USCIS will review state determinations of the unemployment rate and, in doing so, USCIS can assess the method or methods by which the state authority obtained the unemployment statistics. Acceptable data sources for purposes of calculating unemployment include U.S. Census Bureau data (including data from the American Community Survey) and data from the Bureau of Labor Statistics (including data from the Local Area Unemployment Statistics).

There is no provision that allows a state to designate a rural area.

### B.   New Commercial Enterprise

As discussed at the beginning of this PM, the EB-5 Program eligibility requirements are based on the fact that the U.S. economy will benefit from an immigrant investor's investment of capital into a new commercial enterprise that, as a result of the investment, creates at least ten jobs for U.S. workers. We have discussed above the requirements regarding "capital" and "investment." We now turn to the definition of, and requirements for, a "new commercial enterprise."

PM-602-0083: EB-5 Adjudications Policy
Page 9

### 1.    "Commercial Enterprise" Defined

First, the regulation governing the EB-5 Program defines the term "commercial enterprise" broadly, consistent with the realities of the business world and the many different forms and types of structures that job-creating activities can have. The regulation defines a "commercial enterprise" as follows:

> [A]ny for-profit activity formed for the ongoing conduct of lawful business.

8 C.F.R. § 204.6(e).

The regulation provides a list of examples of commercial enterprises. It specifically states that the list is only of examples, and is not a complete list of the many forms a commercial enterprise can have. The examples listed are:

> [A] sole proprietorship, partnership (whether limited or general), holding company, joint venture, corporation, business trust, or other entity which may be publicly or privately owned. This definition includes a commercial enterprise consisting of a holding company and its wholly-owned subsidiaries, provided that each such subsidiary is engaged in a for-profit activity formed for the ongoing conduct of a lawful business.

8 C.F.R. § 204.6(e).

Finally, the regulation provides that the commercial enterprise must be one that is designed to make a profit, unlike, for example, some charitable organizations, and it does not include "a noncommercial activity such as owning and operating a personal residence." 8 C.F.R. § 204.6(e).

### 2.    "New" Defined

In its effort to spur job creation through a wide variety of businesses and projects, the EB-5 Program has presented a broad definition of what constitutes a "new" commercial enterprise into which the immigrant investor can invest the required amount of capital and help create jobs.

The EB-5 Program defines "new" as "established after November 29, 1990." 8 C.F.R. § 204.6(e). The immigrant investor can invest the required amount of capital in a commercial enterprise that was established after November 29, 1990 to qualify for the EB-5 Program, provided the other eligibility criteria are met.

In addition, in the EB-5 Program a "new" commercial enterprise also means a commercial enterprise that was established before November 29, 1990 if the enterprise will be restructured or expanded through the immigrant investor's investment of capital:

PM-602-0083: EB-5 Adjudications Policy
Page 10

### a.    The Purchase of an Existing Business That is Restructured or Reorganized

The immigrant investor can invest in an existing business, regardless of when that business was first created, provided that the existing business is simultaneously or subsequently restructured or reorganized such that a new commercial enterprise results.  8 C.F.R. § 204.6(h)(2).  The facts of *Matter of Soffici*—where an investor purchased a Howard Johnson hotel and continued to run it as a Howard Johnson hotel—were not sufficient to establish a qualifying restructuring or reorganization. 22 I&N Dec. 158, 166 (Assoc. Comm'r 1998) ("A few cosmetic changes to the decor and a new marketing strategy for success do not constitute the kind of restructuring contemplated by the regulations, nor does a simple change in ownership.").  On the other hand, examples that could qualify as restructurings or reorganizations include a plan that converts a restaurant into a nightclub, or a plan that adds substantial crop production to an existing livestock farm.

### b.    The Expansion of An Existing Business

The immigrant investor can invest in an existing business, regardless of when that business was first created, provided that a substantial change in the net worth or number of employees results from the investment of capital.  8 C.F.R. § 204.6(h)(3).

"Substantial change" is defined as follows:

> [A] 40 percent increase either in the net worth, or in the number of employees, so that the new net worth, or number of employees amounts to at least 140 percent of the pre-expansion net worth or number of employees.

8 C.F.R. § 204.6(h)(3).

Investment in a new commercial enterprise in this manner does not exempt the immigrant investor from meeting the requirements relating to the amount of capital that must be invested and the number of jobs that must be created.  8 C.F.R. § 204.6(h)(3).

### 3.    Pooled Investments in Non-Regional Center Cases

The EB-5 Program provides that a new commercial enterprise can be used as the basis for the petition of more than one immigrant investor.  Each immigrant investor must invest the required amount of capital and each immigrant investor's investment must result in the required number of jobs.  Furthermore, the new commercial enterprise can have owners who are not seeking to enter the EB-5 Program, provided that the source(s) of all capital invested is (or are) identified and all invested capital has been derived by lawful means.  8 C.F.R. § 204.6(g).

PM-602-0083: EB-5 Adjudications Policy
Page 11

### 4. Evidence of the Establishment of a New Commercial Enterprise

To show that the new commercial enterprise has been established, the immigrant investor must present the following evidence, in addition to any other evidence we deem appropriate:

(1)   as applicable, articles of incorporation, certificate of merger or consolidation, partnership agreement, certificate of limited partnership, joint venture agreement, business trust agreement, or other similar organizational document for the new commercial enterprise; or,

(2)   A certificate evidencing authority to do business in a state or municipality or, if the form of the business does not require any such certificate or the state or municipality does not issue such a certificate, a statement to that effect; or,

(3)   Evidence that, as of a date certain after November 29, 1990, the required amount of capital for the area in which an enterprise is located has been transferred to an existing business, and that the investment has resulted in a substantial increase in the net worth or number of employees of the business to which the capital was transferred. This evidence must be in the form of stock purchase agreements, investment agreements, certified financial reports, payroll records, or any similar instruments, agreements, or documents evidencing the investment in the commercial enterprise and the resulting substantial change in the net worth or number of employees.

8 C.F.R. § 204.6(j), (j)(1)(i)-(iii).

### 5. Evidence of the Investment in a New Commercial Enterprise

In order for the immigrant investor to show that he or she has committed the required amount of capital to the new commercial enterprise, the evidence presented may include, but is not limited to, the following:

(1)   Bank statement(s) showing amount(s) deposited in United States business account(s) for the enterprise;

(2)   Evidence of assets which have been purchased for use in the United States enterprise, including invoices, sales receipts, and purchase contracts containing sufficient information to identify such assets, their purchase costs, date of purchase, and purchasing entity;

(3)   Evidence of property transferred from abroad for use in the United States enterprise, including United States Customs Service commercial entry documents, bills of lading, and transit insurance policies containing

INDC_0000076

PM-602-0083: EB-5 Adjudications Policy
Page 12

ownership information and sufficient information to identify the property
and to indicate the fair market value of such property;

(4)   Evidence of monies transferred or committed to be transferred to the new
commercial enterprise in exchange for shares of stock (voting or
nonvoting, common or preferred). Such stock may not include terms
requiring the new commercial enterprise to redeem it at the holder's
request; or

(5)   Evidence of any loan or mortgage agreement, promissory note, security
agreement, or other evidence of borrowing which is secured by assets of
the petitioner, other than those of the new commercial enterprise, and for
which the petitioner is personally and primarily liable.

8 C.F.R. § 204.6(j)(2)(i)-(v).


### 6.   The Requirement that the Immigrant Investor be Engaged in the Management of the New Commercial Enterprise

The EB-5 Program requires the immigrant investor to be engaged in the management of the new
commercial enterprise, either through the exercise of day-to-day managerial responsibility or
through policy formulation. It is not enough that the immigrant investor maintain a purely
passive role in regard to his or her investment. 8 C.F.R. § 204.6(j)(5).

To show that the immigrant investor is or will be engaged in the exercise of day-to-day
managerial control or in the exercise of policy formulation, the immigrant investor must submit:

(1)   A statement of the position title that the immigrant investor has or will
have in the new enterprise and a complete description of the position's
duties; or,

(2)   Evidence that the immigrant investor is a corporate officer or a member of
the corporate board of directors; or,

(3)   If the new enterprise is a partnership, either limited or general, evidence
that the immigrant investor is engaged in either direct management or
policy making activities. If the petitioner is a limited partner and the
limited partnership agreement provides the immigrant investor with
certain rights, powers, and duties normally granted to limited partners
under the Uniform Limited Partnership Act, the immigrant investor will be
considered sufficiently engaged in the management of the new
commercial enterprise.

8 C.F.R. § 204.6(j)(5)(i)-(iii).

PM-602-0083: EB-5 Adjudications Policy
Page 13

### 7.    The Location of the New Commercial Enterprise
in a Regional Center

As previously mentioned, there is a regional center model within the EB-5 Program that allows
for not only "direct job" creation, but "indirect job creation" as demonstrated by reasonable
methodologies. Originally introduced as a "pilot program," and now titled the "Immigrant
Investor Program," the program provides investors with expanded opportunities to demonstrate
job creation in accordance with a series of job creation rules discussed below. "Regional center"
is defined as follows:

> Regional center means any economic unit, public or private, which is involved
> with the promotion of economic growth, including increased export sales,
> improved regional productivity, job creation, and increased domestic capital
> investment.

8 C.F.R. § 204.6(e).

A regional center that wants to participate in the Immigrant Investor Program must submit a
proposal using Form I-924, that:

(1)    Clearly describes how the regional center focuses on a geographical
region of the United States, and how it will promote economic growth
through increased export sales, improved regional productivity, job
creation, and increased domestic capital investment;

(2)    Provides in verifiable detail how jobs will be created directly or indirectly;

(3)    Provides a detailed statement regarding the amount and source of capital
which has been committed to the regional center, as well as a description
of the promotional efforts taken and planned by the sponsors of the
regional center;

(4)    Contains a detailed prediction regarding the manner in which the regional
center will have a positive impact on the regional or national economy in
general as reflected by such factors as increased household earnings,
greater demand for business services, utilities, maintenance and repair, and
construction both within and without the regional center; and,

(5)    Is supported by economically or statistically sound valid forecasting tools,
including, but not limited to, feasibility studies, analyses of foreign and
domestic markets for the goods or services to be exported, and/or
multiplier tables.

8 C.F.R. § 204.6(m)(3)(i)-(v).

USCIS will review the proposed geographic boundaries of a new regional center and will deem
them acceptable if the applicant can establish by a preponderance of the evidence that the

INDC_0000078

PM-602-0083: EB-5 Adjudications Policy
Page 14

proposed economic activity will promote economic growth in the proposed area. The question is
a fact-specific one and the law does not require any particular form of evidentiary showing, such
as a county-by-county analysis. In USCIS's experience, the reasonableness of proposed regional
center geographic boundaries may be demonstrated through evidence that the proposed area is
contributing significantly to the supply chain, as well as the labor pool, of the proposed projects.

The Immigrant Investor Program was implemented with the goal of spurring greater economic
growth in the geographic area in which a regional center is developed. The regional center
model within the Immigrant Investor Program can offer an immigrant investor already-defined
investment opportunities, thereby reducing the immigrant investor's responsibility to identify
acceptable investment vehicles. As discussed fully below, if the new commercial enterprise is
located within and falls within the economic scope of the defined regional center, different job
creation requirements apply.

A regional center can contain one or more new commercial enterprises.

The level of verifiable detail required for a Form I-924 to be approved and provided deference
may vary depending on the nature of the Form I-924 filing. If the Form I-924 projects are
"hypothetical" projects,[2] general proposals and general predictions may be sufficient to
determine that the proposed regional center will more likely than not promote economic growth,
improved regional productivity, job creation, and increased domestic capital investment.
Determinations based on hypothetical projects, however, will not receive deference and the
actual projects on which the Form I-526 petitions will be based will receive de novo review
during the subsequent filing (e.g., an amended Form I-924 application including the actual
project details or the first Form I-526 petition filed by an investor under the regional center
project). Organizational and transactional documents submitted with a Form I-924 hypothetical
project will not be reviewed to determine compliance with program requirements since these
documents will receive de novo review in subsequent filings. If an applicant desires review of
organizational and transactional documents for program compliance, a Form I-924 application
with a Form I-526 exemplar should be submitted.

Form I-924 applications that are based on actual projects may require more details than a
hypothetical project in order to conclude that the proposal contains verifiable details and is
supported by economically or statistically sound forecasting tools.[3] Determinations based on

---

[2] An "actual project" refers to a specific project proposal that is supported by a *Matter of Ho* compliant business
plan. A "hypothetical project" refers to a project proposal that is not supported by a *Matter of Ho* compliant
business plan. The term "exemplar" refers to a sample Form I-526 petition, filed with a Form I-924 actual project
proposal, that contains copies of the commercial enterprise's organizational and transactional documents, which
USCIS will review to determine if they are in compliance with established EB-5 eligibility requirements.
[3] In cases where the Form I-924 is filed based on actual projects that do not contain sufficient verifiable detail, the
projects may still be approved as hypothetical projects if they contain the requisite general proposals and
predictions. The projects approved as hypotheticals, however, will not receive deference. In cases where some
projects are approvable as actual projects, and others are not approvable or only approvable as hypothetical projects,
the approval notice should contain a statement identifying which projects have been approved as actual projects and
will be accorded deference and those projects that have been approved as hypothetical projects but will not be
accorded deference.

INDC_0000079

PM-602-0083: EB-5 Adjudications Policy
Page 15

actual projects, however, will be accorded deference to subsequent filings under the project involving the same material facts and issues. While an amended Form I-924 application is not required to perfect a hypothetical project once the actual project details are available, some applicants may choose to file an amended Form I-924 application with a Form I-526 exemplar in order to obtain a favorable determination which will be accorded deference in subsequent related filings, absent material change, fraud, willful misrepresentation, or a legally deficient determination (discussed in more detail below).

### C.    The Creation of Jobs

In developing the EB-5 Program, Congress intended to promote the immigration of people who invest capital into our nation's economy and help create jobs for U.S. workers. Therefore, the creation of jobs for U.S. workers is a critical element of the EB-5 Program.

It is not enough that the immigrant invests funds into the U.S. economy; the investment must result in the creation of jobs for qualifying employees. As discussed fully below, the EB-5 Program provides that each investment of the required amount of capital in a new commercial enterprise must result in the creation of at least ten jobs.

It is important to recognize that while the immigrant's investment must result in the creation of jobs for qualifying employees, it is the new commercial enterprise that creates the jobs.[4] This distinction is best illustrated in the non-regional center context by an example:

> Ten immigrant investors seek to establish a hotel as their new commercial enterprise. The establishment of the new hotel requires capital to pay financing costs to unrelated third parties, purchasing the land, developing the plans, obtaining the licenses, building the structure, taking care of the grounds, staffing the hotel, and the many other types of expenses involved in the development and operation of a new hotel. The immigrant's investments can go to pay part or all of any of these expenses. Each immigrant's investment of the required amount of capital helps the new commercial enterprise – the new hotel – create ten jobs. The ten immigrants' investments must result in the new hotel's creation of 100 jobs for qualifying employees (ten jobs resulting per each individual immigrant's capital investment).

*See* 8 C.F.R. §204.6(j) (it is the new commercial enterprise that will create the ten jobs).

Since it is the commercial enterprise that creates the jobs, the developer or the principal of the new commercial enterprise, either directly or through a separate job-creating entity, may utilize interim, temporary or bridge financing – in the form of either debt or equity – prior to receipt of EB-5 capital. If the project commences based on the interim or bridge financing prior to the receipt of the EB-5 capital and subsequently replaces it with EB-5 capital, the new commercial enterprise may still receive credit for the job creation under the regulations. Generally, the replacement of bridge financing with EB-5 investor capital should have been contemplated prior

---

[4] 8 C.F.R § 204.6(j)(4)(i).

INDC_0000080

PM-602-0083: EB-5 Adjudications Policy
Page 16

to acquiring the original non-EB-5 financing. However, even if the EB-5 financing was not
contemplated prior to acquiring the temporary financing, as long as the financing to be replaced
was contemplated as short-term temporary financing which would be subsequently replaced, the
infusion of EB-5 financing could still result in the creation of, and credit for, new jobs. For
example, the non EB-5 financing originally contemplated to replace the temporary financing
may no longer be available to the commercial enterprise as a result of changes in availability of
traditional financing. Developers should not be precluded from using EB-5 capital as an
alternative source to replace temporary financing simply because it was not contemplated prior
to obtaining the bridge or temporary financing.

It is also important to note that the full amount of the immigrant's investment must be made
available to the business(es) most closely responsible for creating the jobs upon which EB-5
eligibility is based. *Matter of Izummi*, 22 I&N Dec. at 179. Thus, in the regional center context,
if the new commercial enterprise is not the job-creating entity, then the full amount of the capital
must be first invested in the new commercial enterprise and then made available to the job-
creating entity. *Id*.

### 1.   Full-Time Positions For Qualifying Employees

The EB-5 Program requires that the immigrant investor invest the required amount of capital in a
new commercial enterprise in the United States that "will create full-time positions for not fewer
than 10 qualifying employees." *8 C.F.R. § 204.6(j)*.

An "employee" is defined as follows:

> Employee means an individual who provides services or labor for the new
> commercial enterprise and who receives wages or other remuneration directly
> from the new commercial enterprise.

8 C.F.R. § 204.6(e).

The employee must be a "qualifying employee" for the purpose of the EB-5 Program's job
creation requirement. A "qualifying employee" is defined as follows:

> Qualifying employee means a United States citizen, a lawfully admitted
> permanent resident, or other immigrant lawfully authorized to be employed in the
> United States including, but not limited to, a conditional resident, a temporary
> resident, an asylee, a refugee, or an alien remaining in the United States under
> suspension of deportation. This definition does not include the alien entrepreneur
> [immigrant investor], the alien entrepreneur's spouse [immigrant investor's],
> sons, or daughters, or any nonimmigrant alien.

8 C.F.R. § 204.6(e).

PM-602-0083: EB-5 Adjudications Policy
Page 17

The EB-5 Program's job creation requirement provides that it is "full-time employment" that must be created for the ten or more qualifying employees. INA § 203(b)(5)(A)(ii), 8 U.S.C. § 1153(b)(5)(A)(ii). "Full-time employment" is defined as follows:

> Full-time employment means employment of a qualified employee by the new commercial enterprise in a position that requires a minimum of 35 working hours per week.

A full-time employment position can be filled by two or more qualifying employees in a job sharing arrangement as long as the 35-working-hours-per-week requirement is met. However, a full-time employment position cannot be filled by combinations of part-time positions, even if those positions when combined meet the hourly requirement. *8 C.F.R. § 204.6(e).* Direct jobs that are intermittent, temporary, seasonal, or transient in nature do not qualify as full-time jobs for EB-5 purposes. Consistent with prior USCIS interpretation, however, jobs that are expected to last for at least two years generally are not intermittent, temporary, seasonal, or transient in nature.

Due to the nature of accepted job creation modeling practices, which do not distinguish whether jobs are full- or part-time, USCIS relies upon the reasonable economic models to determine that it is more likely than not that the indirect jobs are created and will not request additional evidence to validate the job creation estimates in the economic models to prove by a greater level of certainty that the indirect jobs created, or to be created, are full-time or permanent. USCIS may, however, request additional evidence to verify that the direct jobs will be or are full-time and permanent, which may include a review of W-2s or similar evidence at the Form I-829 stage.

### 2. Job Creation Requirement

As previously discussed, the centerpiece of the EB-5 Program is the creation of jobs. The immigrant investor seeking to enter the United States through the EB-5 Program must invest the required amount of capital in a new commercial enterprise that will create full-time positions for at least ten qualified employees.

There are three measures of job creation in the EB-5 Program, depending on the new commercial enterprise and where it is located:

### a. Troubled Business

The EB-5 Program recognizes that in the case of a troubled business, our economy benefits when the immigrant investor helps preserve the troubled business's existing jobs. Therefore, when the immigrant investor is investing in a new commercial enterprise that is a troubled business or, in the regional center context, is placing capital into a job-creating entity that is a troubled business, the immigrant investor must only show that the number of existing employees in the troubled business is being or will be maintained at no less than the pre-investment level for a period of at least two years. 8 C.F.R. § 204.6(j)(4)(ii).

PM-602-0083: EB-5 Adjudications Policy
Page 18

This regulatory provision, while allowing job preservation in lieu of job creation, does not
decrease the statutory numeric requirement; in the case of a troubled business, ten jobs must be
preserved, created, or some combination of the two (e.g., an investment in a troubled business
that creates four qualifying jobs and preserves all six pre-investment jobs would satisfy the
statutory and regulatory requirements).

A troubled business is defined as follows:

> [A] business that has been in existence for at least two years, has incurred a net
> loss for accounting purposes (determined on the basis of generally accepted
> accounting principles) during the twelve- or twenty-four month period prior to the
> priority date on the alien entrepreneur's [immigrant investor's] Form I-526, and
> the loss for such period is at least equal to twenty percent of the troubled
> business's net worth prior to such loss. For purposes of determining whether or
> not the troubled business has been in existence for two years, successors in
> interest to the troubled business will be deemed to have been in existence for the
> same period of time as the business they succeeded.

8 C.F.R. § 204.6(e).

### b.    New Commercial Enterprise Not Associated
### With a Regional Center

For a new commercial enterprise that is not associated with a regional center, the EB-5 Program
provides that the full-time positions must be created directly by the new commercial enterprise to
be counted. This means that the new commercial enterprise (or its wholly-owned subsidiaries)
must itself be the employer of the qualified employees who fill the new full-time positions. 8
C.F.R. § 204.6(e) (definition of employee).

### c.    New Commercial Enterprise Located Within
### and Associated With a Regional Center

For a new commercial enterprise that is located within a regional center, the EB-5 Program
provides that the full-time positions can be created either directly or indirectly by the new
commercial enterprise. 8 C.F.R. § 204.6(j)(4)(iii). Investors investing in a regional center are
subject to all the same program requirements except that they may rely on indirect job creation as
demonstrated through reasonable methodologies. 8 C.F.R. §§ 204.6(m)(1), (7).

Indirect jobs are those that are held outside of the new commercial enterprise but are created as a
result of the new commercial enterprise. For indirect jobs, the new full-time employees would
not be employed directly by the new commercial enterprise. For example, indirect jobs can
include, but are not limited to, those held by employees of the producers of materials, equipment,
or services used by the new commercial enterprise. Indirect jobs can qualify and be counted as
jobs attributable to a regional center, based on reasonable economic methodologies, even if they
are located outside of the geographical boundaries of a regional center.

INDC_0000083

PM-602-0083: EB-5 Adjudications Policy
Page 19

For purposes of demonstrating indirect job creation, petitioners must employ reasonable economic methodologies to establish by a preponderance of the evidence that the required infusion of capital or creation of direct jobs will result in a certain number of indirect jobs.

### 3.   Evidence of Job Creation

In order to show that a new commercial enterprise will create not fewer than ten full-time positions for qualifying employees, an immigrant investor must submit the following evidence:

> (A) Documentation consisting of photocopies of relevant tax records, Form I-9, or other similar documents for ten (10) qualifying employees, if such employees have already been hired following the establishment of the new commercial enterprise; or,

> (B) A copy of a comprehensive business plan showing that, due to the nature and projected size of the new commercial enterprise, the need for not fewer than ten (10) qualifying employees will result, including approximate dates, within the next two years, and when such employees will be hired.

8 C.F.R. § 204.6(j)(4)(i).

For purposes of the Form I-526 adjudication and the job creation requirements, the two-year period described in 8 C.F.R. § 204.6(j)(4)(i)(B) is deemed to commence six months after the adjudication of the Form I-526. The business plan filed with the Form I-526 should reasonably demonstrate that the requisite number of jobs will be created by the end of this two-year period.

Our AAO precedent decision has articulated the standards by which USCIS will review a business plan:

> The plan should contain a market analysis, including the names of competing businesses and their relative strengths and weaknesses, a comparison of the competition's products and pricing structures, and a description of the target market/prospective customers of the new commercial enterprise. The plan should list the required permits and licenses obtained. If applicable, it should describe the manufacturing or production process, the materials required, and the supply sources. The plan should detail any contracts executed for the supply of materials and/or the distribution of products. It should discuss the marketing strategy of the business, including pricing, advertising, and servicing. The plan should set forth the business's organizational structure and its personnel's experience. It should explain the business's staffing requirements and contain a timetable for hiring, as well as job descriptions for all positions. It should contain sales, cost, and income projections and detail the bases therefore. Most importantly, the business plan must be credible.

*Matter of Ho*, 22 I&N Dec. at 213. USCIS will review the business plan in its totality to determine if it is more likely than not that the business plan is comprehensive and credible. A

INDC_0000084

PM-602-0083: EB-5 Adjudications Policy
Page 20

business plan is not required to contain all of the detailed elements described above, but the more details the business plan contains, as described in *Matter of Ho*, the more likely it is that the plan will be considered comprehensive and credible.

In the case of a troubled business, a comprehensive business plan must accompany the other required evidentiary documents. 8 C.F.R. § 204.6(j)(4)(ii). In the case of a new commercial enterprise within a regional center, the direct or indirect job creation may be demonstrated by the types of documents identified above or by reasonable methodologies. 8 C.F.R. § 204.6(j)(4)(iii).

When there are multiple investors in a new commercial enterprise, the total number of full-time positions created for qualifying employees will be allocated only to those immigrant investors who have used the establishment of the new commercial enterprise as the basis for their entry in the EB-5 Program. An allocation does not need to be made among persons not seeking classification in the EB-5 Program, nor does an allocation need to be made among non-natural persons (such as among investing corporations). 8 C.F.R. § 204.6(g)(2).

In general, multiple EB-5 investors petitioning through a regional center or on a standalone basis may not claim credit for the same specific new job. Thus, as a general matter, a petitioner or applicant may not seek credit for the same specifically identified job position that has already been allocated in a previously approved case.

## V.    Procedural Issues

The EB-5 Program provides that the immigrant investor will file an initial petition and supporting documentation to be classified as eligible to apply for an EB-5 visa through USCIS's adjustment of status process within the United States or through the Department of State's visa application process abroad. Upon adjustment of status or admission to the United States, the immigrant investor is a conditional lawful permanent resident. INA § 216A(a). The EB-5 Program further provides that if, two years after obtaining conditional permanent resident status, the immigrant investor has sustained the investment, created or can be expected to create within a reasonable period of time ten full-time jobs to qualifying employees, and is otherwise conforming to the EB-5 Program's requirements, the conditions generally will be removed and the immigrant investor will be an unconditional lawful permanent resident. INA § 216A(d)(1); 8 C.F.R. § 216.6(c).

### A.    The Sequence of Individual Investor Filings

An immigrant investor seeking admission into the United States as a lawful permanent resident will proceed in the following sequence:

#### 1.    The Form I-526 Petition

- For an immigrant investor who is investing in a new commercial enterprise that is not part of a regional center, the immigrant investor will file a Form I-526 that, together with the supporting evidence, demonstrates by a preponderance of the evidence that the immigrant investor has invested, or is actively in the process of investing, lawfully

PM-602-0083: EB-5 Adjudications Policy
Page 21

obtained capital in a new commercial enterprise in the United States that will create full-time positions for not fewer than ten qualifying direct employees.

- For an immigrant investor who is investing in a new commercial enterprise that is part of a regional center:

    o   The entity seeking designation as a regional center will file a Form I-924 that, together with the supporting evidence, demonstrates by a preponderance of the evidence that the requirements for a regional center have been met. The individuals who establish the regional center can be, but need not be, the immigrant investors themselves; and,

    o   Once USCIS designates the entity as a regional center, each immigrant investor will file a Form I-526 that, together with the supporting evidence, demonstrates by a preponderance of the evidence that the immigrant investor has invested, or is actively in the process of investing, lawfully obtained capital in a new commercial enterprise in the United States that will create directly or indirectly full-time positions for not fewer than ten qualifying employees.

It is important to note that at this preliminary Form I-526 filing stage, the immigrant investor must demonstrate his or her commitment to invest the capital but need not establish that the required capital already has been invested; it is sufficient if the immigrant investor demonstrates that he or she is actively in the process of investing the required capital. However, evidence of a mere intent to invest or of prospective investment arrangements entailing no present commitment will not suffice. 8 C.F.R. § 204.6(j)(2); *see Matter of Ho,* 22 I&N Dec. at 210. Similarly, at this preliminary stage the immigrant investor need not establish that the required jobs already have been created; it is sufficient if the immigrant investor demonstrates in a business plan that it is more likely than not that the required jobs will be created. 8 C.F.R. § 204.6(j); 8 C.F.R. § 204.6(m).

### 2.    The Form I-829 Petition

Within ninety days prior to the two-year anniversary of the date on which the immigrant investor obtained conditional lawful permanent resident status, the immigrant investor will file a Form I-829 to remove the conditions. The Form I-829 petition to remove conditions must be accompanied by the following evidence:

   (1)    Evidence that the immigrant investor invested or was actively in the process of investing the required capital and sustained this action throughout the period of the immigrant investor's residence in the United States. The immigrant investor can make this showing if he or she has, in good faith, substantially met the capital investment requirement and continuously maintained his or her capital investment over the two years of conditional residence. At this stage the immigrant investor need not have invested all of the required capital, but must have substantially met that requirement. The evidence may include, but is not limited to, an

PM-602-0083: EB-5 Adjudications Policy
Page 22

audited financial statement or other probative evidence such as bank statements, invoices, receipts, contracts, business licenses, Federal or State income tax returns, and Federal or State quarterly tax statements; and,

(2)     Evidence that the commercial enterprise created or can be expected to create, within a reasonable time, ten full-time jobs for qualifying employees.  In the case of a troubled business, the immigrant investor must submit evidence that the commercial enterprise maintained the number of existing employees at no less than the pre-investment level for the period following his or her admission as a conditional permanent resident.  At least ten jobs must be preserved or created per immigrant investor.  The evidence may include, but is not limited to, payroll records, relevant tax documents, and Forms I-9.

*See* 8 C.F.R. § 216.6(a)(4)(ii-iv).

It is also important to note that the EB-5 Program allows an immigrant investor to become a lawful permanent resident, without conditions, if the immigrant investor has established a new commercial enterprise, substantially met the capital requirement, and can be expected to create within a reasonable time the required number of jobs.  All of the goals of capital investment and job creation need not have been fully realized before the conditions on the immigrant investor's status have been removed.  Rather, the regulations require the submission of documentary evidence that establishes that it is more likely than not that the investor is in "substantial" compliance with the capital requirements and that the jobs will be created "within a reasonable time."

The "within a reasonable time" requirement permits a degree of flexibility to account for the realities and unpredictability of starting a business venture, but it is not an open-ended allowance.  The regulations require that the business plan submitted with Form I-526 establish a likelihood of job creation "within the next two years," 8 C.F.R. § 204.6(j)(4)(i)(B), demonstrating an expectation that EB-5 projects will generally create jobs within such a timeframe.  Whether a lengthier timeframe for job creation presented in a Form I-829 is "reasonable" is to be decided based on the totality of the circumstances presented, and USCIS has latitude under the law to request additional evidence concerning those circumstances.  Because the law contemplates two years as the baseline expected period in which job creation will take place, jobs that will be created within a year of the two-year anniversary of the alien's admission as a conditional permanent resident or adjustment to conditional permanent resident may generally be considered to be created within a reasonable period of time.  Jobs projected to be created beyond that time horizon usually will not be considered to be created within a reasonable time, unless extreme circumstances, such as *force majeure*, are presented.

**B.     Regional Center Amendments**

Because businesses strategies constantly evolve, with new opportunities identified and existing plans improved, the instructions to Form I-924 provide that a regional center may amend a previously-approved designation.  The Form I-924 provides a list of acceptable amendments, to

PM-602-0083: EB-5 Adjudications Policy
Page 23

include changes to organizational structure or administration, capital investment projects
(including changes in the economic analysis and underlying business plan used to estimate job
creation for previously-approved investment opportunities), and an affiliated commercial
enterprise's organizational structure, capital investment instruments or offering memoranda.

Such formal amendments to the regional center designation, however, are not required when a
regional center changes its industries of focus, its geographic boundaries, its business plans, or
its economic methodologies. A regional center may elect to pursue an amendment if it seeks
certainty in advance that such changes will be permissible to USCIS before they are adjudicated
at the I-526 stage, but the regional center is not required to do so. Of course, all regional centers
"must provide updated information to demonstrate the center is continuing to promote economic
growth, improved regional productivity, job creation, or increased domestic capital investment in
the approved geographic area . . . on an annual basis," 8 C.F.R. § 204.6(m)(6), through the filing
of their annual Form I-924A.

## C.    Deference to Previous Agency Determination

Distinct EB-5 eligibility requirements must be met at each stage of the EB-5 immigration
process. Where USCIS has evaluated and approved certain aspects of an EB-5 investment, that
favorable determination should generally be given deference at a subsequent stage in the EB-5
process. This policy of deference is an important part of ensuring predictability for EB-5
investors and commercial enterprises (and the persons they employ), and also conserves scarce
agency resources, which should not ordinarily be used to duplicate previous adjudicative efforts.

As a general matter, USCIS will not reexamine determinations made earlier in the EB-5 process,
and the earlier determinations will be presumed to have been properly decided. Where USCIS
has previously concluded that an economic methodology satisfies the requirement of being a
"reasonable methodology" to project future job creation as applied to the facts of a particular
project, USCIS will continue to afford deference to this determination for all related
adjudications, so long as the related adjudication is directly linked to the specific project for
which the economic methodology was previously approved. For example, if USCIS approves a
Form I-924 or Form I-526 presenting a *Matter of Ho* compliant business plan and a specific
economic methodology, USCIS will defer to the finding that the methodology was reasonable in
subsequent adjudications of Forms I-526 presenting the same related facts and methodology.
However, USCIS will still conduct a de novo review of each prospective immigrant investor's
lawful source of funds and other individualized eligibility criteria.

Conversely, a previously favorable decision may not be relied upon in later proceedings where,
for example, the underlying facts upon which a favorable decision was made have materially
changed, there is evidence of fraud or misrepresentation in the record of proceeding, or the
previously favorable decision is determined to be legally deficient. A change in fact is material
if the changed circumstances would have a natural tendency to influence or are predictably
capable of affecting the decision. *See Kungys v. United States*, 485 U.S. 759, 770-72 (1988)
(defining materiality in the context of denaturalization). Where a new filing involves a different
project from a previously-approved filing, or the same project but with material changes to the

PM-602-0083: EB-5 Adjudications Policy
Page 24

project plan, deference will not be afforded to the previous adjudication because the agency is
being presented with the given set of facts for the first time.

Since prior determinations will be presumed to have been properly decided, a prior favorable
determination will not be considered legally deficient for purposes of according deference unless
the prior determination involved an objective mistake of fact or an objective mistake of law
evidencing ineligibility for the benefit sought, but excluding those subjective evaluations related
to evaluating eligibility.  Unless there is reason to believe that a prior adjudication involved an
objective mistake of fact or law, USCIS should not reexamine determinations made earlier in the
EB-5 process.  Absent a material change in facts, fraud, or willful misrepresentation, USCIS
should not re-adjudicate prior USCIS determinations that are subjective, such as whether the
business plan is comprehensive and credible or whether an economic methodology estimating
job creation is reasonable.

> **D.    Material Change**

The process of establishing a new business and creating jobs depends on a wide array of
variables over which an investor or the creator of a new business may not have any control.  The
very best of business plans may be thrown off, for example, because of a sudden lack of supply
in required merchandise, an unexpected hurricane that devastates an area in which the new
business was to be built, or a change in the market that the business is intended to serve.

The effect of changed business plans on a regional center or an individual investor's immigration
status may differ depending on when the change is made relative to the alien investor's status in
the United States.

> **1.    Investors Who Have Not Obtained Conditional Lawful
> Permanent Resident Status**

It is well-established that in visa petition proceedings, a petitioner must establish eligibility at the
time of filing and that a petition cannot be approved if, after filing, the petitioner becomes
eligible under a new set of facts or circumstances.  *See, e.g.*, *Matter of Izummi*, 22 I. & N. Dec. at
176 ("If counsel had wished to test the validity of the newest plan, which is materially different
from the original plan, he should have withdrawn the instant petition and advised the petitioner
to file a new Form I-526.").  In addition, the petitioner must continue to be eligible for
classification at the time of adjudication of the petition.  8 C.F.R. § 103.2(b)(1).

Thus, consistent with *Matter of Izummi*, if there are material changes to a Form I-526 at any time
after filing, the petition cannot be approved.  Under these circumstances, if, at the time of
adjudication, the petitioner is asserting eligibility under a materially different set of facts that did
not exist when the petition was filed, he or she must file a new Form I-526 petition.  For
example, if a petitioner files a Form I-526 petition purporting to be associated with a particular
project within the scope of an approved regional center but, subsequent to filing, it is determined
that the proceeds of the investment will be directed to a job-creating entity in an entirely different
project, the petition may not be approved.

PM-602-0083: EB-5 Adjudications Policy
Page 25

A deficient Form I-526 petition may not be cured by subsequent changes to the business plan or factual changes made to address any other deficiency that materially alter the factual basis on which the petition was filed. The only way to perfect material changes under these circumstances is for the immigrant investor to file a new Form I-526 petition to correspond to the changed plans.

Similarly, if, after the approval of a Form I-526 petition but before an alien investor has been admitted to the United States or adjusted his or her status pursuant to that petition, there are material changes to the business plan by which the alien intends to comply with the EB-5 requirements, the alien investor would need to file a new Form I-526 petition. Such material changes would constitute good cause to revoke the approved petition and would result in the denial of admission or an application for adjustment of status.

### 2.   Investors Who Have Obtained Conditional Lawful Permanent Resident Status

Historically, USCIS has required a direct connection between the business plan the investor provides with the Form I-526 and the subsequent removal of conditions. USCIS would not approve a Form I-829 petition if the investor had made an investment and created jobs in the United States if the jobs were not created according to the plan presented in the Form I-526. While that position is a permissible construction of the governing statute, USCIS also notes that the statute does not require that direct connection. In order to provide flexibility to meet the realities of the business world, USCIS will permit an alien who has been admitted to the United States on a conditional basis to remove those conditions when circumstances have changed. An individual investor can, at the prescribed time, proceed with his or her Form I-829 petition to remove conditions and present documentary evidence demonstrating that, notwithstanding the business plan contained in the Form I-526, the requirements for the removal of conditions have been satisfied. Pursuant to this policy, USCIS will no longer deny petitions to remove conditions solely based on failure to adhere to the plan contained in the Form I-526 or to pursue business opportunities within an industry category previously approved for the regional center.

It is important to note that a Form I-526 must be filed in good faith and with full intention to follow the plan outlined in that petition. If the alien investor does not demonstrate that he or she filed the Form I-526 in good faith, USCIS may conclude that the investment in the commercial enterprise was made as a means of evading the immigration laws. Under these circumstances, USCIS may terminate the alien investor's conditional status as required by 8 U.S.C. § 1186b(b)(1)(A).

Furthermore, nothing in this change in policy relieves an alien investor from the requirements for removal of the conditions as set out in 8 U.S.C. § 1186b(d)(1) and 8 C.F.R. § 216.6(a)(4). Thus, even in the event of a change in course, a petitioner must always be able to demonstrate (1) that the required funds were placed "at risk" throughout the period of the petitioner's residence in the United States, and (2) that the required amount of capital was made available to the business or businesses most closely responsible for creating the employment; (3) that this "at risk" investment was "sustained throughout" the period of the applicant's residence in the United States; and (4) that the investor created (or maintained, if applicable), or can be expected to

PM-602-0083: EB-5 Adjudications Policy
Page 26

create within a reasonable period of time, the requisite number of jobs. Accordingly, if an alien
investor fails to meet any of these requirements, he or she would not be eligible for removal of
conditions.

While changed circumstances after the investor has been admitted in conditional lawful
permanent resident status may not require the filing of an amended Form I-526 petition in order
for the investor to proceed with and obtain an approval of a Form I-829 petition, changed
circumstances which are material may prevent deference from being accorded to the prior
determination and a more extensive review will need to be conducted at the Form I-829 stage.
For example, in the case of a petition affiliated with a regional center, the petitioner will only
receive deference to a prior determination of indirect job creation if the new business plan falls
within the scope of the regional center (as defined by either the initial approval or by subsequent
amendment to the regional center) with which the petitioner is affiliated. So if an alien was
admitted to the United States based on a petition related to a regional center that was only
approved for certain projects related to the food service industry, if the proceeds of the alien's
investment were subsequently redirected to an alternate project within the job-creating entity,
that project would have to be within the food service industry to continue to receive deference to
the prior determination of the indirect job creation of the regional center program.[5] Similarly, if
a change in plan required the liquidation of an investment and reallocation of that investment
into either another job-creating entity or new commercial enterprise, the petition may not
comply with the requirements to invest and sustain the investment throughout the period of the
alien's residence in the United States. 8 U.S.C. § 1186b(d)(1)(A)(ii); 8 C.F.R. §§
216.6(a)(4)(iii), (c)(1)(iii).

However, there may be advantages to closely adhering to the business plan described in the Form
I-526. If the alien investor follows the business plan described in the Form I-526, USCIS will
not revisit certain aspects of the business plan, including issues related to the economic analysis
supporting job creation. Thus, during review of the Form I-829, USCIS will generally rely on
the previous adjudication if the petitioner claims to have fulfilled the business plan that
accompanied the Form I-526 petition. This is consistent with the general policy mandating
USCIS deference to previous determinations set forth above in section IV.C.

To improve processing efficiencies and predictability in subsequent filings (i.e. application of
deference), many regional centers may choose to amend the Form I-924 approval to reflect job
creation in additional industries not previously reviewed at the time of project approval, as well
as the resulting change in economic analysis and job creation estimates. Such amendments,
however, are not required in order for individual investors to proceed with filing Forms I-526 or
Forms I-829 based on the additional jobs created, or to be created, in additional industries.

---

[5] Industry codes are useful for determining that verifiable detail has been provided and the estimated job creation in
the economic methodology is reasonable, however it should be noted that these industry codes are used for
informational purposes in estimating job creation and do not limit the economic or job creating activity of an
approved regional center or its investors. Jobs created in industries not previously identified in the economic
methodology may still be credited to the investors in subsequent Form I-526 and Form I-829 filings, as long as the
evidence in the record establishes that it is probably true that the requisite jobs are estimated to be created, or have
been created, in those additional industries.

PM-602-0083: EB-5 Adjudications Policy
Page 27

USCIS will develop a mechanism for the regional center or the immigrant investor to notify USCIS when substantive material changes need to be communicated. Although USCIS will no longer deny petitions solely as a result of a departure from the business plan described in the Form I-526, the certainty afforded by adherence to a previously approved business plan may be eroded as a regional center project departs from that plan. Therefore, if the immigrant investor is seeking to have his or her conditions removed based on a business plan not consistent with the approved Form I-526, the alien investor may need to provide evidence to demonstrate the element of job creation or any other requirement for removal of conditions that is called into question by the changed plan.

Similarly, while the adjudication of Form I-829 petitions will be determined by the facts of an individual case, USCIS may need to revisit issues previously adjudicated in the Form I-526, such as the economic analysis underlying the new job creation in cases where the changes could affect the previously decided issues. For example, if the investment proceeds were diverted from a job-creating entity in one industry to another, and the applicable multipliers changed, USCIS would need to verify that the change did not affect the job creation estimates. Similarly, if the number of investors on a given project changed dramatically, or if certain assumptions or benchmarks made in the economic assessment were not satisfied, USCIS may need to revisit prior determinations to ensure that the requirements for removal of conditions have been met.

USCIS recognizes the fluidity of the business world and therefore allows for material changes to a petitioner's business plan made after the petitioner has obtained conditional lawful permanent resident status. However, immigrant investors, and the regional centers with whom they associate, should understand that availing themselves of this flexibility does decrease the degree of predictability they will enjoy if they instead adhere to the initial plan that is presented to and approved by USCIS.

## VI.    Conclusion

Congress created the EB-5 Program to promote immigrants' investment of capital into new commercial enterprises in the United States so that new jobs will be created for U.S. workers. The EB-5 Program provides for flexibility in the types and amounts of capital that can be invested, the types of commercial enterprises into which that capital can be invested, and how the resulting jobs can be created. This flexibility serves the promotion of investment and job creation and recognizes the dynamics of the business world in which the EB-5 Program exists. We will continue to adjudicate EB-5 cases with vigilance to program integrity and mindful of these important principles.

## VII.    Use

This PM is intended solely for the training and guidance of USCIS personnel in performing their duties relative to the adjudication of applications and petitions. It is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law or by any individual or other party in removal proceedings, in litigation with the United States, or in any other form or manner.