Page 349

THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION


In the Matter of:            )

                             )  File No. FL-03930-A

PALM HOUSE, LLC              )


WITNESS:  Robert Viers Matthews

PAGES:    349 through 750

PLACE:    Securities and Exchange Commission

          801 Brickell Avenue, Suite 1800

          Miami, Florida 33131

DATE:     Monday, February 13, 2017


        The above entitled matter came on for hearing,

pursuant to notice, at 9:51 a.m.


Diversified Reporting Services, Inc.

(202) 467-9200

SEC_000764

Page 350

```
1   APPEARANCES:
2
3      On behalf of the Securities and Exchange Commission:
4         SHELLY-ANN SPRINGER CHARLES, ESQ.
5         TIMOTHY J. GALDENCIO, ACCOUNTANT
6         CRYSTAL IVORY, ACCOUNTANT
7         Securities and Exchange Commission
8         Division of Enforcement
9         801 Brickell Avenue, Suite 1800
10        Miami, Florida  33131
11        (305) 982-6300
12
13     On behalf of the Witness:
14        BRUCE E. REINHART, ESQ.
15        McDonald Hopkins, LLC
16        505 South Flagler Drive
17        Suite 300
18        West Palm Beach, Florida 33401
19        (561) 472-2970
20
21
22
23
24
25
```

Page 352

CONTENTS

```
EXHIBITS:    DESCRIPTION          IDENTIFIED
   183     Emails                   528
   184     Articles                 531
   185     Email, dated 12/13       536
   186     Emails                   610
   187     Email, dated 9/12        680
   188     Email, dated 1/8/13      688
   189     Email                    702
   190     Email, dated 8/4/14      737
   191     Email                    739
```

Page 351

CONTENTS

```
WITNESS:                  EXAMINATION
Robert Viers Matthews          354

EXHIBITS:    DESCRIPTION          IDENTIFIED
   164     Email, dated 11/2/12     361
   165     Email, dated 11/6/12     367
   166     Email, dated 11/25/12    369
   167     Email, dated 11/25/12    370
   168     Email, dated 1/4/13      372
   169     Email, dated 1/4/13      379
   170     Email, dated 2/14/13     380
   171     Email, dated 12/2/12     387
   172     Email, dated 12/18/12    393
   173     Email, dated 3/26/13     396
   174     Emails                   403
   175     Emails                   420
   176     Emails                   423
   177     Email, dated 1/4/14      432
   178     Email, dated 1/3/14      445
   179     Email, dated 10/24/13    453
   180     Email, dated 11/17/13    468
   181     Email, dated 1/3/14      472
   182     Email, dated 11/12/13    477
```

Page 353

```
1              PROCEEDINGS
2         MS. SPRINGER-CHARLES:  We're on the
3    record at 9:51 a.m. on February 13th, 2017.  We
4    are located in the offices of the Miami regional
5    office of the U.S. SEC in Miami, Florida.  My name
6    is Shelly-Ann Springer-Charles.  I'm a member of
7    the staff of the Enforcement Division of the
8    Securities and Exchange Commission.  I'm an
9    officer of the Commission for the purposes of this
10   proceeding.
11        We're today resuming the examination of
12   Robert Matthews, which was adjourned on January
13   31st, 2017, I believe.  Testimony today is
14   pursuant to a Commission subpoena, which has been
15   previously marked as Exhibit No. 142.
16        Mr. Matthews, do you understand that you
17   remain under oath?
18        THE WITNESS:  Yes.
19   Whereupon,
20        ROBERT VIERS MATTHEWS
21   was recalled as a witness and, having been
22   previously duly sworn, was examined and testified
23   further as follows:
24        (Mr. Galdencio enters the room.)
25        MS. SPRINGER-CHARLES:  Let the record
```

2  (Pages 350 to 353)

Page 354

1  reflect that a copy of the Formal and Supplemental
2  Formal Orders of Investigation in this matter will
3  be available for examination during the course of
4  this proceeding.
5      Also, let the record reflect that Tim
6  Galdencio, a staff accountant on this matter, has
7  joined us. Also, joining us at a later point
8  today will be Crystal Ivory and Eric Busto.
9  They're also officers of the Commission for the
10 purposes of this proceeding.
11     (Ms. Ivory enters the room.)
12         EXAMINATION
13 BY MS. SPRINGER-CHARLES:
14     **Q   Mr. Matthews, what was your involvement**
15 **in the drafting and review of Palm House Hotel,**
16 **LLLP offering documents and marketing materials**
17 **that were provided to actual or perspective agents**
18 **and investors?**
19     A   I really didn't have any involvement,
20 other than the fact that Mr. Walsh had asked me
21 for numbers for construction, which I got from the
22 construction company, New Haven Contracting, and
23 numbers for the hotel occupancy rates, and ADRs,
24 average daily rates, which I got from Hospitality
25 Investors Group, who hired HBS Appraisals to come

Page 355

1  up with those numbers.  Yes.  And I was asked by
2  David Derrico to give him what I thought was an
3  outline early on with the deal, which I did email
4  to him.
5      **Q   What do you mean by that, outline**
6  **earlier on?**
7      A   Well, it said -- I didn't really
8  understand, and still don't, completely understand
9  EB-5, but I remember I sent him an email that said
10 that, you know, EB-5 and first mortgage, and it
11 said, construction with a number, and it said,
12 purchase price with a number.  So I think the
13 purchase price I put in -- because this was before
14 we bought the hotel, so maybe the purchase price I
15 put in was thirty-six million or thirty-five
16 million.  And then I put in construction for what
17 I thought it was at the time, I think, of eighteen
18 million.  And then I think I put in soft cost for
19 five or six million.  And so that's how I saw the
20 hotel project, the purchase price, the hard cost,
21 and the soft cost.
22     **Q   Were you aware that the information that**
23 **you provided to David Derrico or to Mr. Payne or**
24 **Mr. Walsh or anyone else associated with the Palm**
25 **House Hotel, LLLP would be provided then to**

Page 356

1  investors?
2      A   I knew that he was going to raise money,
3  and he had told me he was going to raise it
4  through what's called an EB-5, but I didn't really
5  pay much attention to it, because for me, I was
6  just borrowing money from a limited partnership
7  kind of like if you borrow from a bank or a
8  private investor, and they want to know what the
9  numbers look like and the hotel, what's the
10 construction cost, and what's it gonna -- what are
11 the occupancy and the rates going to be.  So those
12 two points of the business in my head were pretty
13 clear, what it would cost to billed, and then how
14 much it would rent for.
15     **Q   I want to make sure that the answer to**
16 **my question -- I hear you, but were you aware that**
17 **when you provided those numbers let's just take**
18 **the numbers that you provided, the hard cost, the**
19 **soft cost, and any other cost that you provided,**
20 **were you aware that that information would end up**
21 **in documents that would be shared with investors?**
22     A   Yeah.  I knew he needed it.  I didn't
23 know what he was going to do with it.  I know that
24 Joe asked me for it, so I gave it to him, but I
25 didn't know exactly they were going to do -- I

Page 357

1  mean, I may have known that they were going to do
2  a PPM.  I don't really remember at the time, but I
3  just remember he wanted those numbers, and so I
4  said, I would have them for you.
5      MR. REINHART:  I think the gist of her
6  question is:  You didn't think Mr. Walsh was
7  providing the money himself?  You knew he was
8  going to go after investors to get the money?
9      THE WITNESS:  Oh, yeah.  Yeah.  I --
10 well, in the beginning, as I said, some of the
11 money I thought was his personal money he made
12 from another project and with the thing that he
13 did in India with raising money.  And then I knew
14 some of the money was going to be from outside
15 investors.
16     In the beginning, there was no EB-5.  In
17 the beginning, he was looking at raising money
18 just as a bridge loan from a high net worth
19 investors.  So that's how the deal started.
20     BY MS. SPRINGER-CHARLES:
21     **Q   I guess I'm asking a slightly different**
22 **question.  Did you know that the information that**
23 **you provided to Mr. Walsh or Derrico or Payne**
24 **during the time that they were raising money, did**
25 **you know that that information would be placed**

3  (Pages 354 to 357)

Page 358

1   into documents that were then going to be shared
2   with investors?
3       A   I don't know if I knew it was going to
4   be in a document because it could've been going to
5   a high net worth guy, and they could've shown it
6   to him. So I thought they would take that and put
7   it in some proposal. Whether it was going to go
8   to an investor or not, I can't tell you at the
9   time. In the beginning, I thought it was going to
10  go to a high net worth individual.
11      Q   Okay.
12          MR. REINHART: But at some point, you
13  understood there was going to be a PPM or some
14  other sort of offering document that was going out
15  there, right?
16          THE WITNESS: Absolutely. Yes.
17          MR. REINHART: I think that's her
18  question.
19          BY MS. SPRINGER-CHARLES:
20      Q   And did you believe that some of that
21  information would end up in that document --
22      A   Oh, yes. Yes. Yes.
23      Q   Okay. That's okay. Okay.
24      A   I'm sorry. I'm missing you.
25      Q   Okay.

Page 359

1           MR. REINHART: Don't talk over her, or
2   she's going to get angry with you.
3           THE WITNESS: Okay.
4           BY MS. SPRINGER-CHARLES:
5       Q   Did you provide pictures and animations
6   and renderings of the hotel to Mark Payne?
7       A   They would ask for progress pictures,
8   and I would have somebody send them progress
9   pictures. I don't know about animation. What was
10  the third thing?
11      Q   Renderings.
12      A   I'm sure I would've given them the
13  renderings that I had of the hotel, yes.
14      Q   You mentioned that you provided them a
15  document that was produced by someone from HIG --
16      A   Yes.
17      Q   -- is that correct?
18          Was that Robin Goetz, I think might have
19  been her last name? Do you know who that is?
20      A   It was either Robin, who worked for
21  Frank, or it might've been Ed Miranda, one of the
22  two did it, yes.
23      Q   What is the document?
24      A   It showed the -- they did a projection
25  on what the occupancy would be for the hotel, and

Page 360

1   then they did a projection what the rates would be
2   for the hotel.
3       Q   Did you provide the appraisal that you
4   had at that time to Mr. Payne?
5       A   Well, I believe I hired Frank to order a
6   new appraisal. And, originally, I hired Frank to
7   have them look at the old appraisal that was done
8   in '08 by -- by a company that I can't think of
9   their name. And what the new appraisal was
10  going -- what they did is, they looked at it, and
11  they opined to certain things in the old
12  appraisal. For example, they said, well, we agree
13  with these rates, and we agree with these prices
14  per room. So they maybe had ten or fifteen things
15  that they agreed to on the old appraisal. It was
16  Callaway & Price.
17      Q   Okay.
18          Did you send plans and schematics to Mr.
19  Payne or anyone else associated with the hotel?
20      A   Probably. Probably. For sure.
21      Q   I don't think -- the old appraisal that
22  was by Callaway & Price, did you also send that
23  document to Mr. Payne or other individuals
24  associated with Palm House --
25      A   I don't remember specifically sending

Page 361

1   it, but I'm sure if they asked me for it, I gave
2   it to them.
3       Q   Did you have a meeting with Joe Walsh,
4   Mark Payne, and I think someone named Stuart in in
5   or about October, the end of October 2012, to
6   finalize, you know, all of the documentation, you
7   know, what they needed from you and what they
8   needed to go into the documentation that was going
9   to be provided to investors?
10      A   I don't recall, and I don't know who
11  Stuart is, never heard the name.
12      Q   Okay.
13      A   It could've happened, but I don't recall
14  anybody named Stuart.
15      Q   Okay.
16          MS. SPRINGER-CHARLES: I'll ask the
17  Court Reporter to mark a copy of this composite
18  exhibit as Exhibit No. 164. It's a copy of a
19  November 2nd, 2012 email from John Marcus Payne to
20  joedirect@gmail.com and rvmatt22@gmail.com as
21  Exhibit 164.
22          (SEC Exhibit No. 164 was
23          marked for identification.)
24          BY MS. SPRINGER-CHARLES:
25      Q   I'm showing you what's been marked as

4 (Pages 358 to 361)

Page 362

1   Exhibit 164.
2           Have you ever seen — well, did you get
3   that email?
4       A   If it went to me, I probably got it.
5           MR. REINHART:  Take a second to read it
6   and make sure.
7           BY MS. SPRINGER-CHARLES:
8       Q   Yeah.
9       A   Yes.
10      Q   Okay.  So the answer to my question is,
11  well, yes, you received this email, and, yes, you
12  did meet with Mark Payne, Joe Walsh, and someone
13  named Stuart to —
14      A   I mean, I don't remember the meeting,
15  but it says I did.  I don't know who Stuart is,
16  though.
17      Q   Okay.
18          And that was to finalize what must be
19  done from a peer point of view in order to sell
20  Palm House Hotel PH2 as an EB-5 project, correct?
21      A   No.
22      Q   Was that the point of the meeting?
23      A   No.  It says -- it says PH2, the
24  residences behind the hotel.
25      Q   Well, it says, Palm House Hotel and in

Page 363

1   parenthesis it says, PH2.  Do you see that?
2       A   Yeah.  We always did PH2 as the one
3   behind, the Palm House Residences.
4       Q   The number 2 or the Roman numeral II?
5   Because I've see later, when I see the Roman
6   Numeral II, as it relates to the residences.  And
7   if you look at this date, this is 11/2/2012, this
8   may jog your memory as to what you would've been
9   doing at this point.  The first set of offering
10  documents that I see are dated in November of
11  2012, if that helps.
12          MR. REINHART:  When did they close on
13  the purchase of the hotel?
14          MS. SPRINGER-CHARLES:  Not until the
15  next year, in August of 2013.
16          THE WITNESS:  Okay.  Then it's probably
17  Palm House.  I never remember them calling it PH2.
18          BY MS. SPRINGER-CHARLES:
19      Q   But this meeting happened?
20      A   I believe.  I don't remember, but I
21  believe.
22      Q   Okay.
23      A   It says we met, so I believe we did.
24      Q   In this email, it says, "It was agreed
25  that the following must be done and produced.  One,

Page 364

1   produce a bling list for the PH2 advisory board.
2   Action, Bob."
3           Did you ever produce that list?
4       A   I believe they asked me for a list of
5   potential people, and I think Ryan gave them some
6   people, and I gave them some potential people, but
7   we never did an advisory board.  So I don't know
8   if they actually got the list or not, but I think
9   they got the list.
10      Q   From you or Ryan, or from both of you?
11      A   I think Joe wanted us to give people
12  that we knew that could be potential advisory
13  board members.
14      Q   Okay.
15          But you never had an actual advisory
16  board?
17      A   No, never.  We never did it.
18      Q   And the people that were on that list or
19  the list of potential members of the board, did
20  they ever agree to be members of the board.
21      A   No.  I never asked anybody to be.
22      Q   Okay.
23      A   He wanted a list of who potential people
24  could be.  And maybe one of the people Ryan -- I
25  remember Ryan saying he had one person for the

Page 365

1   board that agreed to sign up, but I never asked
2   anybody.  They were just Joe asking for potential
3   people that could do it.  I thought it was
4   ridiculous, so I never did it.
5       Q   Did you agree to produce a real picture
6   of PH2 so that it could be more from the
7   architectural drawing?
8       A   Yeah, I could've given them a picture.  I
9   don't remember.
10      Q   How about the CAD plans, number three?
11      A   I'm sure I gave them CAD plans of the
12  project.
13      Q   Okay.
14          Did you provide information to
15  clarify the corporate ownership structure to be
16  used?
17      A   No, because I think he said it was owned
18  structure.
19      Q   Who was he?
20      A   Did we own the hotel then, or no, do you
21  know?
22      Q   No.
23      A   No.  So, yeah, I don't --
24      Q   Who's he?
25      A   Joe.

SEC_000768

Page 366

```
1        Q   Okay.
2        A   I mean, I would've probably said we set
3   up an LLC, and we'll own it in an LLC name.  I
4   think I would've probably said that if they asked
5   me.
6        Q   But do you remember saying that?
7        A   I don't.
8        Q   Okay.
9            What is Echelon?  I think I'm saying it
10  right.  I hope I'm saying it right.
11       A   It was a construction company that I had
12  from a long time ago.  I think it was Echelon
13  Engineering and Construction.
14       Q   What did it have to do with this hotel
15  project?
16       A   I don't know if maybe he was thinking of
17  using Echelon in the beginning for the
18  construction.  I don't remember.
19       Q   Okay.
20           Who's he again?
21       A   Joe.
22       Q   Okay.
23           MS. SPRINGER-CHARLES:  I'll ask the
24  Court Reporter to mark a copy of this 11/6/2012
25  email and attachment from David Derrico to
```

Page 367

```
1   rvmatt22@gmail.com as Exhibit No. 165.
2           (SEC Exhibit No. 165 was
3            marked for identification.)
4        BY MS. SPRINGER-CHARLES:
5        Q   I'm showing you what's been marked as
6   Exhibit No. 165.
7           Did you receive this email from David
8   Derrico?
9        A   I -- probably.
10          (Ms. Ivory leaves the room.)
11       BY MS. SPRINGER-CHARLES:
12       Q   Did you receive this email?
13       A   It looks I did.  I don't remember it,
14  but I'm sure if it says it went to me, it went to
15  me.
16       Q   Okay.
17           In the email David Derrico says, "Nice
18  talking with you today.  Attached is the client
19  questionnaire we went over at lunch."
20           Did you, in fact, go over this
21  questionnaire with Mr. Derrico that day at lunch?
22       A   Probably.  Probably I did.  I don't
23  remember, but I could have.
24       Q   Is there a reason to think that you
25  didn't?
```

Page 368

```
1        A   No.  I mean, if it says it, it sounds
2   like I could've done it.  Because he's asking for
3   revenue figures and construction cost.
4        Q   Right.
5        A   So that would be what I would've
6   provided for them.
7        Q   Okay.
8        A   And I could've provided the detailed
9   timeline and the money that I told you about
10  before, what I thought it would cost to buy it and
11  to finish.
12       Q   Okay.
13           Did you meet with Michael Evans?
14       A   Yes.
15       Q   And did you provide him with information
16  necessary for him to create the economic study?
17       A   I provided him what he asked me for.
18  Again, it would've been the revenue and probably
19  the construction.
20       Q   Okay.
21           (Ms. Ivory enters the room.)
22           MS. SPRINGER-CHARLES:  I'll ask the
23  Court Reporter to mark a copy of this 11/25/2012
24  email from Joe Walsh to David Derrico and Bob
25  Matthews as Exhibit No. 166.
```

Page 369

```
1           (SEC Exhibit No. 166 was
2            marked for identification.)
3        BY MS. SPRINGER-CHARLES:
4        Q   I'm showing you what's been marked as
5   Exhibit No. 166.
6           Did you receive that email?
7           MR. REINHART:  You can put your papers
8   there.
9           THE WITNESS:  Yes, I remember this
10  email.
11       BY MS. SPRINGER-CHARLES:
12       Q   Okay.
13           Why did Mr. Walsh send you that email?
14       A   He was trying to come up with some bonus
15  plan that people could stay at the hotel for a
16  week or something.
17       Q   Okay.
18           And did you respond to the email?
19       A   I don't.
20       Q   It doesn't sound like you were asked for
21  a response.
22       A   Yeah.  I doubt if I did.  Sometimes they
23  send me stuff, and I barely responded to it.
24           MS. SPRINGER-CHARLES:  I'll ask the
25  Court Reporter to mark a copy of this exhibit as
```

SEC_000769

Page 370

1  Exhibit No. 167.  It's an 11/25/2012 email from
2  Bob Matthews to David Derrico and Joe Walsh, blind
3  copying Joe Marcus Payne.
4          (SEC Exhibit No. 167 was
5          marked for identification.)
6      BY MS. SPRINGER-CHARLES:
7      Q  Did you send this email to the
8  individuals that I mentioned?
9      A  Yes, I believe I did.
10     Q  Okay.
11         Did you know that those bios -- when I
12  look at the business plan, it appears that your
13  bio appears in the business plan, as well as in
14  the PPM.  Did you know that your bio was going to
15  be included in those documents?
16     A  I didn't really know what they were
17  going to be for, other than that he was going to
18  use it to raise money and wanted to know who the
19  management was going to be at the hotel.
20     Q  So you knew that that information would
21  be communicated to investors and agents?
22     A  Yeah.  I think at this time I knew it
23  was a EB-5 project.
24     Q  Okay.
25     A  So I mean, he asked me for the bios.  I

Page 371

1  assumed he wanted it for whatever he was doing.
2      Q  Okay.  To raise funds?
3      A  To raise money, yeah.
4      Q  And so to communicate that information
5  to the agents and the investors, correct?
6      A  Right.  I didn't know if he just needed
7  it in his file to have it for background or if
8  actually was going to go in the document.  I can't
9  tell you that today even if it ever did go into
10  the document.  Do you understand what I'm saying?
11     Q  I do.
12         The email before that, I think, we saw
13  David Derrico essentially say that he was trying
14  to finalize the PPM and the business plan.  If we
15  look at Exhibit No. 166 maybe.  If we look at the
16  email, it says -- David Derrico says, "I have
17  drafted the legal documents for the Palm House
18  Hotel project and I've loaded them to the Dropbox.
19  I also added the signatory pages to the
20  marketing" -- well, there's something in quotes --
21  "from the LP agreement and subscription agreement
22  to the marketing docs and signatory booklet
23  folder.  These versions should be used in a final
24  signatory booklet.  The PPM is not yet complete as
25  it needs the final job counts, management bios,

Page 372

1  and fiances from the" --
2      A  There it is.  Then he asked me for the
3  bios, and I sent them.
4      Q  And so you were aware that they would be
5  included in the offering documents?
6      A  At that point, I was, yes.
7      Q  Okay.
8      A  If it says it, yes.
9         MS. SPRINGER-CHARLES:  I'll ask the
10  Court Reporter to mark a copy of this 1/14/2013
11  email from Bob Matthews to Joe Walsh, cc'ing Joe
12  Walsh, Jr. as Exhibit No. 168.
13          (SEC Exhibit No. 168 was
14          marked for identification.)
15     BY MS. SPRINGER-CHARLES:
16     Q  I'm showing you what's been marked as
17  Exhibit No. 168.
18         Did you send that email?
19     A  I'm just trying to remember.
20         MR. REINHART:  Okay.
21         THE WITNESS:  Yeah, I remember this is
22  the one that I said that this Jennifer Gao was
23  Ryan's person that I mentioned earlier.
24     BY MS. SPRINGER-CHARLES:
25     Q  Yeah.

Page 373

1      A  And these look like other potential
2  people, a friend of mine I knew.
3      Q  So these are potential people for the
4  advisory board?
5      A  I believe so.
6      Q  Okay.
7      A  I know Jennifer was for sure.
8      Q  Okay.
9         I'm showing you what's been previously
10  marked as Exhibit No. 62.  It's an email from you
11  to Joe Walsh.  Take a look at it.  It's a
12  composite exhibit, actually.  There are two emails
13  on here; one dated 12/4/2012 and one dated
14  1/2/2013.
15         Did you send or receive the emails in
16  Exhibit No. 62?
17     A  I think it's from Joe to me telling me
18  he did all this stuff in Chinese.
19     Q  Well, did you send the response to him
20  where it says, "We'll check it out" --
21     A  Oh, oh, yes.  Yes, I did see that.
22     Q  Okay.  Joe sent you an email that
23  contains several links in the body of the email
24  from what I can tell, correct?
25     A  Right.

7  (Pages 370 to 373)

Page 374

1  Q   As it relates to this 12/4/2012 email
2  chain between you and Joe, did you click on each
3  link and review?
4  A   No.
5  Q   Why not?
6  A   I would bet that there's no email that I
7  get back to Joe with any comment because I took
8  his stuff and didn't even read it.
9  Q   Why not?
10  A   Because it wasn't my thing.  I didn't
11  know about the EB-5.  I didn't want to know about
12  it.  It was his deal.  That's what I gave him that
13  original deposit for.  And I wasn't going to pay
14  any attention to his stuff.
15  Q   Did you think that was reasonable?
16  A   Actually, I did, yeah, because it was
17  his job, and I didn't want to try to learn a new
18  thing.  My job was, build a hotel, go make those
19  occupancy, make those average daily rates.  That's
20  what I was good at.  Raising money, that wasn't my
21  forte.
22  Q   Do you typically not read all of the
23  legal documents associated with, you know, loans
24  that you receive for your development projects?
25  A   Yes.  In fact, I just got this from you,

Page 375

1  and I didn't even read it was from me.  I thought
2  it was from Joe because I skimmed it.  So I have a
3  little bit of a severe ADD where my time frame for
4  reading documents is never -- when I go to a
5  closing, they would put little yellow stickums on
6  the closing where you sign, and I would sign that
7  and close it and walk away.  It's --
8  Q   And that's typically how you do
9  business?
10  A   It has been.  I tend to trust other
11  people, and sometimes too much so.  But, yes,
12  that's how I've -- that's how I've done it.  I
13  don't -- reading the minutiae isn't what I'm good
14  at.
15  Q   Let's look at the next email on Exhibit
16  No. 62.  Again, did you click on the links in this
17  email when you got this email?  If you keep going,
18  there's a second email in here dated 1/2/2013.
19  A   Yes.  I --
20  Q   Did you click on the links here?
21  A   I would highly doubt it.  I did click on
22  one link once and saw in some language, like Farsi
23  or some weird language, and I just -- I remember
24  doing that in my head because I remember looking
25  at it and going, what is this?  And at some point

Page 376

1  in history, I remember doing that.
2  Q   Okay.
3  And what was that document that you --
4  A   Oh, I have no idea.  I just remember
5  seeing it in some weird language, and I just --
6  Arabic.  I don't know.
7  Q   There was no English translation on the
8  document?
9  A   I don't remember that at all, no.  I
10  just remember seeing some foreign language.  I
11  remember once looking at that, yes.
12  Q   I'm showing you what's been previously
13  marked as Exhibit No. 63.
14  Did you receive this email, the first
15  one on this chain, as well as the second?  This is
16  a composite exhibit.
17  A   My name is on it, so I'm sure --
18  MR. REINHART:  First, look at -- let's
19  make sure it's the same one she's looking at.  This
20  is the first email page, the third or fourth page
21  of the exhibit.
22  THE WITNESS:  Oh, I'm sorry.
23  I did -- I did click on these a couple
24  of months ago.  I went back and tried to look up
25  these things because I had some emails when I was

Page 377

1  going through my emails, and I clicked on them,
2  and they had like a dead page.
3  Q   You're referring to the page that's
4  Bates labeled 42315?
5  A   It was -- I don't remember, but it was a
6  video link.
7  MR. REINHART:  These don't have page
8  numbers.  I don't think they copied with page
9  numbers.
10  MS. SPRINGER-CHARLES:  Oh, okay.
11  BY MS. SPRINGER-CHARLES:
12  Q   So the email dated 11/20/2012 at 2:32
13  p.m., correct, is that what you're looking at?
14  A   Yeah.  I'm not saying I looked at it
15  then.  I remember looking at these later on after
16  everything was blown up and tried to look and see
17  what he had done, and I did it probably for three
18  links or four links, and the links were all
19  closed.
20  Q   Okay.
21  So these three emails, I believe there's
22  three emails in this exhibit, did you receive each
23  of them?
24  A   Probably if I'm on the list, yes.

8  (Pages 374 to 377)

Page 378

1        Q    And there's no reason to believe that
2    you didn't receive them if you're on the list,
3    right?
4        A    If I'm on the list, I probably received
5    it, and it went into my trash.
6        Q    And at that time, did you review them
7    then?
8        A    No.
9        Q    At any point before the last few weeks,
10   did you review them?
11       A    A couple of months ago.
12       Q    I mean, a couple of months ago, did you
13   review them at any point before that?
14       A    No.
15       Q    And did you think that was reasonable?
16       A    Yes.  Why would I look at what he's
17   doing?
18       Q    I'm showing you what's been previously
19   marked as Exhibit 64.
20            Did you receive this email?
21       A    Yes.
22       Q    And did you look at the documents
23   attached to this email when you received it?
24       A    No.  I think it's the questionnaire that
25   he talked about before.

Page 379

1        Q    Well, this email is from Joseph Walsh.
2        A    Yeah, it's more than that.  Yeah, it's
3    more than that questionnaire.
4        Q    Did you look at it at the time?  I think
5    it attaches what's called a signatory booklet.
6        A    No.  I didn't read the PPM, the
7    signatory booklet, his pretty pictures.  I just
8    didn't deal with it.  It really wasn't relevant
9    for me.
10            MS. SPRINGER-CHARLES:  I'm going to ask
11   the Court Reporter to mark a copy of this 1/4/2013
12   email from David Derrico to Bob Matthews as
13   Exhibit No. 169.
14            (SEC Exhibit No. 169 was
15            marked for identification.)
16            BY MS. SPRINGER-CHARLES:
17       Q    I'm showing you what's been marked as
18   Exhibit No. 169.  It appears -- first of all, did
19   you get that email?
20       A    Probably.
21       Q    Probably.
22            Is there any reason for you to believe
23   that you didn't receive the email?
24       A    If the email says it went to me for all
25   of them, I must've got them.

Page 380

1        Q    Did you click on the link when you saw
2    that email?
3        A    I don't remember.  I could've because
4    this asks about finances, but I don't remember
5    clicking on it.
6        Q    Let's introduce the next exhibit, and
7    that might help you to recall whether or not you
8    clicked on it.
9            MS. SPRINGER-CHARLES:  I'd like the
10   Court Reporter to mark a copy of this 2/14/2013
11   email chain between David Derrico and Bob Matthews
12   as Exhibit No. 170.
13            (SEC Exhibit No. 170 was
14            marked for identification.)
15            BY MS. SPRINGER-CHARLES:
16       Q    I'm showing you what's been marked as
17   Exhibit No. 170.
18            Tell me if you sent or received the
19   emails on that email chain.
20       A    Yes.
21       Q    Okay.
22            Does that refresh your recollection as
23   to whether or not you clicked on the link and
24   reviewed that business plan?
25       A    Oh, it says the site was down -- okay.

Page 381

1    So this is the first time I've read the business
2    plan.  Yes.  Yes.
3        Q    So you read the business plan at that
4    time?
5        A    I remember this.  Yes, I read the
6    business plan.
7        Q    And did you meet with David to discuss
8    it?
9        A    I imagine I did, but I don't remember.
10       Q    You don't remember?
11       A    I don't remember.
12       Q    What were the problems that you saw in
13   the business plan?
14       A    I believe they had in the capital stack
15   that I had put twenty-two million dollars in, and
16   I told them -- there's an email somewhere where I
17   specifically tell them this is the capital stack
18   at that I need to do the project.  Again, it was
19   the purchase price of the hotel.  It was the
20   construction costs, and it was the soft costs.
21   Those three things.
22            And they kept trying to add it to make
23   it go higher.  And I think that I was upset that
24   they stuck in a twenty-two million dollar equity
25   that I had put into the project, because I had

Page 382

1    told them on several occasions that my money in
2    was from the beginning when I bought the hotel
3    back in '06. And I remember David or Joe, one of
4    them, saying that it's okay to have it go back to
5    there to be an EB-5 project. And I didn't
6    understand that at all.
7        Q   I'm sorry. Can you explain that.
8        A   Yes. So they gave me this line -- I
9    don't want to say it was a BS line, but it didn't
10   seem like it made any sense to me, that when I
11   bought the hotel in '06, I put down a check for
12   ten million dollars to buy it, for example, that
13   that would be counted towards my equity. And I
14   said, but I lost the hotel, and I only had an oral
15   agreement to buy it back from Glenn Straub. He
16   never signed a written agreement. And I remember
17   them trying to make the case, because there's an
18   email from David where he puts in the twenty-two,
19   and I sent in what it really was. And -- and they
20   said because I was going to buy it back from
21   Glenn, that they could count it or something. So
22   I didn't get into it, because I didn't know EB-5.
23       Q   Did they count the ten million that
24   you --
25       A   Well, the ten and other twelve, the ten,

Page 383

1    the eight -- all the money that I had in the
2    project. Which I never agreed with and always
3    said that it didn't make logical sense to me.
4        MR. REINHART: Can I ask a clarifying --
5        MS. SPRINGER-CHARLES: Uh-huh.
6        MR. REINHART: So prior to buying the
7    hotel back, you had already put twenty-two million
8    dollars into the project?
9        THE WITNESS: It could've been more. I
10   don't know how much.
11       MR. REINHART: Is that where that number
12   twenty-two comes from?
13       THE WITNESS: Yes. It was ten for
14   deposit, another eight in change, and then the
15   demo number.
16       BY MS. SPRINGER-CHARLES:
17       Q   So ten was your -- cash?
18       A   Yeah.
19       Q   Cash deposit of ten million dollars.
20   The eight and change was what?
21       A   It was the money I borrowed, I still
22   owe, on the project. It's on my house. It was
23   called Potomac Realty. It might be eight and a
24   half.
25       Q   So it wasn't equity? It wasn't cash

Page 384

1    that you infused into the project?
2        A   Well, I borrowed the money and put it
3    in.
4        Q   But it was borrowed money? It wasn't
5    your cash that you put into the project?
6        A   No, but I signed personally for the
7    money. So it's my responsibility.
8        Q   There was a personal guarantee --
9        A   Yes.
10       Q   -- on the loan?
11       A   Yes. And it's on my house today.
12       Q   And what about the other, the last
13   portion of that twenty-two?
14       A   It was a guess of what we thought we put
15   into it at the time.
16       Q   And where did the money come from for
17   that last portion?
18       A   Oh, I have no idea what --
19       Q   Was it cash that you had of personal
20   money?
21       A   Yeah. We just -- I think I sat down and
22   tried to calculate what we added to the hotel
23   from, you know, ten years ago. It was a guess, an
24   educated guess.
25       MR. REINHART: She's just asking you the

Page 385

1    source of funds --
2        THE WITNESS: Oh, it would've been just
3    writing a check. It wasn't a loan.
4        BY MS. SPRINGER-CHARLES:
5        Q   But where did that money come from?
6        A   Oh, I don't know. I had a lot of money
7    back then.
8        Q   That's what I'm asking. It was your
9    personal money, correct?
10       A   Yes. Yes. Yes.
11       Q   Okay. Okay.
12       But a portion of that was this loan that
13   you got from --
14       A   Potomac.
15       Q   Potomac. Okay.
16       MS. IVORY: Was there anything else in
17   the document you disagreed with?
18       THE WITNESS: I only to -- no offense,
19   but I only went to the finances. The rest, I
20   didn't deal with. I didn't know enough about it
21   to try to figure out what he was doing with that
22   end. I knew the finances of the construction and
23   what the rates would be to rent the rooms and what
24   the occupancy. Those are my things that they
25   asked me to get, and I hired outside people to get

SEC_000773

**Page 386**

1  them.
2         MS. IVORY:  Okay.  Thank you.
3         MR. REINHART:  But if I understand
4  your -- the issue you did raise, it was that they
5  wanted to represent that there was twenty-two
6  million dollars more in the project than you
7  thought you really had in the project?
8         THE WITNESS:  There's an email I saw
9  that says it's about ninety some odd million
10  dollars.  And my email is very clear that it
11  was -- I think it was sixty something million
12  dollars, whatever, twenty-seven and, say,
13  eighteen, and maybe five.
14         MR. REINHART:  I understand, but just
15  focus on -- I'm just trying to clarify, I think,
16  the questions that you were asked, which is:  The
17  disagreement that you pointed out was that they
18  wanted to say that there was twenty-two million
19  dollars invested in the project already that you
20  said was no longer invested because it had been
21  lost when Mr. Straub got the hotel back, right?
22         THE WITNESS:  Right.
23         MR. REINHART:  Okay.
24         THE WITNESS:  Right.
25         BY MS. SPRINGER-CHARLES:

**Page 387**

1      Q   And what number did you propose that
2  they use?
3      A   I didn't propose any number.  I wasn't
4  putting any money into the project.  I didn't have
5  any money.
6         In fact, to clarify, I specifically
7  remember that they used a twenty-nine million
8  dollar purchase price, which is what I bought it
9  for.  And that I knew that Glenn Straub wasn't
10  going to sell it to us for twenty-nine.  I
11  believed it was a number in the high thirties.  And
12  I remember that.
13         MS. SPRINGER-CHARLES:  I'll ask the
14  Court Reporter to mark a copy of this 12/2/2012
15  email from John Marcus Payne to
16  rvmatt22@gmail.com, it's forwarding an email from
17  David Derrico, as Exhibit No. 171.
18         (SEC Exhibit No. 171 was
19         marked for identification.)
20         BY MS. SPRINGER-CHARLES:
21      Q   I'm showing you what's been marked as
22  Exhibit No. 171.
23         Can you tell me what's being -- can you
24  tell me what's being discussed in that email?
25      A   This is what I was just talking about.

**Page 388**

1      Q   Okay.
2      A   I show a cost of sixty-two five, which
3  is thirty-seven million for the purchase price,
4  and at that point in time, I believe that it's
5  going to be a first mortgage on the property with
6  EB-5 limited partners.
7      Q   You thought that the EB-5 investors
8  would have a first mortgage?
9      A   Yeah.
10      Q   Not Glenn Straub?
11      A   No.  Acquisition allowing first mortgage
12  rights to EB-5 limited partners.  Remember, I
13  don't understand the EB-5 system, so I didn't know
14  they weren't supposed to have a first mortgage.  I
15  guess their money is supposed to be unsecured.
16         And then there's the eighteen number for
17  the construction, and there's the seven.  I
18  guessed five before.  There's the seven for the
19  soft cost.  So in my mind, the project is
20  sixty-two five.  That's the real numbers on what I
21  thought the project would be.
22      Q   Did you address this with them?
23      A   Yes, I remember.
24      Q   When?  With whom?
25      A   I remember talking to David Derrico

**Page 389**

1  about this, because, see, he's got the land for
2  twenty-nine million.  Just what I said before.  And
3  he's -- I believe -- I believe he doesn't get it.
4      Q   Okay.
5      A   He's -- I don't think he was trying to
6  be malicious.  I just think he wasn't being very
7  smart, because it was explained, that I bought it
8  back in '06 for twenty-nine, and so, you know, I
9  don't know what's in his head, but he seems a
10  little thick.
11      Q   He did seem like he wasn't clear, based
12  on his email, but I'm asking, did you clarify it
13  for him?
14      A   Oh, yes, absolutely.
15      Q   In person?
16      A   I either met or talked to him on this
17  for sure.  Because there's -- just to clarify,
18  there's -- oh, there it is, it's right there.  There it
19  is.  So he says he's going to use the ninety-one
20  cost.  So I made up lines, so that -- we are over
21  thirteen million short.  So I made up numbers.
22  They're supposedly thirteen million short, so he
23  just makes up some numbers on what he's going to.
24  I believe he made up like interest or -- yeah,
25  interest and startup operations.

SEC_000774

## Page 390

1   Q  Well, did you -- and, again, did you
2   talk to him about that?
3       A  I absolutely told him what the real deal
4   was on this, one hundred percent.  I remember
5   specifically.  I think we actually met.
6       Q  In email or in person?
7       A  I don't think I ever emailed him.
8       Q  Okay.
9       A  I checked my emails with David.  I very
10  seldom emailed him back.  I'm not really good at
11  doing lots of emails.  I'd rather pick up the
12  phone and solve it.
13      Q  But you recall clarifying this with him?
14      A  One hundred percent.
15      MS. IVORY:  So why do you think he
16  wanted to add the twenty-two million dollars in
17  developer equity to the numbers?
18      THE WITNESS:  From this, it looks like
19  for some reason they want to make it a ninety
20  million dollar deal.  I don't know.  I never did
21  understand it.  I mean, if you look at the page
22  four, this is what I thought the deal was.
23      MR. REINHART:  Hold on.  It's not their
24  page four.  It's number 53924.
25      Go ahead.

## Page 391

1       THE WITNESS:  I mean, either I did this
2   document or Frank or one of my people probably did
3   this document and sent it to them.  And to me, it
4   was very clear, you bought the hotel.  You had to
5   do hard cost construction, and then you had soft
6   cost.  It's just so clear as a bell what the deal
7   was.
8       MS. IVORY:  So do you believe that the
9   purchase price from Glenn Straub considered the
10  money that was already put into the project, this
11  twenty million?
12      THE WITNESS:  I don't understand.  Say
13  it again slowly.
14      MS. IVORY:  So for the purchase price,
15  the thirty million --
16      THE WITNESS:  Thirty-seven.
17      MS. IVORY:  -- thirty-seven million, do
18  you think that was just the value of the hotel, or
19  did it consider the cost that Glenn had incurred
20  over, I guess, the time he owned the property?
21      THE WITNESS:  Yeah, I thought that was
22  the number, and I was close.  I wonder when this
23  was dated.
24      MR. REINHART:  Just answer the question.
25      THE WITNESS:  Well, no, because I

## Page 392

1   guessed at the number, the thirty-seven.  And I
2   think the number was thirty-seven and change.
3       MR. REINHART:  She's asking what does
4   that thirty-seven encompass?
5       THE WITNESS:  To buy the hotel.
6       MS. IVORY:  Including all of the cost
7   that he's --
8       THE WITNESS:  Whatever he did do it.  It
9   didn't matter.  We were going to buy the hotel for
10  around thirty-seven million dollars.
11      When did it close from here?
12      MR. REINHART:  If I'm understanding your
13  question, that's thirty-seven million in new
14  money, not counting the eight that's already in,
15  plus another twenty-nine?  That's thirty-seven
16  million in new money to buy the hotel back from
17  Glenn?  Regardless of whether he spent a dollar or
18  five hundred million dollars, you're going to pay
19  thirty-seven million --
20      THE WITNESS:  Yes.
21      MR. REINHART:  -- and buy the property
22  in the condition it was in on that day?
23      Does that clarify your question?
24      MS. IVORY:  Yeah.
25      THE WITNESS:  Absolutely, yes.

## Page 393

1       MS. IVORY:  Yes.
2       THE WITNESS:  All I was trying say is I
3   thought I did a pretty good job guessing at
4   thirty-seven with Glenn Straub, because I think it
5   was thirty-seven and change.  So it was a pretty
6   good --
7       MS. IVORY:  Thank you.
8       THE WITNESS:  I have a quick question,
9   when did we buy the hotel?
10      MS. SPRINGER-CHARLES:  August of the
11  following year.
12      MR. REINHART:  August 30th, 2013.
13      THE WITNESS:  Okay.  Thank you.
14      MS. SPRINGER-CHARLES:  I'll ask the
15  Court Reporter to mark a copy of this 12/18/12
16  email chain between Bob Matthews and David Derrico
17  as Exhibit No. 172.
18      (SEC Exhibit No. 172 was
19      marked for identification.)
20  BY MS. SPRINGER-CHARLES:
21      Q  I'm showing you what's been marked as
22  Exhibit No. 172.
23      Did you have those correspondences with
24  Mr. Derrico?
25      A  Yes.  This is true.

12 (Pages 390 to 393)

Page 394

1    Q   At that time, had the City already, you
2  know, informed Mr. Straub that they weren't going
3  to give him an extension of time in which to
4  construct the hotel?
5    A   Oh, I don't know the dates.  As I told
6  you before, the Governor gave us two extensions.
7    Q   Right.
8    A   And I don't know if this is the first
9  one or the second one.
10    Q   Well, based on my review of the record,
11  I think this would be the second one.  Well, those
12  extensions would've already been granted, because,
13  I think, Mr. Straub's lawsuit, I think, is public
14  record, that was filed at the end of 2012.
15    A   Right.  But this is asking if we have
16  the approvals in place to build the hotel, I
17  believe.
18    Q   Okay.
19    A   And I'm saying, yes, we have all the
20  approvals in place to build the hotel.
21    Q   Did you think, though, that at that time
22  you should — well, do you know whether Mr.
23  Derrico knew about the potential for the lien — I
24  mean, for the fines to be imposed on the hotel?
25  Do you know whether or not he knew that at that

Page 395

1  time?
2    A   Did we buy the hotel at this time yet?
3  No?
4    Q   No.
5    A   So if we didn't buy the hotel, it didn't
6  matter.  I don't know if he knew or he didn't
7  know, but it wouldn't of mattered in my mind,
8  because I'd been thinking we're going to buy a
9  hotel.  Glenn has got fines running.  And at the
10  closing, he's going to be responsible to have all
11  the fines go away, which is, in fact, what did
12  happen.
13    Q   But at that time, did you communicate
14  that information to Mr. Derrico or to anyone else
15  associated with Palm House Hotel, LLLP?
16    A   I don't even know if I knew the fines
17  were going at this time.  I could've, but if I
18  did, I may or may not have not told him.
19    Q   I didn't say they were, but that the
20  potential for the fines existed?
21    A   I don't remember.  It wouldn't have been
22  in my mind a big thing.  I think what he was
23  asking me about, do we have all the approvals to
24  build the hotel, and I was trying to say, yes, we
25  have all the approvals, but if you want to make

Page 396

1  different changes, we have to get different
2  approvals.
3    MS. SPRINGER-CHARLES:  I'll ask the
4  Court Reporter to mark a copy of this composite
5  exhibit, it's a March 26th, 2013 email and
6  attachment between -- from David Derrico to Bob
7  Matthews, cc'ing Mark Payne, a May 3rd, 2013 email
8  from Bob Matthews to Ryan Black, and an August
9  28th, 2013 email from John Marcus Payne to Bob
10  Matthews, as Exhibit No. 173.
11    (SEC Exhibit No. 173 was
12    marked for identification.)
13    BY MS. SPRINGER-CHARLES:
14    Q   I'm going to show you what's been marked
15  as Exhibit No. 173.
16    Did you send or receive those emails?
17    A   I believe -- yeah.  I think this is the
18  one I got, and I just forwarded it to Ryan, if
19  this is the one I think it is.
20    Apparently, I got it on March 22nd, and
21  then I forwarded it on May 3rd.
22    Q   Okay.
23    A   It must've sat there for a while.
24    Q   Okay.
25    A   Somebody probably yelled at me, and I

Page 397

1  probably then forwarded it.
2    Q   So did you obtain Ryan's signature?  Did
3  you tell Ryan he needed to sign the loan documents
4  and return them to you?
5    A   I don't remember.  I remember sending
6  the loan documents.  I don't remember --
7    Q   Well, why did you send them to him?
8    A   He was the managing director.
9    Q   Okay.
10    But Derrico asked you for your
11  signature, correct?
12    A   Yeah, but I never signed anything, and I
13  wasn't going to start at this point.
14    Q   Okay.
15    So when you forwarded it to Ryan, was it
16  to obtain his signature on the loan documents as
17  managing member?
18    A   Yeah.  Look at it.  You -- you know,
19  they changed the interest rate on it two times, I
20  believe, and he was dealing with Joe at that time
21  directly.  So I just gave it to him and said, look
22  at it.  You know, I don't know what I said.  I
23  think I just forwarded it to him.  I don't think I
24  said anything.  Is this my email right here?
25    Q   Take a look at it.

SEC_000776

Page 398

1    A   But on my email, was there any writing?
2    Q   Well, I just printed the email as you
3    provided it to us.
4    A   Yeah.  Okay.  So I just forwarded it.  I
5    didn't say anything.
6    Q   But did you call him up and tell him,
7    hey, take a read of this, review it, sign it?
8    A   I think I just forwarded it to him.  I
9    think what happened was, they sent it to me in
10   March.  I did nothing with it.  And then probably
11   in May somebody complained, and so I sent it to
12   Ryan.
13   Q   If you turn to the next email, that
14   might be a May 8th email where Ryan sent it back
15   executed.
16   A   Okay.  One minute.
17       Oh, yes, I remember clearly later on
18   looking at this, a couple of months ago, because I
19   sent it to him in May, and he dated it for
20   January.  So he dated it five months earlier.  So
21   he was probably talking to Joe, and Joe said, oh,
22   you have to do this as if it was January.  I'm
23   sure that's what happened.
24   Q   Why are you sure that's what happened?
25   A   Because why would he put January -- why

Page 399

1    would he -- why would he date it in January if I
2    sent it to him in May, unless somebody told him to
3    backdate it.
4    Q   But you provided him with -- you asked
5    him to sign it, correct?
6    A   I don't remember I asked him to sign it.
7    I think I just did what you just saw.  I just
8    forwarded the email to him, and he dealt with it.
9    Q   How would he know what you wanted?
10   A   I don't think he did.  He was dealing
11   with Joe directly.  Clearly, I wouldn't have told
12   him, oh, sign a document and backdate it.  I'm
13   sure Joe Walsh called him up and said, hey,
14   backdate this to January -- I'm not sure.  That's
15   what I think happened.
16   Q   Okay.
17       When Ryan sent this back to you, if you
18   look with me, the email that's attached to this
19   May 8th email, the document that's attached, turn
20   with me to the page that -- page fourteen of the
21   loan docs.  It's the page that's Bates labeled
22   47362.  Do you see that?
23   A   I do see it, yes.  But this is the first
24   time I see that.
25   Q   Ryan has -- I assume what Ryan did was

Page 400

1    cross that out, and this is an assumption, because
2    his initials are next to it.  RB, I'm assuming,
3    are Ryan Black's initials.  He crossed out this
4    portion of the document.  Do you know why?
5    A   I'm just seeing this for the first time.
6    I never knew that he crossed that out.
7    Q   So when you received the document from
8    Ryan, did you look at it?
9    A   No.  I'm totally surprised that there's
10   something crossed out on the loan docs.  I never
11   saw that.  I'd like to read it now, though.
12       I think he's trying to say that, no, Joe
13   you can't put a lien on the property.
14   Q   Had there been liens placed on the
15   property for any violations, the noise violation
16   or the two thousand dollar a day fine that had
17   been accruing, were there liens placed on the
18   property by this date, May 8th, 2013?
19   A   I don't know.  I was thinking more that
20   he was considering -- the more important think
21   would've been the mortgage, so that's right.  But
22   I don't know what he was thinking.
23   Q   Why -- before a few months ago, had you
24   read the loan documents?
25   A   No.

Page 401

1    Q   Why not?
2    A   It was a loan.  I knew he changed the
3    interest rate on me a couple of times.  I think
4    this one ended up at four point two two, if I
5    remember correctly.
6    Q   Correct.
7    A   Is it?
8    Q   Well, looking at the loan document, it
9    says four point two two percent.
10   A   Yeah.  Yeah.  And I did.  I'm sure I
11   looked at that.
12   Q   You're sure you looked at the loan
13   documents?
14   A   The four two two.  No.  I'm sure I
15   looked at the interest rate.  I'm sure I looked at
16   the interest rate when I got it, okay, that's the
17   deal.
18   Q   And did you read anything else that was
19   a part of the loan documents?
20   A   No.  Because if I did read it, Ryan
21   would've been right, that if we wanted to put a
22   first mortgage on it, we wanted to be able to put
23   a first mortgage on it, so he clearly read it
24   because he was smart enough to cross that out.
25   Q   But didn't you want to know what

SEC_000777

Page 402

1    representations you were making in this loan
2    document?  Because essentially you testified that
3    you are Palm House, LLC.  This loan is to you.
4    You're the one that's buying this hotel.  You're
5    the one responsible for repaying the loan.  Did
6    you want to know what terms --
7        A    He was the manager.  He was the guy in
8    charge.  That's why he was getting paid the money.
9    So I didn't really worry about it.  He did just
10   what I sort of would've expect him to.  He
11   would've read the loan documents and made a change
12   or commented.
13       And I mean, I think Ryan knew me well
14   enough to know that I'm not reading loan
15   documents.  That's not my forte.  And I -- there
16   was a lot of trust at the time, you know, because
17   we had these loan documents, and they were, I
18   think, quarterly or monthly or annual payments,
19   and Joe talked about making a deal at some point
20   and doing a discounted present value and paying
21   the interest upfront.
22       So I didn't really think much of the
23   thing -- much of the loan -- I didn't -- I thought
24   this was the deal at the time, but it could change
25   later.

Page 403

1        MS. SPRINGER-CHARLES:  I'm going to ask
2    the Court Reporter to mark a copy of this
3    composite of emails that you either sent or
4    received as Exhibit No. 174.
5            (SEC Exhibit No. 174 was
6            marked for identification.)
7        MR. REINHART:  Do you mind, can we go
8    off the record, so we can do a quick bathroom
9    break, and that will give him a chance to review
10   big stack of documents?
11       MS. SPRINGER-CHARLES:  Let's go off the
12   record.
13           (A brief recess was taken.)
14       MS. SPRINGER-CHARLES:  We're back on the
15   record at 11:12 a.m. on February 13th, 2017.
16       BY MS. SPRINGER-CHARLES:
17       Q    Have you had any substantive discussions
18   with any members of the staff while we were off
19   the record, Mr. Matthews?
20       A    No.
21       Q    Okay.
22       I handed you what's been marked as
23   Exhibit No. 174.  It's a series of emails that you
24   either sent or received, correct?
25       A    Correct.

Page 404

1        Q    Okay.
2        When Palm House received its first
3    Request for Evidence from the USCIS, what role did
4    you play in the response to that RFE?
5        A    They asked for backup on the club, which
6    I believe we hired RFK or one of the -- PKF, one
7    of the consulting companies to look at that, and
8    whatever else they asked for, I'm sure we gave
9    them.  I think they asked Nicky for a timeline on
10   the construction cost.
11       Q    So you got Nick -- Nicky is Nick
12   Laudano?
13       A    Yeah.  And David might've emailed him
14   directly.  I'd have to check.
15       Q    So you saw that RFE?  Did you see the
16   RFE?
17       A    I didn't read it all, but I did look at
18   the part where it was talking about the purchase
19   price, which I just looked at just now again.  I
20   didn't read the rest of it.  But I did look at the
21   part that I thought was the important part for me.
22       Q    Did you meet with David and Joe to
23   discuss that RFE and how they would respond?
24       A    Yeah.  I don't know if we met in person
25   or we just did it by phone or email, but I

Page 405

1    remember responding to this.  Because I
2    specifically remember this answer under 003678.
3        Q    What is the date of the email that it's
4    attached to?
5        A    February 18th.
6        Q    Okay.
7        A    Because the ownership issue came up
8    again.
9        Q    Right.
10       A    And I think this is the first time I
11   realized that they didn't use my ownership
12   purchase price --
13       Q    Okay.
14       A    -- because I remember being upset, like
15   what is -- I don't understand.  Why would these
16   guys put in twenty-nine million?
17       Q    What should they have put in?
18       A    The real purchase price.
19       Q    Which was?
20       A    Thirty-seven, thirty-six, seven fifty,
21   something like that.
22       Q    But the hotel had not been purchased --
23   based on my review of the record, the hotel hadn't
24   been purchased at the point that they started
25   submitting the business plans to the USCIS and

15  (Pages 402 to 405)

Page 406

1  sharing that information to investors.
2      A   Oh, I assumed the hotel was bought.  I
3  didn't look at the date.  Sorry.  So we didn't buy
4  the hotel by this time?
5      Q   Well, by the date of these emails, yes,
6  but --
7      A   Okay.
8      Q   -- the initial business plan that I saw
9  that David shared a copy with you, at that point,
10 you hadn't bought the hotel yet.
11     A   No.  No.  No.
12     Q   Right.  So how would they get that
13 number, that purchase price?  Did you know how
14 much you were going to buy the hotel for?
15     A   No, but I guessed, and I was -- the last
16 thing we just went through --
17     Q   Right.
18     A   -- six months earlier.  I was pretty
19 close to where he would be.
20         MS. IVORY:  How did you know?  How could
21 you guess?  What were you using?
22         THE WITNESS:  Because at one point he
23 said, you know, there was conversations about,
24 well, my cost, plus so many millions of dollars.
25 And so I knew Nicky was working for him, and I was

Page 407

1  trying to mentally keep track of how many millions
2  of dollars were spent, and then how much above
3  that.  So it was an educated guess.
4          MR. REINHART:  Just for the record, when
5  you say he, you're talking about Mr. Straub,
6  right?  You just said he said my cost, plus --
7          THE WITNESS:  Oh, yes, Mr. Straub.
8          MS. IVORY:  Okay.
9          So your educated guess would be based on
10 his cost of the hotel, plus any cost that he
11 would've put into it and a profit?
12         THE WITNESS:  That's what the original
13 idea was, yes.
14         MS. IVORY:  Okay.
15         THE WITNESS:  So to go back to my point
16 about 3678, it's still to this day doesn't make
17 any sense.  Joe says, this is interesting.  I
18 don't even know what that means, this is
19 interesting.  Because what Glenn paid for it had
20 nothing to do with what we were going to pay for
21 it.  He got it under foreclosure.  So we were
22 never going to buy it for ten, and we were never
23 going to buy it for twenty-nine, and we were
24 always going to buy it for some number in the high
25 thirties.

Page 408

1          BY MS. SPRINGER-CHARLES:
2      Q   On 2/20/14, I see an email in Exhibit
3  No. 174 that says from Derrico to you, "Hi, Bob,
4  hopefully, your meeting with Joe yesterday went
5  well and everyone is on the same page.  You need
6  to respond to the RFE comprehensively and
7  accurately and get it prepared as quickly as we
8  reasonable can.  Joe said you wanted to meet on
9  Monday to go over it.  When and where would you
10 like to meet?  Also, if you could send me the PKF
11 report and HVS report and our feasibility study or
12 anything else you have supporting our operating
13 projections.  I can start looking at them ASAP.
14 Thanks, DD."
15         Does this refresh your mind as to
16 whether you met with Joe to discuss --
17     A   If it says I did, then I would've, but I
18 don't know if I met in person or we talked on the
19 phone.  I just don't remember.
20     Q   Did you end up meeting with David to
21 discuss the response to the RFE?
22     A   I either would've emailed him, met with
23 him in person, or called him.  I don't remember
24 which.
25     Q   Here David says in a 2/21 email, "Here's

Page 409

1  an update based on our meeting with Bob this
2  morning."
3      A   Then I met him.
4      Q   Okay.
5          And so looking at the other emails in
6  Exhibit 174 that you've had a chance to review, it
7  looks like Jade and Nick provided certain
8  information and numbers that David needed,
9  correct?
10     A   I'm sure I got the email from David, and
11 then I delegated it to Jade and Nicky and walked
12 away.
13     Q   Had David shared with you the draft
14 response letter and an updated business plan, did
15 you look at this business plan when you received
16 it at this time?
17     A   I don't remember looking at any business
18 plan.  I remember just answering those questions
19 about the club membership, and I believe the time
20 frame on the construction cost.  And somehow they
21 were short on jobs, and were you able to sell five
22 or ten memberships?  That's what I remember about
23 this in my mind, that that was the big thing.
24     Q   But it appears that you requested this
25 information from him, looking at 3/15/14.  David

16  (Pages 406 to 409)

Page 410

```
 1    says to you, "Hi, Bob, as you requested, attached
 2    is the draft response letter and updated business
 3    plan we will be submitting in response to the RFE.
 4    The response letter details the sections of the
 5    business plan that has been updated. I'm waiting
 6    on the new economic analysis from Evans, which I
 7    expect shortly, so I can update the job count and
 8    such and finalize the BP as sent in our response.
 9    Let me know if you have any comments or if you
10    find anything in the business plan that is
11    inaccurate. Thank you for working to put together
12    the supporting information we needed to provide a
13    comprehensive response, DD."
14        A   And did I respond to him in an email or
15    anything?
16        Q   Well, I can't answer that question. But
17    that's my question to you. It appears, based on
18    this, you're saying that you requested to see the
19    business plan.
20        A   I probably wanted to make sure that they
21    would do the right number on the purchase, if they
22    got it right. I don't know -- I don't even know
23    if they ever did get it right. Did they fix it?
24        Q   Well, take a look at it. It's -- did
25    you look at it at the time?
```

Page 411

```
 1        A   I don't remember. I could have. I
 2    don't remember. I mean --
 3        Q   Okay. There it is.
 4        A   Oh, this is the business plan?
 5        Q   That's the document that was attached to
 6    the 3/15/2014 email.
 7        A   Oh, okay. So I'm already confused. I
 8    thought that was like an offering thing or
 9    something. Oh, business review. Sorry.
10            I'm a little confused. This is the
11    updated plan to the response to the RFE?
12        Q   All I'm representing is this is the
13    document that was attached to the 3/15/14 email,
14    one of the documents attached to that email.
15        A   Okay.
16            MR. REINHART: Hang on. Your question
17    was: Does he remember whether he read that or
18    not?
19            MS. SPRINGER-CHARLES: Right.
20            THE WITNESS: I mean, I don't. I
21    thought it was going to be a piece of paper that
22    said -- just answered the questions that they
23    asked.
24            MR. REINHART: Answer the question. You
25    see this document in front of you here. Do you
```

Page 412

```
 1    remember whether or not you read that?
 2            THE WITNESS: No.
 3            BY MS. SPRINGER-CHARLES:
 4        Q   Looking --
 5            MR. REINHART: Hold on. No, you didn't
 6    read it, or, no, you don't remember if you read
 7    it?
 8            THE WITNESS: No, I don't remember if I
 9    ever read it. I mean, I can tell you one hundred
10    percent I never like read every -- I would've read
11    every page and like gone through it. I might've
12    done what I'm doing right now, looking for that
13    section where it says what the purchase was.
14            BY MS. SPRINGER-CHARLES:
15        Q   Well, sit here today and look at it and
16    tell me if you believe they got it right, if you
17    find the relevant page.
18        A   Well, right away, no. Right away, this
19    draft right here.
20            MR. REINHART: You're pointing to page
21    five --
22            THE WITNESS: Page five of the business
23    plan.
24            MR. REINHART: Okay. Just for the
25    record, we have to be clear what you're looking
```

Page 413

```
 1    at. You're looking at page five?
 2            THE WITNESS: And page four.
 3            BY MS. SPRINGER-CHARLES:
 4        Q   Okay.
 5        A   Because they're using that number that
 6    was higher than the number that I gave them. So
 7    right there I would tell you that they didn't do
 8    it.
 9        Q   Can you be specific what number?
10        A   Specifically, they're saying that the
11    cost was ninety-one million when the cost that I
12    gave them was sixty-two five, specifically.
13        Q   And to be clear, I know we've gone over
14    this, but let's be clear, what was part of the
15    sixty-two five?
16        A   The sixty-two five was the purchase
17    price for thirty-seven million, the construction
18    cost for eighteen and change, and the FF&E,
19    furniture, fixtures, and equipment, for seven and
20    change.
21        Q   And what made up the -- the ninety-one
22    million? Based on your discussions with them,
23    what did they say went into that ninety-one
24    million?
25        A   Well, from the email that you showed me
```

SEC_000780

Page 414

1    before, they added twenty-two million dollars
2    extra on equity trying to claim this thing where
3    we bought it back for twenty-nine million, which
4    didn't make any sense to me.  It still doesn't
5    make sense to me.
6         Q   And you told them that it did not make
7    sense?
8         A   One hundred percent.
9         MS. IVORY:  So can we turn to page
10   forty-eight of the business plan.  This may help.
11        THE WITNESS:  Sure.
12        MS. IVORY:  On the top of the page,
13   there's a reconciliation that totals ninety-one
14   million dollars.  Is this where you think they may
15   have gotten that number?
16        THE WITNESS:  Yes, absolutely.  Because
17   once again, these idiots are using a purchase
18   price in '06, which was twenty-nine million
19   dollars when I bought the hotel.
20        MS. IVORY:  Okay.
21        If we look at the top of the page, as
22   far as the source of funds --
23        THE WITNESS:  Right.
24        MS. IVORY:  -- there's EB-5 capital of
25   thirty-nine point five million dollars and

Page 415

1    developer equity of twenty-two million dollar.  Do
2    you know what that twenty-two million dollars may
3    have represented?
4         THE WITNESS:  Oh, I'm pretty sure that
5    it represented the money when I bought this in '06
6    on the money that I put it, but then I lost the
7    hotel in a foreclosure, gave it to Glenn Straub,
8    and he paid ten cent for that purchase price, and
9    that's what the USCIS saw in the papers on that
10   RFE.
11        BY MS. SPRINGER-CHARLES:
12        Q   But you specifically told them when they
13   were drafting this -- drafting the offering
14   materials, the marketing and offering materials
15   that they should not use that twenty-two million
16   dollars in developer equity number?
17        A   Yes, one hundred percent.  And I told
18   them that they don't have the right purchase
19   price.  They just put in a number I bought in '06.
20   Their theory was, that that's the number that
21   we're going to count on the hotel from the
22   beginning.  It didn't make sense to me, but I
23   wasn't smart enough to know maybe you can do that
24   with EB-5 if the guy shakes your hand and says
25   he'll sell you the hotel back.  I don't know.

Page 416

1    So -- but I was clear.  It didn't make sense to
2    me.
3         MS. IVORY:  So there were specific
4    discussions surrounding the twenty-two million
5    dollars in developer equity?
6         MR. REINHART:  Listen to the question.
7         MS. IVORY:  So were there specific --
8         THE WITNESS:  There were for me way back
9    when that email that I saw before when I gave them
10   my analysis of the hotel for sixty-two five.
11        MS. IVORY:  Okay.
12        BY MS. SPRINGER-CHARLES:
13        Q   And did you clarify that in that email
14   that we saw before?
15        A   I don't know if I clarified an email,
16   but I one hundred percent clarified it on the
17   phone or in person.  This was a big deal to me.  I
18   specifically remember.
19        Q   We've seen that number appear this
20   morning in some of the documents that you
21   received.  Did you ever notice that twenty-two
22   million dollars in developer equity in this
23   business plan when you got it?
24        A   No.  I just saw it on page four and page
25   five.  They did their plan.  They asked me to

Page 417

1    respond to the information with that RFE where, in
2    fact, they said they got an approval, which today,
3    I believe, they never even got an approval.  I
4    think they lied to me.  And then I just -- they
5    wanted to know about the club memberships, so I
6    gave it to Jade to try to hire a consultant and
7    get that.  Then they wanted to know about the
8    construction.  So I delegated to Nicky, and I
9    didn't go through it.
10        Q   Who told you that they got an approval
11   for what?
12        A   There's an email I just read that said
13   that -- congratulations, I have good news and bad
14   news, and the good news is we got our first 526
15   approval.  I could find it for you.
16        Q   Well, actually, it says, "The good news
17   is we finally received a response on our first
18   Palm House investor, and there's no issue with the
19   investor.  The bad news is we received an RFE
20   asking for more up-to-date information regarding
21   the project."
22        A   Okay.  There's an email in my thing that
23   I promise you you have that says they got their
24   first -- it was from Mark Payne, and it says they
25   got their first 526.  I thought it was this.  But

18  (Pages 414 to 417)

Page 418

1   there's one in there, I promise.
2       **Q   I saw that email, and we can talk about**
3   **that a bit later.  We'll talk about it a bit**
4   **later, but it seems to me that immediately it was**
5   **clear to you that that wasn't correct at that**
6   **time?**
7       A   No.  No.  I believed them that they got
8   it.
9       **Q   You believed them?**
10      A   Oh, yes, I believed them that they got
11  it.  I thought they got it.  I thought it was good
12  news.  Mark said, oh, good news, we got it.  I was
13  confusing that good news with this good news.  I
14  thought this was the one where they got the 526
15  approval.
16      **Q   Okay.**
17          MS. IVORY:  So just to confirm, the
18  ninety-one million dollars, upon seeing the
19  original business plan, you did know that was
20  incorrect, and you spoke to -- was it Kevin?
21          MS. SPRINGER-CHARLES:  David.
22          MS. IVORY:  David.  I'm sorry -- David
23  about the ninety-one million dollars total funds?
24          THE WITNESS:  Right.  I don't know if I
25  saw it in the business plan.  I know I saw it in

Page 419

1   that email we were talking about before.
2           MS. IVORY:  Okay.
3           THE WITNESS:  That's where I saw it.
4           MS. IVORY:  Okay.
5           MR. REINHART:  Let me repeat the
6   question.  But regardless of where you saw it, at
7   some point, you had a conversation with David
8   where you said ninety-one million is not the right
9   number?
10          THE WITNESS:  One hundred percent.  And
11  that the purchase price was the wrong number, that
12  Glenn wasn't going to sell it to us for twenty
13  million.
14          MR. GALDENCIO:  And can you clarify what
15  the correct number for the equity -- the
16  developer's equity?
17          THE WITNESS:  They knew I didn't have
18  any money.  I didn't put in any money, except for
19  the original money when I bought it.
20          MR. REINHART:  So your answer to his
21  question is, the correct number is --
22          THE WITNESS:  Zero.
23          MR. GALDENCIO:  Thank you.
24          MS. SPRINGER-CHARLES:  I'll ask the
25  Court Reporter to mark this composite exhibit

Page 420

1   documents, these are emails that you sent or
2   received as Exhibit No. 175.
3           (SEC Exhibit No. 175 was
4           marked for identification.)
5           BY MS. SPRINGER-CHARLES:
6       **Q   Tell me if you sent or received these**
7   **emails, and then after that, please tell me what**
8   **these documents attached to these emails are.**
9           **I'm showing you what's been marked as**
10  **Exhibit No. 175.  Just take your time and take a**
11  **look at these emails.**
12          **Did you send or receive those emails?**
13      A   Yes.
14      **Q   Starting with the first email, what is**
15  **the document that's attached to that email?**
16      A   It's the pro forma that I said that I
17  supplied to them.
18      **Q   Okay.**
19          **Let's go to the next email.  Did you**
20  **provide this appraisal?**
21      A   Yes.
22      **Q   Okay.**
23          **And that's on the page Bates labeled**
24  **55497.  The appraisal attached to that email is**
25  **found on that page.**

Page 421

1       **Let's look at the email dated 11/13/'12,**
2   **Bates labeled 42954.  What is the document**
3   **attached to that email?**
4       A   It looks like an AIA contract.
5       **Q   And that does that AIA contract tell us?**
6       A   At this point in time, it says the total
7   contract is -- this in 2012.  So this is
8   probably the original one, which is probably where
9   I got my eighteen million dollar number.
10      **Q   And you provided this document, correct?**
11      A   Yes.
12      **Q   Okay.**
13          **The last email in Exhibit No. 175, it's**
14  **a 7/3 email from you to Joe Walsh.  Why did you**
15  **send this email, and what are the documents**
16  **attached to this email?**
17          MR. REINHART:  Is there a Bates number
18  associated with that?
19          MS. SPRINGER-CHARLES:  Yes.
20          MR. REINHART:  42089.  Thank you.
21          THE WITNESS:  I need a copy of the
22  building finals per units.  Oh, it's a -- it looks
23  like -- oh, it looks like sign-offs for the units
24  for the framing, and drywall, electrical, fire
25  alarm sprinkle, mechanical plumbing, and building.

SEC_000782

Page 422

1    BY MS. SPRINGER-CHARLES:
2        Q   Why were you sending emails to Mr. Walsh
3    at that time?
4        A   He asked me for them maybe.  I don't
5    know.  But I assume he asked me for them.  I
6    would've got them from Nicky.  Probably to see how
7    far along it was.  I don't know.
8        Q   Okay.
9            I'd like to talk now about Kevin Wright.
10   We talked about him earlier.  Were you aware that
11   Kevin was going to be marketing the Palm House
12   project to agents and investors for the EB-5
13   program?
14       A   Yes.
15       Q   Were you aware that he was creating a
16   slide show or a sort of -- a slide show, a
17   PowerPoint presentation or a slide show to share
18   with those agents and investors?
19       A   I don't know if he was creating one or
20   if there wasn't one already created, but I am
21   aware that he asked me for pieces of information
22   when he was doing, I believe, presentations in
23   China or somewhere.
24       Q   So you knew that you were providing
25   information to him for use in these presentations

Page 423

1    to the agents and the investors, correct?
2        A   Yes.
3        Q   You instructed Jade at times to answer
4    questions that Kevin or David Levinson may have
5    had, or give them information that they were
6    requiring, correct?
7        A   Typically, I would try to give her all
8    of the questions that they had.
9            MS. SPRINGER-CHARLES:  I'll ask the
10   Court Reporter to mark a copy of this composite
11   exhibit as Exhibit No. 176.
12           (SEC Exhibit No. 176 was
13           marked for identification.)
14       BY MS. SPRINGER-CHARLES:
15       Q   I'm showing you what's been marked as
16   Exhibit No. 176.  It's a composite exhibit.  Take
17   a minute to look through it.  It's related to some
18   information that was found on a website associated
19   with some company called AAE Group.
20           Did you send or receive the emails in
21   Exhibit No. 176?
22       A   Yes.
23       Q   What was the issue being discussed in
24   those emails?
25       A   I believe it was about some company that

Page 424

1    was -- a website that was causing Kevin angst.
2        Q   Why?
3        A   He said it had -- I just re-read briefly
4    that they put out false information.  I remember
5    this happening.
6        Q   So did you discuss that issue with Joe
7    Walsh, Sr.?
8        A   Oh, I don't -- I don't know if I did or
9    not.  If there's an email in here that says I did,
10   then I suppose I did, but I don't know if I did or
11   I didn't.  I just remember he was very upset.
12           MR. REINHART:  Clarify which he you're
13   talking about.
14           THE WITNESS:  Kevin was very upset.  He
15   wanted me to write a letter, and there's a letter
16   at the end that he wrote -- somebody wrote it on
17   my stationary.
18       BY MS. SPRINGER-CHARLES:
19       Q   Right.
20       A   Yeah, here it is.  Here.  Kevin Wright
21   wrote it, my name is Robert Matthews, you know.
22   And he wanted me to somehow help him with AAE,
23   because they wouldn't remove it from their
24   website.  I still don't know what it is.
25       Q   And the question, though, is:  Did you

Page 425

1    speak with Joe Walsh about it?
2        A   I don't remember.  I really don't.
3        Q   On 3/24/14, the emails are in
4    chronological order.  It's Bates labeled 10872.
5            MR. REINHART:  I'm sorry.  What
6    number --
7            THE WITNESS:  I don't have a 72.
8            MR. REINHART:  What number was that?
9            MS. SPRINGER-CHARLES:  It's an email,
10   dated 3/24/2014, Bates labeled 10872.
11           MR. REINHART:  Got it.
12       BY MS. SPRINGER-CHARLES:
13       Q   At the top of the email, Jade writes,
14   "Good morning, David and Kevin.  Bob spoke with
15   Joe, who will take care of the AAE group's site.
16   Kevin, I sent you an email to call Bob when you
17   get a chance."  Does this refresh your
18   recollection as to whether you spoke with Joe or
19   not?
20       A   No.  I mean, it says I did, so I
21   might've.  I don't -- maybe he -- I think Kevin
22   was afraid of Joe, and he wanted me to call him up
23   and try to get help.  I think that's what this is.
24       Q   But today, you can't recall any
25   discussion with Joe about this issue?

SEC_000783

Page 426

```
1        A   I don't.  I don't.
2        Q   Okay.
3            MR. REINHART:  And, again, to clarify
4    you're not saying you didn't have that
5    conversation with Mr. Walsh?  You're just saying,
6    as you sit here today, you don't recall if you had
7    that conversation?
8            THE WITNESS:  Correct.
9        BY MS. SPRINGER-CHARLES:
10       Q   Did Jade provide Kevin with maps and
11   videos of Palm Beach on your behalf to Kevin for
12   inclusion in the documents?
13       A   I think he asked her to get some things,
14   and she maybe went to the Chamber of Commerce or
15   somewhere and got them.
16       Q   Okay.
17           She also provided information about HBA
18   and Gordon Campbell Gray?
19       A   Yes.
20       Q   As well The Sixth Senses?
21       A   The spa, that they were going to operate
22   the spa, yes.
23       Q   She also provided him with copies of
24   permits in the AIA, correct?
25       A   Correct.
```

Page 427

```
1        Q   Did Jade also provide him with a copy of
2    the HVS appraisal review conducted by John Lancet?
3        A   Yes, probably.  If he asked for
4    anything, she would've given it to him, just for a
5    general statement.
6        Q   It looks like you may have also -- well,
7    correct me if I'm wrong, did you try to get a
8    valuation from a Hank Scalley with PKF at one
9    point?
10       A   Yes.  I believe they did a market study.
11   I'm not sure when.
12       Q   Is it correct that, based on his
13   preliminary numbers, he did not come to the same
14   value that you had at prior appraisals; is that
15   correct?
16       A   Yeah.  He was a real -- he was a real
17   stickler.
18       Q   Why?  What was his reasoning?
19       A   I don't know if he didn't believe the
20   rates or -- but he didn't get Palm Beach, that
21   there's only a certain amount of hotel rooms.  He
22   didn't really seem to understand the situation, is
23   all I remember.
24       Q   Do you recall what value he came to?
25       A   Oh, I have no idea.
```

Page 428

```
1        Q   Based on your responses, we don't need
2    to introduce all of these documents, so I'm trying
3    to streamline today.
4        A   Thank you.
5            MR. REINHART:  Every time you -- I see
6    it's creeping on the noon hour.  I don't know if
7    there's a logical breaking point coming up, but
8    whenever is a logical breaking point for you.
9            MS. SPRINGER-CHARLES:  Yes, shortly.  I
10   guess in the next twenty minutes maybe, twenty,
11   thirty minutes.
12           MR. REINHART:  Whatever time you went.  I
13   notice you're flipping through a large stack of
14   documents and happily not asking those questions,
15   so whatever time you need to streamline is fine.
16       BY MS. SPRINGER-CHARLES:
17       Q   Did you work with Frank Orenstein on any
18   other hotel projects?
19       A   Yes.
20       Q   Which ones?
21       A   Oh --
22           MR. REINHART:  Just clarify time frame.
23   You mean before the Palm House or since the Palm
24   House?
25           MS. SPRINGER-CHARLES:  Before the Palm
```

Page 429

```
1    House.
2            THE WITNESS:  We worked on trying to buy
3    the Conrad in Ft. Lauderdale, one in Central
4    America, a lot of work on one in the Galapagos,
5    the Ganesvort in New York City.
6            MR. REINHART:  Spell that for the Court
7    Reporter.
8            THE WITNESS:  G-A-N-E-S-V-O-R-T.  There's
9    two of them; one downtown and one uptown.
10           The Hyatt Regency Bonaventure in Weston.
11       BY MS. SPRINGER-CHARLES:
12       Q   Was that before the Palm House?
13       A   Yes.
14           MR. REINHART:  Perhaps, we should
15   clarify.  Before the Palm House, remember, he
16   bought the hotel originally back in '06, so --
17           MS. SPRINGER-CHARLES:  Before --
18           THE WITNESS:  Sorry.  I thought you
19   meant before Joe's version of the Palm House.
20           MS. SPRINGER-CHARLES:  That's what I
21   meant.
22           THE WITNESS:  Great.  Yes.
23           MR. REINHART:  So for the record, we'll
24   just clarify, before 2011?
25           MS. SPRINGER-CHARLES:  Right, before.
```

21  (Pages 426 to 429)

SEC_000784

Page 430

1   MR. REINHART: 2011.
2   MS. SPRINGER-CHARLES: Right.
3   THE WITNESS: Yes.
4   BY MS. SPRINGER-CHARLES:
5   Q   Anything else?
6   A   There's probably another half a dozen. I
7   can't remember the names.
8   Q   What was your role as it related to
9   those projects?
10   A   He had identified hotels that he thought
11   could be good purchases, and I was trying to help
12   negotiate to get the hotels to be a principal.
13   Q   In owning the hotels?
14   A   In owning the hotels, yes.
15   Q   Were you successful in any of the deals
16   that you mentioned?
17   A   Yes. Yes.
18   Q   Which ones?
19   A   The Bonaventure, we bought. The other
20   ones were big deals, hundreds of millions of
21   dollars. And they weren't really hotels that were
22   on the market for sale. We tried to find things
23   that weren't for sale to try to make a deal with
24   the buyer.
25   Q   But did you successfully purchase those

Page 431

1   hotels?
2   A   No. I believe he went on to do the
3   Galapagos deal and one in Columbia, and I didn't
4   take any piece of it.
5   Q   Just the Bonaventure? Is that the only
6   one that you --
7   A   Yes.
8   Q   -- obtained some ownership interest in?
9   A   Yes.
10   Q   But exactly what role did you play? Be
11   specific about the different deals.
12   A   Well, I would help Frank. I mean, he
13   was an entrepreneur also, and he knew the
14   hospitality industry really well. But I was a
15   good negotiator, and so I would try to put
16   together -- for example, on one of them, I was
17   putting together the financing and to get him
18   approved for funds, that we could do the deal to
19   negotiate with the guy that was selling it.
20   One of the gentlemen had a tax issue in
21   New York City, and it was a big hotel. I can't
22   remember the name. But we were trying to buy it
23   before it went to the market. So I helped him out
24   with trying to get a proof of funds and
25   negotiating a deal with him and meeting people,

Page 432

1   just kind of what I do for a living.
2   MS. SPRINGER-CHARLES: I'll ask the
3   Court Reporter to mark a copy of this 1/14/2014
4   email and its attachments from Jade Yu to Kevin
5   Wright, blind copying you, Mr. Matthews, as
6   Exhibit No. 177.
7   (SEC Exhibit No. 177 was
8   marked for identification.)
9   BY MS. SPRINGER-CHARLES:
10   Q   You've been provided with Exhibit No.
11   177.
12   Can you tell me why did Jade send this
13   email to Kevin?
14   A   I think this was to do with that 526. So
15   this is -- Kevin wanted some refund agreement
16   signed, the way I remember it.
17   Q   There's also a document, a letter, there
18   from Frank Orenstein. Do you see that letter?
19   A   Yeah. I'm trying to read it now.
20   Q   Okay.
21   A   Yeah, that was Frank. That was Frank
22   trying to puff up his -- trying to puff up
23   Matthew's hospitality.
24   Q   Were you a co-developer with Frank on
25   the hotels listed in this -- the six projects

Page 433

1   listed in this email?
2   A   Well, the Cartagena one, he asked me to
3   be. The Galapagos one, he wanted me to be. I met
4   with the principals. But I never went forward and
5   went in the deal.
6   Q   So you are not a co-developer on either
7   of those?
8   A   No. I mean, I helped him. I met with
9   the people. I started it. This one's Greg
10   Norman.
11   Q   Which one?
12   A   This one here. Because I knew Greg.
13   Q   Referring to the Bates label number?
14   A   Oh, I'm sorry. I can't read that
15   number.
16   MR. REINHART: 6900, subparagraph 6.
17   BY MS. SPRINGER-CHARLES:
18   Q   Okay. The Delano?
19   A   Yeah. So I mean, I didn't -- I met with
20   them. I went forward -- I think if I asked him
21   for a piece of the deal, because, say, maybe Frank
22   would end up on one of these deals with fifteen
23   percent or ten percent, he probably would've given me a
24   piece of it, and I never pushed it. I never felt
25   like I did enough to really earn a percentage of

22   (Pages 430 to 433)

Page 434

1 the hotel.
2      Q    So to answer the question, you were not
3 a co-developer of any of the projects that were
4 listed in this letter attached to Exhibit No. 177?
5      A    Well, when you say co-developer, I
6 worked with him to developed some, but I never
7 official took any ownership and never finished the
8 deal.  So I may have -- Frank and I co-developed
9 and started working on them, but I never finished
10 it.  It never ended up being the developer or
11 co-developer technically on the deal.
12      Q    Jade provided this information to Kevin.
13 Were you aware that this information – whether or
14 not the information from this letter would appear
15 in any documents shared with investors?
16      A    No.
17      Q    But you were aware that he was going to
18 be marketing to investors, correct?
19      A    Right.  I thought this was just more for
20 Kevin's own edification.
21      Q    Although you were aware that he was
22 preparing documents for investors?
23      A    Absolutely.
24      Q    Okay.
25           Other than in the ways that we've – I

Page 435

1 guess, did you -- other than in the ways that we
2 spoke about already, did you participate in any
3 other way in creating the offering documents and
4 marketing materials that were shown to actual and
5 potential investors or agents?
6      A    Absolutely not.  But I did walk some
7 people through the hotel when they asked me to and
8 talked about construction and was very excited
9 about the design.
10      Q    I think now -- we can talk about that
11 once we come back from lunch.  I think you have a
12 call to make, Bruce.
13           But other than that, which we'll talk
14 about, those in-person meetings with investors
15 when we come back, but did you otherwise
16 participate in drafting or reviewing the documents
17 that were --
18      A    No, absolutely not.
19      Q    -- shown to actual or potential
20 investors or agents?
21           MR. REINHART:  Let her finish her
22 question.
23           THE WITNESS:  No.
24           BY MS. SPRINGER-CHARLES:
25      Q    Do you know who was involved in the

Page 436

1 drafting process of the offering documents and
2 marketing materials?
3      A    I believe that David Derrico was
4 involved.  And I believe the man behind the
5 curtain, Joe Walsh did everything.  He
6 micromanaged the whole thing.
7      Q    Do you think Joe Walsh was the person
8 with ultimate authority over the statements
9 contained in the offering documents and marketing
10 materials that were shown to actual and potential
11 agents and investors?
12      A    There's no question that Joe Walsh was
13 involved in every detail.
14           MR. GALDENCIO:  And how do you know
15 that?
16           THE WITNESS:  Because Joe was the
17 biggest micromanager in the world.  He would
18 separate everybody out.  I just had a meeting with
19 Tony Reitz last week on the federal lawsuit, and
20 he verified everything that I thought and that
21 Marcus thought where he would let Tony something,
22 he would let Marcus know something, he would let
23 David Derrico know something, and because -- I'll
24 tell you specifically what happened.  There was a
25 trust agreement, and Tony was meeting with the

Page 437

1 lawyers, Keith and Joe, and he had mentioned that
2 he never even knew that there was an escrow
3 agreement officially signed, and that he looked at
4 it and he said, oh, it's on USREDA letterhead. How
5 could that be an escrow agreement?  If a bank did
6 an escrow agreement, it would've been on bank
7 letterhead.  And we had a conversation in that
8 meeting last week, and it was clear to me that Joe
9 micromanaged everything.  He was in charge.  Every
10 single item.  He was a complete control freak.
11           MR. GALDENCIO:  I appreciate what you're
12 saying, that you're speaking in general terms of
13 the nature of how he works, but as to these
14 documents that we were discussing previously, what
15 are you basing your opinion that he was, in fact,
16 the person that was responsible for those
17 documents?
18           THE WITNESS:  Well, because everything
19 went to Joe.  Every email, everything that
20 happened went to Joe, and he would make his
21 decision, and then send it out, if he wanted more
22 information or if he wanted less, get on this
23 response.  For example, on the response with the
24 RFE, he put in big letters, Bob read this.  I
25 remember, I better read this one, because I

SEC_000786

Page 438

1  tried -- I ignored a lot of his stuff, but if it
2  was in big letters, I tried to follow-up on it.
3        MR. GALDENCIO:  So you personally
4  observed him managing the documents and how the
5  documents were going to look and what they were
6  going to say?
7        THE WITNESS:  And the whole process, and
8  I don't think anybody would tell you differently.
9        BY MS. SPRINGER-CHARLES:
10  **Q    So the answer's yes?**
11  A    Yes.  Sorry.
12  **Q    Were you involved in distributing any of**
13  **the offering documents or marketing materials to**
14  **anyone?**
15  A    Never.
16  **Q    Do you know anything about that process,**
17  **who was responsible for distributing those**
18  **materials to potential investors and agents?**
19  A    I have no idea how it works.  Even now I
20  don't know how it really works.
21        MS. SPRINGER-CHARLES:  Okay.  Let's go
22  off the record.
23        (A brief recess was taken.)
24        MS. SPRINGER-CHARLES:  Back on the
25  record at 12:06 p.m. on February 13th, 2017.

Page 439

1        Bruce, would you like to have your
2  witness clarify?
3        MR. REINHART:  Yes.  And I know you
4  didn't ask me, but you usually do, he did not have
5  any substantive conversations with the staff
6  during the time we were off the record.
7        Mr. Matthews wanted to expand a little
8  on the question that was asked of how you -- what
9  was the basis for your conclusion that Mr. Walsh
10  was knowledgeable of the offering documents and
11  what was in the offering documents?
12        MR. GALDENCIO:  And I can just say, not
13  just knowledgeable, but responsible.  If that's
14  okay.
15        MR. REINHART:  Okay.  It's your
16  question.
17        Do you understand the question?
18        THE WITNESS:  Yes, I do.  Joe visited me
19  at my house several times and was involved with
20  all of my dealings with him, was involved in every
21  facet all the way down to drawing the logo.  He
22  would actually work and draw the logo for the
23  thing.  He was a complete control freak.  And he
24  spoke to me on several occasions, and it was very
25  clear that he was the quarterback of the team and

Page 440

1  running everything.  There's no question in my
2  mind, and I believe in anybody else that worked
3  for him mind, that he was the master mind.  He was
4  the guy that was going do it.  And you couldn't
5  tell him anything.
6        We were all afraid of Joe.  We didn't --
7  no one wanted him to go off on his thing.  He
8  would go off and become violent where his eyes
9  would pop out, and he would look at you, and he
10  would scream.  And everybody was afraid of Joe.  I
11  would not want to get into a confrontation with
12  him.  I know Kevin was petrified of him.  And I
13  know Mark was afraid of him.
14        I never saw really David Derrico
15  interact with Joe much.  But everybody danced
16  around him with pins and needles.  He wasn't a guy
17  that you wanted to cross.  Because he didn't care
18  what the lawyers said.  He didn't care what the
19  accountants said.  He knew it all.  And that was
20  his thing through the whole thing is, I know
21  better.
22        Even when I argued with him about what
23  the purchase price was, I'm doing an EB-5, I know
24  that you can go back to when you bought it.  It
25  didn't matter.  You weren't going to argue with

Page 441

1  him, because you were never going win.  So I don't
2  know if that helps or not, but that's how it was.
3        MR. GALDENCIO:  My comment goes to the
4  EB-5, specifically the materials that were
5  associated with the EB-5, so is that the same
6  representation as of that?
7        THE WITNESS:  Absolutely, one hundred
8  percent.
9        MR. GALDENCIO:  And I'm not clear on his
10  involvement in the management of the hotel
11  renovation itself.  Are you saying that he was
12  hands-on involved in those renovation decisions?
13        THE WITNESS:  No.  I would absolutely
14  say that I was in charge of the renovation under
15  Nicky; in other words, Nicky worked for me and did
16  the renovations, and he knew brought about the
17  design changes where the budget went up a lot when
18  we bought in HBA from London.  But he --
19        MR. REINHART:  When you say he, you mean
20  Mr. Walsh?
21        THE WITNESS:  I mean, Mr. Walsh.
22        We walked through it several times, and
23  I would show him -- you know, at least we talked
24  through at least three times, and I would show him
25  what's going on, but he didn't understand

24  (Pages 438 to 441)

SEC_000787

Page 442

1    construction. He didn't understand real estate.
2    He -- he did a contract that was oral for the
3    other deal. He was not as smart as he thought he
4    was.
5              MR. GALDENCIO: Did Mr. Walsh ever
6    represent that anybody else was involved in
7    drafting EB-5 materials or publishing the EB-5
8    materials?
9              THE WITNESS: No. I don't know if they
10   self-published it. I know he later on bought a
11   publishing press, but I don't know if he did it
12   in-house or if he hired an outside lawyer. I
13   really don't know.
14             MR. GALDENCIO: Let me clarify, when I
15   say publish, I don't mean physically running a
16   press, but preparing the documents that were going
17   to be distributed.
18             THE WITNESS: I don't -- I never had
19   that. And I don't if Henry Handler worked with
20   him and did it with him. I really don't know. I'd
21   be speculating on who actually did the documents.
22             MR. REINHART: I think his question was:
23   Did Mr. Walsh ever represent to you or say to you
24   that somebody else had control over the content of
25   these documents?

Page 443

1              THE WITNESS: Oh, no. There was no
2    question that Joe was in charge. If I were to
3    guess, I would guess that he had David Derrico do
4    the documents. That would be my guess because he
5    was a lawyer.
6              MR. GALDENCIO: Did he ever make a
7    representation to you -- and I'm not putting words
8    in your mouth, but just as a hypothetical, this --
9    I'm the one in charge of the EB-5, I'm the one who
10   controls this project?
11             THE WITNESS: Oh, he was very clear that
12   he was the one in charge of everything. There was
13   no question that Joe Walsh was in charge of this
14   deal one hundred percent.
15             MR. GALDENCIO: And this deal meaning
16   the EB-5 project?
17             THE WITNESS: The EB-5 project, yes.
18   Yes. He bragged about it, and he was very clear
19   with people, even if you were professional, that
20   he knew me. Even sometimes with the construction
21   he would try to argue with me. And I was like,
22   Joe, you don't know what you're talking about,
23   that's not going to work, are you -- you know, he
24   would come up with things that were just --
25   literally, they would be from outer space, like

Page 444

1    things that didn't make any sense logically.
2              MR. REINHART: Can I ask a follow-up
3    question here?
4              The end product of the EB-5 process was
5    to get money out of the investors, right? That
6    was the end -- the EB-5 was to raise money from
7    the investors, right?
8              THE WITNESS: I believe that he set up a
9    limited partnership to raise money from the
10   investors, a limited partnership to invest into
11   Palm House. That's what I thought.
12             MR. REINHART: Okay.
13             And given your interactions with him
14   over the years, do you have any question that the
15   final offering documents would've gone out of his
16   organization without him approving them?
17             THE WITNESS: There's no way anything
18   went out without him going through every single
19   item.
20             MS. SPRINGER-CHARLES: I'll ask the
21   Court Reporter to mark a copy of this 1/3/14
22   email. It attaches some prior emails to it. It's
23   a forwarded message from Kevin Wright to Bob
24   Matthews as Exhibit No. 178.
25             (SEC Exhibit No. 178 was

Page 445

1    marked for identification.)
2              BY MS. SPRINGER-CHARLES:
3         Q   You've been handed Exhibit No. 178.
4         A   Yes. This looks like Kevin or David
5    asking to say I was involved with the Four Season
6    project.
7         Q   Did you respond to this email?
8         A   I don't know. I don't remember. Is
9    there a response?
10        Q   I'm just asking you. I ask you. You
11   don't ask me.
12             MR. REINHART: I think what he's asking
13   you is, do you have another document you could
14   refresh him memory with?
15             MS. SPRINGER-CHARLES: No, I don't.
16             THE WITNESS: Yeah. No. No.
17             BY MS. SPRINGER-CHARLES:
18        Q   What I do have is Exhibit No. 69, which
19   I would like to show you. It's a composite
20   document of a series of, I believe, PowerPoint
21   presentations that are primarily in Chinese, not
22   English. I'd like to show you that.
23             Have you ever seen these documents
24   before?
25        A   I can tell you I've never seen this

25  (Pages 442 to 445)

1    document.
2        Q   Okay.
3            Let's flip through the first eight
4    pages, if we go eight pages in.  It's going to say
5    page sixteen of eight-six, I think, on the top of
6    the document.  I'd like to ask what was your
7    involvement with Point Breeze on Nantucket?
8        A   That was my -- it was recently an 1852
9    building that had an addition, and I matched it
10   back to the originally 1892, matched everything
11   historically, paint color, everything.  And it
12   ended up that the two subs put into a Chapter 7.
13       Q   When was that?
14       A   A long time ago.
15       Q   About what year?
16       A   Between four and eight years ago.
17       Q   So prior to you repurchasing the hotel
18   from Glenn Straub, correct?
19       A   Yes.
20       Q   Okay.  Prior to 2011, correct?
21       A   Yes.
22       Q   And you never repurchased the hotel or
23   reacquired it?
24       A   I tried to, but I didn't succeed.
25       Q   Okay.

1            What was your involvement, if any, with
2    the four seasons French Polynesian at Bora Bora?
3        A   Nothing, except for Frank was talking
4    about giving me a piece of this deal on one of our
5    deals.  I think he had a five percent residual.
6    But other than that, nothing.
7        Q   How about the Hyatt Regency Cartagena?
8        A   I met with the people.  I don't know how
9    many times.  I don't remember their name.  They
10   spoke Spanish and had an American with them.  So I
11   met on this deal, but he ended up doing the deal.
12   I didn't do it.
13       Q   Frank?
14       A   Frank did.  On both of these, the next
15   one, too.
16       Q   The Cartagena Botagan?
17       A   Yes.  Yeah.  I think it was an old hotel
18   we were going to redo over.
19       Q   What about the Galapagos Eco-Luxury
20   Resort?
21       A   Yeah.  We put a lot of time in that.  The
22   guy just tried to friend me on LinkedIn, in fact.
23       Q   How did you put time into this one?  What
24   was your role?
25       A   We were trying to get them -- it was a

1    couple of maybe brothers or partners, and they
2    were trying to get financing.  And it was a bid
3    deal because it was the only approved on the
4    Galapagos because it's very green there.  So this
5    was a big deal.  In fact, I know that Greg Norman
6    went over and went to the Galapagos.  I remember.
7    I don't remember if it's specifically for this
8    deal, but I believe he did on one of them.
9        Q   What was your role, is the question?
10   What did you do?
11       A   I just -- I met with people and worked
12   on it with Frank, but I didn't end up in the deal.
13   I didn't end up in owning it at the end.
14       Q   Okay.
15           The next one is Casi Cielo Panama?
16       A   Yeah.  I had little involvement.  He was
17   telling me about it.  Again, I met with some
18   people, but I didn't do anything with it.
19       Q   The Delano Hotel Mars de Indias, what
20   was your role on that project?
21       A   This was the one where I believe -- I
22   believe that when they came to town, they met with
23   Greg Norman.  You know, Frank took the lead on it.
24   I don't remember.  I didn't end up in the deal.
25   None of these deals I ended up doing with him at

1    the end of the day.
2        Q   And the last one, the Marriott
3    Courtyard, again, you didn't end up doing this
4    one?
5        A   No.  And that one I really -- it
6    wasn't -- I wasn't involved with that one.
7        Q   So you wouldn't call yourself a
8    co-developer on any of these deals, correct?
9        A   I wouldn't, other than the fact that I
10   helped him as a developer, but at the end, didn't
11   get a piece of the deal.  I mean, I could've
12   fought and probably got a piece of these deals,
13   but to me it wasn't worth it.
14       Q   We saw Jade provide Kevin with that
15   letter from Frank that said that you were a
16   co-developer on some of these deals.
17       A   Until you told me I was co-developer, I
18   didn't know that I was a co-developer.  I thought
19   I was just working on deals.  So I didn't really
20   pay attention.  Is that what that letter says, I'm
21   a co-developer?
22       Q   Well, we can look back at Exhibit No.
23   177.  We see that Jade provided Kevin with this
24   letter from Frank that says that you were
25   invaluable as a co-developer on this deal.

26 (Pages 446 to 449)

Page 450

1    A   Okay.  So that's Frank embellishing.
2    **Q   Did you know that information about your**
3    **involvement in these deals would end up in the**
4    **documents in Exhibit No. 69?**
5    A   No.  No, I didn't know any of this.
6    Niklaus Leuenberger was a manager.  I didn't know
7    any of this was going to be in there.
8    **Q   Why did Jade provide that information to**
9    **Kevin?**
10   A   I wouldn't even understand why you would
11   put him -- for example, the Point Breeze.
12   Unfortunately, it was one of the most passionate
13   things I tried to redo to bring these buildings
14   back, and I lost it, and it was a failure at the
15   end.  It wasn't -- like I wouldn't put on my
16   resume, oh, Bob did Point Breeze, and it was the
17   best thing he ever did.  It ended up in Chapter 7
18   so I never would've put that into something I was
19   trying to get.  When I ask you for money, oh, by
20   the way, I did this and it went into Chapter 7.  I
21   mean, it seems stupid to me, but whatever.
22   **Q   Why did Jade send Kevin the email?  I**
23   **don't think Nantucket was on that deal.  I'm not**
24   **sure if it was.  But why did Jade send Kevin the**
25   **email attaching the letter from Frank?**

Page 451

1    A   The only thing I know about this is I
2    think Kevin asked for more information or
3    something.  I think maybe Frank was in the office
4    and trying to help out.  I really don't recall.
5    **Q   Shortly, just before we go off the**
6    **record for lunch, you mentioned that you met with**
7    **potential or actual investors, correct?**
8    A   The guys looking for the green cards?
9    **Q   EB-5 investors, yes.**
10   A   Right.
11   **Q   Yes?**
12   A   Right.
13   **Q   Yes?  The answer's yes?**
14   A   The answer's yes.
15   **Q   Okay.**
16   **On how many occasions did you meet with**
17   **investors?**
18   A   I know that I probably walked the hotel
19   with them three or four times.  And I know one
20   time that they asked me to do it and I wasn't
21   there, and I asked somebody else to walk them
22   through.
23   **Q   So you personally walked with investors**
24   **on three to four occasions?**
25   A   Yeah.  And it could've been two and

Page 452

1    could've been six, but in my head, it was three or
2    four times I remember walking through.
3    **Q   More than once?**
4    A   Yes.  I remember he asked me to do it
5    more than once.
6    **Q   With a different group of investors each**
7    **time?**
8    A   Yes.  Or a couple maybe they would come
9    through.  I remember a young couple wanted to walk
10   through.
11   **Q   What did you discuss at these meetings**
12   **with investors?**
13   A   It would always be the same.  I would do
14   my typical walk-through.  If you were not an
15   investor, you were just a person, you wanted to
16   know what was going on, a friend or something, I
17   had this walk, I still do it today, and I start
18   one area, and I walk up top to the second floor
19   and out to the back to the front door.  I show
20   them the function room.  And I would show them the
21   construction, and there would be people working.
22   And that was it.
23   **Q   Did you ever tell them how their**
24   **investor funds were being used?**
25   A   No, I never discussed anything with

Page 453

1    money with these people.  I just would show them
2    the hotel, talk about this black and white marble.
3    I'd probably show them a picture in the lobby,
4    what the lobby was going to look like.  That's
5    what I still do today.  That's my tour.
6    **Q   Did you ever meet with an individual, I**
7    **think he English name is Effie?**
8    A   I remember the name Effie.  She worked
9    for Joe maybe.
10   **Q   Let's just introduce some documents that**
11   **I think will help us get through this.**
12   **MS. SPRINGER-CHARLES:  I'll ask the**
13   **Court Reporter to mark this composite exhibit of**
14   **emails as Exhibit No. 179.  emails that you either**
15   **sent or received.**
16   **(SEC Exhibit No. 179 was**
17   **marked for identification.)**
18   **BY MS. SPRINGER-CHARLES:**
19   **Q   I'm showing you what's been marked as**
20   **Exhibit No. 179.**
21   **Let's go through these to see if it will**
22   **refresh your memory as to, you know, maybe how**
23   **many times you met with investors and who these**
24   **investors were.**
25   **In the first email, John Marcus Payne**

SEC_000790

## Page 454

1  sends you an email on 10/24/13.  He says, "Bob,
2  apparently, twenty-five Chinese are coming over as
3  early as the second week of November to see Palm
4  House.  This is the boat ride.  I would suggest
5  that you join us for the boat ride with your new
6  lady who you hired.  We will call -- we will cater
7  lunch on the boat."
8       Does that meeting ever happen?
9   A  Yeah.  I remember he did bring in a bus
10  load one, and we did a walk through, and I forgot,
11  but I remember that clearly.
12   Q  Okay.
13       Those were potential EB-5 investors?
14   A  Yes.  Yes.
15   Q  And you did a boat tour with them, a
16  boat ride?
17   A  I don't know if I went on the boat.  I
18  know I walked them through the hotel.  I remember
19  them pulling up and taking pictures and walking
20  around the front.  It was like kind of crazy.
21   Q  What did you discuss with the investors
22  at that time?
23   A  I don't think they all spoke English, so
24  I think there was a person that I talked to, one
25  of the people specifically and walk-through and

## Page 455

1  maybe they translated.
2   Q  Translated what?  Was being talked
3  about?
4   A  Like I would show them the lobby and
5  say, this is what I'm going to do to the black and
6  white marble, and I would -- I was very
7  enthusiastic about the project.  It's my baby.  So
8  I would do the tour through the hotel.
9   Q  Let's look at the 12/3/13 email from
10  John Marcus Payne to yourself.
11   A  Okay.
12       MR. REINHART:  Start reading from the
13  bottom up.
14       THE WITNESS:  Oh, sorry.
15       MR. REINHART:  No.  Next page.
16       THE WITNESS:  Next page?
17       MR. REINHART:  Right.
18       THE WITNESS:  Okay.  Yeah, I remember
19  this.  He wanted to bring somebody through, a
20  Russian guy, I guess.
21       BY MS. SPRINGER-CHARLES:
22   Q  And did you -- do you recall meeting?
23   A  Yeah.  I mean, I don't remember what
24  they looked like or anything, but I remember
25  him -- I remember seeing this email and walking

## Page 456

1  somebody through the hotel.
2   Q  Okay.
3       Again, the type of discussion that you
4  had was what?
5   A  It would be the same one that I just did
6  a walk-through last week with one of the investors
7  looking where we start on the first floor, we go
8  through the lobby.  I would show them a picture of
9  the lobby.  I would show them a picture of the
10  pool.  I would go through the restaurant.  I would
11  go to the second floor.  I'd showed them where the
12  second floor restaurant was going to go.
13       I would go over to the top floor on the
14  third floor, and I would walk two of the units on
15  the third floor.  Then I would go down the back
16  staircase, and I would come out back to the lobby,
17  walk to the function room, show them the function
18  room, and we had some samples of what the ceiling
19  would look like, and I would show them that, and
20  we'd walk in.  And by that time, I would come in
21  and take a left, and I would show them what the
22  model looked like, the end product.  That's my
23  typical walk through.
24   Q  And you never discussed with any
25  investor how their funds were being used or what

## Page 457

1  would be used?
2   A  Absolutely, no.  No.  No.  I didn't know
3  how they would be used, by the way.
4   Q  Well, you received the funds, right, so,
5  of course, you knew how --
6   A  Well, I knew how the construction funds
7  would go through, but I never said, oh, the lobby
8  cost thirty-seven thousand dollars or anything --
9  it wasn't like that.  No one ever --
10   Q  Or just how you had used any of the
11  funds that you had received from Joe Walsh
12  generally?
13   A  No.  And I don't think anybody ever
14  asked me.  No.  I just would show the hotel and
15  show what I was doing.  That's what -- that was my
16  forte.  That's what I was good at.
17   Q  Let's look at the 1/17/2014 email.  At
18  the bottom, Kevin Wright writes about an Effie.  Do
19  you see that email?
20   A  Yes, I do.
21   Q  Okay.
22       And if we flip some more, there'll be
23  some pictures --
24   A  Is that her?
25   Q  Well, we can read the emails and see

SEC_000791

Page 458

1   what's attached.  Do you recall meeting with the
2   individuals in these pictures?
3       A   Yes.  I think that's the girl I had a
4   picture with Donald, but I don't know.  One of
5   them I got a picture with Donald Trump, and I
6   think it's her.  Yes.  Yes.  Yes.
7       Q   Okay.
8           So you did meet with Effie?
9       A   Yeah.  We went -- her husband and me and
10  I went to some event at Mar-a-Lago.  And she
11  wanted to meet Donald, and I signaled him, and he
12  came over and took a picture with her.
13      Q   Did David Levinson and Kevin Wright also
14  accompanying them to their hotel at that trip?  I
15  notice that some of the pictures I see, certain
16  individuals, and I'm not sure if --
17      A   I don't know.
18      Q   Who's in this picture that's Bates
19  labeled XIAYAN-0120?
20      A   I recognize me.  And if that's Effie
21  with the -- hold on.  And Effie, and I believe her
22  husband was there, but I don't see him there.
23      Q   Who are the other individuals in that
24  picture?
25      A   Oh, I have no idea.  I don't know.

Page 459

1       Q   Are either of those David or Kevin?
2       A   It's not Kevin, I don't think.  It could
3   be Kevin.  I don't know.  He looks very stern, if
4   it is him.  It could be Kevin.
5       Q   Let's look at the picture in
6   XIAYAN-0123.
7       A   That's the lower level where the spa's
8   going.  I'm probably telling them, this is where
9   the spa goes.
10      Q   Is David or Kevin in that picture?
11      A   I don't know what David -- I don't
12  remember what David looks like.  He could be the
13  tall guy.  I just don't remember.
14      Q   Okay.
15          How about Kevin?
16      A   So I don't know.  And the other guy
17  looks like Kevin a little, but I'm just not sure.
18      Q   Okay.  That's fine.
19          What did you discuss with Effie when
20  you -- on that trip?
21      A   I guess she wanted to be an exclusive
22  agent.  Somebody must've made this up, agent
23  certificate.  I don't know.
24      Q   And you're looking at Exhibit 179,
25  correct?

Page 460

1       A   Yes.  Somebody --
2       Q   And you executed that agreement,
3   correct?
4       A   Yeah, that's my signature.  Kevin
5   must've asked me to make some exclusive agent.  She
6   must've been important.  I don't remember.
7       Q   But the question is:  What did you
8   discuss with her on that trip to the hotel?  Would
9   it be the same things that you talked about
10  before?
11      A   Yeah, but one of them -- one of them, I
12  don't remember which person, but there was one
13  agent that if she did so many sales, she wanted to
14  get like half price on hers, and I delegated it to
15  Kevin.  I don't know if it's her, but one of them
16  wanted a deal.  I remember that.  It could be her.
17  I just don't remember.
18      Q   And you mentioned that you took them to
19  an event?
20      A   Yes.
21      Q   Effie and her husband?
22      A   Yes.
23      Q   What event was that?
24      A   I don't know.  It was an event at
25  Mar-a-Lago.  It was a black tie event, I'm sure.

Page 461

1       Q   Did you take them to your home, as well?
2       A   Yes, I'm sure I must've.  I don't know,
3   but I bet I did.
4       Q   Why?  Why do you bet you did?
5       A   Because if she was important and she was
6   with the twenty-five people, I bet you twenty
7   bucks that they would ask me to take her to the
8   house.
9       Q   Why?
10      A   Because Joe always wanted everybody to
11  go see the house, because the original design for
12  the Palm House came from the inspiration from my
13  house.  So if you went in the model, you'd see the
14  columns that are in my house or in the columns of
15  the old model.  So there was certain items.  The
16  bar at my house looks like what we were doing for
17  the club.  So it was the inspiration of doing the
18  Palm House design.
19          MR. REINHART:  Also, describe for them
20  where your house is, physically where your house
21  sits.
22          THE WITNESS:  It sits on the ocean in
23  Palm Beach.
24          BY MS. SPRINGER-CHARLES:
25      Q   Did you discuss with them past projects

29  (Pages 458 to 461)

Page 462

1  that you've worked in?
2      A   If they asked me, I would've answered
3  it.  I don't remember.  But if they said, did you
4  do the Point Breeze, I would've said yes.
5      Q   That was going to be my next question.
6  Did you discuss with them the past Point Breeze
7  project?
8      A   I probably did, because the Point Breeze
9  is where I got the inspiration for doing a club.
10  That was my first club that I was doing, and this
11  we wanted to do a club here.  So I very well
12  could've talked about Point Breeze.  I was very
13  passionate about Point Breeze.
14      Q   Well, do you recall if you had that
15  discussion?
16      A   I don't, but I could've very well.
17      Q   We saw the picture where you introduced
18  her to now President Trump.  Did you tell her at
19  the time that she shouldn't say anything about the
20  fact that they were there to potentially invest in
21  EB-5 investors?
22      A   Wait.  Say it again.
23      Q   Did you tell Effie or her husband that
24  they should not mention the fact they were
25  potential agents for EB-5 investing or that you

Page 463

1  were seeking EB-5 funding?
2      A   No.  In fact, I think I remember when I
3  introduced them, I think I said that they were
4  looking at bringing a lot of money over to the
5  States.  I think she was looking at doing other
6  deals besides Palm house with high net worth
7  individuals.
8      Q   Well, my question is specifically about
9  EB-5 funding.  Did you tell them not to mention
10  that you were seeking EB-5 funding?
11      A   No.  No.  I never would've said that.
12      Q   Did you tell them that the hotel would
13  be open in October of 2014 and that they would be
14  invited to an opening ceremony?
15      A   I don't know when I told them the hotel
16  would be opening.  I'd have to look at the time
17  frames, but --
18      Q   It looks like they came over at the end
19  of January of 2014 or so.
20      A   Well, there's about a year left to
21  finish the project today.  So -- maybe ten months
22  if you push it.  So I don't know when they came.
23  Did the money just come in, or was it already full
24  construction?  I don't know -- I'd have to see a
25  timeline.  We had a timeline --

Page 464

1      Q   I'm just asking if you recall --
2      A   Yeah.  I don't.  I don't.  But I did --
3  I did -- we were going to do a big opening, and
4  still plan on it.
5      Q   Looking at Exhibit 179, on 3/11/14,
6  again, these are in chronological order.  The
7  email Bates labeled 12371.  Take a look at this
8  email.
9      A   Oh, I remember this.  This was about
10  some guy that didn't like the hotel or something.
11  And Joe was mad, I remember.  There was
12  a guy that was mad and Joe was mad because he was
13  mad.
14      Q   Well, take a minute to read.
15      A   Yeah.  He was upset on my walk-through,
16  I remember.  He might've asked me a question, and
17  I would've said -- if they told him something and
18  it wasn't true, I probably said, oh, no, we're not
19  opening the hotel in ninety days, it's going to
20  take me a year and a half to finish.  But I
21  didn't -- I told the truth, and I think Joe was
22  mad at me.  I don't know what I said to him but
23  whatever I told him was the truth, and Joe was mad
24  at me because I didn't play his whatever he wanted
25  me to say.  And that's what that is.

Page 465

1      Q   So do you recall with this potential --
2      A   Absolutely.
3      Q   -- potential investor who was associated
4  with this Arturo Venti --
5      A   Yes.
6      Q   -- and discussing the project?
7      A   Yes.
8      Q   Okay.
9          Did you follow-up on this email after
10  Joe sent you this email that, "Please speak Arturo
11  and get to the bottom of this.  Let me know what
12  happens, please"?  Did you or anyone else on your
13  behalf speak with Arturo or Mark Payne?
14      A   I don't know.  I mean, I think Mark
15  would remember better than me, but I don't
16  remember.  Mark may have called him and asked what
17  was wrong.  I don't remember what it was, but
18  there was some issue that he didn't like.
19      Q   So you don't recall?
20      A   I don't.  I'm sorry.  I don't.
21      Q   Let's turn to the 3/14/2014 email.  Other
22  than Effie and the initial large group of
23  investors, do you remember another Chinese agent
24  visiting at any point?
25      A   I'm sure there would've been at least a

SEC_000793

Page 466

1    couple of others that came through.
2         Q    Let's look at 3/18/2014. Did anyone
3    bring any Brazilian -- potential Brazilian
4    investors to visit the hotel?
5         A    Yeah. I thought it was -- I thought it
6    was -- it thought it was Kevin. Yeah. I didn't
7    know who brought them. Somebody did. So Kevin
8    asked me to walk them through, I guess.
9         Q    Did it ever happen? That's my question.
10        A    I don't know.
11        Q    You don't know?
12        A    Don't remember.
13        Q    Okay.
14             Lastly, in April of 2014, April 21st,
15   2014. Take a look at this email and tell me if
16   you recall these individuals visiting at this
17   time, at or about this time.
18        A    I don't remember, but I probably met him
19   and walked him through.
20        Q    But you don't have a specific memory of
21   meeting these individuals?
22        A    No.
23        Q    So, generally, you met with investors on
24   an average between three to four times?
25        A    Plus the big group, which was twenty to

Page 467

1    twenty-five people.
2         Q    Okay.
3              And at those meetings, you generally
4    just discussed the project itself?
5         A    The hotel and the construction and the
6    finishes and the model.
7         Q    And you did not discuss how the investor
8    funds were being used?
9         A    No, never.
10        Q    Did you discuss anything else, other
11   than what you've mentioned?
12        A    Just I was pretty passionate about the
13   hotel and excited about it.
14        MS. SPRINGER-CHARLES: All right. Let's
15   go off the record.
16        (A brief recess was taken.)
17        MS. SPRINGER-CHARLES: Back on the
18   record at 12:38 p.m. on February 13th, 2017.
19        BY MS. SPRINGER-CHARLES:
20        Q    The loan documents that saw earlier that
21   you forwarded a copy to Kevin, Kevin forwarded you
22   back — I mean, to Ryan, Ryan forwarded you back a
23   signed copy that he executed, and I think we saw
24   an email where Mark Payne sends you a
25   fully-executed version later that day — later

Page 468

1    that year, I think, in August. Did you know that
2    those documents would be attached to the offering
3    materials that were provided to potential or
4    actual agents and investors?
5         A    No. I thought that was a loan between
6    Joe and I on the limited partnership.
7         MS. SPRINGER-CHARLES: Off the record.
8         (Whereupon, at 12:42 p.m., a luncheon
9    recess was taken.)
10             A F T E R N O O N   S E S S I O N
11        MS. SPRINGER-CHARLES: We're back on the
12   record at 1:36 p.m. on February 13th, 2017.
13        BY MS. SPRINGER-CHARLES:
14        Q    Mr. Matthews, did you have any
15   substantive discussions about this matter with any
16   member of the staff while we were off the record?
17        A    No.
18        MS. SPRINGER-CHARLES: I would like to
19   ask the Court Reporter to mark a copy of this
20   11/17/2013 email from rvmatt22@gmail.com to Kevin
21   Wright as Exhibit No. 180.
22        (SEC Exhibit No. 180 was
23        marked for identification.)
24        BY MS. SPRINGER-CHARLES:
25        Q    I'm showing you what's been marked as

Page 469

1    Exhibit No. 180.
2         MS. IVORY: Did you receive this email?
3         THE WITNESS: Yes.
4         MS. IVORY: So could you help me
5    understand, I guess, the basis of this email or --
6         THE WITNESS: I think Kevin was asking
7    me how much do I think was spent, and he needs a
8    guesstimate now, and I answered twenty million.
9         MS. IVORY: So that twenty million, what
10   did that consider, only cost that you
11   out-of-pocket put into the project, or --
12        THE WITNESS: Well, now I'm going to
13   have to read the dates and all that and see, make
14   sure.
15        MR. REINHART: This is about two and a
16   half months after you buy the hotel back and
17   close.
18        THE WITNESS: Oh, thank you.
19             It's a typo, how much has been already
20   spent on construction on construction.
21             I guess I'm guessing twenty million, but
22   if it's right when we bought it, it couldn't have
23   been-- then he's asking how much was spent on the
24   hotel maybe from the beginning. I don't know. If
25   it was right when we bought it, we couldn't have

SEC_000794

Page 470

1  spent twenty million, unless he's counting spent
2  on the hotel buying it and then doing
3  construction, but even then, I couldn't spend that
4  much money.
5      MR. REINHART:  Well, I think what
6  they're asking you, if that was you respond back,
7  you're the one who puts the twenty million dollar
8  number out there?  So I think her question was:
9  What were you considering when you said twenty
10 million?
11     THE WITNESS:  I would've known what this
12 was about back then.  It's a little different.
13 Kevin might've talked to me and said, oh, how much
14 do you think we spent on the hotel from when it
15 was bought back in '06?  I have no recollection on
16 what it was.  I can't tell you.  But back then I
17 guessed twenty million.  So it certainly would've
18 been what he spent on the hotel in the last three
19 months or anything like that.  So I'm thinking the
20 question is, how much was spent in the hotel in
21 the past?
22     BY MS. SPRINGER-CHARLES:
23   Q   By whom?
24     A   I don't know.  I mean, he asked me to
25 make a guesstimate.  I made a guesstimate.  I

Page 471

1  don't really recall by who.  That could've been
2  Glenn, and Glenn was maybe twelve.  So that
3  could've been Glenn -- what Glenn spent, because
4  that was one of the questions at one time.
5      MS. IVORY:  Okay.
6      THE WITNESS:  And then another eight,
7  the eight I threw in.  I don't -- that actually
8  makes sense a little bit.  It could've been that.
9  It could've been the eight and change that I
10 borrowed.  Remember, the mezz money.
11     MS. IVORY:  Okay.
12     THE WITNESS:  And then what Glenn spent.
13 Maybe he spent between eight and twelve, and I
14 spent the eight, plus another three or four.  So
15 that could very well be what it was.
16     MS. IVORY:  Okay.  So total money spent
17 before the actual acquisition?
18     THE WITNESS:  Today sitting here, I
19 can't think of any other logical answer why I
20 would've said twenty million.
21     MS. IVORY:  And could you think of any
22 reason why he would want that information from
23 you?
24     THE WITNESS:  Oh, they asked me many
25 questions, you know.  I don't know why.

Page 472

1      MR. REINHART:  He said mezz, M-E-Z-Z,
2  like mezzanine.
3      MS. SPRINGER-CHARLES:  I'll ask the
4  Court Reporter to mark a copy of this 1/3/2014
5  email chain.  The first email is Jade Yu to David
6  Levinson and Kevin Wright with a blind copy to
7  you, Mr. Matthews, and its attachments as Exhibit
8  Number 181.
9          (SEC Exhibit No. 181 was
10         marked for identification.)
11     THE WITNESS:  Can I just go back real
12 quick?  There's probably going to be an AIA
13 document that would go out and tie out that
14 number.
15     MS. IVORY:  Okay.
16     THE WITNESS:  Because I saw an AIA
17 document today, and it said, approximately, spent
18 to date eighteen.
19     MS. IVORY:  Okay.
20     THE WITNESS:  And so this could've been
21 the next two over the next couple -- say the next
22 month and a half, you could've easily spent
23 another two.
24     MS. IVORY:  Okay.
25     THE WITNESS:  So if you found an AIA

Page 473

1  document around here, that's probably what it's
2  going to tie to.
3      MS. IVORY:  So maybe let's take a look
4  at this document that was just marked Exhibit 181.
5      MS. SPRINGER-CHARLES:  Mr. Reinhart, I'm
6  sorry.  The attachments are not on your copy of
7  your document.
8      MR. REINHART:  That's all right.  I can
9  peek.
10     MS. IVORY:  So, yes, can you take a look
11 at this email.  Maybe that will help you recollect
12 the twenty million, or the basis of the twenty
13 million.
14     THE WITNESS:  Well, there's the thing
15 that says it was about twenty million, two
16 eight-five.
17     MS. IVORY:  Okay.
18     THE WITNESS:  And there's an AIA, but it
19 doesn't have that piece of paper that needs to be
20 there on it that shows what was spent.
21     MS. IVORY:  Okay.
22     So on the first page, which is ending in
23 Bates 18680, there's the second paragraph where it
24 looks as if David has provided a reconciliation of
25 twenty-two million dollars.  If you can take a

32 (Pages 470 to 473)

Page 474

1  look at that, and I believe you response right
2  below it in bolded font.
3      THE WITNESS:  Right.  And I believe that
4  when I guessed that Glenn had spent twelve, that I
5  guessed very accurately.
6      So I'm not sure.  So he's asking
7  questions, and then we're confirming what the
8  answers are.  So say again what the question is.
9      MS. IVORY:  It appears, though, because
10  the email is to David Levinson, and it's from
11  Jade --
12      THE WITNESS:  Right.
13      MS. IVORY:  -- but Kevin writes on this
14  top email, he wrote bcc'ed on it.
15      THE WITNESS:  Right.
16      MS. IVORY:  So just based on it, it
17  looks like the responses from Jade are in bold.
18      THE WITNESS:  Right.  Correct.
19      MS. IVORY:  With the questions unbolded,
20  I guess.
21      So my question is:  It seems like in the
22  second paragraph, there's a reconciliation of
23  twenty-two million dollars here.
24      THE WITNESS:  Correct.
25      MS. IVORY:  Can you explain to me what

Page 475

1  you believe maybe this twenty-two million dollars
2  represents.
3      THE WITNESS:  I think it's really clear.
4  It's saying how much was spent as of 11/15/12,
5  it's saying twenty million, two eighty-five.
6  They're saying does one seven spent -- the cost in
7  2013, and she's saying no.  In 2103, Glenn spent
8  four point seven.  So this should tie out with the
9  AIA.  If you would have those missing pages, you
10  would see it tie out on what was spent.  Jade
11  wouldn't have just made up a number.
12      MS. IVORY:  Right.
13      So I'm asking you on the second
14  paragraph it starts, so, approximately, twelve
15  million that Glenn spent.
16      THE WITNESS:  Right.
17      MS. IVORY:  It goes out and it says that
18  in an attachment after it shows how much Glenn
19  spent from, I guess, 2009 to '12.  Then it goes to
20  what was spent in 2013.  We're trying to reconcile
21  to twenty-two million dollars.  And I'm asking
22  that question, because before we spoke of
23  twenty-two million dollars in developer cost that
24  were spent during the period.
25      THE WITNESS:  Oh, I see what you're

Page 476

1  trying to ask me.  Yeah.  It doesn't -- I don't
2  know.  Is that what they're trying to do, tie out
3  that number?  I don't know.  Let me just read it.
4  I know the answer says five point three was spent
5  previously under Royal 160.
6      BY MS. SPRINGER-CHARLES:
7      Q   Maybe if I introduce the earlier emails
8  with the attachments and such, it'll help to have
9  a better discussion.
10      A   Do we have the 11/1/13 attachment that
11  shows the breakdown?
12      Q   I'm going to introduce it.
13      A   Okay.  Because I think that will help a
14  lot.
15      MS. SPRINGER-CHARLES:  Let's go off the
16  record for a second.
17      (A brief recess was taken.)
18      (Ms. Ivory leaves the room.)
19      MS. SPRINGER-CHARLES:  Let's go back on
20  record.
21      BY MS. SPRINGER-CHARLES:
22      Q   Mr. Matthews, did you have any
23  substantive discussions with any members of the
24  staff while we were off the record?
25      A   No.

Page 477

1      Q   We had a pending discussion going, but
2  we're going to make a few copies so that we can
3  show you some documents to help refresh your
4  memory as to what exactly was being discussed in
5  that 1/3/14 email, Exhibit No. 181.
6      MS. SPRINGER-CHARLES:  But I'd like to
7  move on at this time to ask the Court Reporter to
8  introduce this email.  It's a 11/12/13 email from
9  Kevin Wright to Mr. Matthews, I believe, as
10  Exhibit No. 182.
11      (SEC Exhibit No. 182 was
12      marked for identification.)
13      BY MS. SPRINGER-CHARLES:
14      Q   I'm showing you what's been marked as
15  Exhibit 182.
16      Earlier, you testified that someone told
17  you that Palm House Hotel, LLLP, one of its
18  investors had received its I-526 approval.  Can
19  you tell me what you recall about that, and if
20  it's related to this email that you received from
21  Kevin.
22      A   This email?
23      Q   Exhibit 182.  I'm sorry.  Yes.
24      A   It's not related to that email.
25      Q   Exhibit 182, the one in your hand.

33  (Pages 474 to 477)

## Page 478

1    A   Correct.  Okay.  So this is the one I
2   was talking about earlier where they said that the
3   526 was approved and someone said -- Mark sent out
4   the wrong email.  So Kevin says it's not approved.
5        Q   Well, it looks like you sent that email
6   to Kevin.  Do you see that?
7        A   Oh, yeah, I must've told Kevin that the
8   526 got approval in a conversation.
9        Q   And then Kevin asked, is that correct,
10  and you responded, no, Marcus sent out the wrong
11  email --
12       A   Sent out the wrong email.
13       Q   -- exclamation mark?
14       A   Right.  Right.  So Marcus told me --
15  somewhere there's an email where Marcus said we
16  have 526 approval, and I thought that was a good
17  thing, whatever a 526 approval is.  And I think I
18  told Kevin we had a 526 approval, and then I found
19  out that we didn't have a 526 approval.
20       Q   Okay.  So to clarify, at or about this
21  time, November of 2013, that that was not true,
22  correct?
23       A   Yes.
24       Q   Okay.
25       A   One hundred percent.  Somewhere Marcus

## Page 479

1   had sent me one that -- or told me on the phone
2   that we really didn't have it.
3        Q   Okay.
4            Do you know whether Kevin ever
5   communicated to any potential actual investors
6   that the Palm House Hotel, LLLP, that one of its
7   investors had been approved, had had its I-526
8   petition approved?
9        A   No, I have no idea.
10       Q   Did you ever make that representation to
11  any actual or potential investor or agent?
12       A   No.  I did for a short period of time
13  think we did have one, and I probably was excited
14  and told Kevin, we got a 526, whatever that means.
15  I just knew it was the next step in the process.
16       MR. REINHART:  Listen to her question,
17  which is:  Did you ever say that to an investor,
18  an agent, or anyone affiliated with an investor?
19       THE WITNESS:  No.  No.
20       BY MS. SPRINGER-CHARLES:
21       Q   I've placed in front of you a stack of
22  documents -- exhibits that I'd like to go through.
23  The first one starts with Exhibit No. 53.  It's an
24  excerpt from an investor file.  And I'd like you
25  to look at the first -- the first document in this

## Page 480

1   exhibit is a cover letter, but it's then followed
2   by a PPM that's dated 12/2/2012.  Can you flip to
3   the PPM.  Have you ever seen this PPM that's dated
4   12/2/2012?
5        A   No.
6        Q   If we keep going -- well, we talked
7   previously about the first business plan.  We saw
8   before an email that you saw at least a draft of
9   it.  Okay.  Is that correct?
10       A   I did, yes.
11       Q   And then you probably read a draft of
12  it?
13       A   No, I never read the whole thing.  I
14  read the numbers of the hotel and the
15  construction.  That's the only part I focused on
16  because that's the only thing I thought was
17  important for me.
18       Q   In this package -- and I think that is
19  consistent with your prior testimony.
20           In this package, there is a limited
21  partnership agreement, if we keep flipping
22  through.  And these aren't Bates labeled.  I'm
23  sorry.  But you'll come upon a document titled,
24  Limited Partnership Agreement.  Well, before that,
25  after the business plan -- let's just go in order

## Page 481

1   to make it easier.
2        MR. REINHART:  Is there a page number in
3   the exhibit?
4        MS. SPRINGER-CHARLES:  No.
5        MR. REINHART:  Because I have page
6   numbers.
7        MS. SPRINGER-CHARLES:  Because it's a
8   composite exhibit, so, yeah.
9        BY MS. SPRINGER-CHARLES:
10       Q   All right.  If you flip passed the
11  business plan, the next document that you get to
12  is an economic study.
13       A   Okay.
14       Q   That's dated December 18th, 2012 that, I
15  believe, it says it's prepared by Michael K.
16  Evans.  Did you read that document?
17       A   No, but I know he did one.  I gave him
18  information for it.
19       Q   But did you read it?
20       A   No.
21       Q   The next document -- I'll wait for you
22  to get there.
23           So after the business plan, this
24  document, did you read the economic study?
25       A   No.  I could've looked to see if he had

34 (Pages 478 to 481)

SEC_000797

Page 482

1 the right construction numbers or something, but I
2 didn't read it.
3   Q   Okay.
4       You didn't read it in its entirety?
5   A   I never read any of them.
6   Q   Okay.
7       After that document, we'll get to a
8 document titled, Limited Partnership Agreement.
9   A   I never even remember seeing that one.
10  Q   It's dated 11/30/2012. Do you recall
11 seeing it?
12  A   Never.
13  Q   Did you see the PPM and not read it?
14  A   No. I mean, even that one, I don't
15 recognize any of it. They could've sent me the
16 PPM and asked me to comment, and I never did. I
17 never would. In fact, I think David did send it
18 to me once, and I just ignored it.
19      MR. REINHART: I think her question was:
20 Did you ever see the limited partnership
21 agreement?
22      THE WITNESS: No, I never did.
23      (Ms. Ivory enters the room.)
24      BY MS. SPRINGER-CHARLES:
25  Q   There's an Accredited Investor

Page 483

1 Questionnaire that's also attached to this
2 document. Did you ever see a -- did you ever read
3 any version of the investor questionnaire?
4   A   No.
5   Q   There's a subscription agreement that's
6 also attached to the PPM in Exhibit 53, dated
7 11/24/12. Did you ever read the subscription
8 agreement?
9   A   No. I saw that the other day for the
10 first time.
11  Q   The first time you saw the escrow
12 agreement was when, in testimony with us?
13  A   No. I saw it in the federal lawsuit.
14 That's the one that Tony Reitz brought up and said
15 it would've been on bank stationary.
16  Q   And so you've never seen that before
17 then?
18  A   No.
19  Q   And we saw the loan document before.
20  A   Yes. And I looked at the first page and
21 saw the interest rate.
22      Which just to clarify, in the loan
23 documents, for my whole life, like the loans on my
24 house or the loan on any of my loans that I've
25 done throughout my career, I've never read the

Page 484

1 loan documents. Somebody else -- somebody would
2 always read it, I assumed, and I would sign it.
3 But I've never -- I could put my hand on the
4 Bible, I've never read one of the loan documents,
5 ever. And it wasn't unusual. And if you ask my
6 lawyers in Connecticut, did he ever read -- they
7 would laugh at you and say, Bob, wouldn't have the
8 attention span to read the loan documents.
9   Q   Well, who did you rely on in this case
10 to read the loan documents?
11  A   I just relied that Joe -- this was his
12 deal. I relied that he was doing what he was
13 getting paid to do. A hundred percent on him from
14 the very first agreement, that if you look back in
15 the very beginning when he was going to raise
16 sixty-two five. So when he set out the EB-5 and
17 he had four pages of what an expert he was with
18 everything. So I totally relied on him for all of
19 that. I didn't even question it. It wasn't even
20 a maybe. So it wasn't -- I just want to clarify,
21 it wasn't unusual for me not to read the loan
22 documents. I've never read loan documents in my
23 life. Maybe the most I would say is, what's the
24 interest rate, like I would make sure they had the
25 right interest that they told me they were going

Page 485

1 to do.
2      MS. IVORY: So the last time we spoke,
3 we spoke of, I guess, a loan that you had before
4 that was cross-collateralized and cross-defaulted
5 where pretty much where you lost the three hundred
6 million dollars before.
7      THE WITNESS: Three hundred and
8 thirty-five, yes.
9      MS. IVORY: So after that experience of
10 the loan document having collateral attached
11 across all of your properties, you still didn't
12 want to read the loan document?
13      THE WITNESS: Yeah. Because in my mind,
14 it was pretty simple. He's raising it. That was
15 me being arrogant. That was me being arrogant and
16 not reading, not having a lawyer and read the loan
17 documents. This was a guy that was going to raise
18 the money. I wasn't really worried about it. It
19 didn't even make any sense to me. Because I even
20 knew the loan he was doing. He talked to me
21 orally and said, hey, this is this loan, but by
22 the way, we're going to do one with -- I want to
23 do a prepaid deal with you. And that's why we
24 were working on those calculations. I never
25 really even believed that that was the loan that

SEC_000798

Page 486

```
 1  was going to be the ultimate thing.  I always
 2  thought he would do a deal and he would end up
 3  getting about four million dollars on a fee, which
 4  that's why Jade was running present values on it.
 5  So it wasn't -- it's just not my nature to read
 6  the loan documents.
 7        BY MS. SPRINGER-CHARLES:
 8     Q   But didn't you think it would be
 9  important for the investors to know what the
10  actual terms of your agreement was?
11     A   No, not at all --
12        MR. REINHART:  Listen to her question.
13  Listen to her question.  She's asking about the
14  investors, not about you.  Her question was: Don't
15  you think it was important that the investors know
16  the actual terms of the deal?
17        THE WITNESS:  Oh, do I think that the
18  investors should know what the deal is?
19  Absolutely.  Yes, one hundred percent, I think the
20  investors should absolutely know what their deal
21  was and what they were doing.
22        BY MS. SPRINGER-CHARLES:
23     Q   So then why didn't you read the offering
24  materials to see what they were being told about
25  how their funds were being invested and, you know,
```

Page 487

```
 1  what the return was going to be and whether it
 2  would be prepaid interest or not?  Why didn't you
 3  read the documents to see if they were being told
 4  that stuff?
 5     A   He told me pretty clearly that they got
 6  a minuscule interest rate, something below one
 7  percent.  I think it's zero point two five or zero
 8  point three five interest.  And that they wanted
 9  their money back, but mostly they wanted their
10  green cards.  That's what I was told, that most of
11  them didn't really care about the money.  They
12  really wanted their green cards.
13        And I met a couple of them, and the ones
14  that I met just were like so excited to be in the
15  States, and they seemed very like -- like it was a
16  big deal just to be here.
17        So I wasn't really thinking about what
18  the investor wanted, because that wasn't my end of
19  the year.  My end was to do a hotel, do a really
20  good design, do a really good construction budget,
21  make sure I get those eight average daily rates.
22  Mine was the business side of the deal.  That's
23  what I focused on.  And I was good at that side of
24  the deal.
25     Q   I understand that, but I saw in one of
```

Page 488

```
 1  these emails between you and David Derrico related
 2  to the loan documents, getting them executed.
 3  David says, "Hi, Bob, Marcus said he would speak
 4  to you yesterday" -- and it's Exhibit 173 --
 5  "regarding the loan documents for Palm House and
 6  to send them your way for signature.  We have
 7  filed a few I-526 applications for Palm House
 8  investors already, so the sooner we get these docs
 9  signed and included in our submission packages,
10  the better."
11        So at this point, are you not aware that
12  the loan documents are going to be a part of the
13  I-526, at least the submission package to the
14  USCIS?
15     A   Is this the loan docs that I got, and
16  then I forwarded to Ryan three months later?
17     Q   Right.
18     A   Yeah.  It came in.  I didn't pay
19  attention.  Three months go by, someone calls up,
20  hey, we've got to get this done.  I'm like, oh,
21  okay, I'll forward it to Ryan.  I didn't even --
22  it wasn't even my purview.  I was over here
23  focusing on with lots and lots of employees and
24  all kinds of decisions trying to do a really good
25  job on the other side.
```

Page 489

```
 1     Q   I guess my question is:  At that point,
 2  didn't you think -- maybe you didn't read it
 3  before, but at this point, when you know that this
 4  document is going to be submitted with these
 5  investors' I-526 petitions to the USCIS, didn't
 6  you think it would be important to read that
 7  document at that time?
 8     A   No.  Why would I think it would be
 9  important?  You guys need to get in my head.  He
10  was doing that.  That was his job.  Here's his job
11  over here.  Here's my job over here, make the
12  hotel work, build it, do a great job.  I wasn't
13  even thinking about raising the money.  Yeah, if
14  he spent me three or four people to walk through
15  on a bus load, I would walk them through and show
16  them the hotel.  But that just wasn't in my
17  purview.  It just didn't even make any sense for
18  me to inject my opinion over on what he's doing
19  because he was the expert.  Plus, the guy was a
20  mania with an unbelievable temper.  I was never
21  going to interfere with whatever he was going to
22  do, because I didn't know that world.  I still
23  don't know the world.  I still don't understand.  I
24  don't even know what a 526 is, as we sit here
25  today.
```

SEC_000799

Page 490

1    Q   I guess -- and this will be the last
2  question on this, you say it's just his world, but
3  the loan document is between Palm House, LLC --
4    A   LLP.
5    Q   -- LLC and -- Palm House, LLC and Palm
6  House Hotel, LLLP.  The agreement are between
7  those two entities.  So it wasn't just his world,
8  right?
9    A   Yeah, but that agreement was, Bob,
10  what's the interest rate?  Remember, if you read
11  the first document, it started out a LIBOR, plus
12  point zero eight, do you remember, the very first
13  document.  Then he changed it to something.  Then
14  he changed it again.  At the end, he went four
15  point two two.  I would've looked at that four
16  point two two.  I knew in my head that it had, I
17  think, a seven-year window.  Five years, it was
18  supposed to be due with a two-year extension.  I
19  knew that part of it.  That's all I cared about,
20  when do I have to pay it back?  I wasn't worried
21  about whatever the rest of it said.  I knew the
22  interest rate, and I knew when it was due.  Just
23  like any deal I'm doing, what's the interest rate,
24  when's it due?  That's it.  You wouldn't worry
25  about anything else if you're a developer.

Page 491

1    Q   So you weren't worried about what was
2  being disclosed to investors?
3    A   I wasn't even thinking about it.  It
4  wasn't my job.  It wasn't what I was supposed to
5  do.  It just wasn't.  And it wasn't typical for me
6  not to read a loan document.  My whole career,
7  which I've done really well until this, I never
8  read the loan documents.  I knew what the interest
9  rate was.  I tried to get as low as I could.  That
10  was my big thing.  And I knew I had at least five
11  years to get it back.  And I knew what my
12  projection was.  Like if you ask me about, Bob,
13  did you think could sell these as a condo hotel at
14  this per foot, did you think you could sell eight
15  a year, like I would be good at that.  You could
16  ask me that and that would be my expertise.  This
17  wasn't.
18       I knew he was lending me money, and I
19  would pay it back five, seven years from now, and
20  I knew that that was like secondary.  In my mind,
21  that was like -- in my mind, that was like
22  twenty-five percent.  The other seventy-five
23  percent is to do a good job to make sure they get
24  their green cards.  That was the part I thought
25  getting the hotel up and running and meeting the

Page 492

1  construction budget, that's what I thought was the
2  most important thing.  To this day, I believe that
3  in my heart, that they want to get the green cards
4  first.
5       MR. GALDENCIO:  Mr. Matthews, are you
6  familiar with the term "covenants" in a loan
7  agreement?
8       THE WITNESS:  Covenants.  Things you
9  can't do, covenants?  I don't know.
10       MR. GALDENCIO:  Have you ever
11  experienced reading covenants in the loan
12  documents?
13       THE WITNESS:  If a covenant says, for
14  example, what your debt service would be, so a
15  covenant might say it has to be one point two to
16  one debt coverage.  So I you have a million
17  dollars coming in, you know, you could service --
18  or you have a million two coming in, you could
19  service a million dollar loan.  They wouldn't
20  count that extra point two percent.  If that's a
21  covenant, then I know what that is.
22       MR. GALDENCIO:  You had experience with
23  covenants that would trigger foreclosure, other
24  than failure to pay?
25       THE WITNESS:  No.  In my mind, in the

Page 493

1  world of lending, the covenant -- if you had an
2  ongoing investment income-producing property,
3  which this wasn't at that point, so if it's an
4  office building backed with JP Morgan, and you had
5  X-amount of income coming, when they gave you a
6  loan, they would make sure you had a point two, an
7  extra twenty percent coverage.  Then you would
8  have a term and an interest rate, and then when it
9  was due.  Those were the most important things.
10       I mean, could there be some other
11  things?  I think some of them would be like if you
12  were insolvent or you went bankruptcy, then it
13  could be due, but other than that, most people, as
14  long as you pay them monthly, they left you alone
15  and you didn't have any issues.
16       MR. GALDENCIO:  No.  Don't you think
17  those covenants are important to know what could
18  trigger foreclose?
19       THE WITNESS:  I never even thought about
20  i.  I couldn't imagine why someone would foreclose
21  if I did what I said I would do.  It wouldn't even
22  make any sense to me.
23       BY MS. SPRINGER-CHARLES:
24    Q   Since we're here, let's look at an
25  example.  I don't believe that this is the final

37  (Pages 490 to 493)

Page 494

```
 1    executed loan agreement, but I think the clauses
 2    I'm going to talk about is in that document.  So I
 3    think it's safe for us to look at it.
 4            Exhibit 53, turn with me to the loan
 5    documents.  They're at the back of Exhibit 53.  Are
 6    you there?  Let's just walk through some of terms
 7    of this document.  The interest rate on the second
 8    page of this document is four point two two,
 9    correct, and you knew that?
10        A   Correct.  And the term above it.
11        Q   The five-year term at the first — I
12    guess the first advance.
13            Let's look at number one under, Payment.
14    It says, "The borrower," which is Palm House, LLC,
15    "shall make interest only payments monthly on the
16    balance of all advances until the expiration of
17    five years from the first advance."
18            Now, these documents are attached to the
19    offering materials that investors get, but I feel
20    like you've already testified that you didn't plan
21    to make monthly interest payments; is that
22    correct?
23        A   No.  The loan I knew had monthly
24    interest payments, but I know on his other deals
25    he always wanted to do a pre-payment deal.  He
```

Page 495

```
 1    wanted the cash up front.  So I knew that.  So I
 2    knew he was going to try to negotiate a deal.  I
 3    knew this is what was signed, exactly the five
 4    years and the four point two percent, and I knew
 5    they were monthly or quarterly payments.  But I
 6    also knew that he was telling me, and Marcus was
 7    tell me, that they're going to do like they did on
 8    Royal Palm and like the one with Jack Nicklaus's
 9    son, and they were going to try to get the
10    payments upfront.
11        Q   And we saw in our last day here that we
12    saw that one agreement that you said this is the
13    only thing I signed, and in that agreement, it
14    does provide for prepaid interest, correct?
15        A   Right.  Right.
16        Q   However, investors are being told that
17    they're monthly interest payments.  You never
18    intended to make monthly interest payments,
19    correct?
20        A   No.  I would've thought -- if Joe
21    didn't come to me and can say, hey, Bob, I want to do
22    a deal, and I want to prepay the interest, would I
23    have done that deal with him?  Probably I
24    would've.  But at this point in time, I was
25    planning on making monthly payments.  But I knew
```

Page 496

```
 1    in the back of -- I knew what was going on with
 2    everybody else.  And Mark had told me he's going
 3    to try to do a deal for prepayment.
 4        Q   Well, we can look back at the last
 5    document that we got.  I know the date in that
 6    document is well before this 11/30/2012 --
 7        A   Right.
 8        Q   -- that the discussions of prepaid
 9    interest was well before it.  It was in April of
10    that year and subsequently.  So you knew at that
11    point that it was going to be a prepaid interest
12    situation, correct?
13        A   No.  I knew he -- I had this deal.  This
14    is the deal I had, this four point two two with
15    five years, but I knew Joe was talking about doing
16    a deal, the half of pre-payment.  So I had Jade
17    run numbers, which I went over with you last time,
18    on what the discount rate would be, the present
19    value, so -- because I don't know who would be
20    stupid enough if you had a loan with monthly
21    payments -- this gentleman will understand.  I'm
22    sorry.  I forgot your name, but --
23            MR. GALDENCIO:  Tim.
24            THE WITNESS:  Say it gain.
25            MR. GALDENCIO:  Tim.
```

Page 497

```
 1            THE WITNESS:  Tim will understand that
 2    if you have a loan payment with monthly payments
 3    over five years, and you went to the guy and said,
 4    hey, I'll pay you upfront, you're going to get a
 5    discount.  If you don't, you're a fool.  And so I
 6    knew that was going to -- in my mind, I knew he
 7    was going to ask that at some point, but I didn't
 8    know when.
 9            BY MS. SPRINGER-CHARLES:
10        Q   Well, what I'm saying to you is that he
11    did ask it prior to the date of this document.  I
12    can try to pull it.  But I can try to pull the
13    email.
14        A   No.  I believe that he did, but this is
15    what he sent me, and I just forwarded it.  I mean,
16    I think he wanted to at some point do that.  He
17    just never did it.  He didn't do it on this
18    document.  So I would've done that deal with him
19    if he asked me to.  If he gave me a loan document
20    that said we're going to do prepaid interest, and
21    he gave me a discount rate -- I can tell you I
22    remember talking to Mark and telling him, Mark --
23    because Mark was saying, other people get the
24    money, and then they send back like ninety-six
25    thousand dollars to Joe.  And I remember Mark
```

SEC_000801

Page 498

1   telling me, you technically have to send the money
2   to the developer, you can't just deduct it from
3   the five hundred. That's the proper way to do it.
4       And I remember clearly that I thought he
5   was going to want to do that at some point. In my
6   mind, it was at the end of the loan. I really
7   believed that after forty-six five, he'd come
8   back. When he got to like forty-two five of an
9   advancement, he'd say, okay, I'll take the last
10  four, I'll send you the last four, you send it
11  back to me, and that's our deal and let's change
12  this. That's what I thought he was going to do.
13  In my mind, that's what I thought.
14      Q   Did you discuss that with him? That's
15  just what you thought? That wasn't a discussion
16  that you had with him?
17      A   No. That's how -- I thought he would do
18  something like that. At some point, I thought he
19  would contact me --
20      MR. REINHART: Answer her question. Did
21  you actually have that discussion, or is this just
22  something you hypothetically were thinking would
23  happen?
24      THE WITNESS: I had discussions with him
25  about doing a present valued prepayment deal. One

Page 499

1   hundred percent I had the discussion. We never
2   agreed on it, but we definitely had the
3   discussion. We talked about it.
4       BY MS. SPRINGER-CHARLES:
5       Q   My question is: Why isn't that deal the
6   deal that appears in the loan documents that are
7   attached to the offering materials sent to
8   investors?
9       A   I have no idea. He was in charge. He
10  could've done whatever he wanted.
11      I never actually agreed to do a deal to
12  pay him prepaid interest. The concept, I talked
13  to him about, but the numbers, I never did agree
14  with a number to do a prepaid interest deal with
15  him.
16      Q   Well, let's take a look at the emails --
17  or the documents that we looked at last time. It's
18  Exhibit 80. I'll show you what's been previously
19  introduced as Exhibit No. 80. These loan
20  documents are dated 11/30/2012.
21      On 11/25/2012, you send -- if you look
22  at the last few emails in this package, David
23  Derrico, an email, and Joe Walsh, bcc'ing Mark
24  Payne, an email with a management bios.
25      MR. REINHART: Do you have any Bates

Page 500

1   number on that?
2       MS. SPRINGER-CHARLES: The Bates on the
3   email is 42834.
4       MR. REINHART: Oh, thank you.
5       MS. SPRINGER-CHARLES: You're welcome.
6       BY MS. SPRINGER-CHARLES:
7       Q   It attaches the bios, but it also
8   attaches that one agreement that you said is the
9   only document that you had signed if you look at
10  it. Have you found it?
11      A   Yes.
12      Q   And in this agreement, I believe, there
13  is discussion of prepaid interest. It says under
14  the heading to that end, and if you look down a
15  little bit before, it says, "Joe will raise a
16  prepaid amount of interest in this exercise, and
17  that amount shall be three point two percent
18  measured against the amount agreed for the raise."
19      A   This is correct.
20      Q   So prior to this loan document, you had
21  agreed --
22      A   In the very beginning, very beginning,
23  this came to me, and I signed it, and Joe was
24  going to raise sixty-two million, and I was going
25  to pay three point two percent interest at that

Page 501

1   time. So clearly the terms of this agreement
2   changed a lot. But that was the original deal
3   that he was going to do. And if he brought bridge
4   financing, he was going to get paid two percent.
5       Q   Well, you said that this is the only
6   agreement that you entered into. This is the
7   ultimate agreement, correct, is that your
8   testimony?
9       A   My testimony is, this is the only
10  agreement that I signed. Other people signed
11  other things.
12      Q   Right. For you, you personally.
13      A   For me, right.
14      Q   Is this the only agreement you made with
15  Joe Walsh?
16      A   Yes.
17      MR. REINHART: Listen to her question.
18  This is the only agreement you made with him, or
19  the only agreement you signed?
20      THE WITNESS: Well, it's the only
21  agreement that's good. It's the only agreement
22  that I signed with him.
23      BY MS. SPRINGER-CHARLES:
24      Q   Is it the only agreement you made with
25  him?

39 (Pages 498 to 501)

## Page 502

1    A.  No.  Later on, he changed the numbers
2  and the interest rate.
3    Q.  Okay.
4    A.  And he then -- after this agreement, it
5  was going to be thirty-nine five he was going to
6  raise, and then, subsequently, he was going to
7  raise forty-six five.
8    Q.  Okay.  And what was the interest term
9  changed to?
10    A.  The four point four percent -- sorry,
11  four point two percent.
12    Q.  Was it still going to be prepaid
13  interest?
14    A.  No.  He wanted to at some point make it
15  prepaid interest, but we never reached an
16  agreement with him.  I specifically met him when
17  Jade sent me that present value, and I remember
18  having breakfast with him once at Cocina to talk
19  about it, and we never agreed on it.
20    Q.  You never agreed on what?
21    A.  That we would do a prepaid deal or what
22  the discount rate would be.
23    Q.  So what was the agreement?
24    A.  Well, the only agreement is the one
25  that's here.  That's the only agreement that's

## Page 503

1  actually -- the four point two two percent.
2    Q.  Monthly?
3    A.  Monthly, yes.
4    Q.  But you didn't make monthly interest
5  payments, correct?
6    A.  No, but I don't think they were due
7  until after the loan funded.  I didn't think there
8  was going to be any interest payments due until
9  after the loan funded.
10    Q.  What do you mean by until after the --
11    A.  Well, after you closed on the whole
12  loan.  It would've been way too complicated to
13    Q.  The full amount?
14    A.  Yeah.  How would I have done that?  If
15  he sent me half a million, I would've tried to
16  figure out what four point two two percent is for
17  thirty days.  I never would've.
18    Q.  Well, it does say, "Borrower shall make
19  interest only payments monthly on the balance of
20  all advances until the expiration of five years.
21  The balance of all advances and all accrued unpaid
22  interest would be repaid as follows," and then
23  that's how it proceeds.  So --
24    A.  If he sent me a bill, I would've paid
25  it.  He never sent me a bill.  And I was a hundred

## Page 504

1  percent under the impression that at some point he
2  wanted to do a prepaid interest deal.  That's just
3  the way it is.  It didn't change.  No matter what
4  you ask it's not going to change what I thought
5  the deal was.
6    Q.  But my ultimate question is:  That's not
7  what investors were told?
8    A.  I don't know what they were told.  I can
9  only tell you what I know with him.  I didn't deal
10  with the investors on what they were told.  I
11  showed them the hotel.  I walked them through, but
12  I didn't deal with them on that.
13    Q.  We're looking at the loan documents that
14  Palm House, LLC entered into, though, and that
15  agreement has nothing to do with prepaid interest
16  looking at the loan agreement.
17    A.  Correct.
18    Q.  Okay.
19    A.  But, in fact, if it was prepaid
20  interest -- if Joe is going to claim that he got
21  paid prepaid interest, then why did he sue me and
22  say I didn't pay him any interest?  You can't have
23  it both ways.  It's got to be one or the other.
24    Q.  There are other representations and
25  warranties that I think are made in this loan

## Page 505

1  document.  And to go to Tim's question, I just
2  thought, as a developer, wouldn't it be important
3  to know what Palm House was representing that it
4  was going to do?  So, for example, "Collateral.
5  The borrower should execute in favor of the lender
6  the loan and security agreement and promissory not
7  and provide lender with a security interest in all
8  assets of the borrower as security for
9  satisfaction of the loan."
10    A.  If somebody, a bank or a limited
11  partnership, gave me a document to sign that gave
12  them security, it would've been -- I would've sent
13  it to Ryan, and Ryan would've signed it.  I was
14  going to go make a loan document to make a
15  collateral or whatever.
16    Q.  But what were you going to do to make
17  sure that Palm House, LLC met its obligation under
18  the loan documents?
19    A.  I was going to make sure that I did a
20  really good project and pay back all of the money
21  when it was due.  In fact, I was trying to figure
22  out a way halfway through to pay back the money
23  before it was due.  When I realized that Joe was a
24  used car salesman.  I mean, when I started dealing
25  with Joe down the road, I immediately started

SEC_000803

Page 506

1  figuring out ways to pay him off ahead of time and
2  try to get loans to pay him off ahead of time,
3  because the whole program scared me.
4     Q  Well, I'm asking a specific question,
5  though.  One of the representations is that the
6  borrower of Palm House, LLC would provide the
7  lender with the security interest in all assets of
8  the borrower as security for the satisfaction of
9  the loan.  What did you do to ensure that Palm
10  House, LLC was meeting that obligation?
11     A  You would never, as a developer, do
12  anything.  The bank would give you something to
13  sign.  There's no loan where the developer says,
14  oh, let me make up a security interest agreement
15  and give it to you, Mr. Banker.  You would never
16  do that.  They would give it to you at a closing
17  on a loan, and they would have a note, a mortgage,
18  and all these things.  Maybe they'd want a UCC-1.
19  And you would sign whatever they gave you.  But it
20  was never incumbent upon the developer to go come
21  up with security or collateral agreements.  It's
22  totally unheard of.  Never heard of it in my life.
23     Q  Okay.
24       "The borrower conducts its business
25  solely in its name without the use of a trade name

Page 507

1  or the intervention of or through any other entity
2  of any kind, other than as disclosed on any
3  addendums attached hereto."
4       What did you do to ensure that that
5  provision was -- that Palm House was going to live
6  up to that provision?
7     A  I think we did trade name Palm House.  I
8  think we did do that.
9     Q  One of the assets, the boat, it wasn't
10  placed in the name of 160 Royal Palm House,
11  correct?
12     A  Correct.
13     Q  Does that violate this provision?
14     A  It very well could, but my counsel said,
15  Bob --
16       MR. REINHART:  Don't talk about what
17  your counsel told you.
18       THE WITNESS:  Oh, sorry.
19       BY MS. SPRINGER-CHARLES:
20     Q  Again, did you look at this document to
21  see provisions such as that one to make sure that
22  Palm House was meeting its obligations?
23     A  No, I didn't.
24     Q  The offering documents also says that
25  the Palm House, the borrower, would provide

Page 508

1  financials to Palm House Hotel, LLLP on a
2  semi-annual unaudited statement, and then I think
3  also later after the close of the fiscal years,
4  audited -- accountant reviewed financial
5  statements.  Palm House also stated that it would
6  provide DE 34 employment reports and form I-9
7  employment eligibilities or verification forms to
8  Palm House Hotel, LLLP.  What did you do to ensure
9  that Palm House was meeting those obligations?
10     A  The workers with all of that, Nicky had
11  all of the workers under control, just because
12  that's ordinary business.  It wasn't because I
13  specially said, let's do it.  That's how you
14  should do business.
15       What were the other parts?
16     Q  Did Nicky provided any documentation,
17  the DE 34 employment reports and the form I-9
18  employment eligibility verification forms to Joe
19  Walsh or anyone else associated with the issuer?
20     A  I don't know, but if Joe asked him for
21  it, he would've given it to him.
22     Q  Did you or anyone else provide any form
23  of financial statements to Joe Walsh or anyone
24  else associated with Palm House, LLLP?
25     A  No.  But it's not unusual to close the

Page 509

1  loan, do the construction, and then give them
2  either quarterly or annual financial statements.
3  So we were prepared to do that.
4     Q  I guess the documents don't say that,
5  that it will happen after the loan is closed.  What
6  they say is, that you provide them on a semiannual
7  basis and also on an annual basis.
8     A  If somebody asked me for an accountant
9  to go in and do a review, I would've done it.
10     Q  Did Joe ever ask you for financials?
11     A  No.  No.  But, typically, how it works,
12  if you're borrowing money, if the lender will say
13  to you, hey, by the way, can you provide this for
14  me, and then you would go get it and provide it
15  for them.
16     Q  Well, in reading this document, that's
17  what the document says, that you would be
18  providing this information.
19     A  Right.  But, typically, there's always
20  an ask.
21     Q  And there was no ask?
22     A  Any bank loan -- any real deal, they ask
23  you to do something, and then you do it.  You're
24  not proactively saying, oh, let me go get a
25  financial statement.  It isn't done like that.

SEC_000804

Page 510

```
 1   I've never had in any of my loans what you're
 2   saying, ever.
 3       Q   So my question is:  No one from the
 4   issuer ever came to you and said, can I have a
 5   copy of the financial statements --
 6       A   No.
 7       Q   -- of Palm House or 160 Royal Palm?
 8       A   Correct.  And if they did, you can see
 9   by my emails, we were always good to give them
10   whatever they ask for.
11       Q   Did anyone ever ask -- anyone associated
12   with the issuer ever ask to inspect the books and
13   records of Palm House or 160 Royal Palm?
14       A   Not that I know of.
15       Q   I'm showing you what's been previously
16   marked as Exhibit No. 4.  It's an email from Ryan
17   Black to you, dated October 13th, 2013.  Here,
18   Ryan is asking you for the historical financial
19   books for Royal 160, "Please get it in Quickbooks
20   or Peachtree."
21           Did you ever provide this material to
22   Ryan?
23       A   If there's an email with it that Jade
24   sent them, then I did.  If not, then I didn't.
25       Q   Do you recall this email?  Do you recall
```

Page 511

```
 1   why he was asking for it at this time?
 2       A   I don't.
 3           Is Royal 160 the old entity that I used
 4   or the one that Glenn set up, 160 Royal?  Which
 5   entity?
 6       Q   160 Royal Palm is the entity -- 160 is
 7   the old entity.
 8       A   Oh, so he's asking for the old entity.
 9   Oh, I --
10       Q   Did you ever provide it?
11       A   I don't think so.
12       Q   Okay.
13           Let's looks at the next email, 11/6/2013
14   on this same Exhibit 4.  Number three -- this is
15   Jade sending you an email.
16       A   Right.
17       Q   Number three, it says -- well, she says,
18   "Bob, Ryan just called.  He filled out the
19   paperwork for Palm House, LLC rather than 160
20   Royal Palm, LLC.  So he's going to resend me the
21   docs.  One, he does not want a debit card issued,
22   so he wrote not authorized in that section.
23           "Two, he would be willing to allow a
24   debit card only if no meals, entertainment, fuel
25   charges are made from that card.  He wants it done
```

Page 512

```
 1   via Express and then reimbursement.
 2           "Three, he wants complete transparency
 3   of the QB files; meaning, he wants remote
 4   accessibility to view QB, or he said he will
 5   coordinate it with the lawyers who did the closing
 6   to go obtain the loan docs, and I would have to
 7   record in the QB.
 8           "He's probably going to call you, unless
 9   you want to make the call ahead of him.  Thank
10   you."
11           And it looks like Jade was trying to set
12   up some bank -- a bank account for one of the
13   entities, for Palm House, LLC.
14       A   This was a continuation of Glenn's
15   entity over that he had with Bank of America.
16       Q   Okay.  He had a bank account for that
17   entity with Bank of America?
18       A   With Bank of America.  And they were
19   trying to transfer it over, as I remember.
20       Q   Did you provide Ryan with these items
21   that he's requesting?
22       A   I don't know.
23       Q   Did you give him complete transparency
24   of the QB files; meaning, he wants remote
25   accessibility to view QB?  Did you provide Ryan
```

Page 513

```
 1   with remote accessibility to view QB?
 2       A   He took it.  I didn't provide it.  He
 3   took it.
 4       Q   He took what?
 5       A   He hacked the server and got his
 6   transparency.
 7       Q   Well, at or about the time of this
 8   email, did you affirmatively give him remote
 9   accessibility to view Quickbooks?
10       A   He could've had it with Jade.  I don't
11   remember, but he could've had it with Jade
12   originally, yes.  He could've.  I don't know.
13       Q   Why did Ryan say that he didn't want a
14   debit card issued?
15       A   I don't know.  But I remember arguing
16   about it saying, I'm not paying for my gas.  I've
17   never done that since I was in business.  That's
18   ridiculous.  I should get health insurance.  I'm
19   making my car payment.  You guys should be paying
20   for my car.  So I really don't know.
21       Q   You told that to Ryan?
22       A   Yeah.
23       Q   Who else did you tell?  Did you tell
24   it to Joe?
25       A   Did I tell it to Joe?  I don't recall
```

42 (Pages 510 to 513)

Page 514

```
 1   telling it Joe.
 2       Q   Why do you believe that you're entitled
 3   to that?  You'd have to give your story on the
 4   record, so why do you believe you're entitled to
 5   the gas and --
 6       A   Well, even my manager would get a car,
 7   in this case a used BMW, an apartment paid for,
 8   health, dental, gas -- even the guys that work for
 9   me got that.  So as a CEO in my companies for my
10   whole career, I've always have that, my
11   manufacturing companies, my software companies. It
12   wouldn't even be a question that they would take
13   care of those things as perks.
14       Q   As perks?
15       A   Absolutely.
16       Q   In looking at the loan documents.  I
17   guess in the business plan, was it disclosed that
18   those items would be taken care of as perks out of
19   the loan proceeds?
20       A   Oh, I have no idea.  I mean, as matter
21   of course, in real life.
22       Q   No.  I know, but I want to know what's
23   actually disclosed in the documents that investors
24   got.  When you provided the numbers of how the
25   funds were going to be used, were those things
```

Page 515

```
 1   line items?
 2       A   I don't think we would've gone to that
 3   level of the gas on a line item.  No, I don't
 4   think so.
 5       Q   What else do you think is a perk besides
 6   the gas?  You said your insurance, your car
 7   insurance?
 8       A   Yeah.  Typically, you would have your
 9   car, your car payments, your insurance, your
10   health insurance, your dentist, your gas.  That's
11   what I can think of as a perk in my mind.
12       Q   Anything else?
13       A   There could be.  I mean, apartment, we
14   gave them apartment, yeah.  Moving expenses.  I
15   remember paying my managers' moving expenses to
16   come down here.
17       Q   I mean for you, for you specifically.
18       MR. REINHART:  You mean on this
19   particular transaction?
20       MS. SPRINGER-CHARLES:  On this
21   particular transaction.
22       MR. REINHART:  I'm sorry.  You're asking
23   what he actually got, or what he -- what perks he
24   generally gets, or what he actually got on this
25   deal?
```

Page 516

```
 1       MS. SPRINGER-CHARLES:  What perks you
 2   thought you were entitled to generally on this
 3   deal, and then what you actually got would be the
 4   next question.
 5       THE WITNESS:  Oh, I don't know what I
 6   actually got, but I know that's, in my mind, what
 7   I was entitled to.  I don't know if they paid my
 8   health insurance.  I'd have to look.
 9       BY MS. SPRINGER-CHARLES:
10       Q   And then the next question:  Was that a
11   line -- when you have an analysis of these are the
12   proceeds I'm going to get, this is how I'm going
13   to use those proceeds, were those expenses
14   included in that?
15       A   No.
16       Q   Let's stick with the loan documents for
17   now.  On pages nine, ten, eleven, and twelve,
18   there are certain representations that are made.
19       MR. REINHART:  Are we --
20       MS. SPRINGER-CHARLES:  The loan
21   documents.
22       MR. REINHART:  Thank you.
23       BY MS. SPRINGER-CHARLES:
24       Q   Let's look at page nine.  Still Exhibit
25   53 just as an example.  Because I think these
```

Page 517

```
 1   provisions that I point out will be in all
 2   versions of the loan documents that I've seen.
 3       Under number four, Representations and
 4   Warrantee, it says, "The borrower, hereby,
 5   represents and warrants to the lender that" -- I
 6   skip the stuff in parenthesis -- well, it says,
 7   "which representations and warrantees will survive
 8   the delivery of this agreement and the making of
 9   any advances of any loan and shall be deemed to be
10   continuing until all loans are fully paid and this
11   agreement is terminated, that," and if we look at
12   A4, "The borrower has all required permits without
13   unusual restrictions or limitations to own,
14   operate, and lease its property, and to conduct
15   the business in which it is presently engaged, all
16   of which are in full force and effect."
17       When we look at what required permits
18   means on page eight, it says it means, "All
19   permits, licenses, approvals, consents, and
20   waivers necessary pursuant to any legal
21   requirement to be obtained from or made by any
22   governmental authority for the ownership by the
23   borrower of its assets or for the conduct of its
24   business."
25       Given the definition of required permits
```

SEC_000806

Page 518

```
1    and its statements, was this statement true for
2    the entire -- you know, from the inception of
3    this -- I guess as of the date of this document,
4    maybe I should ask, as of 11/30/2012?
5        A   So did we have all the permits in place
6    to build a hotel?
7        Q   Without unusual restrictions or
8    limitations to own, operate, and lease its
9    property and to conduct the business in which it
10   is presently engaged, all of which are in full
11   force and effect.
12       A   All the approvals under the 2012
13   approvals were all in place, yes.
14       Q   Looking at the public record, it looked
15   like in July of 2012, the town had denied 160
16   Royal Palm, at that time owned by Glenn, their
17   request for the two-year extension until the next
18   year to finish the hotel pursuant to that original
19   2007 Declaration of Use.  So, again, is that
20   statement still true, given that?
21       A   Yeah, because there's two different
22   things.  One is, you have the approval to build
23   it, and, two, by the way, Glenn because you're
24   late on building it, we're going to nick you two
25   thousand dollar a day, that you're going to have
```

Page 519

```
1    to pay off that fine later.  So --
2        Q   What is Glenn seeking from the hotel?
3    Was he seeking -- what was he seeking from the
4    town?  I'm sorry.
5        A   What was he -- he wanted to get that
6    second two-year extension.
7        Q   Right.  And he had --
8        A   They denied it.  But he still could
9    work, though, under the permit.  He still had the
10   permit to build a hotel.  Otherwise, they would've
11   just stopped all the work and you couldn't go
12   there anymore.
13           So what it was was a monetary damage
14   that wouldn't happened later on.  So say they
15   never negotiated that fine down, at the end, when
16   he went to get his CO, they'd look at him and go,
17   Mr. Straub, give me two million dollars, or we're
18   not going to give you the CO and you can't open
19   the hotel.
20       Q   What about D?  It says, "The borrower's
21   in material compliance with all legal requirements
22   applicable to its property of the conduct of its
23   business, including without limitations those
24   pertaining to or consuming the employment of labor
25   employees that are for the public health safety
```

Page 520

```
1    and the environment."
2            Given that the town had denied the fine,
3    was, you know, Palm House still in material
4    compliance with all legal requirements applicable
5    to it?
6        A   I read it to be that you could go
7    forward, but they're going to make you pay the
8    fine at the end if you don't negotiate it.  That's
9    how I read it.  I mean, you could make an argument
10   the other way, but I don't think it's that strong.
11           MR. REINHART:  You're asking how he
12   reads that today, not whether he read it this way
13   back then?
14           THE WITNESS:  Well, I never read it.
15           BY MS. SPRINGER-CHARLES:
16       Q   Right.  Because I think the point is
17   you've already testified that you did not read
18   this document.
19       A   I didn't.  But I'm reading it when you
20   asked me, and I'm trying to answer the best I can.
21       Q   Right.
22           Let's just turn to page eleven.  It says
23   under the heading of, Conditions of Every Advance,
24   "In addition to all other conditions contained in
25   this agreement, every advance shall be subject to
```

Page 521

```
1    the following conditions precedent that -- and no
2    event of default has occurred and no event shall
3    have occurred or be continuing, which pursuant to
4    the provisions of Section 8 with the lapse of time
5    and/or the giving of a notice as specified therein
6    would constitute an event of default."  And in
7    this document it talks about what would constitute
8    events of default.
9            Prior to Joe Walsh filing the lawsuit,
10   did they ever come -- did Mr. Walsh or anyone else
11   ever declare default?
12       A   No.
13       Q   Okay.
14           What did Joe Walsh, if you know, or
15   anyone else do to determine whether an event of
16   default had occurred prior to sending funds over
17   to you?
18       A   I don't think he did anything.  I think
19   he took a boiler plate loan agreement and sent it
20   in.  That's what I think, but that's just beside
21   the point.
22           MR. REINHART:  The way I think her
23   question was:  From your perspective, were they
24   doing any due diligence or any checking before
25   they sent you money to make sure there was no
```

44  (Pages 518 to 521)

## Page 522

1  event of default in place?
2        THE WITNESS:  No.  We would request it.
3  They would just send it.
4        BY MS. SPRINGER-CHARLES:
5     Q   Under B, it says -- again, this is a
6  condition that needs to happen before every
7  advance is made to Palm House.  That's the way I
8  read it.  It says, "No Material Adverse Change.
9  There shall have been no material adverse changes
10  as determined by the lender in the assets,
11  liabilities, financial condition, or business of
12  the borrower since the date of any financial
13  statements delivered to the lender before or after
14  the date of this agreement."
15        Now, did you Joe Walsh or anyone else do
16  anything to ensure that this provision -- that
17  there were no material adverse changes, as
18  specified here?
19     A   No.
20        MR. REINHART:  Not as far as you know?
21        THE WITNESS:  Not as far as I know.
22        BY MS. SPRINGER-CHARLES:
23     Q   Right, to your knowledge.
24        Let's look at page twelve, under D.  The
25  second sentence says, "The borrower shall pay all

## Page 523

1  taxes, assessments, governmental charges, or
2  levies, or claims of labor, supplies, and rents,
3  and other obligations made against the borrower or
4  any of its properties, which if unpaid, might
5  become a lien or charge against it or any of its
6  properties, except liabilities contested in good
7  faith with the prior written notice of the lender,
8  and, again, which is requested by the lender, the
9  borrower shall maintain reserves in amounts and in
10  form, books, cash, bond, or otherwise satisfactory
11  to the lender."
12        This sentence that I just read, the
13  government was charging a two thousand dollar a
14  day fine at some point, right —
15     A   The Town of Palm Beach.
16     Q   — shortly after the date of this
17  document?
18     A   True.
19     Q   Did you ever discuss with Joe Walsh
20  whether that needed to be disclosed in any of the
21  offering documents provided to investors?
22     A   I did not.
23     Q   But based on this document, it's the
24  obligation of the borrower to take care of that
25  fine, correct, unless — unless the lender is

## Page 524

1  given written consent to and reserves some amount
2  of money to cover any of those charges, that's
3  what this says, correct?
4     A   Correct.
5     Q   Did you know that at the time that this
6  document was created?
7     A   No, but I did satisfy the other lender,
8  just to be clear, Glenn in those loan documents.
9     Q   Elaborate, so that the record is clear.
10     A   So the record's clear, I knew about the
11  fine, and I did a set off on the loan to make sure
12  that that fine could not come back to me.  And so
13  I did a set off in three or four places in the
14  original loan documents -- in the original
15  agreement with Glenn Straub, so that I never
16  really thought about worrying about that fine for
17  me --
18        MR. REINHART:  I'll ask you to clarify
19  something.  You said the original agreement with
20  Glenn Straub.  Clarify what you're talking about.
21        THE WITNESS:  The buy/sell agreement
22  with Glenn Straub.
23        MR. REINHART:  In August of 2013?
24        THE WITNESS:  Yes.
25        MR. REINHART:  Can I ask one follow-up

## Page 525

1  question on what you're asking?
2        MS. SPRINGER-CHARLES:  Sure.
3        MR. REINHART:  I think she asked you a
4  question about whether you ever discussed with Mr.
5  Walsh compliance with that provision of the
6  agreement?
7        THE WITNESS:  No.
8        MR. REINHART:  Did you make Mr. Walsh
9  aware of the fact that this lien was accruing,
10  that the Town was asserting a two thousand dollar
11  lien against the property?
12        THE WITNESS:  Absolutely.
13        BY MS. SPRINGER-CHARLES:
14     Q   And the question is:  When?
15     A   I don't remember when, but I know we
16  talked about it.  I know there was an email that I
17  saw last time that somebody specifically asked me
18  about it, and I answered it then, too.
19        MR. REINHART:  Okay.  To the best of
20  your recollection, did you notify Mr. Walsh of
21  that lien before or after the closing on the
22  property?
23        THE WITNESS:  Before.
24        BY MS. SPRINGER-CHARLES:
25     Q   Before the closing on the property --

SEC_000808

Page 526

```
1      A   Absolutely.
2      Q   -- so before August of 2013?
3      A   One hundred percent.
4      Q   Did you notify him of the potential --
5   the fines weren't accruing at the date of these
6   documents, but the City had already denied Mr.
7   Straub's request for extensions.  So the fines
8   weren't accruing at the time these documents were
9   created.
10     A   Really?
11     Q   I think they started accruing in 2013,
12  in February of 2013, if I'm not mistaken.
13     A   Okay.  I'll believe you.
14     Q   160 Royal Palm filed suit against the
15  Town of Palm Beach on December 27th, 2012 for its
16  failure to grant them the extension of time in
17  which to complete the hotel.
18     A   Yeah.  Why did they file the suit?
19  Because they were getting fined?
20     Q   Well, the fine was set to start running
21  in February of 2013, based on my reading of the
22  evidence in the public domain.
23     A   That makes sense in my mind.
24     Q   Okay.
25         And the question is:  When is the first
```

Page 527

```
1   time that Joe Walsh learned first about the
2   potential of, you know, this fine commencing in
3   February of 2013?
4      A   Well, before we bought the hotel, I was
5   very upfront with Joe with everything.  There were
6   no secrets.  So I know I discussed it with him.  I
7   can't tell you the date, but I know I discussed it
8   with him before this hotel was closed on.  I'm
9   sure of that.
10         MR. REINHART:  I think her question goes
11  to the offering documents.  Do you know whether
12  when these offering documents were finalized and
13  sent out to the investors, was Mr. Walsh aware of
14  the fine or the potential for the fine?
15         THE WITNESS:  Oh, I think he knew about
16  it, yes.
17         MR. REINHART:  And what makes you say
18  that you think he knew about it?
19         THE WITNESS:  Because we talked about it
20  specifically.
21         MS. SPRINGER-CHARLES:  I'm going to ask
22  the Court Reporter to mark this composite exhibit
23  of emails that, they are related to this --
24  the permits and the fines that commences in
25  February of 2013 as Exhibit 183.
```

Page 528

```
1          (SEC Exhibit No. 183 was
2           marked for identification.)
3      BY MS. SPRINGER-CHARLES:
4      Q   I'm showing you what's been marked as
5   Exhibit No. 183.  It's a series of emails that I
6   think you either sent or received related to the
7   fines.  Take a look at this, and then let's
8   discuss, please.
9          In Exhibit No. 183, I see that Ryan
10  Black, at least, was made aware of the potential
11  for fines back in October of 2012; is that
12  correct, if I'm reading these emails correctly?
13  Look at the second email.  Did you send or receive
14  these emails?  Let's make that clear.
15     A   I believe so.
16     Q   Okay.
17         Let's look at the second email, and it
18  says, "Palm House Hotel Issues.  Here's a list of
19  issues that our due diligence has revealed."  And
20  you're forwarding this -- I think you're sending
21  this email to Ryan Black.  Do you see that?
22     A   Okay.
23     Q   And then the attachment says, "Here's a
24  list of issues that our due diligence has
25  revealed.  The Town is prepared to the stick to
```

Page 529

```
1   the February 14th, 2013 deadline for construction.
2   Plans and prints have not been submitted as of
3   October 22nd, 2012 for the function room, lobby,
4   restaurant, and spa."  And it continues.
5          Does this -- so was Ryan Black aware of
6   this at this time?
7      A   Yeah.  I believe this list was --
8      Q   Marisa Bacarella, B-A-C-A-R-E-L-L-A,
9   sent this list.
10     A   I believe this was a list that was
11  prepared for Ryan to try to show to Glenn to try
12  to negotiate the price down.
13     Q   Right.  And we see him have some
14  correspondence with Mr. Evans related to that and
15  some other issues.
16         But my question for you is:  So was Ryan
17  aware at this time?  He was, correct?
18     A   Yes.
19     Q   Okay.
20         Was Joe Walsh aware around this time
21  that the potential for a fine was there?  Because
22  I don't see much discussions with Joe about this
23  fine until November 16th, 2013.  I'm not
24  representing whether or not he knew.  I'm just
25  saying based on what I've seen in the documents
```

46  (Pages 526 to 529)

SEC_000809

Page 530

```
 1    provided, this is the first time I've seen
 2    discussion with Joe Walsh about the fines, or
 3    that -- I don't know if they're about the fines,
 4    but that would have some reference to the fines.
 5        A   If Ryan knew about it and I knew about
 6    it, Joe knew about it.
 7        Q   Do you recall having a specific
 8    discussion with him back in 2012 about the fines?
 9        A   I know I talked to Joe about the fines
10    because it was kind of a big deal.  And that's why
11    I went out of my way to make sure the fines were
12    protected in the agreement with Glenn Straub.  So
13    I believe Joe knew about it.  I don't remember the
14    exact date that we said it.  I don't.  But I know
15    he knew about it.
16        Q   Did you ever have any discussion with
17    him about whether the potential -- I may have
18    asked it already, but I just wanted to make sure I
19    have it on the record -- about whether the
20    potential for the fines to accrue -- to be imposed
21    should be disclosed in the offering materials?
22        A   I never talked to him about that, no.
23        Q   Once the fines were placed, started
24    accruing, did you have any discussions with Joe at
25    that time about whether or not we should now
```

Page 531

```
 1    disclose in these offering documents and any
 2    updated offering documents that they created that
 3    the fines were accruing?
 4        A   No, but I wasn't even thinking about
 5    offering documents just to be clear.
 6        Q   Let's look at 11/16/2013.  It's an email
 7    from Joe to you.  It looks like at the bottom of
 8    it Joe, Jr. forwarded to Joe, Sr. links to two
 9    articles, and he says, "Dad, need these looked
10    into.  The agent said there was a client loss
11    based on these."  And two links are attached.
12        MS. SPRINGER-CHARLES:  I'll ask the
13    Court Report to mark a copy of the articles that
14    were attached to those links.  They weren't attach
15    to the actual email, but I'm going to ask her to
16    mark those as Exhibit 184.
17        (SEC Exhibit No. 184 was
18        marked for identification.)
19        BY MS. SPRINGER-CHARLES:
20        Q   I'm showing you what's been marked as
21    Exhibit No. 184.
22        Do you believe that those were the --
23    based on your memory, were those the articles that
24    were attached to those links?
25        A   Yes.
```

Page 532

```
 1        Q   Joe, Sr. forwards this email from his
 2    son to you, and he says, "Bob, we need something
 3    or some way to explain these.  Maybe we can write
 4    an article glowing in nature speaking of the
 5    owners.  Also, speaking about the fines imposed
 6    regarding the elevator, et cetera.  We need
 7    immediately."
 8        In addition to the two thousand dollar a
 9    day fine, there were other fines being imposed on
10    160 Royal Palm due to noise violations and others,
11    correct?
12        A   After the hundred and fifty ton
13    compressor unit was put in, they did a decimal
14    reading and it was too high, and they imposed some
15    fines for a period of time.
16        Q   Was a lien ever put on the hotel related
17    to that?
18        A   If you do a fine with the Town, they
19    absolutely lien you.
20        Q   Okay.
21        So with the two thousand dollar a day
22    fine, was there also a lien?
23        A   Yes.
24        Q   Okay.
25        Was this the first time that you and Joe
```

Page 533

```
 1    Walsh, Sr. or anyone related to the Palm House
 2    discussed the two thousand dollar a day fine --
 3    well, not discuss, but that he was made aware of
 4    it, I should ask, to your knowledge?
 5        A   I thought I talked to Joe about the fine
 6    early on.  It was a big enough issue and an
 7    important enough issue, that I know I spoke to
 8    him.  I don't have the dates and notes, but I know
 9    that I spoke to him about it.  The reason I know
10    is because that's why I went out of my way to make
11    sure it was done in the contract.
12        Q   Let's just look at the last email on
13    Exhibit No. 184.  It's a March 24th, 2014 email
14    from you to Kevin.  Do you see that?
15        A   Yes.
16        Q   It says, "The lawsuits stems from what
17    Glenn's opening date was supposed to be.  The
18    permit is separate and cannot be canceled.  They
19    can only do a fine.  They want the hotel open."
20        Was that true?
21        A   With several exclamation points, by the
22    way.
23        Q   Yes.
24        Was that true?
25        A   Yes.
```

47 (Pages 530 to 533)

Page 534

1     Q   And it still is true, is that the case?
2     A   Yes.
3     Q   All they can do is a fine?  You can
4  continue to construct on the project, and they
5  just fine you?
6     A   Right.  We just rolled it for another
7  year.  But I suppose they can get mad and find
8  some other reason to cancel it, but, yes.
9     Q   But at that time, that was true?
10    A   That was true.
11    Q   What has since happened?  Is the fine
12 still accruing?
13    A   The fine is still accruing.
14    Q   How much is currently -- like how much
15 is the total now?
16    A   I'm guessing around a million eight, two
17 million, something like that.
18    Q   Why haven't you paid the City and just,
19 you know, ask them to stop the fine from running?
20    A   You can't.  Because the fine would keep
21 running the next day because they want a CO.
22    Q   Is that why, because you need to get a
23 CO in order for that to happen?
24    A   Oh, absolutely.  I mean, if you said
25 what can you do today to solve it?

Page 535

1     Q   Right.
2     A   It's very simple.  So you go to the
3  Town.  I plan on in the next forty-five days
4  showing them the proof of funds to finish the
5  project, and go into them and saying, guys, I've
6  met with other council members and we owe you two
7  million dollars, let's quit fooling around.  I
8  spoke to one of the former town council members,
9  and I think he threw out a number of like two
10 hundred thousand dollars.  We have to slap your
11 wrist, and so pay us two hundred thousand dollars,
12 but and give us a new date for the CO.
13    So say we pick a date out -- I'm making
14 this up -- eighteen months, and then my -- my
15 advice would be to say to them, if we don't meet
16 that deadline, then you can reimpose all those
17 fines.  If we don't do what we say we're going to
18 do -- but I would make sure I had a couple of
19 months extra, so I knew we would succeed in doing
20 what we said we'd do.  And I think the fines would
21 go away.  They really want the hotel built just
22 like everybody else.
23    Q   I think let's segue back.  We'll go back
24 to our previous discussion before we move on.
25    MS. IVORY:  So I just want to go back to

Page 536

1  Exhibit 171, and this was an email between you and
2  Mark Payne where there was the sources and uses.
3  And, basically, in the sources and uses, they come
4  up with the source of funds of ninety-one million
5  dollars and the use of ninety-one million dollars.
6  And I'm hoping that you can help me with reviewing
7  these documents that I want to present as
8  Exhibit --
9     MS. SPRINGER-CHARLES:  185.  We'd like
10 to mark this composite exhibit of documents a
11 series of emails starting in December 2013 through
12 January of 2014 as Exhibit No. 185.
13    (SEC Exhibit No. 185 was
14    marked for identification.)
15    MS. IVORY:  So I'm hoping with reviewing
16 this document you may be able to help me
17 understand where this twenty-two million dollars
18 of developer equity stems from.  So if we turn to
19 the third page, it is an attachment entitled, Bob,
20 Questions for Palm House.
21    THE WITNESS:  Correct.
22    MS. IVORY:  At the bottom, it is, I
23 guess, number 5A, surrounding the project
24 financing -- finances.  If you can take a look at
25 that.  It also goes to the next page.

Page 537

1     And there's -- the attachments are
2  included.  I think it's Attachment F, as well as
3  Attachment C within this package.  I'll tell you
4  Attachment F is Bates stamped 38596.  And it's
5  halfway through about.  Yes.  So where you were
6  looking with the tables on it, it looks like --
7  keep going.  It's like Attachment F looks like
8  this.  It's like a spreadsheet.  So maybe you
9  flipped all the way passed it.  There you go,
10 that's Exhibit F.  And then behind that is Exhibit
11 C -- or Attachment C.
12    THE WITNESS:  Okay.
13    MS. IVORY:  No.  Okay.  How about C?
14 That looks like something that may have been the
15 A1A we spoke about before.
16    THE WITNESS:  Yes.  Thank you.
17    MS. IVORY:  Awesome.
18    So can you describe to me what would be
19 on this Attachment C.  Describe for me what this
20 is.
21    THE WITNESS:  So the Attachment C would
22 be the schedule value of the work on the far
23 left-hand side.
24    MS. IVORY:  Okay.
25    THE WITNESS:  That's the thirty-eight

48 (Pages 534 to 537)

Page 538

```
 1   number and change.  And then work completed from
 2   previous applications would be the next line,
 3   approximately, twenty million and change.
 4         MS. IVORY:  Okay.
 5         THE WITNESS:  And then G would be total
 6   completed and stored, which would be the same as
 7   what was completed.  So it's a little redundant.
 8   And then -- then the far right one would be the
 9   balance to finish.  And, typically, there would be
10   a retainage amount.  I don't know why you don't
11   have one there, but, typically, there would be a
12   retainage on the contract.
13         MS. IVORY:  So this period, it says, the
14   period to November 15th, 2012.
15         THE WITNESS:  Okay.
16         MS. IVORY:  And so when we looked back
17   at the original document where Section 5A, it
18   shows the total expenditure on hard cost, it shows
19   twenty point two million spent through November
20   15th, 2012.
21         THE WITNESS:  Okay.
22         MS. IVORY:  However, the new one, and it
23   takes me through November 3rd, 2013, shows about
24   twenty-two million dollars spent.
25         Now, when I look at this in comparison
```

Page 539

```
 1   to this Exhibit 171 where there's the developer
 2   equity of twenty-two million dollars, are we
 3   talking about the same twenty-two million dollars
 4   here?  No.
 5         THE WITNESS:  There was no twenty-two
 6   million dollars, except from when I owed it
 7   before.  Are you asking me that?
 8         MS. IVORY:  Right.  So looking at the
 9   date, is this before you owned it?  It looks like
10   these costs that we talk about in the attachment,
11   fees.  Is that back when you owed it, or --
12         THE WITNESS:  Oh, I understand what
13   you're saying.  So -- Bruce, can you help me just
14   a little bit.  Show me when I bought it and how
15   many months I would've owned it at this point.  Do
16   you know what this is dated, this sheet?
17         MR. REINHART:  Attachment C.
18         MS. IVORY:  Attachment C.  I just went
19   by -- I thought the period to date would be, but I
20   guess you're saying it's not.
21         MR. REINHART:  This purports to the up
22   through the period, including November of 2012.
23   You didn't buy the property back until August of
24   2013.  I believe that's what the record shows.
25         THE WITNESS:  Okay.
```

Page 540

```
 1         So just to answer the question like
 2   this, I think, if I got that question, I would've
 3   immediately delegated it because I'm already lost.
 4   I would've said, get with Nicky and see what we
 5   spent to date.  I would've said, get to, you know,
 6   whatever accountant.  I wouldn't have done it,
 7   because it's just not what I do.  I would say to
 8   the guy, what did you spend, Mr. Construction Guy?
 9   And then I would give to Jade to try to go to them
10   and to answer the questions.
11         So if this is here in Exhibit C, I
12   would've gotten it from the construction guy, and
13   she would've asked him, hey, how much was spent to
14   day to answer this question?
15         MS. IVORY:  Okay.
16         THE WITNESS:  Okay.  And that's where it
17   would've come from.  I don't know -- I'm not
18   purporting to completely understand exactly when
19   it was or where, but I would've delegated it and
20   that's how I would've go the answer.
21         MS. IVORY:  Okay.  Because I'm trying to
22   understand back to this email, Exhibit 171,
23   there's twenty-two million dollars characterized
24   as developer equity.  And if you're saying these
25   costs were incurred before the project was -- the
```

Page 541

```
 1   hotel was purchased -- I'm sorry, in 171 is the
 2   actual email where it looks like David Derrico --
 3   that's not the one you're looking at.
 4         THE WITNESS:  I'm sorry.  I'm sorry.
 5         MS. IVORY:  Oh, that's why we're not
 6   there.  Okay.  171.
 7         MS. SPRINGER-CHARLES:  181?
 8         MS. IVORY:  171.
 9         THE WITNESS:  Oh, this is David Derrico
10   trying to explain the deal.
11         MS. IVORY:  Right.
12         THE WITNESS:  Correct.  So --
13         MR. REINHART:  Let's work off the marked
14   exhibit, so the record is clear what you're
15   looking at.
16         THE WITNESS:  Can I have the other one
17   that I just had?
18         MR. REINHART:  What exhibit is that?
19         MS. SPRINGER-CHARLES:  181.  Is it?
20   Yeah.
21         MR. REINHART:  I just want to make sure,
22   yes.
23         Just as you're looking at different
24   documents make sure the record's clear which
25   document you're looking at.
```

SEC_000812

Page 542

```
 1         THE WITNESS:  So the way I read it is
 2    that if this is the entity when I owned the hotel
 3    back in '06, Royal 160, that's the entity that
 4    owned it when I owned it alone.
 5         MS. IVORY:  Okay.
 6         THE WITNESS:  And I'm saying five point
 7    three was spent when I owned that entity.
 8         MS. IVORY:  Okay.
 9         THE WITNESS:  And Glenn spent money.  It
10    looks like around twelve million dollars.
11         MS. IVORY:  Okay.
12         THE WITNESS:  Sitting here today, that's
13    what I see.  There could be more money spent, but
14    that looks like the answers to the question.  I
15    mean, I think this feels a little light to me.  I
16    thought it would've been more.  It's ten million
17    down for a deposit, and then I guess I didn't
18    count that eight five loan as being spent.
19         MS. IVORY:  Okay.
20         THE WITNESS:  So I don't know if that
21    helps you or not.  I'm trying help you.  I just
22    don't know.
23         MS. IVORY:  So I guess going back to --
24    and this is Exhibit 171.
25         THE WITNESS:  Right.
```

Page 543

```
 1         MS. IVORY:  The developer equity is
 2    listed at twenty-two million dollars.  If the
 3    twenty-two million dollars are the same twenty-two
 4    that we're speaking of from this Attachment C,
 5    where they're rounding up to twenty-two millions
 6    dollars, do you think the characterization of the
 7    twenty-two million dollars is appropriate.  So
 8    would that could really be a source of funds for
 9    the hotel, the twenty-two million dollars in funds
10    that were spent before acquisition.  Is that a
11    fair characterization of that amount?
12         THE WITNESS:  For me, no.  I don't
13    believe when you buy something and you lose it in
14    foreclosure, you can count your old basis.  Ask
15    the accountant.  I mean, it doesn't make any sense
16    to me.  It never did.  That's why my email was
17    really clear, thirty-seven to purchase it with an
18    EB-5 first mortgage, eighteen and change for
19    construction, seven million and change for FF&E.
20    That's my understanding of the deal.
21         MS. IVORY:  Okay.  If we go to the last
22    page, which is, I believe -- 171, yes, the last
23    page of that.  So this is what you provided?
24         THE WITNESS:  Yes.  This was the deal.
25         MS. IVORY:  And it does not include the
```

Page 544

```
 1    twenty-two million dollars described there?
 2         THE WITNESS:  No.  And a hundred percent
 3    no.
 4         MS. IVORY:  Okay.
 5         THE WITNESS:  I mean, if you look at
 6    this back now today and you look backwards in
 7    history, the only thing you'll find is that,
 8    whoops, that was the purchase price within a
 9    couple of hundred grand.  B, the FF&E is around
10    seven four to this day on my numbers I run today.
11    And the balance to finish went up when we hired
12    the fancy people from London for the construction.
13    Otherwise, it's the same exact deal.  It's not
14    going to change.
15         MS. IVORY:  So what I wanted to do is
16    just compare the use of funds that you have on
17    this sheet, the last sheet of Exhibit 171, to what
18    is in the bottom of this email, which is the first
19    page it, so it's all attached.
20         THE WITNESS:  Yeah, because these guys
21    have twenty-nine to buy the hotel, and it's just
22    not true.
23         MS. IVORY:  Correct.
24         So when we look at hard costs, it looks
25    like you have a total of twenty-five -- you have a
```

Page 545

```
 1    total on your sheet of eighteen point five million
 2    almost at the bottom.
 3         THE WITNESS:  True.
 4         MS. IVORY:  Okay.
 5         So was there any difference between --
 6    are these the numbers that you gave them on this
 7    last sheet of Exhibit 171?
 8         THE WITNESS:  So back when I gave them
 9    this, when I thought they were going to have a
10    first mortgage, I will have had an AIA, I promise
11    you it will be in the records, that says eighteen
12    to finish the hotel.  That's where I would've
13    gotten the number, from the contractor.  Then --
14         MR. REINHART:  Hold on one second.  When
15    you were stating this, just for the record, you're
16    referring to 53924?
17         THE WITNESS:  Correct.
18         And then we brought in the fancy pants
19    designers from London, and we went way up-scale.
20    So things we never imagined.  I mean, shells on
21    the wall, a whole other level.  We also moved the
22    room lights out.  So I'm not mad that we did that.
23    It was a better deal to do that.  But the budget
24    changed substantially because of those things.  So
25    when I did this projection, I didn't know we were
```

Page 546

1    going to hire somebody from London and do those
2    things.
3              So the budget for the hard cost
4    construction went up. The purchase price went up
5    by about two hundred grand. And the FF&E went up
6    by about two hundred grand.
7              MS. IVORY: So did the fancy pants, I
8    guess, company come in after December 2nd, 2012
9    before the acquisition?
10             THE WITNESS: Yeah. Before all of
11   their -- oh, yeah. Before we had -- we could find
12   the contract that's for a million and change when
13   we signed with them. Then they would've started
14   doing work. And then months later, we would've
15   started getting these thick plans that we have
16   today at the Palm House, like thick, thick for
17   each room.
18             MS. IVORY: Okay.
19             So if you had to guess -- estimate the
20   date of your budget as compared to the actual
21   budget that's in this email, dated December 2nd,
22   around how much time do you think elapsed between
23   when your budget was prepared --
24             THE WITNESS: I don't know, but the
25   proof is going to be in that AIA. If you found a

Page 547

1    thirty-eight eight AIA, which there will be one,
2    then that's when we knew it changed.
3              MS. IVORY: Okay.
4              So when we look at the summary and the
5    email that comes up to the ninety-one million
6    dollars in budget, the only number that you don't
7    agree with is the twenty-two million dollars in
8    developer equity? Are there any other cost here
9    on the source or use of funds that you don't agree
10   with?
11             THE WITNESS: Well, I think that there's
12   a plug number. Clearly, this nine eight startup
13   operations, I don't even know what that means.
14   It's a plug number. It's not from me.
15             MS. IVORY: Okay.
16             THE WITNESS: And that's a lot of money
17   to start a hotel.
18             MS. IVORY: What about the interest and
19   carrying cost?
20             THE WITNESS: Over what period of time?
21   I would take a loan times four point four percent
22   interest -- four point two two interest and see.
23   So if I drew down forty million dollars at four
24   percent, that would be a million six a year. So
25   it looks like they're allocating two years of

Page 548

1    interest to carry. I don't know where he got it
2    from. I think it's a plug number in my mind.
3              MR. GALDENCIO: On the sheet that you
4    prepared that's titled, Capitalization, am I
5    characterizing that correctly, you prepared this
6    or you had it prepared?
7              THE WITNESS: Yes.
8              BY MS. SPRINGER-CHARLES:
9    **Q   Which one?**
10   A    This one.
11   **Q   Did you have it prepared, or did you --**
12   A    Oh, I don't do it. I don't like typing
13   and figure. That's not my thing.
14             MR. GALDENCIO: Were you the source of
15   the numbers?
16             THE WITNESS: Well, I would've asked for
17   the numbers. I guessed on the purchase price. I
18   wouldn't asked my construction guy to put the hard
19   cost, and I would've asked probably Frank for the
20   soft cost and plugged them in.
21             MR. GALDENCIO: What is the equity line,
22   the very top line, what does that signify?
23             THE WITNESS: Well, you can tell I
24   didn't do it, because I guess this was if you just
25   paid cash. I mean, I think it was supposed to be

Page 549

1    the total uses of funds. But if an investor came
2    in and just wrote a check sixty-two five, it could
3    be done as an equity deal. I think at this point,
4    we didn't know which way the deal was going to go.
5    Because I clearly thought at this point they were
6    going to have a first mortgage on it.
7              MR. GALDENCIO: Who's they?
8              THE WITNESS: EB-5. See, allowing for a
9    first mortgage pledge to EB-5 limited partners. So
10   in my mind, I believed they were going to have the
11   first mortgage at this point in time.
12             BY MS. SPRINGER-CHARLES:
13   **Q   Because you were going -- why would that**
14   **be the case? Why wouldn't Glenn have the first**
15   **mortgage?**
16   A    Because we didn't even know if Glenn was
17   going to do a deal with taking back paper. It was
18   just buying it for cash.
19             MR. GALDENCIO: What were going to be
20   your other sources of equity besides the line item
21   that says, EB-5, thirty-seven million?
22             THE WITNESS: This was prepared to show
23   you what the hotel would cost. What will it cost
24   to buy the hotel, do the hard cost, and do the
25   soft cost. That's me. I'm good at that. I mean,

SEC_000814

Page 550

1    that's my thing.
2            So I don't know where the rest of the
3    money was coming from.  I think originally maybe
4    Joe was trying to raise -- I believe that could be
5    the sixty-tow five in the very first email.
6    Sixty-two million in the very beginning.  Joe was
7    going try to raise sixty-two million dollars
8    through either EB-5 or through a private -- or for
9    bridge financing.
10           MR. GALDENCIO:  So to restate that, if
11   I'm correct, when you prepared this sheet, this
12   sheet being the capitalization sheet, you expected
13   that there would be sixty-two point five million
14   raised through EB-5 funds; is that correct?
15           THE WITNESS:  Yeah.  But I don't know
16   why I only allowed thirty-seven.  I don't remember
17   why.  But, yes -- because I mean it can't be a
18   coincidence that my project is sixty-two five and
19   he was going to raise sixty-two.  It's too -- it
20   doesn't make any sense.
21           MR. GALDENCIO:  Well, going down to the
22   uses acquisition, you were expecting the hotel was
23   going to cost the project thirty-seven million?
24           THE WITNESS:  True.  Which I believe I
25   was within two hundred and fifty thousand dollars

Page 551

1    of guessing Glenn Straub's brain, which is not an
2    easy thing to do.
3            MR. GALDENCIO:  And the mortgage was
4    actually not an EB-5 mortgage, but rather a take
5    back mortgage from the seller, correct?
6            THE WITNESS:  I -- no.  I never thought
7    somebody would sell me a hotel for thirty-seven
8    and take it all back in paper.  Unheard of.
9            MR. GALDENCIO:  No.  I'm saying, what
10   actually happened?
11           THE WITNESS:  Oh, what actually
12   happened?  Was that we paid seventy-seven and
13   change, and he took back a mortgage for
14   seventy-five percent that had a floor of six
15   percent.
16           MR. GALDENCIO:  What I'm curious about
17   is that, if you're budgeted for sixty-two five,
18   and sixty-two five wasn't raised combining the
19   EB-5 money and the mortgage take back, then
20   doesn't that leave you with a hole in the
21   construction cost?
22           THE WITNESS:  I didn't know if he was
23   going to get it from a private investor or how he
24   was going to get it.  He said to me, hey, how much
25   is the project going to be?  And I go, hey, the

Page 552

1    project's going to be sixty-two five.  This is
2    what it's going to cost.  Never, do you have
3    twenty-two million to kick into the deal?
4    Everybody knew the story with me.  He was lending
5    me money.  So there was never a question that I
6    was going to put in any money on that deal.
7            MR. GALDENCIO:  So was your expectation
8    that Mr. Walsh was going to raise sixty-two point
9    five million?
10           THE WITNESS:  At this point, either he
11   was going to get an EB-5 first mortgage, a bank
12   mortgage, take back paper with Joe.  I really
13   didn't know how he was going to do it.  He just
14   said, hey, what are the economics of the deal?  And
15   I'd say, hey, these are the economics, you can buy
16   it for X, you can put in Y for hard cost, and you
17   can put in Z for soft cost.  That's me. That's my
18   thing.
19           MR. GALDENCIO:  But your expectation was
20   you that you were going to be firm, which was
21   sixty-two point five million to do the deal?
22           THE WITNESS:  Yeah.  I didn't have any
23   money.  So absolutely.
24           BY MS. SPRINGER-CHARLES:
25       Q   Can I ask?  I'm showing you what's been

Page 553

1    previously marked as Exhibit 63.  You received a
2    copy of -- I'm going to hand it to you, Bruce.
3            MR. REINHART:  No problem.
4            BY MS. SPRINGER-CHARLES:
5        Q   You received a copy of this 11/20/2012
6    email that attached this PDF document -- well, two
7    documents; one was the Michael Evans report, and
8    then one was what looks like a brochure.  And in
9    that brochure, if you flip through it, you'll see,
10   that there is a chart that has the ninety-one
11   thousand (sic) total investment, and a line item
12   for developer equity of twenty-two million.  Do
13   you think that that was a misrepresentation?
14       A   Right here.  Is this it?
15       Q   Yes.
16       A   Yeah, one hundred percent.  One hundred
17   percent, unless you count when I originally bought
18   it.
19       Q   If you count when you originally bought
20   it, would it not be a misrepresentation?
21       A   Well, I put in ten in cash.  Then I
22   PG'ed and borrowed another, I think, eight five,
23   so that's eighteen five, and then I think there
24   was another five and change that went into it,
25   probably five two.  It's on that email that we

SEC_000815

Page 554

1    just saw.
2        Q   I think I got it.
3            So as is, you think that that --
4        A   I agree.
5        Q   Okay.  Unless you knew that it was
6    counting the loan that you got, plus old money
7    from when it was Royal 160, then it must have been
8    representing that?
9        A   Unless you count that, I think it's a
10   misrepresentation.  And I don't see how you get to
11   count it when it changed title.
12       Q   You got the email, though, when you saw
13   this.  And so did you say to Joe, hey, Joe, you
14   can't put this in the materials that are going to
15   investors?
16       A   As I said before earlier, I specifically
17   talked about that twenty-two million dollars
18   and -- with David.  Did I talk about it with Joe?
19   I don't remember if I talked about it with Joe.
20       Q   But you did talk about --
21       A   I know I talked about it with David.  And
22   I'm pretty sure I talked about it with -- oh, I
23   did talk about it with Joe, because I remember
24   he's the one that told me that we're going to
25   count it from when you bought it.  Yes, I did talk

Page 555

1    to Joe about it.  I'm positive.
2        Q   And he said it was fine because we're
3    going to count from when you --
4        A   Right.  Because I had an agreement to
5    buy it back from Glenn, but it was never signed.
6    And my argument was, if that agreement was signed,
7    in my mind, maybe you could count it, because
8    Glenn was going to hold it for a certain amount of
9    time, and then give if back to you with a profit,
10   plus what he spent.  So that seemed like it made
11   more logical sense to me.  But, again, I didn't
12   know EB-5 from Adam, so I didn't really think
13   about too much, but that was his representation.
14       Q   Let's stick with that Exhibit No. 63, I
15   think.  And I'll just ask a few questions about
16   this.  The document that's attached to the email
17   that we were looking at.
18       A   Right.
19       Q   I've seen various versions of this.  It's
20   usually like this Exhibit No. 67 that I'm just
21   looking at for reference.
22           Have you seen Exhibit 67 --
23       A   No.
24       Q   -- any of the documents in Exhibit 67?
25       A   No.  This is very cool looking.

Page 556

1        MS. SPRINGER-CHARLES:  Let's go off the
2    record for one second.
3            (A brief recess was taken.)
4        MS. SPRINGER-CHARLES:  We're back on the
5    record at 3:27 p.m. on February 13th, 2017.
6        BY MS. SPRINGER-CHARLES:
7        Q   Mr. Matthews, did you have any
8    substantive discussions with any members of the
9    staff while we were off the record?
10       A   No.
11       Q   Okay.
12           We were looking at Exhibit, I think, 63.
13   I think it should be in front of you.  And we were
14   looking at the PDF brochure that was attached to
15   Exhibit -- to one of the emails on Exhibit 63.  And
16   the reason I'm showing you Exhibit 63, it's the
17   document that you actually saw, so I'm showing you
18   this -- well, that was sent to you.
19           Did you look at Exhibit 63, this PDF
20   that was attached to the 11/20/2012 email from Joe
21   Walsh?  Did you look at it at that time?
22       A   I don't believe -- I think that I
23   skimmed the Evans report, if this is it.  Is this
24   the whole Evans report?
25       Q   Well, did you skim the document that was

Page 557

1    attached to that email is the question?
2        A   If this was attached, I remember looking
3    at this because it was a page and a half.  I
4    looked at it quickly.
5        Q   Okay.
6        MR. REINHART:  When you say this, for
7    the record, what are you talking about?
8        THE WITNESS:  I remember looking at this
9    because it was quick.  I just went boom, boom,
10   boom, and it looked good, and I just --
11       BY MS. SPRINGER-CHARLES:
12       Q   At the Evans report that's attached to
13   the email?
14       A   Yes.
15       Q   How about the PDF document that's
16   attached to the email?
17       A   I've seen it since.
18       Q   At that time?
19       A   At that time, I don't remember looking
20   at it, but I have definitely seen it since.
21       Q   When did you see it?
22       A   Because I talked to Marcus and asked if
23   he knew how Joe got my pictures.
24       MR. REINHART:  The question was:  When?
25       BY MS. SPRINGER-CHARLES:

53  (Pages 554 to 557)

Page 558

1    **Q   When?**
2       A   Oh, within the last year when I went
3    through emails and stuff.  And these are pictures
4    on my piano that were taken.
5       **Q   So at the time, you don't recall seeing**
6    **these pictures in this document at the time you**
7    **received the email; is that correct?**
8       A   Yes.  But I know that -- I think that he
9    made a brochure out of one of these, and he left
10   some around.  I remember like flipping -- not at
11   this, but at a brochure at some point in time.  I
12   saw.  I believe it was in Chinese, or it was in
13   some other language.
14      **Q   Does it look like the brochures in**
15   **Exhibit No. 67?  It's a composite exhibit of, I**
16   **think, three or four different versions of this**
17   **brochure; one in Chinese, one, I think, in**
18   **English, and one that may be in Farsi.**
19      A   Yes, the Farsi one.
20      **Q   Okay.**
21         **So between 2012 and before things ended**
22   **in October of 2014, you saw a copy of the green**
23   **brochure?**
24      A   I saw the green brochure somewhere.  I
25   don't remember when, but I know I saw that

Page 559

1    brochure because it was like an ugly puke green.  I
2    remember thinking that.
3       **Q   The pictures that you mentioned that he**
4    **had in the version of the brochure that you have**
5    **in Exhibit No. 63, did you provide those pictures**
6    **to Joe Walsh for inclusion in the brochure?**
7       A   I actually don't remember.  So I asked
8    Marcus, and he told me that, no, he took them off
9    the piano.
10      **Q   He took a photo of a photo?  What do you**
11   **mean he took them off the piano?**
12      A   I think he -- I had more than one of
13   those pictures.  I had a set in my office, and I
14   had a set in my house.  And I think Joe took those
15   pictures.  But I could've given them to him.  He
16   could've asked me for these pictures, but I don't
17   think I did.
18      **Q   The statement in the document that you**
19   **received says, World renowned advisory board, and**
20   **there are pictures of you and Hillary and Bill**
21   **Clinton.  I think that's your wife.  Is this Mia?**
22      A   Yes.
23      **Q   And one of your daughters?**
24      A   My daughter.
25      **Q   With Hillary and Bill Clinton.  And I**

Page 560

1    can't see who's in that other picture next to it.
2       A   That's Teddy.
3       **Q   Kennedy?**
4       A   Teddy Kennedy.  And Alec Baldwin and
5    Vicky.
6       **Q   Okay.**
7          And the language here says, "The Palm
8    House will be governed by an advisory board
9    consisting of political and business leaders with
10   worldwide experience."
11         Was that statement true at the time?
12      A   Absolutely false.  We talked about
13   setting up an advisory board, and I never set up
14   an advisory board.
15      **Q   When you saw this in the brochures**
16   laying around -- I'll show you Exhibit 67.  We can
17   look at just one example of what it looked like in
18   one of these brochures.  It says, Worldwide
19   Renowned Advisory Board again.  This is not the
20   version you saw, but a version in Exhibit 67.  It
21   says, "Our advisory board will assist in branding
22   the Palm House as a desired destination hotel and
23   frequented by the wealthy around the world.  The
24   Palm House will be governed by an advisory board
25   consisting of political and business leaders with

Page 561

1    worldwide experience."
2          When you saw it, did you see that
3    language in it?
4       A   No.  But it's just so classic Joe, I'm
5    not surprised at all.
6       **Q   Why?  Why do you say that?**
7       A   Because he just embellished everything.
8    I mean, it wouldn't be beyond him to do anything
9    to try to promote his thing.
10      **Q   So you didn't give him the pictures?  For**
11   **the record, you did not provide -- you don't**
12   **recall --**
13      A   I don't think I did.  I don't recall.
14   But I did ask Mark, and Mark's got a much better
15   memory than me, because he actually takes notes
16   and remembers everything.
17         MR. GALDENCIO:  For the record, those
18   pictures are real pictures?  They weren't
19   Photoshopped; is that correct?
20         THE WITNESS:  Yeah, those are real
21   pictures.  Yes.
22         BY MS. SPRINGER-CHARLES:
23      **Q   Did you ever ask any of these**
24   **individuals whether -- did you or Joe, to your**
25   **knowledge, ever ask -- or anyone else associated**

54 (Pages 558 to 561)

Page 562

1  with this offering ever ask any of the
2  individuals, the political figures in the photos,
3  if you could use their image or names in the
4  offering materials or marketing materials?
5      A  Absolutely not.
6      Q  On the page in Exhibit 67, the page
7  that's Bates labeled HAULOU-0051.  Are you there?
8      A  Yes.
9      Q  It says, "Bonus program for the
10  investor.  Each investor will receive one free
11  week yearly stay at the Palm House."  Do you see
12  that?
13      A  Yes.
14      Q  Was that true at that time?
15      A  He asked me to do that, and I agreed,
16  yes.
17      Q  At what point would they able to redeem
18  that free week's stay?
19      A  Once it was opened.  And I didn't like
20  it because it's going to affect your numbers.  A
21  week doesn't sound like a lot, but when you
22  multiply it by a lot of people, it's a lot.
23      Q  We've gone over this developer equity
24  thing a lot today.  However, looking at page
25  sixty-seven, because I don't want to regret asking

Page 563

1  something and just assuming.  On the page that's
2  Bates labeled HAULOU-0049.  Below the box that has
3  the EB-5 investment of thirty-nine point five
4  million and developer equity of twenty-two million
5  and financing of twenty-nine point five million,
6  do you see that?
7      A  Yes.
8      Q  Below there's text that says, "The
9  investment very secure because fifty-seven percent
10  of the investment comes from developer equity and
11  financing."
12      Was that a true statement?
13      A  Is twenty-two million fifty-seven
14  percent ninety-one million?
15      Q  Well, it says developer equity and
16  financing, and the financing number was
17  twenty-nine point five million.  Do you see that?
18      A  Oh, I'm sorry.
19      Q  So I think that would represent -- was
20  it true?
21      A  It's not going to be true, because it
22  was never twenty-two million put it.  So it can't
23  be true.  Sorry.  Trick question.
24      Q  Was that intended to mislead -- did Joe
25  intend to mislead investors by putting that

Page 564

1  information in the documents?
2      A  I don't know what Joe intended.  If you
3  knew what Joe intended, you'd be way ahead of all
4  us.  I have no idea what that guy intended.
5      Q  So you don't know?
6      A  Who knows.  He could've believed that,
7  oh, it counts from when you bought it in '06.  I
8  don't know what he believed.  I mean, in my heart,
9  if I put my hand on a bible, I think later on I
10  learned that you have to have a certain percentage
11  that has to be developer equity, and I think -- I
12  learned that with Kevin Wright.  And I think he
13  was trying to make that percentage equal -- that
14  number -- like if it's supposed to be thirty-seven
15  point two percent, he plugged in that number to be
16  thirty-seven point two percent.  That's what I
17  think today.
18      Q  I'm showing you what's been previously
19  marked as Exhibit No. 9.
20      Do you need a break?  You need a break?
21      A  No.  I need a new kid.
22      Q  Exhibit No. 9, you either sent or
23  received some of the emails in this exhibit, but
24  they are related to an I-526 denial refund
25  agreement.

Page 565

1      A  Oh, yes, I remember this.
2      Q  As well as an I-526 denial forty
3  thousand dollars administrative fee refund
4  agreement.
5      A  Yes.
6      Q  Did you get Ryan -- well, Les Evans to
7  sign these agreements under power of attorney?
8  Let's look at 1/14/2014, the email dated
9  1/14/2014.
10      A  1/14?
11      Q  Yeah.  And then one dated 3/25/2014.
12      A  I got it.
13      Q  Did you get Les Evans to execute these
14  documents under power of attorney?
15      A  Yeah, I probably gave it to them, or
16  Jade did.  One of us would've asked Les to do it.
17      Q  It was you or Jade did?  You or Jade?
18      A  Yes.
19      Q  Okay.
20      Tell me about the circumstances
21  surrounding these two agreements.
22      A  Kevin sent it and said, you have to get
23  this sign.
24      Q  Did you read them?
25      A  Not really.  No.  Did I read the letter

SEC_000818

Page 566

1  that --
2      Q   Both agreements, the I-526 denial refund
3  agreement and the I-526 denial forty thousand
4  dollar administrative fee refund agreement.
5      A   I mean, I can just remember the
6  circumstances.  I don't know specifically, but I
7  remember that Kevin wanted it signed because he
8  said he needed it to be able to continue doing the
9  money.  Because Joe raised the first seventy
10  percent of the money.  Then Kevin raised the other
11  thirty percent of the money.
12      Q   Did Joe know about these agreements?
13      A   I have no idea.  I don't know.  I
14  imagine he would've gotten a copy of it, but I
15  don't remember talking to him about it.
16      Q   In these agreements, at least the I-526
17  denial refund agreement, I don't think both of the
18  forty thousand dollar refund agreements, it
19  purports to say that if the investor's petition
20  aren't approved, that 160 Royal Palm would be
21  refunding them their investment principal and
22  administrative fees, correct?
23      A   Correct.
24      Q   How did -- I mean, was that true at the
25  time these agreements with entered into?

Page 567

1      A   Kevin said that to continue the funding,
2  you have to do it.  And I remember I thought that
3  he put in a certain amount of time to pay it back,
4  but I was so assured that this 526 and everything
5  was going to -- whatever was supposed to happen
6  was going to happen.  You know, for me it seemed
7  like a tenth of one percent risk.  Everybody's,
8  oh, this is going.  So I didn't even think it was
9  a big risk.
10      Q   So here it says -- so the answer is,
11  yes, it was true?  It was a true statement, that
12  160 Royal Palm --
13      A   Yeah, absolutely.
14      Q   -- intended to repay investors if their
15  petitions were denied, correct?
16      A   We did, yes.
17      Q   Both the administrative and principal
18  investment fees, correct?
19      A   Yes.
20      Q   Since the denial, have you refunded any
21  of the investors?  Has 160 Royal Palm refunded any
22  of the investors?
23      A   No.
24      Q   Have any of them asked to be refunded?
25      A   I believe there's a lawsuit with

Page 568

1  fifty-eight investors that have now asked to be
2  refunded.
3      Q   Have any asked to be refunded, I guess?
4      A   I don't know.  It's a thick lawsuit.  I
5  didn't read it, but I would imagine somebody would
6  ask for their money back by now.
7      Q   Has anyone come to 160 Royal Palm and
8  asked for a refund?
9      A   Oh, no.  No.
10      Q   Back then, back in December 24th,
11  2013 -- I heard your explanation -- or on March
12  24th, 2014, how did you believe you'd get the
13  funding to repay investors if their petitions
14  weren't approved?
15      A   I never even thought it was a risk.  I
16  thought for sure he was going to raise the money
17  and everything was going to work out.  I had my
18  end covered to do a great hotel, so I had no -- I
19  didn't even have any doubt that Joe wasn't going
20  to do what he was going to do.
21          And at that point in time, you got to
22  remember, he just did an empty building with
23  almost no revenue, and he had told me that
24  everybody got their green cards on it.  So I am
25  naively thinking, if he did an empty building with

Page 569

1  no revenue on it, then Royal Palm can certainly a
2  really great hotel in Palm Beach would've been
3  successful.
4      Q   Did you make suggested changes to the
5  letters?  Did you participate in the drafting of
6  the letters?
7      A   I remember that whatever Kevin was
8  doing, I asked for more time or something to get
9  it back.
10          MR. REINHART:  No.  Her question was:
11  Did you change the wording of those letters at
12  all?
13          THE WITNESS:  That's what I'm trying to
14  answer.  I think he had something, and I think I
15  asked for it to be longer or something to give me
16  a chance to do it.
17          Yeah.  I remember thinking if we didn't
18  do it, we'd get a new loan on the project.
19          BY MS. SPRINGER-CHARLES:
20      Q   I'm sorry?
21      A   That was my comfort level.  I'm just
22  reading it now.  If we didn't get it, like in the
23  off chance you didn't get it, we would just
24  refinance the project to pay it back.
25      Q   But you, either directly or through

## Page 570

1  Jade, traded drafts with Kevin before you settled
2  on the final letter, right?
3      A   Absolutely. Because his original one
4  was even really worse, and I was like, I didn't
5  want to do this just to be clear. Kevin was like,
6  if you don't do it, we're not going to give you
7  anymore money. And then the whole project didn't
8  work and everybody lost everything. So I was sort
9  of put in a corner.
10     Q   It looks like on January 8th and 9th,
11 2014, Mark Payne was also part of the discussions
12 on how to get the wording just right. Is that
13 true?
14     A   Oh, I'm sure that Mark usually did the
15 wording for everything, so -- where's email from
16 Mark?
17     Q   If you look at January 8th and 9th.
18     A   Yes, I see where Mark's making a
19 recommendation.
20     Q   Do you know if Mark shared any
21 information about these letters or this letter,
22 the first one, related to the principal with Joe
23 Walsh, Sr.?
24     A   I don't know what he did with it. Oh,
25 yeah, there it is right there. It says I would

## Page 571

1  refinance the loan. Okay. So if there was a
2  chance it didn't work, I would've done a
3  refinance.
4      Q   As it relates to the second letter
5  related to the administrative fees, I see on March
6  25th, 2014, Mark Payne sends you an email. And
7  the second note on it says, "Read Kevin's note.
8  Yes, I think the thought that one would be on the
9  hook is germane. Joe receives forty K, and he
10 would already return it as he guarantees, and so
11 we'll just back end it on his guarantee. Joe is
12 actually the backstop for the guarantee of the
13 return of forty K."
14         Again, does this indicate that Mark
15 Payne was a part of -- well, he aware of this
16 letter?
17     A   Yeah. Mark always made changes. Mark
18 would send me an email. You'll see him in my
19 emails. And he would give me the letter. Then I
20 would put it on my stationary and sign it. He was
21 good at that. That wasn't something I was really
22 good at.
23     Q   Do you know if he shared -- if he
24 discussed the administrative refund letter with
25 Joe Walsh or not?

## Page 572

1      A   I don't know what he did with Joe.
2          Can we just go one second?
3          MS. SPRINGER-CHARLES: Off the record.
4          (Whereupon, at 3:52 p.m., a short recess
5  was taken.)
6          MS. SPRINGER-CHARLES: Let's go back on
7  record.
8          BY MS. SPRINGER-CHARLES:
9      Q   Mr. Matthews, did you have any
10 substantive discussions with any member of the
11 staff while we were off the record?
12     A   No.
13     Q   Let's keep looking at Exhibit No. 67,
14 which is a copy of the green brochures. On the
15 page that's Bates labeled HAULOU-0051, there are
16 pictures of Hawker jet, a one hundred foot yacht,
17 and then a Rolls-Royce, and then it says, "Some of
18 the member facilities and amenities."
19         Did you have any discussions with Joe
20 Walsh about including the pictures in the
21 marketing materials?
22     A   No, not the pictures, but we did discuss
23 having the boat and chartering a Hawker jet for
24 the club and having a Rolls-Royce provided for the
25 hotel.

## Page 573

1      Q   Where were those funds supposed to come
2  from to make those purchases?
3      A   The Hawker jet we were going to charter
4  and charge the members DOC, direct operating cost.
5  The Rolls-Royce we were going to buy or lease.
6      Q   The question was: Where was the money
7  coming from to pay the charter fees and to buy
8  the --
9      A   Well, this was going to be set up once
10 the hotel had cash flow positive, was operational,
11 except with the boat. We were going to buy, and
12 he was going to redecorate it, and --
13 specifically, is there a line item for a boat? No.
14 He told me to buy the boat, and I bought the boat.
15     Q   So the jet, the Rolls-Royce, those were
16 going to be things that were acquired after the
17 hotel had cash flow, correct?
18     A   Well, we weren't going to buy the jet --
19     Q   Well, the chartering of the jet.
20     A   We would charter the jet on an hourly
21 basis. After we had the hotel open, we were going
22 to supply a Rolls-Royce. It would've been
23 twenty-five hundred bucks a month. It would've
24 been in the numbers. The boat was the big item
25 that was going to be done ahead.

SEC_000820

Page 574

```
 1        Q   So that's -- I want to go in steps, so
 2   that the record's clear.  So those two items were
 3   intended to be acquired or chartered after the
 4   hotel was operational, correct?
 5        A   True.
 6        Q   Why was the boat different, if it was?
 7   Was the boat different?
 8        A   The boat was different.  We were going
 9   to buy the boat and operate it.  It was going to
10   be an ongoing thing.  It wasn't going to be a once
11   in a while charter a plane.  It was going to be an
12   ongoing thing for the hotel, for example, for the
13   club.  That's specifically why we put the boat in,
14   to be one of the amenities for the club sales.
15        Q   Why wouldn't that have been acquired --
16   there's no club if there's no hotel, right?
17        A   True.
18        Q   So why wouldn't you acquire the boat
19   after the hotel is operational?  Why wouldn't
20   you -- or why didn't you?
21        A   We looked at boats.  He said buy the
22   boat.  I think we put down a million dollars of
23   money.  I wasn't worried about it because I knew
24   in my mind some of the money was his personal
25   money.  So putting down a million dollars to buy a
```

Page 575

```
 1   book didn't seem unusual to me at all.
 2            Could we have bought a boat later?  I
 3   guess we could've, but he wanted to decorate the
 4   boat, and it takes time.  I worked on the boat for
 5   probably a year, and it still wasn't done.
 6        Q   Do you think it was reasonable to buy
 7   the boat at that time when, based on your last
 8   testimony, you testified that, you know, you were
 9   dependent on Joe to infuse money to Nick to
10   continue the construction of the hotel.
11        A   Right.
12        Q   Was it reasonable to buy a boat at the
13   time that you bought the boat if the hotel wasn't
14   finished?
15        A   Yeah.  We were going to start club
16   sales.  We started getting the paperwork.  We have
17   all the club documents together.  So if you were
18   selling a club membership for a hundred and fifty,
19   two hundred thousand dollars, and you sold five
20   hundred of them, that's a hundred million dollars.
21   And if you could bring people out on the boat and
22   use it to show -- we were going to use it as a
23   prop to show the hotel to sell the individual
24   units, it would've made a lot of sense.
25            MR. GALDENCIO:  You said he told you.
```

Page 576

```
 1   Who is he?
 2            THE WITNESS:  Joe did.
 3            MR. GALDENCIO:  Joe Walsh?
 4            THE WITNESS:  Joe Walsh, yes.
 5            MR. GALDENCIO:  But Joe Walsh is not
 6   managing the hotel, correct?
 7            THE WITNESS:  Is he managing -- he
 8   wasn't the manager of the hotel, no.
 9            MR. GALDENCIO:  Why is he telling you to
10   do something that is directly related to the
11   hotel?
12            THE WITNESS:  Why is Joe telling me?
13            MR. GALDENCIO:  Yes.
14            THE WITNESS:  I think they call it the
15   golden rule.  He who has the gold makes the rules.
16   He would tell me what to do, and we would do it.
17            MR. GALDENCIO:  But you testified
18   earlier that he would try to tell you things
19   regarding construction, and you wouldn't do it.
20            THE WITNESS:  Yeah.  I would do what --
21   I mean, I compromised on some things, but I did
22   what I knew was a hundred percent right on that.
23   He had a boat.  He decorated it.  He did a good
24   job on his boat.  So --
25            MR. GALDENCIO:  I'm having trouble
```

Page 577

```
 1   understanding --
 2            THE WITNESS:  Can I just tell my
 3   daughter real quick?
 4            MR. GALDENCIO:  Please.
 5            THE WITNESS:  Thanks.  One second.
 6            MS. SPRINGER-CHARLES:  Go off the
 7   record.
 8            (A brief recess was taken.)
 9            MS. SPRINGER-CHARLES:  Back on the
10   record at 3:56 p.m. on February 13th, 2017.
11            BY MS. SPRINGER-CHARLES:
12        Q   Mr. Matthews, did you have any
13   substantive discussions with any members of the
14   staff while we were off the record?
15        A   No.
16            MR. GALDENCIO:  My question goes to the
17   timing of the boat acquisition.  The same thing
18   that Mrs. Ivory was talking about.  I'm having
19   trouble just understanding why money would be
20   taken out of the project that would otherwise be
21   available to complete the hotel to do something
22   that is -- has not a direct connection to the
23   hotel construction.
24            THE WITNESS:  Okay.  So the budget was
25   thirty-nine five, and then it was up to forty-six
```

58  (Pages 574 to 577)

Page 578

1   five, is what I was told. I haven't seen a PPM or
2   anything and even now. And it was integral in
3   doing the marketing for the hotel.
4        So, for example, Greg Norman and I flew
5   over to Sardinia and started preselling these
6   condo hotel units. And our projection for the
7   gross revenue in sales was over two hundred
8   million dollars. So if you think about it,
9   there's a first mortgage for twenty-seven four,
10  and then forty million and change for a second
11  mortgage. And so there's a huge windfall of money
12  coming in. So having that boat was one of the
13  items -- for example, I think Greg got it for a
14  week or two as part of him helping out. So he
15  would've used that boat as a prop for the hotel.
16       Mar-a-Lago, Donald's club, didn't have a
17  boat. So it would've given us a competitive
18  advantage for raising money for the club. The
19  same with the jet. So the club membership -- we
20  didn't have golf. Okay. So Donald had a separate
21  golf club for his club to join for whatever, two,
22  three hundred thousand dollars. So we were trying
23  to give us as much benefit as we could.
24       So we came up with the name Alibi, which
25  was a club in the 1930s on North Avenue. That's

Page 579

1   where the name came from. And so the idea was to
2   make a club and to do the membership sales, which
3   I had started on Nantucket originally. Eric
4   Schmidt, the CEO of Google, was my first founder.
5   He became the Chairman of Alphabet. We got
6   Natalie Cole. We got Jim Belushi. So it was to
7   brand the club with high-end people.
8        MR. GALDENCIO: Were there any sales at
9   the club?
10       THE WITNESS: No. We prepared the sales
11  documents, but we didn't start selling the club
12  memberships yet. We talked to people, but we
13  didn't start selling the club memberships yet, no.
14       MR. GALDENCIO: Back to funding the
15  boat, did Mr. Walsh represent to you, don't worry
16  about spending this money on the boat because I'm
17  going to be supplying you with more money?
18       THE WITNESS: Yeah. I would've never
19  bought a project behind the hotel to do a
20  development if I didn't think I was going to get
21  more money. So he talked a very big game. He was
22  sending money in. I wasn't thinking there was an
23  issue. I didn't have any reason to think that he
24  couldn't say buy a boat, you buy a boat and do a
25  good job.

Page 580

1        From the marketing perspective, I was
2   one hundred percent with the boat. I thought it
3   was a great idea. I still think it's a great
4   idea. I think a club raising a hundred million
5   dollars, that I don't know how much was in the
6   numbers on this deal in the business plan, but it
7   would've helped a lot for the hotel. It would've
8   been a really nice add on. Somebody's coming
9   there for their honeymoon. We give them the boat
10  for the weekend. It would've been a nice add on.
11       BY MS. SPRINGER-CHARLES:
12       Q   Wasn't Phase II, which included the 149
13  Brazilian and the yacht, wasn't that supposed to
14  be a separate offering?
15       A   He talked about doing it as a separate
16  offering with an investor at one point, and then
17  at one point he talked about it being an EB-5
18  project.
19       Q   Right.
20           And so wouldn't that need now new
21  offering documents, new offering materials,
22  saying, hey, you new set of investments, this is
23  how we're going to use your funds, we're going to
24  buy this lot for the residences, we're going to
25  buy a boat, we're going to use it to charter this

Page 581

1   jet? Isn't that what would've happened if that
2   was the case?
3        A   Yes. I always thought he was going to
4   do that. Remember, I only put down a million
5   dollars on Phase II. So I always thought that
6   would get reimbursed back somehow with a due to or
7   due from on this with Joe.
8        Q   Do you have any evidence of Joe -- any
9   contemporaneous documents and evidence of Joe
10  saying, yes, go ahead, buy 149 Brazilian, or, yes,
11  go ahead, buy the yacht?
12       A   Well, I have emails from Joe with
13  brochures called Palm House Residences back and
14  forth of what the amenities would be. So does it
15  say in there, buy the land tomorrow? I don't
16  know, but it sure was obvious that he said to do
17  it.
18       Q   But is that -- let's introduce -- I'll
19  introduce some emails. You can go ahead while I
20  do that.
21       MS. IVORY: So I guess you just
22  mentioned that the -- I guess the jet and the boat
23  were considered amenities of the Palm House
24  project?
25       THE WITNESS: Yes.

59  (Pages 578 to 581)

SEC_000822

Page 582

1      MS. IVORY:  So would the revenues be
2  associated with the EB-5 project from the club, or
3  would this be considered something separate?
4      THE WITNESS:  No.  The revenues were
5  going to go in.  Back when they did that denial,
6  they asked about how many club memberships you
7  could sell, and PKF did a study, and I think said
8  you could sell ten in a year.  A very conservative
9  number.
10     MS. IVORY:  Okay.
11     So who would own and operate the yacht?
12     THE WITNESS:  It was set up to be an
13 offshore company.  And we would have a separate --
14 we hired a captain.  We hired an engineer.  We
15 started a very big rehab of this boat.  It was a
16 Delta, one of the best American boats made.  So we
17 were doing it, you know, to match the hotel.  The
18 designer did the colors in the black and white for
19 the marble in the lobby to match the boat.
20     MS. IVORY:  So who be the owner and
21 operator of the yacht?
22     THE WITNESS:  It was going to be owned
23 by an offshore company.  It was owned by an
24 offshore company.
25     MS. IVORY:  Do you know the name of the

Page 583

1  company?
2      THE WITNESS:  Alibi Limited, I think.
3      MS. IVORY:  And do you know who was the,
4  I guess, managing member of that company?
5      THE WITNESS:  I think it was my wife.  It
6  could've been me.
7      MS. IVORY:  Okay.
8      So was it ever in the budget for the
9  EB-5 project to acquire the yacht?
10     MS. SPRINGER-CHARLES:  The Palm House
11 Hotel, LLLP EB-5 project.
12     THE WITNESS:  In the beginning, when the
13 money came in, I believe some it was personal
14 money and some of it was for the hotel.  All the
15 way through I believed that.
16     MR. REINHART:  When you say for the
17 hotel, you mean EB-5 money?
18     THE WITNESS:  EB-5 money for the hotel.
19 All the way back to Les Evans.  So in my mind, he
20 had personal money and EB-5 money going in.  So I
21 didn't think about it.  I didn't think it was an
22 issue.  If he says spend a million dollars on a
23 boat, I spent a million dollars on a boat.
24     BY MS. SPRINGER-CHARLES:
25     Q   Whose million dollars did you think you

Page 584

1  were spending on the boat?
2      A   I thought that was part of his money.  I
3  never had it in my budget for the hotel.
4      MR. REINHART:  So when you say his, you
5  mean --
6      THE WITNESS:  Joe's.
7      BY MS. SPRINGER-CHARLES:
8      Q   Joe Walsh.
9          At what point did you believe Joe Walsh
10 stopped sending you personal money and that all
11 the funds that he was sending was EB-5 money?
12     A   Only till I talked to Toney Reitz
13 recently did I find out.
14     Q   So you thought the funds coming over
15 represented -- for the entire time between 2012
16 and until October of 2014, you thought all of the
17 funds that came over was -- for the entire time
18 both a mix of personal funds and EB-5 funds?
19     A   And I thought even other EB-5 funds.  I
20 had heard through the grapevine that he had
21 used -- if he got money in for the golf Jack
22 Nicklaus's son deal, that sometimes he would give
23 you that money, and then not give you your
24 money --
25     MR. REINHART:  Just clarify, this is

Page 585

1  what you know now or what you know back then?  I
2  think her question was, what did you know back
3  then, not what you believe today.
4      THE WITNESS:  No.  I had heard that.
5      BY MS. SPRINGER-CHARLES:
6      Q   Back then?
7      A   I had heard that he sometimes would
8  switch the money around.  I don't know exactly.
9      Q   Back then you heard that?
10     A   I heard that sometimes he would loan
11 money in between the entities.
12     Q   But did you think that he was then
13 defrauding those investors in that investment?
14     A   No.  I thought that he had a package of
15 money and that maybe it went to here, and if they
16 needed it, it went over there.  So -- and I
17 thought it came out of fees because he had -- on
18 the other deals he supposedly got prepaid
19 interest.
20     Q   But in these offerings documents, there
21 are specific uses of proceeds -- in the loan
22 documents that were attached, there are used of
23 proceeds.  And so if I'm investing in one of these
24 projects, I think my money is going where the
25 document say it's going.  So wouldn't it be a

60 (Pages 582 to 585)

## Page 586

1  fraud to then divert my funds to another project?
2      A   I don't know.  But in the documents, he
3  also showed a boat and said we were going to have
4  it in the club, according to this brochure right
5  here.  So I thought that was part of the package
6  on the EB-5.
7      Q   But I thought you testified that you
8  didn't think that that was going to happen until
9  Phase II, correct?
10     A   No.  I testified that the boat was going
11 to happen in Phase I.  The club was in Phase I.
12 And that I thought that the land behind the hotel,
13 he was going to do separately either with an
14 investor or with EB-5 funds.
15     Q   And what made the boat different again?
16     A   Because we needed to do the club sales.
17 We needed the boat to do the club sales.  And we
18 had projected club sales -- Michael Evans had
19 projected club sales in his report.  So I thought
20 it was part of the first phase, what I'll call
21 Phase I.
22     MR. GALDENCIO:  You mentioned that you
23 had an understanding that Mr. Walsh would move
24 funds between projects.  How did you get that
25 understanding?

## Page 587

1      THE WITNESS:  Tony told me.  I don't
2  remember when he told me, but Tony told me that at
3  some point after this thing was done.  He told me
4  that he didn't have any personal money in it, and
5  I was like, what?
6      MR. GALDENCIO:  Well, he told you
7  that -- you just said he told you that after this
8  thing was done.  This being the project blew up?
9      THE WITNESS:  Witness the last year he
10 told me that.  And he just reaffirmed it last
11 week.
12     MR. REINHART:  I think their question
13 is -- I'll try to clarify what you said a second
14 ago -- it's not what you know now.  What did you
15 know prior to --
16     MR. GALDENCIO:  And how did you know
17 that?  You testified earlier that you knew prior
18 to now or prior to the blow up of the project that
19 Mr. Walsh would move money between projects.  And
20 my question is:  How did you know that?
21     THE WITNESS:  I didn't know factually.  I
22 had heard that from either Mark or Tony.  Somebody
23 told me that sometime -- because I would ask Tony
24 for money, and he would say, how much came in
25 sometimes, and then Joe would tell me a different

## Page 588

1  amount came in.  And so at some point, I remember
2  hearing that from either Mark or Tony.  One of
3  those two people definitely told me that.
4      MR. GALDENCIO:  And was the money that
5  was spent on the boat going to be added to your
6  loan?
7      THE WITNESS:  My loan?
8      MR. GALDENCIO:  The money that came out
9  of the -- the money that you received from Walsh.
10     THE WITNESS:  A personal loan.
11     MR. GALDENCIO:  That was going to go on
12 to the loan for the hotel?
13     MS. IVORY:  So in other words to
14 rephrase, the one million dollars that came out of
15 the Regions bank account ending 7918, that was a
16 160 Royal Palm account, and it was used to fund, I
17 guess, the one million dollar deposit on the boat.
18 If the boat was titled to Alibi, LLC, where your
19 wife is the managing member, he's asking, was this
20 a loan to you since the boat would be in Mia's
21 name?
22     THE WITNESS:  No.  The intent was -- the
23 only reason we put it in Mia's name is because the
24 lawyer told me to put it in an offshore company,
25 and we didn't want to have a loan.  So if you

## Page 589

1  buy -- if you buy a boat and you have a loan
2  against it, we had a separate LLC, so that if you
3  took back paper to sell it.  So I think the boat
4  was four and half million dollars.  And say we put
5  down a million.  So now we owe three five.  We
6  didn't want to have the obligation going to the
7  hotel.
8      MS. IVORY:  So what the asset, what's
9  the asset considered the asset of the hotel or
10 Alibi, LLC?
11     THE WITNESS:  Even though it was in
12 Alibi's name, it was one hundred percent always
13 considered for the hotel.  It wasn't a boat for my
14 wife or I.  It was for the club and done how the
15 lawyer told be to do it, put it in an offshore
16 company.  That's how they do big boats.
17     MS. IVORY:  So I guess the one thing is,
18 when we look -- and I'm not sure if you have an
19 exhibit the purchase and sale agreement for the
20 yacht?
21     MS. SPRINGER-CHARLES:  I do not.
22     MS. IVORY:  But I believe looking at the
23 documents, that you were included on the purchase
24 and sale agreement, but I hadn't seen your name in
25 the past on the other documents.  Is there a

SEC_000824

Page 590

```
 1   specific reason that you were -- you signed as the
 2   purchaser on the yacht and no other assets for 160
 3   Royal Palm?
 4        THE WITNESS:  I think the only reason I
 5   signed was because, I believe, Mia owned Alibi
 6   Limited, and I was going -- I think I was the
 7   President.  And so Robb Maass wanted me to sign
 8   the document.  So I said, well, make me the
 9   President, and I'll sign the document.
10        MS. IVORY:  Was there any intent -- I
11   guess how would it actually work when the yacht
12   was placed in service?  Would the boat be leased
13   to 160 Royal for the hotel, or how would it
14   actually --
15        THE WITNESS:  That's exactly what we
16   talked about.  We talked about doing a charter
17   agreement that was a see through agreement.  So
18   that whatever my costs were on the boat,
19   automatically they paid those costs.  It wasn't --
20   we weren't going to make any money.  It was a pass
21   through deal.  So that's exactly what we were
22   going to do is, we were going to have a charter
23   agreement on an annual basis for X-amount of
24   money, and that money would've been exactly
25   whatever the cost were.  Are you with me?
```

Page 591

```
 1        MS. IVORY:  Okay.  No.  I understand.
 2        So are there any documents for this
 3   agreement, the charter agreement?
 4        THE WITNESS:  I think we started the
 5   charter agreement documents.  I know I talked to
 6   Jade about it at one point, and I believe I talked
 7   to Robb about it at one point, yes.
 8   BY MS. SPRINGER-CHARLES:
 9        Q   Robb?
10        A   Robb Maass, the maritime attorney.
11        MR. REINHART:  M-A-A-S-S, and Robb with
12   two Bs.
13        MS. IVORY:  So I guess the one question
14   is:  To the extent -- well, let me step back.
15   Where's the boat now?
16        THE WITNESS:  The boat was sold.  My
17   wife funded it after with her money.  When this
18   deal blew up, we kept funding it to keep it going
19   for all the rehab.
20        MS. IVORY:  So let's talk about that.
21        THE WITNESS:  Then we sold it.
22        MS. IVORY:  So after the blow up, what
23   happened with the boat, or what the plan after the
24   blow up?
25        THE WITNESS:  We spent all our money
```

Page 592

```
 1   trying to keep it going till the end.
 2        MS. IVORY:  With the intent of, I guess,
 3   owning the boat?  Or did you put money in?  Was it
 4   a loan to Palm House, the money you put into the
 5   boat after the fact?
 6        THE WITNESS:  I fully expected that some
 7   day I'd be reimbursed that money.  To this day,
 8   there's money in an escrow account.  And I fully
 9   expected that money to come back to my wife, yes.
10        MS. IVORY:  Okay.
11        So all the money put in after the fact
12   was a loan to Palm House or whoever owned the
13   hotel all these years later?
14        THE WITNESS:  Yes.  Yes.
15        MS. IVORY:  So, I guess, what happened
16   with the boat?  So where is it no?  You started
17   saying that it was ultimately sold.  Can you help
18   me understand what happened from, I guess, that
19   point, from the blow up until now.
20        THE WITNESS:  Yeah.  What happened with
21   the boat was, Ryan went out and bought a bill
22   payable from the HBA, the designers, for, I think,
23   twenty thousand dollars, and he had the boat
24   arrested last November, but it could be two
25   Novembers ago, sometimes in the last two years.
```

Page 593

```
 1   And we went to court, and we had a federal lawsuit
 2   where Ryan tried to claim the boat.  It was, you
 3   know, stolen or something, whatever malarkey he
 4   came up with.  And we went into a federal lawsuit
 5   with Judge Marra, who didn't put up with their
 6   shenanigans, and he ruled in our favor on the
 7   boat.  And we were able to sell the boat to the
 8   guy that wanted to buy it.  And then we took the
 9   net proceeds, and we put it into an escrow
10   account.  It was going to go 160, so I could use
11   the money for 160, which I could've paid legal
12   fees.
13        So immediately after we won the lawsuit,
14   they went to a civil court, state court, whatever,
15   without us being there.  I don't know what it's
16   called, but it's called something when the lawyer
17   goes without you.  They went into court, and they
18   said, oh, this guy stole sixteen million dollars,
19   we want to take the money and give it to the
20   receiver.  So they gave it to the receiver a
21   couple of month ago.  He just went in and took
22   seven hundred grand out and to pay Joe back.
23        MR. REINHART:  The short answer to her
24   question, if I can, the boat was sold, right?
25        THE WITNESS:  Yes.
```

62 (Pages 590 to 593)

## Page 594

```
 1          MR. REINHART:  There was a profit on the
 2   sale, right?
 3          THE WITNESS:  Not a profit, but whatever
 4   was left --
 5          MR. REINHART:  There's net proceeds
 6   after the loan was paid off?
 7          THE WITNESS:  Two million three.
 8          MR. REINHART:  And that money went into
 9   escrow?
10          THE WITNESS:  Yes.
11          MR. REINHART:  And that money is either
12   still in escrow or it's gone back to the hotel
13   project either through the receiver or court
14   order?
15          THE WITNESS:  And to Joe.
16          MS. IVORY:  Okay.  So two point three
17   million, ultimately, went back into Palm House?
18          THE WITNESS:  No.  It went into an
19   account.  And then about three weeks ago, the
20   receiver asked for about seven or eight hundred
21   thousand dollars, of which three hundred and
22   change was for Joe.  And it was a new judge, and
23   they gave him the money.  And I turned in my
24   stomach.
25          MR. REINHART:  But the balance is still
```

## Page 595

```
 1   in escrow.  It's still in escrow under court
 2   control, and they're fighting about who gets it.
 3          MS. IVORY:  Okay.
 4          MR. REINHART:  I think that's between
 5   the -- and this is all court records, so I hope
 6   I'm not testifying, but there's the black Walsh
 7   group that claims they should get the money on
 8   behalf of the hotel, and Mr. Matthews and his
 9   group are claiming the money should go to the
10   hotel.
11          MS. IVORY:  I guess --
12          MR. REINHART:  But -- I'm sorry -- none
13   of the money is going to him personally.
14          MS. IVORY:  Okay.
15          I think you mentioned earlier that there
16   was a staff, a crew for the yacht?
17          THE WITNESS:  Yes.
18          MS. IVORY:  So did they stay on board
19   after the whole blow up in October?
20          THE WITNESS:  Yeah.  They stayed on
21   until we couldn't afford them anymore.
22          MS. IVORY:  So who funded that?
23          THE WITNESS:  My wife.  The boat was
24   never done.  Just so you understand, it was a
25   complete gut rehab, all painted all meticulous,
```

## Page 596

```
 1   like a real rehab of this boat.  It never like
 2   went out and somebody used the boat for pleasure.
 3   Don't have that in your head because that didn't
 4   happen.  It was just a complete gut rehab done at
 5   a boat yard in Ft. Lauderdale.
 6          MS. IVORY:  So around how much do you
 7   think was put into it, I guess, with Mia's or your
 8   personal funds into the whole --
 9          THE WITNESS:  I'm guessing between five
10   hundred and seven fifty, something like that.
11          MS. IVORY:  My question is:  As opposed
12   to -- I guess why continue to put the money into
13   the yacht after the fact when, ultimately, it
14   seems as if there's a lease agreement, there's no
15   way that you would personally profit, I don't
16   believe, based on your testimony, from chartering
17   the yacht out to the club, so why continue to do
18   it for so long?
19          THE WITNESS:  Because we signed an
20   agreement with the receiver, and we had a stand
21   still agreement for the lawsuits, and I was going
22   to get the financing, and I came up with two term
23   sheets to finance the hotel.  So this was going to
24   be part of the hotel.  I had never given up to
25   this day to get the hotel done.  So it was all
```

## Page 597

```
 1   going to be part of the hotel, so we did as much
 2   as we could.  Even after it blew up, we put money
 3   into -- I put money into Palm House to keep it
 4   going.  I never gave up on it.
 5          MR. GALDENCIO:  But there were funds
 6   paid on behalf of the boat out of Palm House PB,
 7   LLC, correct?
 8          THE WITNESS:  Absolutely, yes.  They had
 9   recently paid them.  We weren't supposed to pay
10   the money.
11          BY MS. SPRINGER-CHARLES:
12      Q   How would the boat in 149 Brazilian
13   serve as collateral to secure the loan that the
14   investors made to Palm House, LLC, if it's placed
15   outside of the Palm House 160 corporate structure,
16   if it's owned by these entities that have no real
17   relation to 160 Royal Palm or Palm House, LLC?
18      A   So the boat -- she was correct, we were
19   going to do a charter agreement with the boat.
20      Q   Which you haven't done it?
21      A   We started it.  There's a beginning of a
22   charter agreement to do a master lease on the boat
23   to go back to the hotel.  So --
24      Q   Did you produce that to us?
25      A   I don't know.  If you've got it, you've
```

SEC_000826

Page 598

1  got it. But I know we started it.
2  **Q  No. I'm asking, because I don't I've**
3  **seen one.**
4      A  I know we -- we either started it or we
5  talked to the attorney about how to do it, but we
6  definitely talked about it.
7  **Q  But you didn't have a complete**
8  **agreement?**
9      A  No. No.
10  **Q  My question is, okay, that would somehow**
11  **serve as collateral then to secure the loan that**
12  **was made?**
13      A  Well, I don't really understand your
14  question.
15  **Q  Well, let's look at the loan documents.**
16  **Because when I look at the loan documents, it says**
17  **under, "Grant of security interest, obligation**
18  **secured. The borrower, hereby, grants to the**
19  **lender a subordinated security interest in all of**
20  **the borrower's present and future rights, title,**
21  **and interest in real property, furnitures and**
22  **fixtures, inventory, deposit accounts, and reserve**
23  **bank accounts, reserve accounts where they're**
24  **located and whether now existent or hereafter**
25  **created or arise and collectively called the**

Page 599

1  collateral." There's some other relevant — that
2  I don't need to read into the record.
3      Then under, Representations and
4  Warranties, "The borrower represented that it had
5  good and marketable titles with properties and
6  assets, including all of the collateral subject to
7  no mortgage pledge liens, security interest
8  encumbrance of other charges, which is not set
9  forth in any addendums attached hereto, as well as
10  the borrower conducts its business solely in its
11  name without the use of a trade name or the
12  intervention of or through any other entity of any
13  kind, other than as disclosed on any addendums
14  attached hereto."
15      MS. IVORY:  So I think in short, maybe
16  the question is:  If the one million dollars went
17  out of this Palm House account and another one
18  million dollars went out for the yacht, as well
19  as, I guess, any funds that went out of the Palm
20  House PB account, I think that's the name of it,
21  why wasn't it in the name of Palm House in an
22  asset to which Palm House had the right to, if
23  anything -- a blow up happens, you know, they
24  could've seized it themselves?  Why wasn't it in
25  that name of the hotel if a lot of the expenses

Page 600

1  came out of the Palm House account?
2      BY MS. SPRINGER-CHARLES:
3  **Q  As well as 149 Brazilian, the same**
4  **question applies.**
5      A  I'll answer just one at a time.  The
6  boat, we didn't want to create a liability for the
7  LLC.  So if you close on the boat, and Palm House
8  owned the boat, which my lawyer told me to make
9  sure you had an offshore ownership.  Okay?
10  **Q  We don't want you to get into what your**
11  **lawyer told you.**
12      A  Okay.  Sorry.
13      But if you signed on the boat, the hotel
14  would've had a four and a half million obligation,
15  an extra liability that wasn't there before.  I
16  didn't want the hotel to have that liability.  But
17  if you had a separate LLC and anything ever
18  happened, the most they could ever do, and they
19  almost did, is take the boat.  They couldn't then
20  have a charge against the hotel.  You with me?
21      MS. IVORY:  I understand.
22      I mean, when I think about it on the
23  balance sheet, there's a liability, but an asset
24  for the boat would've been there as well, right?
25  So a net net, zero zero.  If you have an asset,

Page 601

1  you have the liability, as well.  So are you
2  saying that the loan agreement that was signed for
3  the remaining balance was cross-collateralized,
4  cross-defaulted where if someone defaulted on that
5  loan, other assets will be at risk?  Is that what
6  you're trying to say?
7      THE WITNESS:  Yes.  So if just say Palm
8  House owned the boat.  I bought it from you.  I
9  think it was four and a half or five and a half
10  million.  I think the loan was four and a half
11  million, so it must have been five and a half.  So
12  now I have -- I bought it from you, and I put it
13  into this lovely, beautiful hotel over here.  I
14  just created a four and a half million dollar
15  liability that wasn't there before.  I would never
16  want do that with the boat, so that if we couldn't
17  make the payments or something went wrong, they
18  could come in after that LLC.
19      So keep in mind now, we set up a
20  different offshore entity, and something goes
21  wrong with the boat where the seller's going to
22  take back -- it was only a one or two year loan.  I
23  think it was a one year loan.  So now he comes in.
24  What can he do?  He can take the boat.  He can
25  never touch the hotel.  It's kind of like a

SEC_000827

Page 602

1  nonrecourse loan to the hotel.  The boat was never
2  going to be for us.  It was always for the hotel.
3  No one tried to steal money and buy a boat.  That
4  was not the intention here.
5          MS. IVORY:  No.  I understand.  But as
6  far as looking at documents, was the loan document
7  only have the boat as collateral?
8          THE WITNESS:  Yes.
9          MS. IVORY:  If the only collateral is
10  the boat, then it wouldn't matter because the only
11  collateral on that loan was the boat.  You have a
12  four point five million dollar asset and a four
13  point five million dollar liability, net net is
14  still zero.  But if the boat was worth more than
15  four point five, then it could've been an asset.
16  So I'm just trying to understand, you know, was it
17  something that a loan document beyond, you know,
18  having just the boat as collateral?
19          THE WITNESS:  They would've had more
20  than the boat as collateral.  The LLC would've had
21  to sign on the loan.  I didn't want the hotel to
22  have to sign on a loan.  I didn't want another
23  loan on the hotel if something ever went wrong
24  with the boat.  So my lawyer said, set up an
25  offshore company.  So I did what he said.  I put

Page 603

1  it in Mia's name.  But it was never ever, ever
2  supposed to be for anything, but the hotel.
3          Also, Glenn had a personal mortgage.  If
4  it ever blew up, Glenn would've got the boat
5  before the investors ever got the boat.
6          BY MS. SPRINGER-CHARLES:
7      Q    Why not disclose all of this?  Why not
8  just tell investors, we're going take some of your
9  thirty-five -- thirty-nine point five million, you
10  Palm House Hotel, LLLP investor, and I'm going to
11  buy a boat?  Why not say that?
12      A    Because I'm not dealing with the
13  investors.  I'm dealing with Joe Walsh, who's
14  lending me money.
15      Q    You're dealing with the investors'
16  money, so --
17      A    No.
18      Q    It's not Joe Walsh's money.  This is
19  investor money, right?
20      A    I believe some of it was Joe Walsh's
21  money.  One hundred percent my hand on a Bible, I
22  believe that.
23      Q    Thirty-nine and a half million of it was
24  supposed to be investor money, correct?
25      A    Well, I heard forty-six five.  So that's

Page 604

1  what I heard.
2      Q    Why not tell the investors, I'm going to
3  take your thirty-nine and a half or your forty-six
4  and a half million dollars, and I'm going buy a
5  boat?  Why not just tell them?
6      A    So if I did it, and I was going to do a
7  PPM, and I was going to raise money from
8  investors, instead of just saying there's going to
9  be a boat that you can use, I would've disclosed
10  it to them, if it was my deal.  That wasn't my
11  job.  I did what he asked.  He wanted to put a
12  million dollars down.  I took the million dollars.
13  I put it down.  He wanted to decorate the boat.  I
14  didn't care.  I wanted the boat for the hotel
15  because it was going to produce a lot of income, a
16  lot of revenue for this club.  It was a great
17  idea.  So I was thinking as a businessman dealing
18  with this guy that I thought was honorable.  I can
19  look back now and say, oh, that was stupid.  It's
20  easy to look back now, but then I didn't know.
21      Q    But now looking back, you see that
22  placing the boat or the property behind the hotel
23  in another entity's name violates some of the
24  representation of warrantees that were --
25      A    One hundred percent, I agree with you

Page 605

1  now.  Yes.
2          MS. IVORY:  And just so that I'm clear
3  before we move forward, you're saying that there
4  was a document for which Joe Walsh will receive
5  the boat if -- can you clarify again?  Help me
6  understand.
7          MR. REINHART:  Not Joe Walsh.  Glenn
8  Straub.
9          MS. IVORY:  Oh, Glenn Straub.  Okay.
10  So Glenn Straub would receive the
11  boat --
12          MR. REINHART:  Explain.  You have to
13  testify.  I can't testify.
14          THE WITNESS:  Glenn was in first
15  position.
16          MS. IVORY:  Okay.  For all of the assets
17  of --
18          THE WITNESS:  Everything.  Everything.
19          MS. IVORY:  Even the Alibi, LLC?
20          THE WITNESS:  He had just --
21          MR. REINHART:  No.  Answer her question.
22          THE WITNESS:  If I put it in that name,
23  yes.
24          MS. IVORY:  Okay.  Okay.
25          MR. REINHART:  It's your point about the

65  (Pages 602 to 605)

SEC_000828

Page 606

1  asset, right?  If he added it as an asset to the
2  LLC, that's increasing Mr. Straub's collateral
3  position before the -- before the EB-5 investors.
4      MS. IVORY:  Okay.  Got it.  Thank you.
5      BY MS. SPRINGER-CHARLES:
6      Q   Looking back, it would've been prudent
7  to read the loan documents, right?
8      A   Let the record say that I said yes.
9      Q   And just to be clear, there are no
10  documents that reflect that Joe Walsh told you to
11  utilize funds that he transferred to you to
12  purchase the yacht, correct?
13      A   No.  I think there are notes with Mark
14  Walsh.  He told me he had notes in his notebook.
15      MR. REINHART:  Mark?
16      THE WITNESS:  Oh, sorry.
17      BY MS. SPRINGER-CHARLES:
18      Q   No.  Mark Payne?
19      A   Mark Payne, yes.
20      Q   Documents that you have that --
21      A   No, I don't have any.  Sorry.  I don't
22  have any.
23      Q   Okay.
24          What about 149 Brazilian, any documents
25  where Joe says, yes, you're authorized to utilize

Page 607

1  funds that I've transferred to you in order to
2  purchase for 149 Brazilian?
3      A   I think when he tells me to buy the
4  property and does a brochure on it and sends me
5  the brochure, that in my mind, he didn't
6  specifically say -- I don't an email that says, go
7  buy the property, but he did tell me to buy the
8  property.
9      MS. SPRINGER-CHARLES:  Let's go off the
10  record.
11      (A brief recess was taken.)
12      MS. SPRINGER-CHARLES:  Let's go back on
13  the record at 4:33 p.m. on February 13th, 2017.
14      BY MS. SPRINGER-CHARLES:
15      Q   Did you have any substantive discussions
16  with any members of the staff while we off the
17  record, Mr. Matthews?
18      A   No.
19      MR. GALDENCIO:  Mr. Matthews, if you
20  could pick up again Exhibit 171.  It should be
21  right on top.  And looking again at that
22  ninety-one million for the total uses of funds,
23  and, again, going back to the sources, and we
24  talked about the developer equity of twenty-two
25  million, and you testified that that was not a

Page 608

1  number that should be used as a source of funds,
2  because that was the amount that you had invested
3  in prior to the foreclosure, the first
4  foreclosure; is that correct?
5      THE WITNESS:  Yes.  But just to be
6  clear, Joe told me that you'd go back to the
7  beginning.  That was his theory, which I didn't
8  agree with.
9      MR. GALDENCIO:  I do not find an email
10  where you respond that that twenty-two million
11  should be not included.  Did you respond?
12      THE WITNESS:  I probably didn't send an
13  email.  If you can't find one, then I'm sure I
14  didn't send it.  I know I responded, because this
15  is what the deal was, and they were very confused.
16  David Derrico was putting in purchase prices from
17  '06, and I remember talking to him and telling
18  him -- it even says it in one of these things,
19  which is also what Bob told me.  He's reading an
20  old appraisal.  And I'm telling him, yes, I bought
21  it for twenty-nine back in '06.
22      MR. GALDENCIO:  I understand that, Mr.
23  Matthews, but -- please, I'm not being
24  argumentative, but I'm reading an email, I'm
25  reading something in writing where it's being

Page 609

1  represented to you that this twenty-two million is
2  going to be included as a source of funds, and I
3  don't have a response in writing from you in the
4  production that says that you object to that or
5  that that's incorrect or that shouldn't be used.
6      THE WITNESS:  I probably didn't send him
7  an email.
8      MR. REINHART:  I think he's testified
9  that they had a phone conversation or an in person
10  conversation.
11      THE WITNESS:  I think I met him in
12  person.
13      BY MS. SPRINGER-CHARLES:
14      Q   David Derrico?
15      A   Yes.
16      MR. GALDENCIO:  I want to be very clear
17  and make sure that you are recollecting correct,
18  that if there is a written response, then we need
19  to see that.
20      THE WITNESS:  Yeah.  I barely did
21  written responses, as you guys can see from this.
22  They would ask me something.  Mostly, I didn't pay
23  attention to this PPM crap, and -- but I did
24  remember talking about this with David, because I
25  remember specifically the sixty-two and change

66 (Pages 606 to 609)

Page 610

1   that I thought it was.  So I know what I talked
2   about.  I know what I talked about with Joe.  And
3   I know he wanted to use the twenty-nine million
4   dollar number when I bought it, and I didn't agree
5   with it, but he said, mind your own business, I'm
6   doing the EB-5, you can go back to when you had it
7   originally.  And I said, okay, I'm not going to
8   argue with you anymore.  It was his deal.
9           MS. SPRINGER-CHARLES:  I'll ask the
10  Court Reporter to mark a copy of this composite
11  exhibit of emails related to the Palm House
12  Residences as Exhibit No. 186.
13          (SEC Exhibit No. 186 was
14          marked for identification.
15  BY MS. SPRINGER-CHARLES:
16      Q   I'm showing you what's been marked as
17  Exhibit No. 186, Mr. Matthews.  We can go through
18  this together, if you'd like.  I think it might be
19  more efficient that way.  The first email -- and
20  I'll take my time to give you time to read them --
21  12/9/2013, Palm House Residences Discussion Sheet.
22  You sent that Joe Walsh, correct?
23      A   I believe yes.  I believe I sent him
24  this, yes.  It's to do with the club benefits,
25  yes.

Page 611

1       Q   What is this document that's attached to
2   it that says, Palm House Residences Discussion
3   Sheet for Financing?
4       A   I believe that he asked me how it could
5   tie in with the hotel with the club, and these
6   were all the amenities we were going to do from
7   the spa to the wine cellar to the game room, beach
8   privileges.
9       Q   So was this supposed to be separate
10  financing from the thirty-nine and a half million
11  raised from Palm House Hotel investors?
12      A   The club was supposed to be part of the
13  hotel from the beginning.
14      Q   I know, but can you answer my question.
15          MR. REINHART:  She asked the Palm House
16  Residences, not the hotel -- not the club,
17  residences.
18          THE WITNESS:  Well, I was going to say
19  the club that was going to be part of it from the
20  beginning, but then we were going to add this
21  amenity list of the club over to the Phase II.
22  BY MS. SPRINGER-CHARLES:
23      Q   So with separate financing than the
24  original thirty-nine and a half million?
25      A   To build the building it would've been

Page 612

1   separate financing, but all of these things were
2   built into the first financing.
3       Q   And is that -- if I look at the use of
4   funds in the business plans, I'd see all of these
5   things?
6       A   You would see -- you would see --
7       Q   The Rolls-Royce, the yacht, and the jet?
8   Let's just talk about those.
9       A   No.  I meant the ones for the spa and
10  the cabaret ballroom.  I meant those items that
11  are physically part of the hotel.
12      Q   Okay.  But not the Rolls-Royce, the
13  yacht, and the jet?
14      A   Well, I testified that the yacht was
15  going to be part of Phase I.
16          MR. REINHART:  No.  But her question
17  was:  Would that specifically be in the uses of
18  funds?
19  BY MS. SPRINGER-CHARLES:
20      Q   The uses of funds in the business plans.
21      A   Not the business plan that I read, no.
22      Q   In any of the business plans that you've
23  ever seen?
24      A   No.  Only that he wanted it.  It wasn't
25  in a plan.

Page 613

1       Q   You see the next one is 12/11/2013
2   email.  On the bottom, Joe says to you, "Bob,
3   please let me know when you will have something on
4   PHR, Palm House Residences.  We need to form a
5   corporation on it and some prelim plans,
6   projections, et cetera.  Let me know where it is
7   at, please."  And you responded, "I know.  We
8   should have preliminary information today."
9           You then send him some Phase II, a map
10  and a site plan, correct?
11      A   Correct.
12      Q   Joe then says -- well, Chris Eitel sends
13  Joe an email, "Hey, Joe, first off, I'd like to
14  say thanks again for a wonderful party.  Christy
15  and I both have had smiles on our faces since we
16  got home."  Let's just skip ahead.  It says, "I've
17  attached my first attempt at the cover for the PHR
18  brochure.  Please let me know if this is what you
19  are envisioning.  The gate is separate from the
20  background, so I can change that image out if
21  you'd like to see something different.  I'm going
22  to start on the sugar deal brochure now."  I don't
23  think that's relevant to this.
24          Who's Chris Eitel?
25      A   His design guy.

Page 614

1    Q   Joe responds -- well, forwards it to you
2  and says, "Bob, first stab at a simple brochure
3  for PHR.  Remember, this is for sales only.  The
4  inside will have beauty shots of Palm Beach with
5  your designs.  Comments, I like it so far."  You
6  respond, "Please review this" -- well, Joe, again,
7  forwards that email to you and says, "Please
8  review this idea.  I think it will work with your
9  drawings.  We need prices, et cetera."  And you
10 respond, "Joe, this looks like a great start."
11         The next email -- yes, I read that
12 correct?
13    A   Yes.  Yes.
14    Q   And that exchange happened?
15    A   And if you didn't say it was great, you
16 were going to get screamed at.  So, absolutely, it
17 looked great for me.
18    Q   The next email is 12/23/2013.  Jade
19 sends an email to Joe Walsh, cc'ing you.  It says
20 from Bob Matthews.  "Good afternoon, Joe.  Please
21 refer to the attached document laying out the
22 specs of the Palm House Residences.  Please, also
23 note the following changes to the brochure," and
24 you articulated certain changes.
25         At the bottom, it says, "Balance Project

Page 615

1  Equity."  It says, "The Palm House Residences
2  project is seeking to raise seventy-five million
3  in developer equity and will finance the remaining
4  balance for development.  This capital stock
5  provides added security and ensures a highlight
6  return for project investors.  We need
7  seventy-five million total, of which we need
8  twenty-two million to date to purchase the land.
9  If Mr. Wang and Mrs. Pan put together the
10 seventy-five million, we'll have the Palm House
11 club membership number thirty-one in a free medium
12 size unit and a first mortgage.  To the remaining
13 investors, we will give them a second mortgage at
14 seven percent APR, and then can apply towards a
15 unit."  Do you see that?
16    A   Yes.
17    Q   So, again, 149 Brazilian, was that where
18 the residences were supposed to be?
19    A   Yes.
20    Q   But was that supposed to be purchased
21 for Phase II, yes, correct?
22    A   Yes.  This is two people that liked
23 them.  Their favorite number was thirty-one.  And
24 that Joe asked Jade, I remember specifically, to
25 put this together to look at them for one of the

Page 616

1  investors he was going to bring in.
2    Q   And so -- this will be the last time I
3  ask you because actually now I think I did ask
4  you, but why did you buy 149 Brazilian at the time
5  that you did?
6    A   Because Joe told me to.
7    Q   Do you have any documentation where Joe
8  told you that you should purchase it?
9    A   Well, to have contiguous land behind the
10 hotel available is a big deal.
11    Q   I guess first my only question was:  Did
12 Joe tell you to purchase it?  Did you have any
13 contemporaneous documentation --
14    A   I don't have an email.  But if you ask
15 anybody, Joe, Mark, anybody, they will testify
16 that he absolutely told me to buy it, and that's
17 why I bought it.
18         (Mr. Galdencio leaves the room.)
19         MR. REINHART:  Your prior question was,
20 and I want him to expand on his answer, if he
21 needs to, was why they chose to make the purchase
22 at the time that they did?
23         BY MS. SPRINGER-CHARLES:
24    Q   Well, yeah, I asked that a while back,
25 but go ahead.  Why?

Page 617

1    A   Well, that property was for sell, and
2  along with it there was a little house that was
3  for sale.  And to have -- which virtually ended up
4  as three lots for sale at the same time contiguous
5  to Palm House and Palm Beach was a big deal.  In
6  fact, the land was already under agreement with
7  somebody else.  So to get that to be part -- to
8  connect to Palm House economically was a big --
9  was a once in a lifetime opportunity.
10    Q   Let's look at the email on 5/9/2014 on
11 Exhibit 186.  It's Bates labeled SEC-MR-B-0038159.
12 It's an email from David Derrico to you.  Do you
13 see that?
14    A   Correct.
15    Q   And he says -- and cc's Jade.  And the
16 subject is, Palm House, dash, Phase Roman Numeral
17 II.  "Hi, Bob, it seems like we are in the good
18 position of being close to having all seventy-nine
19 investors for the Palm House project.  And Joe has
20 told me a little about the Phase II residences,
21 club, et cetera plans.  He would like me to start
22 getting the paperwork ready for potential
23 investors.
24         "I understand there are three adjacent
25 parcels we are trying to purchase and, obviously,

Page 618

1    the plans would be different if we acquire one,
2    two, or all three of them.  I understand the goal
3    is to have full service residences probably leased
4    and offering full maid and hotel services for job
5    creation purposes, the private club, exclusive
6    restaurant, et cetera.
7            "Any details you could give me on those
8    plans would be appreciated.  So I was hoping to
9    talk with you about what the plans are, how far
10   along they are, if we have any projections yet, or
11   what I can do to help move that process along.
12   Hopefully, we have something ready for new
13   investors since Phase I is all filled up.
14           "Feel free to give me a call or email me
15   any documents or projections you currently have,
16   and let me know if you'd like to set up a
17   meeting."
18           You received this email, correct?
19      A   Correct.
20      Q   Did you ever work on any offering
21   materials related to Phase II?
22      A   I believe I had a set of prints done by
23   an architectural firm.  And this is dated 12/9.
24   This is now five -- May, so it's five months
25   later.  Joe's not able to get an investor group,

Page 619

1    you know, a high net worth person, so he decides
2    that he's going to make it an EB-5 project.
3       Q   But you haven't seen or participated in
4    working on any offering materials or marketing
5    materials to EB-5 investors for Phase II?
6       A   The only thing I did is, I did a site
7    plan on both pieces contiguous.  That was the only
8    thing I got done.
9       Q   Did you separately see any offering
10   materials for Phase II?
11      A   No.
12      Q   The 155 Brazilian property, were any
13   funds ever exchanged to purchase that property,
14   Vivian Doris's property or Doris Vivian?  I'm not
15   sure.
16      A   There was a lawsuit --
17          MR. REINHART:  No.  No.  Answer her
18   question.
19          BY MS. SPRINGER-CHARLES:
20      Q   Were any funds ever set aside or
21   transferred?
22      A   I believe she got funds from Les Evans's
23   liability insurance about six months ago, but that
24   was it.
25      Q   Other than that, no?

Page 620

1       A   No.
2       Q   So you never acquired that property
3    either personally or through any property that you
4    owned or controlled?
5       A   No.
6       Q   Just to wrap up the discussion of the
7    yacht.  Alibi -- I'd just like to confirm
8    these statements for me, if you know the answer.
9    Alibi Limited is a Cayman Islands entity?
10      A   True.
11      Q   It was formed on or about June 18th,
12   2014?
13      A   True.
14      Q   You were the President of that entity?
15      A   True.
16      Q   The initial and only member was a
17   Flagship Offshore Limited?
18      A   I imagine it's true.
19      Q   If you don't know, it's fine to say you
20   don't know.
21      A   I don't know.  I don't know any of the
22   dates on any of it.
23      Q   Did Flagship transfer its interest in
24   Alibi Limited to Alibi, LLC?
25      A   I don't know.

Page 621

1       Q   Did Mia end up owning the boat through
2    her ownership of Alibi, LLC, which was a Delaware
3    corporation?
4       A   I believe so.  I believe it owned Alibi,
5    the offshore company.
6       Q   Alibi, LLC owned the offshore company?
7       A   That's what I think.
8       Q   Okay.
9            Did you direct Jade -- we have evidence,
10   I think, in Exhibits 23 and 24 of Jade directing
11   the transfer of funds, about two million dollars.
12      A   Yes.
13      Q   Did you direct Jade to transfer those
14   funds for the purchase of the yacht?
15      A   Yes.
16      Q   There was about a hundred and ten
17   thousand dollars that was transferred from Les
18   Evans's AE IOTA account towards International
19   Yacht -- International Yacht --
20      A   IYC.
21      Q   -- IYC --
22      A   Correct.
23      Q   -- Collection?
24           Did you personally or through Jade
25   direct Les to transfer those funds?

SEC_000832

Page 622

```
 1        A   Yes.  It was for the improvements on the
 2   boat.
 3        Q   Was five hundred thousand dollars of at
 4   that initial two million dollars set aside for
 5   improvements on the boat?
 6        A   Either five hundred or a million, I
 7   don't recall, but one of the two.
 8        Q   A portion of it was?
 9        A   Yes, a portion of it was.
10        Q   Okay.  In like an escrow account with
11   IYC?
12        A   Yes.
13        Q   Okay.
14            The yacht's since been sold, we
15   confirmed.
16            The seller had a mortgage on the yacht,
17   right?
18        A   Yes.
19        Q   And when the yacht was sold, did you
20   repay the seller?
21        A   Yes.
22        Q   Okay.
23            After the about, approximately, three
24   hundred and ten thousand was transferred to
25   receiver to cover expenses, does the remaining
```

Page 623

```
 1   balance -- is it still with the court?
 2        A   No.  I believe -- I thought the receiver
 3   got around seven hundred and eighty thousand
 4   dollars.
 5        Q   Is that how much he got?
 6        A   (The witness nods head.)
 7        Q   Okay.
 8            And is the balance with the court?
 9        A   Yes.
10        Q   Okay.
11            One million dollars deposit was issued
12   to purchase 149 Brazilian.  Did you or Jade or
13   Jade, through you, direct Les Evans to write the
14   check that was used to -- as the down payment for
15   that?
16        A   Yes.
17        Q   Did Mirabia or anyone else ever make
18   mortgage payments to the lender in that
19   transaction, Medici?
20        A   I don't know.  I don't know if it was a
21   balloon.  I'd have to look at the note and
22   mortgage.
23        Q   You don't know if --
24        A   I don't know.
25        Q   Okay.
```

Page 624

```
 1        A   I don't think so.
 2        Q   When consulting fees were transferred to
 3   HIG, did you ever share in any of the fees that
 4   HIG received?
 5        A   No.
 6        Q   I think I asked this already today, but
 7   I don't know if I got a clear answer, and so I
 8   want the record to be clear.  When did you believe
 9   Joe Walsh stopped sending you personal money?
10        A   I knew in the beginning -- I thought in
11   the beginning it was personal money and that he
12   had a buffer of personal money in the account.  I
13   thought when he actually closed on the hotel.  Then
14   it was EB-5 money in my mind.
15        Q   So do you believe that the money used to
16   purchase the hotel from Glenn Straub was EB-5
17   money?
18        A   Today?  Yes.
19        Q   Then, as well?
20        A   Some of it, yes.  Some of it.
21        Q   And all of the transfers that you
22   received after that, at that time, did you believe
23   those were EB-5 money once you'd acquired the
24   property?
25        A   Well, I knew that the three million two
```

Page 625

```
 1   he borrowed on his building, I thought was his
 2   money.
 3        Q   Right.  After you've now acquired the
 4   hotel.  Because that three million two was used to
 5   acquire the hotel, right?
 6        A   True.
 7        Q   So at the point that you now own --
 8   well, Palm House owns the hotel -- well, you own
 9   the hotel -- at the point that you own the
10   hotel --
11            MR. REINHART:  Technically, 160 owns the
12   membership shares in Palm House, LLC.
13            MS. SPRINGER-CHARLES:  No.  Palm House,
14   LLC owns the membership shares in 160 Royal Palm.
15            THE WITNESS:  She's got it.
16            MR. REINHART:  Because 160's owned the
17   hotel through the whole time.
18            MS. SPRINGER-CHARLES:  Right.
19            MR. REINHART:  Right.
20            BY MS. SPRINGER-CHARLES:
21        Q   At the point that Palm House acquires
22   Glenn Straub membership interest in 160 Royal
23   Palm, all subsequent transfers from Joe Walsh,
24   what did you believe those funds to be?  Were
25   those EB-5 funds at that point?
```

70 (Pages 622 to 625)

SEC_000833

Page 626

```
1        A  I thought that the large majority of
2   them were, but I still thought he had personal
3   money, and that if he didn't get an EB-5 sale,
4   that he'd kick money in.  I didn't really think
5   about it a lot, but that's what I remember
6   thinking at the time.
7        Q  But you weren't sure which was personal
8   and which was --
9        A  I didn't know.  I thought he would have
10  a due to, due from, like maybe he'd put in four
11  million of his own money, and then maybe -- I
12  didn't know.  I don't want to guess.
13       MS. IVORY:  Earlier, you said the buffer
14  in the account, so is there a specific account
15  that you believe personal funds came from Joe
16  Walsh?
17       THE WITNESS:  I thought he had money in
18  Hong Kong.  I still do.  Is that the question?
19       MS. IVORY:  Was there a specific account
20  that you felt like, okay, if it comes from this
21  account, it's personal money?
22       THE WITNESS:  Oh, now, it never was like
23  that.  He would just wire money to Less or 160.
24       MS. IVORY:  Okay.
25       BY MS. SPRINGER-CHARLES:
```

Page 627

```
1        Q  The one point eight million dollar
2   broker commission --
3        A  Yes.
4        Q  -- I think I know the answer, but I just
5   want to ask, so that you can tell me what your
6   answer is -- why would that go to you and not back
7   into the project?
8        A  I think the answer is that --
9        Q  Or why should that?  Because that's your
10  representation that that's your money, correct?
11       A  One hundred percent.
12       Q  Okay.  Why should it go to you and not
13  back into the project?
14       A  I believe that that would be called the
15  effort of getting this hotel back for thirty-seven
16  million dollars when there was an appraisal on it
17  for finished just as a hotel for ninety, and
18  putting up with Glenn Straub for three years and
19  ten months and going in there on weekends and
20  designing it.  And so I didn't think it was that
21  big of a fee at all.
22       Q  But you were getting your one point one
23  million dollar developer fee, and your one point
24  one administrative management fee, right?
25       A  I understand that.  And today, where I
```

Page 628

```
1   am today, it seems like a lot more money today,
2   but back then, it wasn't.  I made like twenty-five
3   million dollars in '07.  It wasn't that much
4   money.  Today, it's a lot of money.
5        Q  Did you discuss with Joe Walsh that you
6   believe that the one point eight million dollar
7   commission should go to you?  Did you discuss that
8   with him?
9        A  I don't remember talking with Joe Walsh.
10  Whether I did or I didn't, I don't remember.  I
11  know I talked to him about the commission.  I
12  remember that.  I don't know if I talked to him
13  about the brokerage fee.
14       Q  The 115 Lower Church Hill house and the
15  guest house -- there's a guest house attached to
16  it?
17       A  Yes.
18       Q  That's a separate address, right?
19       A  Yes -- oh, no.
20       Q  Same address?
21       A  Same address.
22       Q  Okay.
23          We'll grab some documents, so we can
24  walk through and talk about it.
25          I'm showing you what's been marked as
```

Page 629

```
1   Exhibit No. 88.  It's a composite exhibit of a
2   series of emails related to the Connecticut
3   property that are -- you know, these emails are
4   sent in June of 2013.  Can you tell me what these
5   emails are about?
6        A  Well, the first email is when Mark was
7   going to try to help me out to buy the house.  I
8   think we were trying to buy the mortgage at that
9   time.
10       Q  Why was Mark going to do this?
11       A  I don't know.  Mark was a friend.  He
12  was trying to help me get the house back for -- it
13  looks like one three fifty.
14       Q  This letter that Less Evans executed,
15  was this true?  Was he holding one point three
16  five million dollars in clear funds in his trust
17  account for Mark Payne in regards to the purchase
18  of the loan -- of the note?
19       A  Well, according to Joe Walsh, he had a
20  million three fifty in there.
21       Q  Okay.
22          Was it true?
23       A  I don't -- I don't know if he had three
24  fifty of his money or EB-5 money.  I have no idea.
25       Q  Did this -- was Mark Payne successful in
```

71 (Pages 626 to 629)

SEC_000834

Page 630

```
 1    buying the note back --
 2        A   No.
 3        Q   -- so that you'd get the property back?
 4        A   No.
 5        Q   What was going to be the agreement?  If
 6    he bought the note, if he was successful, what
 7    would happen?
 8        A   Oh, I don't know.  I don't know if we
 9    ever got that far.
10        Q   But what was the intent, for him to then
11    transfer it to you once he acquired it?
12        A   Yeah.  He wasn't -- he didn't want to
13    buy the house.  He was trying to help me out.  I
14    was to figure a way to buy the house at that time.
15        Q   Let's look at Exhibit No. 140.  It's an
16    email from Marcus Payne sends you a draft email,
17    and you forward it to Les Evans, and it looks like
18    the language in the first attachment says, "This
19    is confirming our conversation with you yesterday.
20    By this document, I'm offering you the amount of
21    one point three five million dollars for the above
22    noted notes on that stated piece of property," and
23    it's the 115 Lower Church Hill property that he's
24    referring to.  It says, "I was informed of this
25    property through friends in the polo world in
```

Page 631

```
 1    northern Florida who knew that I was interested in
 2    a property in the northeast, which let me access
 3    friends and polo.
 4         "I was introduced to Bob Matthews, and
 5    he informs me of the above-noted property.  There
 6    is no relationship between Bob and myself, other
 7    than through this offer.  I was not solicited on
 8    this matter, but, in fact, purchased this
 9    myself -- pursued this myself.  My plan is to buy
10    out the property, fix it up, work on pool, outside
11    roof, et cetera, and then take advantage of a
12    rising real estate market."  And it continues on
13    there.
14         Was that true at the time?
15        A   I always thought that Mark wasn't trying
16    to buy for him.  I always thought he was trying to
17    buy the property for me.
18        Q   Do you know if ever sent this letter on
19    to Miss Karina, K-A-R-I-N-A, A-Z-B-E-K-Y-A-N?
20        A   I don't know.
21        Q   Let's look at Exhibit 25.  It's a
22    composite exhibit of documents related to the
23    repurchase -- or the purchase of 115 Lower Church
24    Hill by a company associated with Nick Laudano.  On
25    1/31/14, Jade sends you a link to this auction.
```

Page 632

```
 1    I'll just start by asking the question.  Why did
 2    Nick purchase this property?
 3        A   So what happened was, my little brother
 4    sent me a note somehow that my old house was
 5    being -- I lost my house, and that it was being
 6    auctioned off.  And I told Nicky about it.  And I
 7    had all my furniture from the house there.  And
 8    the idea was that Nicky was going to buy the
 9    house.  And I trued up -- because we had money
10    that he was owed.  And I think I got him within a
11    hundred grand.  If he got the two eight -- I paid
12    him, I think, it was two six or two eight to buy
13    the property -- that he would be within a hundred
14    grand of what he was owed, because he was always
15    behind.  And he was going to buy the property.  I
16    told him he could use my furniture to make it a
17    model, because it fit perfectly in the house, all
18    my curtains and my furniture and everything else.
19    If he sold it, which was the intent someday, I
20    think he would've done something for me, but we
21    didn't have anything in writing.  It was me trying
22    to tell him, hey, I bought this property for five
23    million dollars originally, and you can get a good
24    deal on it.  I think you can buy it for about half
25    that, put in a little bit of money, and flip it.
```

Page 633

```
 1    So that was the intention.
 2        Q   Do you have any paper documenting these
 3    intentions?  First, do you have any document where
 4    he's sending you a bill saying, this is how much
 5    you owe him, if you give it to me now -- the two
 6    point five million or whatever it is that you
 7    said?
 8        A   Oh, you mean -- what I did was I just
 9    paid his bill on the construction.
10        Q   Do you have an email where he sent you
11    his bill, or do you have any other document --
12        A   No.  It was on the AIA.  Yeah, it'll be
13    on the AIA with Nicky.  If you look up when this
14    was paid, you'll see it's within a hundred grand
15    of what he was owed on the AIA.
16        Q   There's an email from him to you on the
17    AIA?
18        A   No, but there's an AIA that when it
19    shows the money that you owe from him showing
20    exactly what the amount was, and it was within --
21    I remember specifically, it was within a hundred
22    grand of one way or the other of what he owed.
23        Q   What should I be looking for?
24        A   You should be looking for an AIA
25    document, that around the time this was purchased
```

72 (Pages 630 to 633)

Page  634

1  with Nicky's stuff of what was owed.
2      Q   It would be dated around the time that
3  this was purchased?
4      A   Yeah, it will be.
5      Q   Shortly before?
6      A   I can tell you, because I asked him -- I
7  asked him when I went -- when I saw you last time,
8  I specifically asked him -- I said, Nicky, let
9  me -- you know, you showed me a document.  I said,
10  Nicky, let me see where we were with this whole
11  thing.  Because he would ask me for money.  I
12  would just send him money.  I never went through
13  the bills.  I trusted him.  And I said, where were
14  we when you got house, and he said, Bob, you were
15  within a hundred grand, and he showed me a line
16  item.  So I know I could get it for you.
17          So with all that money that I gave him
18  was to get him current on his bill.  And I
19  supported him buying the house.  I tried to help
20  him out.  He was behind almost three million bucks
21  for the whole project.
22      Q   Why is Jade sending you the auction link
23  on 1/3/14?
24      A   Because I'm sure my brother asked me --
25  he told me about the auction.  I probably told

Page  635

1  her, get me the auction link.  I want to see it.  I
2  even think I wrote on one of the checks that it
3  was 150 Lower Church Hill to help Nicky out.
4      Q   Let's go to -- well, why didn't you
5  write it was fees for his services?  Wouldn't that
6  have made more sense if that's what it was?
7      A   Probably.  Yes, in retrospect.
8      Q   So why didn't you?
9      A   Well, honestly, I didn't write it.  Jade
10  wrote it.  So would it have made more sense?  Yeah.
11  I mean, it was clearly for fees on his thing.
12      Q   I know there's points when you
13  transferred.  Was there any other transferred fees
14  on his services?
15      A   Yeah, all the time.
16      Q   And how did you do that?
17      A   He would ask me for money.  I would send
18  it.
19      Q   Did you ever put memos, like you did
20  with 115 Lower Church Hill?
21      A   Oh, I didn't do the memo.  Jade did the
22  memo.  Could she have written memos on checks?  I
23  don't know.  Maybe.  I don't know.  I'd have to
24  look at it.
25      Q   I'm just trying to understand why she

Page  636

1  would've written on 115 Lower Church Hill, why
2  would she write that there, and why not create
3  other memos?
4      A   Because I probably said, hey, Jade, send
5  him the money, he's buying 115 Lower Church Hill.
6  I probably told her that.  So she sent him the
7  money.  And so she was probably trying to keep
8  track of it, so she'd knew what was going on.
9      Q   Let's look at the next email, 1/31/14.
10  Jade sends you, it looks like some log in
11  information for the house -- for the auction.  Do
12  you see that?
13      A   Yes.  Yes.
14      Q   It says, "Click on the buyer's checklist
15  tab at the middle of the page to log into the
16  auction, and then proceed to bid."
17          Why would she send that to you?
18      A   Because I wanted to watch the bid,
19  because Nicky and I were betting on what he could
20  get the house for.
21      Q   You sent it to Gerry, correct, at the
22  next email, 2/1/14?
23      A   Hold on.  I sent to Gerry.  I thought
24  Gerry sent it to me.  So I'm little confused.
25      Q   Do you see it?

Page  637

1      A   No.  Help me out.
2      Q   That page, the second page Bates labeled
3  5413.
4      A   To Gerry -- oh, okay.  Yes, I sent
5  him --
6      Q   You forwarded that same information to
7  Gerry?
8      A   Yes.
9      Q   If you look at 2/1/14, it appears that
10  Nick or his company was the winner of the bid at
11  two point six million dollars, correct, and he
12  forwards that to you?
13      A   Yeah.  He says, here we go.
14      Q   Why did he forward you that information?
15      A   To tell me that he won.  This was a
16  really big deal for him.  Oh, two million five,
17  not two million eight.  Sorry.
18      Q   Yeah, two million five, two point five
19  nine five.
20      A   So it was within ninety-five thousand
21  dollars of fifty percent of what I paid for the
22  house.
23      Q   I then see him send you a bunch of
24  documents that seem to be related to the purchase.
25  Again, why is he sending these emails to you?

SEC_000836

Page 638

1    A   He kept me in.  This was a big deal to
2  help Nicky do a rehab.  And Nicky's been really
3  good to me, so I was trying to support him.  And
4  it was my old house.  And he let me sleep in it
5  once, I think, for two days or for three days.  So
6  it was an emotional thing.  It was my old house
7  that I lost at foreclosure.
8    Q   Look at that 2/3 and 2/4 email, it looks
9  like Jade formed NJL Development Group, LLC.
10   A   Probably.
11   Q   Why does Jade do that?
12   A   Because Nicky would've said form me an
13 LLC agreement.
14   Q   Why?  Nicky told Jade to do that?  Did
15 Jade take instructions from Nick?
16   A   Absolutely.  Yeah.
17   Q   But that was for his personal deal,
18 right?  Why would she be taking instructions from
19 him as it related to his personal deal?
20   A   Because secretaries sometimes do
21 personal things for you.
22   Q   Well, was she his secretary or yours?
23   A   Well, she was my right-hand person, but
24 Nicky used Jade, too.  Jade worked for whoever
25 needed something.  Jade worked for Joe.  Jade did

Page 639

1  stuff for Joe when he asked her.
2    Q   What's Botticelli?
3    A   I was trying to figure that out.  I
4  think there was the original one that Craig set up
5  for Nicky for this LLC, and I don't really
6  remember why.  I tried to remember this one, and I
7  don't remember why.  I think Nicky needed an LLC.
8  I don't remember what the deal was.
9    Q   On 2/23/2014, Nick forwards to you an
10 email related to purchasing the property, and he
11 was being asked to submit some missing
12 documentation, and you said, "Guess you should
13 send it by twelve."  Why were you instructing him
14 what to do?
15   A   I don't know.  I just have to find the
16 email first, so I can see what --
17   Q   Okay.
18   A   It must've been due or something.  Oh,
19 because it says it's due by twelve.
20   Q   Right.  And why did he forward it to
21 you?  Why is he involving you in all this
22 discussion?  Why isn't he just handling it
23 himself?
24   A   Because I'm trying to help out Nicky.
25 He's a construction guy.

Page 640

1    Q   I'll show you what's been previously
2  marked as Exhibit 26.  I'd like to confirm whether
3  certain amounts of monies were transferred to Nick
4  and what for.
5    On the first page, this is an excerpt
6  from the April 2014 Les Evans's trust account.  And
7  there was -- on 4/10, there was a hundred and five
8  thousand transferred to New Haven Contracting
9  South, and from my review of the records, it
10 appears to coincide with the time that he's trying
11 to purchase the house and do the renovations.  Do
12 you know whether or not that was for fees that he
13 incurred working on Palm House?
14   A   I can just say that I don't believe
15 Nicky got any money or any loans from 160 for
16 anything but for fees.
17   Q   Okay.
18   So all of the funds that were
19 transferred -- let's just short circuit, all of
20 the funds that were transferred to Nick Laudano or
21 any entity that he controlled, including an entity
22 called MJL Investments, I believe, were for fees?
23   A   Yeah.  And they should all tie out to
24 the AIA, his AIA budget.
25   Q   One of the wires hear says -- you know,

Page 641

1  you noted, it says, 115 Lower Church Hill.  This
2  is a wire from the Regions account for eight
3  hundred and forty-five thousand.  Do you see that?
4    A   I do.
5    Q   And, again, just to be clear, why do it
6  say 115 Lower Church Hill?
7    A   Because I'm sure I said to Jade, Jade,
8  wire Nicky eight hundred and forty-five thousand
9  dollars.  He's doing the 115 Lower Church Hill
10 deal.
11   Q   There's a second wire on 6/6/2014 for
12 the same amount, and if we look at the Regions
13 wire report, the last page, was that also for the
14 115 Lower Church Hill deal?  It says it on the
15 beneficiary information at the bottom.
16   A   Oh, yes.  Yes.
17   Q   Okay.
18   But all of those fees, all the fees that
19 we see in Exhibit 26, the one zero five, the two
20 point six five million, the -- and both eight
21 hundred and forty-five thousand dollar fees, they
22 were for fees that Nicky had from doing work on
23 the hotel?
24   A   Yes.
25   Q   So he didn't buy the house for you the

SEC_000837

Page 642

1  way Marcus was going to do it for you?
2      A   No.  Marcus was going to do it for me
3  for a million three.  Something I could actually
4  afford to do.  I couldn't afford to go do a house
5  for two million five, and then spend all the money
6  into the thing.
7      Q   But could Nicky?
8      A   Nicky was making good money.  He made a
9  lot of money off of me.  Plus he had his pizza
10 businesses going.  He never down like I went down.
11 I mean, he down a little bit, but not anywhere
12 near me.  He was self-performing work.  I think I
13 said last time, Nicky probably made five or six
14 million bucks.
15     So, you know, I will tell you right now
16 on a Bible, if Nicky sold this house and made a
17 lot of money, do I think he would've done
18 something for me?  I truly believe he would've.  I
19 let him use my furniture, which the house got
20 broken into.  They stole all my rugs.  I mean, it
21 was a freaking mess that day.  He ended up losing
22 the house.  He ended up losing money.  But if he
23 did sell that for six million bucks or something,
24 do I think Nicky would've said, hey, Bob, here's a
25 couple of hundred grand, you know, thanks for

Page 643

1  helping me out?  I absolutely believe he would've
2  done that as a gentleman.  But there was no
3  agreement to do that ever.
4      Q   It would be helpful for me if you could
5  go back in your records -- and maybe I have it and
6  I've just overlooked it, but if you can find an
7  AIA or any other request for funds that's tied to
8  either my expenditures the way that you're
9  representing that was contemporaneously --
10     A   Absolutely.
11     Q   -- sent to you or provided to you by
12 Nick Laudano or someone affiliated with Nick
13 Laudano.
14     A   Yeah.  Nicky showed a whole file on his
15 fees and his extras and everything.
16     Q   Okay.
17     A   In fact, I asked -- remember last time
18 you asked me about -- that gentleman asked me, oh,
19 did you have this person on the payroll and this
20 person?  I picked up the phone.  I called Nicky
21 when I left.  I go, Nicky, you ran those guys for
22 me, right?  And he sent me something that said,
23 yeah, you had a due to -- I'm making this up.  I
24 don't remember the number, but you had a due to
25 for a hundred ten thousand dollars.  He had every

Page 644

1  one of them accounted for just like I said he
2  would've.
3      Q   Well, if you can provide that to us, as
4  well as --
5      A   Absolutely.  Yeah.
6      Q   -- anything else that you have showing
7  that the funds that were transferred to Nicky at
8  or about -- you know, the funds in Exhibit 26 --
9      A   No problem.
10     Q   -- were related to the expenditures that
11 he had or whatever money he earned.
12     A   I want to be clear, he was behind.  I
13 did him a solid.  He was behind like two million
14 and change in getting paid.  And by him doing this
15 deal, I caught him up.  Okay.  But he was behind
16 for the whole thing.  So you'll see that in the
17 AIA one hundred percent.  So did I help him?  Yes.
18 I got him current.  But I mean, really, he
19 should've been current from the beginning.  If he
20 wasn't my friend, he wouldn't have ever stayed
21 that far behind.
22     MS. SPRINGER-CHARLES:  Those are two
23 things, if it's fine with you?
24     MR. REINHART:  Okay.
25     THE WITNESS:  No.  That's simple.

Page 645

1      BY MS. SPRINGER-CHARLES:
2      Q   In or about November 2014, did MJL
3  Development take out a one point seven two five
4  million dollar loan to renovate and rehabilitate
5  the property?
6      A   Yes.
7      Q   And that was guaranteed by Nicky and
8  Mia, correct?
9      A   Correct.
10     Q   Why did Mia guarantee that?
11     A   Because Keith Marler, who's a second
12 mortgage lender, knew Mia.  Keith knew I didn't
13 have anything, so he wasn't going to ask me to
14 guarantee it.  And Keith, I had a relationship
15 with Keith where he -- let's just say, I had a
16 piece of property that I bought for a million one,
17 and I borrowed from Keith three hundred and fifty
18 thousand dollars on it.  It was paid off.  And
19 Keith did a six month loan and gave me a handshake
20 that he'd roll it for another six months, and when
21 it came do, he took the property, and I lost
22 the -- I lost all the money.  So he knew Mia and
23 Keith -- I don't know if Keith knew Nicky or not.
24 So I helped him, and I introduced to -- I don't
25 know if introduced them then or before.  And he

SEC_000838

Page 646

1   said, well, I want to get your wife. In fact,
2   she's on it now. She's got to pay it. She's got
3   a deficiency.
4       Q   But why Mia? What does that have to
5   do -- why was Mia needed?
6       A   Because I was vouching for Nicky, but I
7   couldn't vouch because I didn't have any financial
8   wherewithal to sign anything. I'm underwater. Mia
9   had -- wasn't underwater like I was underwater.
10  She's the one that put the money for Bonaventure
11  into the boat. So she had assets where I didn't
12  have any assets. So that's why he wanted Mia on
13  board.
14      Q   But didn't Mia enter into an option to
15  purchase agreement with Nicky to purchase the
16  property for two point eight million dollars?
17      A   We did talk about an option. I don't
18  know if we ever exercised it or not. We did at
19  one point, yeah. So I don't know if we ever signed
20  it. We did talk about that at one point. Because
21  the idea was, he was going to take it and flip it,
22  or if I got on feet someday, I would get the
23  property back. That was the original idea.
24      Q   You'll get it back. Was that the idea?
25      A   That was a hundred percent the idea. You

Page 647

1   can do it as an investment, but if I get on my
2   feet, I'll pay you a profit, and I'll get the
3   property back someday. I never got on my feet to
4   do that, obviously.
5       MS. IVORY:   So I guess if the option was
6   executed, then I guess Nicky wouldn't get five to
7   six million dollars on the property? He wouldn't
8   be able to flip it, because it would go to you?
9       THE WITNESS:   No. It was never going to
10  be that Nicky could go spend a million dollars on
11  a property, and he was going to sell it to me for
12  two five. I mean, I don't know if he particularly
13  ever got it. I don't know. Is it signed?
14      BY MS. SPRINGER-CHARLES:
15      Q   Well, in order to get the one point
16  seven two million dollar loan, I saw that document
17  as a part of it.
18      A   Oh, Keith wanted to us do it. Yeah,
19  you're right. Keith wanted us to do it. You're
20  right. Keith wanted -- you're right. Keith
21  wanted that document in there.
22      Q   Why would you agree? But that was
23  always the understanding, that you were going to
24  reacquire the property from Nicky?
25      A   No. Nicky bought it as an investment

Page 648

1   marry.
2       Q   For himself?
3       A   For himself. But if I ever got on my
4   feet, I would go to Nicky, and I would've said --
5   it wasn't anything in writing, but I would've
6   said, hey, Nicky, I'm on my feet, can you sell me
7   the property. Depending what he put into it, can
8   you make a million bucks on the deal and sell it
9   back to me or something?
10      Q   Well, it says two point eight million
11  dollars in the agreement, and he paid two point
12  six five million, plus eight hundred and
13  forty-five thousand, plus another eight hundred
14  and forty-five thousand, plus a hundred and five
15  thousand. So was he going to make anything?
16      A   I don't understand. Eight hundred and
17  forty-five and eight hundred and forty-five.
18      Q   Looking at Exhibit 26, I asked if all of
19  the fees in Exhibit 26 were his profits, right?
20      A   Yes, that's true.
21      Q   I guess I'm not great at math, but if I
22  added two point six five million dollars, plus --
23      MS. IVORY:   Is it four point four, what
24  you're getting?
25      MS. SPRINGER-CHARLES:   Right.

Page 649

1       THE WITNESS:   I don't think he was into
2   it for that much at all. They might've been fees,
3   but I'm not saying they went into 115.
4       BY MS. SPRINGER-CHARLES:
5       Q   That's what I'm asking. Did they go
6   into 115?
7       A   Oh, no, I don't think so. No. I don't
8   know what they went into, but I can tell you that
9   I would be really, really surprised if Nicky spent
10  two point five, plus another million nine on that
11  house. I don't believe at it all.
12      Q   Well, let's go back to Exhibit 26, so
13  that the record's clear then. I pointed to a one
14  hundred and five thousand dollar payment that went
15  to Les Evans's trust account to New Haven at that
16  point. Do you know whether that money went
17  towards the purchase or renovation of 115?
18      A   I don't.
19      Q   How about the two point six five million
20  dollars, did it go to the purchase or renovation
21  of 115?
22      A   I don't know. Because what you just
23  told me, the four four, it's not logical, so it
24  doesn't make sense to me.
25      Q   If we look back at Exhibit 25, he's

SEC_000839

Page 650

1  forwarding you how much it's going to cost him,
2  and you said he said, this is how much it's going
3  to cost me?
4      A   Oh, you're talking the purchase price,
5  too?
6      Q   Yes.  Yes.
7      A   So you're saying two -- I think the
8  purchase price was the fee.  I don't believe this
9  other money --
10     Q   Not the other, even though it says it on
11 the wires that we looked at?  That's my question.
12     A   No, I don't -- I believe that the
13 true-up that I spoke to you about would've been
14 around the two four, two five number.  That
15 true-up is what I believe was to true him up, not
16 more than that.
17     MS. IVORY:  So the purchase price was
18 about the two point five, two point six?
19     THE WITNESS:  A hundred percent.
20     MS. IVORY:  Okay.
21     BY MS. SPRINGER-CHARLES:
22     Q   Why then did these wires, these two
23 separate wires for eight and hundred forty-five
24 thousand dollars on -- I think this is May 13th,
25 2014 and June 6th, 2014, why is the memo, the ORG

Page 651

1  to BNF info, why is it 115 Lower Church Hill?
2      A   I don't know, but I can promise you he
3  never spent a million six on that property, or a
4  million seven.  There's just no way.
5      Q   So what happened to the rest of the
6  money?  What did he do with it?
7      A   I don't know.  That's money he made.  I
8  don't know.  I actually thought when you showed me
9  those, I thought that was used for the purchase.
10 So I misunderstood what you said.  I thought was
11 money towards the purchase.
12     Q   Well, I don't know.  That was my
13 question to you.
14     A   I thought that the eight hundred numbers
15 that you were showing me --
16     Q   Uh-huh, with 115 Lower Church Hill
17 memos.
18     A   I thought that was going towards the
19 purchase of the property.  That were his fees.
20 That's what I believed.  If it's different, then I
21 don't know.
22     Q   We were looking before, there's a stack
23 of offering documents -- actually, let me make
24 sure.
25     MR. REINHART:  53, 54, all those?

Page 652

1      MS. SPRINGER-CHARLES:  Yeah.
2      BY MS. SPRINGER-CHARLES:
3      Q   Before we move on to that, can you look
4  at Exhibit 67, please.  It's the green brochures.
5  The appraisal numbers that are in these documents
6  on page -- let's look at, for example,
7  HAULOU-0049.
8      A   Yes.
9      Q   It says the appraisal for the hotel is
10 one hundred thirty-seven million, five hundred
11 thousand.  Do you see that?
12     A   Yes.
13     Q   Once the property is completed, the
14 appraisal values the property at over forty
15 percent more than the initial investment.  Do you
16 know what that appraisal value represents?
17     A   If you gave me the appraisal, which is
18 here somewhere, I would be able to tell you.  It's
19 here somewhere.  I have it.
20     Q   What exhibit are you looking at?  Exhibit
21 No. 175, okay, that attaches the appraisal.  Okay.
22     A   Correct.  If you could just read that
23 number.
24     Q   It's the page Bates labeled
25 SEC-MR-E-0055501.

Page 653

1      A   So this is an appraisal done with
2  various scenarios.
3      Q   Okay.
4      A   One is a hotel.  One is condo hotel
5  where, I believe, a certain amount of units sold.
6  And as a stabilized hotel, they're saying it was
7  worth one thirty-seven five.
8      Q   Okay.
9      A   Minus the cost to complete at that time,
10 thirty-four eight.  They do a conventional hotel
11 less cost to complete.  And then they do a
12 discounted cash flow for eighteen months.  Just
13 like I was talking about before that anybody would
14 do a discounted cash flow.  And they come up with
15 an as is value for ninety million dollars.
16     Q   So the one hundred thirty seven million,
17 five hundred (sic) dollar value is the hotel as if
18 it were completed, correct?
19     A   Correct.
20     Q   But perspective future value of what --
21     A   Right.  And ninety was as is.  And Bob
22 was buying it back for thirty-seven.  And the
23 value as is was ninety.  So he feels really
24 entitled to that.
25     Q   Was it misleading to put the one

SEC_000840

Page 654

1 thirty-seven in this document?
2      A   I can tell you that if I did that
3 document, I would never put the one thirty-seven
4 in because it's very misleading.  It says it right
5 here clear as a bell.
6      Q   Did you ever communicate that to Joe
7 Walsh?
8      A   Oh, I never looked at the document.
9      Q   Let's look at Exhibit No. 54.  There is
10 a second PPM attached to Exhibit 54, and this one
11 now is dated 3/5/14.
12      A   So this isn't the same PPM as this PPM?
13      Q   It is not the same as Exhibit No. 53.
14 It's different.  And it's dated 3/17/14.
15          The first question, did you ever see
16 that document?
17      A   No.
18      Q   Okay.
19          The business plan that's attached to
20 this PPM, it's also dated 3/5/14.  Did you read
21 this business plan?
22      A   No.
23      Q   We saw that you were involved, though,
24 when they received the RFE, you were aware that
25 David was creating an updated business plan,

Page 655

1 correct?
2      A   I thought he was responding to the RFE,
3 and I tried to get -- I tried to help him get the
4 answers back.
5      Q   To respond to the RFE and to update the
6 business plan, correct?
7      A   Yeah.  If it says it needed an update,
8 then yes.
9      Q   Okay.
10          But you didn't -- once it was completed,
11 did you read it?
12      A   No.  I tried to help him with the
13 answers with the club memberships and the history
14 with the sale and all that.
15      Q   Okay.
16          MR. REINHART:  Just so we're clear, when
17 you say did you read it, you mean the business
18 plan, dated March 5th, 2014?
19          MS. SPRINGER-CHARLES:  Correct.  Yeah.
20          MR. REINHART:  Okay.
21          BY MS. SPRINGER-CHARLES:
22      Q   Let's look at Exhibit No. 55.  We now
23 see a third version of the PPM that's dated June
24 2nd, 2014.  Did you ever see this document?
25      A   No.

Page 656

1      Q   Did you have any role in creating this
2 document?
3      A   If it's similar to the other ones, I
4 supplied the construction cost, and I supplied
5 what I thought the hotel rooms would rent for and
6 what the vacancy and occupancy would be.
7      Q   Pay attention to the dates, as well.
8          MR. REINHART:  Did you know they were
9 preparing an updated PPM, so you provided updated
10 numbers, or did you just provide the numbers once?
11          THE WITNESS:  I heard recently that
12 there were five business plan from somebody --
13          MR. REINHART:  Not what you know now.
14 Back then.
15          THE WITNESS:  I didn't know they ever
16 did another one.
17          BY MS. SPRINGER-CHARLES:
18      Q   So other than the first two that we just
19 saw, you don't know that they did a third one,
20 correct?
21      A   No.  I thought they did one.  I
22 didn't -- oh, there was a response to the PPD
23 I-526, yes.  So I knew they -- I helped with that
24 response, yes.
25      Q   Okay.

Page 657

1          What about now there's a third document,
2 dated June 2nd 2014 PPM that's attached to the
3 Exhibit 55, did you know that this PPM was created
4 at that time?
5      A   No, I did not.
6      Q   And you did not see that document at
7 that time?
8      A   No.
9      Q   You didn't participate in any way in
10 creating that document?
11      A   No.
12      Q   How about -- okay.
13          I'm showing you what's been marked as
14 Exhibit 56.  It should be in front of you.
15 Attached to Exhibit 56 is a business plan that's
16 dated December 10th, 2014.  This is after Ryan
17 Black has been removed as the managing member of
18 the Palm House, LLC to add context to my question.
19 Did you participate in drafting this business
20 plan, dated December 10th, 2014?
21      A   Is this the business plan?
22      Q   It's called the Confidential Business
23 Review.
24      A   Oh, yeah.  No.  If it's that thing, no.
25      Q   And it's dated December 10th, 2014, if

78  (Pages 654 to 657)

Page 658

1    that helps.  Did you participate at all?
2         A   No, not to my recollection.
3         Q   I'm showing you a fourth business plan.
4    It's Exhibit 57.  It's dated 8/7/2015 this time.
5    Did you participate in -- did you ever see this
6    document?
7         A   No.  The first time I saw it was just
8    now.  I've never seen this one even in my emails
9    or ever anywhere.
10        Q   Did you have any role in creating this
11   document or the prior business plan attached to
12   Exhibit 56?
13        A   No.
14        Q   Turn with me to Exhibit 58.  It's an
15   Economic Report prepared by Michael K. Evans,
16   dated August 7th, 2015.  Did you ever have -- did
17   you provide Mr. Evans with any information to
18   create this document?
19        A   If he asked me for something and there's
20   an email that I sent it to him, then I would've
21   given it to him, but I don't remember this one.
22   This one's a lot longer.
23        Q   And the date, if you look at the date.
24   It's August 7th, 2015.  Does that refresh your
25   memory as to whether you participated?

Page 659

1         A   I met him in the beginning, and I
2    thought it was two or three years before this, so,
3    no.
4         Q   Have you seen this document before
5    today?
6         A   No.  I've never seen anything dated in
7    '15.
8         Q   I'm showing you what's been marked as
9    Exhibit 61.  It's titled, Addendum to Loan
10   Documents.  Can you tell me what that is and if
11   you had any role in the drafting and obtaining the
12   executions on this document?
13        A   I've never seen this one before even
14   afterwards.
15        Q   You've never seen Exhibit 61?
16        A   No.  I don't believe I've ever gotten
17   this like after the blow up or before the blow up.
18        Q   Okay.
19            I'm showing you what's been marked as
20   Exhibit No. 96.  It's an email from John Marcus
21   Payne to you and himself on 6/26/16 attaching a
22   Satisfaction of Mortgage document.
23            You received this email, correct?
24        A   Oh, yes, I know what this is.
25        Q   You received it?

Page 660

1         A   Yes.
2         Q   What is it?
3         A   Oh, Mark had this idea, because he was
4    still stuck on the LLP, that he thought he could
5    do -- to try to get rid of the fake second
6    mortgage, that he could do this.  And I said it
7    will never work.  No one's going to take title
8    insurance.
9         Q   My next question, do you think this is
10   valid?
11        A   No.  It'll never work.  It's on the land
12   records.  It would never work.
13        Q   I'm showing you what's been previously
14   marked as Exhibit No. 70.  It's a brochure in
15   Chinese.
16            The only question is:  Have you ever
17   seen that document?
18        A   No.  A hundred percent no.
19        Q   Why did you smile?
20        A   Because he's now putting people's
21   pictures in who bought houses.  It's just
22   pathetic.
23        Q   I'm showing you what's been previously
24   marked as Exhibit No. 71.  It's a document in
25   Farsi under the heading, the Palm House.

Page 661

1            Have you ever seen this document before?
2         A   I opened up one document that looked
3    like this writing once that I mentioned earlier.  I
4    think this -- I don't know if this was it, but it
5    was something written like this that I thought was
6    Farsi.  Only because I heard they did one in
7    Farsi.
8         Q   But this was after the fact --
9         A   Yes.
10        Q   -- not contemporaneously --
11        A   No, after.
12        Q   I'm going to show you this, and I only
13   have one copy because it's a rather large exhibit.
14            Have you ever seen the complete
15   investment -- or a version of a complete
16   investment portfolio on Palm House?
17        A   No, I haven't.  It's thick.  It feels
18   important.
19        Q   I'm showing you what's been previously
20   marked as Exhibit 66.
21            Have you ever seen this document?
22        A   I looked this website up once later on.
23        Q   What website?
24        A   This EB-5 thing, EB-5 petition.  I
25   clicked it once and looked it up online.

SEC_000842

Page 662

1    Q   When you say later on --
2    A   A year ago, six months ago.  That's the
3  only thing I know about it.
4    Q   So you've never seen Exhibit 66?
5    A   No.
6    Q   Let's look at Exhibit No. 68, and I'd
7  like to spend sometime on this.
8        Have you seen this before?
9    A   No.
10   Q   In question two, it says, "How much
11 money will the project seek to raise?"  It says,
12 "The project will use a total of ninety-one
13 million US dollars.  The developer has already
14 invested twenty-two million US dollars of his own
15 equity."
16       Was that a true statement?
17   A   Only based on the '06 purchase, not
18 based on when this was actually bought later.
19   Q   The developer in all of the documents is
20 Palm House, though.  So how would that still be
21 true?  In all of the offering documents, the
22 developer is listed as Palm House.  And if you're
23 using the prior stuff, it wasn't always 160 Royal
24 Palm.  It was Royal 160, correct?
25   A   I agree with you one hundred percent.

Page 663

1    Q   So is it true at all?
2    A   No, it's not true.  And it's not true
3  that there was a bridge loan.
4    Q   That's my next question.  Was there a
5  bridge loan of funding of twenty-nine point five
6  million to ensure the continuation of the
7  construction of the project as the EB-5 funding is
8  being utilized, was that true?
9    A   Never.
10   Q   Do you know what that bank -- you see it
11 says, Bank financing.  Do you know what that
12 refers to?
13   A   I think it refers to cartoonville make
14 believe world.
15   Q   There was no bank financing of
16 twenty-nine point five million dollars?
17   A   There was never any bank financing.
18 Correct.
19   Q   Under, When will the Palm House project
20 be open, question three, it says, "Current
21 projects have the finishing of the Palm House
22 Hotel for season of 2013."  Generally, it talks
23 about what season means in Palm Beach.  At the
24 last sentence it says, "This means the project
25 will proceed with the City of Palm Beach's

Page 664

1  approval to be open for season 2013, 2014."
2        Was that true?
3    A   The opening dates, I'd have to look
4  back, I can tell you that this statement is
5  not true.
6    Q   Which one?
7    A   The one says, "The building has received
8  permanent COs for the east and west wings."  And
9  you showed me earlier the sign-off for the HBC
10 electrical and plumbing.  That's called a
11 temporary Certificate of Occupancy.  You can't
12 have a permanent CO until the rest of the
13 building's fireproofed and has a proper egress.  So
14 that statement is complete false.
15   Q   When you sent those sign-offs that we
16 looks at earlier to, I think, Joe Walsh, did you
17 represent to him that those were the permanent
18 COs?
19   A   Absolutely not.
20       MR. REINHART:  I think they're actually
21 attached to this exhibit.
22       MS. SPRINGER-CHARLES:  They're attached
23 to Exhibit No. --
24       MR. REINHART:  The one I'm looking at is
25 68.

Page 665

1        MS. SPRINGER-CHARLES:  -- 68.  They're
2  actually attached to Exhibit No. 168.
3        MR. REINHART:  I should say there are
4  some that appear to be like those other ones
5  attached.  I don't want to testify that they're
6  the same.
7        MS. SPRINGER-CHARLES:  Right.
8  BY MS. SPRINGER-CHARLES:
9    Q   Look at question five.  It says, "Is the
10 Palm House project approved by the USCIS?  Yes,
11 the Palm House project is approved by the USCIS
12 through South Atlantic Regional Center's NAICS
13 code approval.  The Palm House projects falls
14 under these listings."
15       Is that statement misleading?
16   A   Yes, I would say it's very misleading.
17   Q   Why?
18   A   Because I don't think they ever approved
19 the project.  Isn't that the 526?
20       MS. IVORY:  If we go back to question
21 three, we talked about the permanent CO.  Isn't
22 that almost the only thing that was outstanding to
23 stop the two thousand dollar a day dine?
24       THE WITNESS:  Yes.  If you had the
25 permanent CO, you wouldn't have the two

80  (Pages 662 to 665)

Page 666

```
1    thousand -- it would stop it one hundred percent.
2         MS. IVORY:  Okay.
3         BY MS. SPRINGER-CHARLES:
4    Q   Let's look at question six.  It says,
5    "Can a copy of the appraisal report that values
6    the Palm House Hotel at one hundred and
7    thirty-seven million, five hundred thousand US
8    dollars be provided?  There's a copy of the
9    appraisal report completed by Callaway & Price can
10   be found on page two forty-eight of the investment
11   portfolio."  Then it says, "It's important to note
12   that the building at present is worth over one
13   hundred and ten million US dollars before
14   completion."
15        Was that true at that time?
16   A   No.  I believe it said ninety.
17   Q   The building at present?
18   A   No.  I believe the appraisal came in at
19   ninety.
20   Q   Right.  So what about the building
21   itself?  Does the appraisal breakdown, you know,
22   the building versus the land versus -- is my
23   question?
24   A   No.  No.
25   Q   No?
```

Page 667

```
1    A   They might put a valuation on the land,
2    but what they mean is the ninety million.  It
3    wasn't one ten.
4    Q   It wasn't one ten?  It was ninety
5    million?
6    A   It was ninety million.
7    Q   Okay.
8         MR. REINHART:  Look at question ten.
9         MS. SPRINGER-CHARLES:  Let's look at it
10   together, question ten.
11        MR. REINHART:  We all found the same one
12   at the same time.
13        BY MS. SPRINGER-CHARLES:
14   Q   Well, number ten, was there any evidence
15   that you actually invested over twenty-two million
16   dollars?
17   A   No, unless it was fabricated.
18   Q   Okay.  That's it for now.
19        Eleven?
20   A   It says, our EB-5 project may receive
21   bridge loan financing.
22   Q   Okay.
23        On the next page, it says, "A bridge
24   loan of twenty-nine point five million US dollars
25   was obtained from a wealthy private equity
```

Page 668

```
1    source."
2         Who was that source?  Was that true?
3    A   That was not true.
4    Q   It says, "These funds, along with Mr.
5    Matthew's equity investment, were used to bring
6    the Palm House Hotel to the present and continuous
7    development position."
8         Was that true?
9    A   I'm sorry.  Which one was it?  I'm
10   sorry.
11   Q   The next sentence.  It says, "The funds,
12   along with Mr. Matthew's equity investment, were
13   used" --
14   A   No.
15   Q   -- "to bring the Palm House Hotel to the
16   present and continuous development position."
17   A   Not true.
18   Q   Do you think that that bridge financing
19   of twenty-nine point five million was referring to
20   Glenn Straub's mortgage?
21   A   Glenn's mortgage was twenty-seven point
22   four.  It's hard to confuse the two.  They're
23   different numbers.
24        MR. REINHART:  You're missing all the
25   good stuff.  Go back.
```

Page 669

```
1         BY MS. SPRINGER-CHARLES:
2    Q   Turn with me to sixteen, question
3    sixteen.  It says, "Can a list of names be
4    provided for the future members of the Palm House
5    club?"  And it says, "Due to the exclusive nature
6    of the Palm House club, no list of names can be
7    furnished.  The rich and famous want privacy, and
8    we must facilitate their desire, as such. However,
9    we do know that such luminaries as
10   multi-billionaire Bill Koch of Koch Industries,
11   Eric Schmidt, Chairman of Google, Tony Bennett of
12   song and stage, Celine Dion, one of the most
13   famous singers in the world, and President Bill
14   Clinton will be part of the club."
15        Is that a true statement?
16        MR. REINHART:  Actually, you read it
17   wrong.  It says, famous signers in the world.
18        MS. SPRINGER-CHARLES:  It does say
19   famous signers in the world.  I think that's a
20   typo and my brain corrected it.
21        BY MS. SPRINGER-CHARLES:
22   Q   But were those individuals listed signed
23   on to be a part of the club?
24   A   No.  But I will tell you I would've
25   asked Eric and I would've asked Bill to be members
```

SEC_000844

Page 670

1  of the club.
2          MR. REINHART:  Clarify which Bill.
3          THE WITNESS:  Sorry.  I would've asked
4  Bill Koch to be a member of the club.  And I
5  would've asked Eric Schmidt to be a member of the
6  club.  He was my original member at Point Breeze,
7  so I would've asked him.
8          BY MS. SPRINGER-CHARLES:
9      Q   Did you ever ask him?
10     A   No.
11     Q   Did you ever tell Joe Walsh or anyone
12  else associated with the Palm House Hotel, LLLP
13  that these individuals would be part of the club?
14     A   No.
15     Q   Did you provide this picture of the
16  billboard of Mia in Times Square?
17     A   I did.  I sent it to Joe, and told him
18  that Mia got a billboard in Times Square just as a
19  point of information.  She was very happy about
20  it.
21     Q   Did you tell him that he could include
22  it in the offering materials?
23     A   One thousand percent no.
24     Q   Would you describe Mia as famous singer
25  and entertainer in the US?

Page 671

1      A   I would describe my lovely wife as being
2  a great actress, and she just won -- she's up for
3  South Florida lead actress for the year, and two
4  of her plays that she had leads in are up for top
5  ten -- or are top ten, two of them are top ten,
6  but I would not say that she is a famous singer in
7  the United States, no.
8          MR. REINHART:  I'll note for the record
9  they spelled singer wrong again.
10         MS. SPRINGER-CHARLES:  It says signer.
11         MR. REINHART:  Whoever was interpreting
12  this for Mr. Walsh wasn't doing a very good job.
13         BY MS. SPRINGER-CHARLES:
14     Q   Can you turn back with me to question
15  fourteen.  The question is, "How will the Palm
16  House project make money?"  And if we turn to the
17  next page where the response continues, the
18  sentence that starts with, Due largely.  It says,
19  "Due largely in part to Mr. Matthew's strong
20  connections with the City of Palm Beach officials,
21  the Palm House projects received special approval
22  to sell portions of the Palm House Hotel as
23  condos."
24         Was that true?
25     A   It's a condo hotel.  I did get the

Page 672

1  approvals for it to be a condo hotel, so that is
2  true.
3      Q   Okay.
4          "With a total valuation of one hundred
5  and thirty-seven point five million dollars, there
6  is a range of profits that can be earned from the
7  sale of parts of the hotel as condos."
8          We've already talked about the fact that
9  that valuation is as stabilized, correct?
10     A   True.
11     Q   "This flexibility has already peaked the
12  interest of some individuals in Palm Beach,
13  including clothing mogul Tommy Hilfiger, who's
14  been in talks with the developer regarding turning
15  the Palm House Hotel into a Tommy Hilfiger branded
16  hotel."
17         Was that true?
18     A   We did talk about doing a deal with
19  Tommy Hilfiger, but it was just preliminary for it
20  to be a hotel for Tommy Hilfiger.
21     Q   That Tommy Hilfiger's like a branded
22  hotel, you did?
23     A   Yeah, we did with the designer knew him.
24  We did talk about that.  But I didn't sell it to
25  him.  We didn't make a deal.  They didn't go that

Page 673

1  far.  Just there was a point in time when we
2  talked to him for a couple of weeks.
3      Q   Okay.  So that -- okay.
4          And you communicated that to Joe Walsh
5  or someone affiliated with Palm House --
6      A   He must've known that I was talking to
7  him, yeah.
8      Q   In our review of -- did you ever attend
9  any seminars or anything in China or Dubai or any
10  other country to promote the Palm House Hotel
11  investment to EB-5 investors?
12     A   No.  I did go to Beijing once, and I met
13  with some high net worth guys, one owned some kind
14  of oil factory, about doing other deals.
15     Q   But not EB-5 deals?
16     A   No.  I may have met somebody.  I may
17  have met an agent.  I dont remember.  But I
18  didn't go to any seminars or anything lying that,
19  no.
20     Q   Were you aware that in several places in
21  Palm House Hotel's offering materials and
22  marketing materials it stated that investor funds
23  would be held in escrow pending approval of their
24  I-526 petition?
25     A   I was aware of it last week when they

82  (Pages 670 to 673)

Page 674

1    told me about the fake escrow agreement, but until
2    then, I didn't think they were in escrow, no.
3        Q    Prior to that, you didn't think that
4    they were being held in escrow --
5        A    No.
6        Q    -- that they were told that their funds
7    would be held in escrow?
8        A    Yeah.  I don't know what they were told,
9    but I never thought they were in escrow.  I never
10   thought Les's account was an escrow account.
11       Q    I asked this question a slightly
12   different way before, but I want to ask it again
13   to make sure we got your response on the record.
14   Prior to advancing your funds, did Joe Walsh do
15   anything to make sure there were no material
16   adverse changes in the operation's assets or
17   financial condition of Palm House and it's
18   subsidiaries taken as a whole?
19       A    No.
20       Q    Not that you know of?
21       A    Not that I know of.
22       Q    In the business plan, there is a
23   discussion -- let's look at Exhibit 53, just by
24   way of example.  Unfortunately, I didn't write the
25   page number, but there's some language in here

Page 675

1    that says, "Further, the club membership includes
2    reciprocity with four other Matthews ventures
3    facilities either open or in the planning stages.
4    Point Breeze and Nantucket opens June 19th, 2008.
5    Grand opening in the Point Breeze cabaret will be
6    celebrated with Natalie Cole, a founding club
7    member.  Other clubs in various stages of planning
8    include locations in Stowe," I think that's how
9    you say it, S-T-O-W-E, "Vermont, Aspen, Colorado,
10   and a full island Caribbean facility in the
11   Bahamas chain of islands.  Certain of the business
12   plans also go on to say members would have
13   reciprocity with other hotels under common
14   ownership plans and developments in Aspen, St.
15   Barts, and South Hampton, slash, Nantucket."
16       Were these statements true at the time
17   they were made?
18       A    Yeah, we were trying to do other clubs,
19   and Natalie Cole did open up the Point Breeze in
20   Nantucket.  And I'm still working on Aspen.  I
21   worked on a private island to do one.  And I did
22   work on the Green Mountain Inn in Stowe, Vermont.
23   So I wanted to do more than one and still do of
24   the hotels, but I never represented that we had
25   them built or we had them or anything.

Page 676

1        Q    It says, other clubs in various stages
2    of planning, include locations in Stowe.  Can you
3    tell me about that one?
4        A    That was called the Green Mountain Inn.
5    I negotiated to buy it at one point.
6        Q    And what happened?
7        A    I don't remember.  It could've been the
8    price was too -- I don't remember what happened.
9        Q    What about Vermont?  What was there?
10   What project was in Vermont?
11       A    Green Mountain Inn in Stowe, Vermont.
12       Q    Okay.  Oh, it's Stowe, Vermont.  Oh
13   Aspen, Colorado.  Okay.  I got it.
14       What was in Aspen?
15       A    Aspen had a piece of land on the
16   mountain that I met with some people about doing a
17   hotel actually on the mountain.  I'm still looking
18   at Aspen.  It's one of my targets.
19       Q    What do you mean by you met with some
20   people about looking at a --
21       A    It was one of my target areas to be,
22   Aspen, Nantucket, Palm Beach.  It's where the one
23   tenth of one percent people go.  So we wanted to
24   have a reciprocal.  So when this was low season in
25   the summertime, the advantage of this club is that

Page 677

1    you can go to another club in the summer.  That
2    was the whole idea and still is the idea.
3        Q    I guess what I'm trying to understand,
4    what about full island Caribbean facility in the
5    Bahamas chain of islands?
6        A    I remember, it was Perry Institute, and
7    they owned, I think, a five hundred and fifty acre
8    island.  And I worked a lot of time with the widow
9    that owned that island, and we never did anything,
10   but we worked on it.
11       Q    As of the date of the first business
12   plan, 1/4/13, had you -- I guess what I'm trying
13   to get at is, how much work had you done on any of
14   these potential projects?
15       A    I did work on them.  I mean, I met with
16   the guys from Perry Institute several times.  I
17   looked at what it was -- being we were looking to
18   keep it a non-profit, so you could avoid some of
19   the taxes going to the Bahamas.  We looked at the
20   runway and if it had to be extended.  I mean, I
21   spent time on them, on all of them, but it didn't
22   happen.
23       Q    By this -- by 1/4/2013, had you lost
24   Point Breeze already?
25       A    Yes.

83  (Pages 674 to 677)

SEC_000846

Page 678

1    Q   Why wouldn't you disclose that?
2    A   I did disclose it.
3    Q   In the business plan that was sent to
4  the investors or in any of the other marketing
5  materials.  Why didn't you ensure that that was
6  disclosed to investors?
7    A   There was no secret that Joe Walsh knew
8  that the Point Breeze project went Chapter 7.  It
9  wasn't a secret.  I didn't disclose it to the
10  investors because I didn't disclose anything to
11  the investors.
12    Q   I asked why didn't you ensure that it
13  was disclosed to investors?
14    A   Oh, I wouldn't even think about it.  I
15  just --
16    Q   But didn't you think that was important?
17    A   Why would I think about what he's going
18  to do when he's raising money?  It wasn't in my
19  head.  It just wasn't my thing.
20    Q   Wouldn't it be important to the people
21  that were lending you the money, to the investors
22  to know that you had a hotel deal that -- you
23  know, that you essentially lost a few years
24  before?  Don't you think that would've been
25  important to them to know?

Page 679

1    A   Yes.  And if I did the PPM, I would've
2  disclosed that, because I think it was very
3  relevant, absolutely one hundred percent.
4    Q   Did you tell Joe Walsh that he should
5  disclose that information?
6    A   No, I didn't tell Joe Walsh how to do
7  the PPM at all.
8    MS. SPRINGER-CHARLES:  Let's go off the
9  record.
10    (A brief recess was taken.)
11    E V E N I N G  S E S S I O N
12    MS. SPRINGER-CHARLES:  Back on the
13  record at 6:01 p.m. on February 13th, 2017.
14    BY MS. SPRINGER-CHARLES:
15    Q   Did you have any substantive
16  discussions --
17    A   No.
18    Q   -- with any members of the staff while
19  we were off the record?
20    A   No.
21    Q   We were just talking about the fact that
22  you mentioned -- well, that the Point Breeze was
23  mentioned in the business plan in I think all of
24  them, but no similar disclosure about the fact
25  that you had lost the property was there.  Was

Page 680

1  there an effort to conceal your past in the
2  offering documents?
3    A   I don't know.  I never read them.  I
4  never hid my past.
5    Q   Not by -- by you or by anyone else?
6    A   Joe, apparently, hid it by putting that
7  in there.  Right now I know that, but then I
8  didn't know it.
9    MS. SPRINGER-CHARLES:  I'm going to as
10  the Court Reporter to mark this composite exhibit
11  of emails that span September 2012 through
12  November 2012 as Exhibit No. 187.
13    (SEC Exhibit No. 187 was
14    marked for identification.)
15    BY MS. SPRINGER-CHARLES:
16    Q   I'm showing you what's been marked as
17  Exhibit No. 187.
18    On this first page, this is an email
19  that Mark Payne is forwarding to you that he
20  received from Joe Walsh; is that correct?
21    A   Yes.
22    Q   Let's look to the second to last
23  statement, full statement on this email.  It says,
24  "It is imperative that we get some new info on Bob
25  on the Net, or letters from powerful people

Page 681

1  extolling the virtues of Bob."
2    Let's then look -- let's look at the --
3  well, actually, let's look at this email, because
4  I think it might -- I don't know if it clarifies
5  anything that we were talking about before.
6    Joe Walsh says, "Hi, Mark, it appears
7  the appraisal is very old; hence, it will not
8  carry the weight it needs to.  Can we get a quick
9  update to your numbers or simply the numbers
10  presented presently with appropriate dates.
11  However, what is very old is that it shows" --
12    MR. REINHART:  Very good.
13    BY MS. SPRINGER-CHARLES:
14    Q   -- "very good is that it shows the
15  demolition and now it can be seen the work that
16  has been accomplished recently.  Beyond this, I've
17  attached our simple changes to the presentation.
18  Kevin Wright will be in our meeting tomorrow and
19  will help to verify the job count.
20    "There's a question as well as to the
21  value of the investment in the property.  It
22  appears it was originally purchased for around
23  sixty-two million and acquisition cost is
24  thirty-seven million.  I've explained this
25  acquisition cost as a way of ensuring that the

84  (Pages 678 to 681)

## Page 682

1  EB-5 limited partners will be in first priority on
2  the property.  A simple letter of commitment to
3  buy the property for eighty, plus million in year
4  five from someone would be good.  This shows that
5  the limited partner was, in fact, protected
6  because there's someone else for the take out.
7  Take a look, and we'll go from here."
8          Can you tell me what was discussed in
9  here?
10     A   It's a little confusing because it says
11  it was purchased for around sixty-two million.  I
12  don't understand where that's coming from.
13     Q   Okay.
14     A   And he asked me would I be able to get
15  somebody to commit to buy it five years from now.
16  I thought that was the stupidest thing I ever
17  heard in my life, commit to buy something five
18  years from now.  So I think I pretty much laughed
19  at that.  And I don't think I got him any letters
20  from powerful people extolling my virtues.
21     Q   Let's look at the document that's --
22         MR. REINHART:  Look at the date, as
23  well.  See if that gives any context.  This is
24  almost a full year before you actually close on
25  the hotel.

## Page 683

1         THE WITNESS:  Oh, okay.  Okay.
2  BY MS. SPRINGER-CHARLES:
3     Q   Let's look at the presentation that's
4  attached.  Page fourteen of that presentation, it
5  looks similar to the page that you had provided
6  that with we were looking at the Derrico email
7  trying to differentiate.  Let's look here.
8     A   Okay.
9     Q   Did he change anything on this
10  presentation?  Can you not see it?  It says,
11  equity, sixty-two point five million.  Do you see
12  that?
13     A   Yes.
14     Q   Total of sources, sixty-two point five
15  million.  Acquisition allowed first mortgage
16  rights to EB-5 limited partners, thirty-seven
17  million.  Remaining hard and soft cost, slash,
18  FF&E, twenty-five point five million.  Do you see
19  that?
20     A   I do.
21     Q   And then the total hard cost is eighteen
22  point four eight three million.  Is it different
23  than the numbers that we were looking at prior?
24     A   I think those look like my numbers.
25     Q   Okay.  I got you.  Okay.  I'm done with

## Page 684

1  that.
2     A   Yeah, sixty-two five.  Yeah.
3     Q   Looking to the next email, a 9/18/12
4  email, Marcus -- John Marcus Payne forwards you an
5  email from a Zach Hempen, H-E-M-P-E-N, Z-A-C-H. It
6  says, "Hey, Marcus, doing research for tomorrow
7  and the first three links I get when Googling Bob
8  Matthews Palm Beach are very negative articles. Is
9  there any way to get this cleaned up at," I think
10  it's a typo, maybe it should be as, but it says,
11  "at Joe, Sr. was under the impression that it
12  already had been.  I think you will be meeting
13  with Bob soon, so hopefully you can discuss and
14  get back to us."  And he links to, I think, two or
15  three different links.  And Marcus forwards you
16  that and says, "Let us chat this morning."
17         The last email is 11/15/2012.  It
18  says -- this is from Gary -- well, who's Zach
19  Hempen? Do you know who that is?
20     A   I don't know.
21     Q   Okay.
22         Who Gary Truitt?  He's in the next
23  email.
24     A   Gary Truitt was a reputation management
25  guy that worked for Joe and worked for me and

## Page 685

1  tried to do good articles on you.
2     Q   It says, "Here's the article I posted
3  today on a new blog I set up.  It looks like
4  they've taken three spots on the first page, so
5  thinks are finally kicking in."
6         So does this refresh your memory as to
7  whether there was an effort to try to conceal your
8  past issues related to losing the hotel or any
9  other past financial troubles that you'd had at
10  that point?
11     A   Well, I had asked Gary to help me, I
12  believe, early on to try to help me clean up,
13  because it's a pretty known fact that people look
14  at the first two Google pages.  And I asked Eric
15  Schmidt, the CEO of Google at the time, hey, Eric,
16  I have all these bad articles on me, what can I
17  do?  And he said, try Googling me.  He said the
18  only thing you could do is do new stories.  And if
19  you want to get your reputation back, that's the
20  only thing you can do is do new stories.  You can
21  never get rid of old stories.
22         So Gary was trying to help me for a long
23  time, I believe, way before this to do things to
24  try to get me, so it wasn't all this nasty stuff.
25  Just like today, if you Google me, you have all

85  (Pages 682 to 685)

SEC_000848

Page 686

1   this nasty stuff.
2       Q   Did Joe Walsh want to have that cleaned
3   up so that investors wouldn't be able to find out
4   about your history?
5       A   Yeah.  I mean, what was his intent?  I
6   think his intent was, oh, have everything cleaned
7   up tomorrow.  But I never tried to hide or deny
8   anything that happened to me.  I was very proud of
9   my history.  I had thirty years of a very
10  successful career.  And my blow up in '08, I was
11  not the only developer that blew up in '08.  So
12  Joe actually hired Gary, I think, on a retainer
13  for a year or two or three years to try to clean
14  up Joe's reputation.  So it wasn't for me to
15  defraud any investors.  I really did it because I
16  got sick of being Googled and it looked like crap.
17      Q   If it wasn't to defraud any investors,
18  when I look up the writeup that appears under
19  management in the business plan and also in
20  the PPM, in each version of the PPM and each
21  version of business pan, there's a writeup that I
22  think -- at least in the first one, you provided
23  to David Derrico, and he put it into the
24  documents.
25      A   Sure.

Page 687

1       Q   And a part of that writeup, that initial
2   writeup says, the second full paragraph says,
3   "Over the last few years, like many US developers,
4   Matthew's companies were battered by the financial
5   collapse.  The group has weathered the storm and
6   returned with an organization that is more agile
7   and refined.  The exposure has produced an
8   organization that is well educated in navigating
9   the distressed asset financial process and this
10  knowledge has allowed us access to a substantial
11  number of undeveloped assets."
12          So you provided this?
13      A   Yes.  And I think usually people doing a
14  bio don't put in how they blew up, but I wanted to
15  be very clear.
16      Q   I guess at that point why didn't you
17  give more details about the Nantucket project?
18      A   On my bio?
19      Q   Yes.
20      A   Because one project out of all of the
21  maybe forty deals I did that blew up does not make
22  your career.
23      Q   But at that time things -- I guess let's
24  introduce this composite exhibit of documents as
25  Exhibit No. 188.

Page 688

1           (SEC Exhibit No. 188 was
2           marked for identification.)
3       BY MS. SPRINGER-CHARLES:
4       Q   I'm showing you what's been marked as
5   Exhibit 188.  Please take your time to look
6   through these.  These are emails that attach
7   financial information about you and your wife at
8   various points.  The first one was sent from Nick
9   Laudano to you on 1/8/2013.
10      A   The first one looks like a federal tax
11  lien, which is on all the land records, and you
12  don't exactly hide that.  This is a financial
13  statement.
14      Q   Were these accurate at the time?
15      A   Yes.
16      Q   Okay.
17      A   This has one point -- it wasn't very --
18  I wasn't doing very well.
19      Q   And the next one was a 11/22/13
20  statement of financial condition that Jade sent to
21  you.
22      A   Right.  Again, again, part of the blow
23  up.
24      Q   12/10/13, there's another one that Jade
25  sent some documents related to Iberia Bank that

Page 689

1   Jade sent to you.
2       A   Correct.
3       Q   Were all of these accurate at the time
4   that they were created?
5       A   Yes.
6       Q   Okay.
7       A   So this is pretty reflective of the '08
8   blow up all the way through.
9       Q   Also, the last email, a 12/27/2013 email
10  from Jade to you, was this accurate at the time
11  she sent it?
12      A   Yes.
13      Q   What's 11 Cliff Road?
14      A   A house on Nantucket.
15      Q   So that property went into foreclosure.
16  So did 101 Casa Bendita.
17      A   Yes.
18      Q   You had thirty-five million dollars at
19  one point in outstanding mortgages on those
20  properties?
21      A   Yes.
22      Q   There were legal judgment and tax liens
23  that as high, as I see, seventeen point one
24  million dollars at some point.  Was that correct?
25      A   Yes.

86  (Pages 686 to 689)

SEC_000849

Page 690

1    Q   And you had a net deficit at some point
2   as high as nineteen point seven million, correct?
3    A   As low as.
4    Q   As low as, yes.  Correct?
5    A   Correct.
6    Q   Don't you think the investors would've
7   wanted to know your entire financial profile?
8   You're going to say over the past years, like many
9   US developers he was battered — you know,
10  Matthews' companies were battered by the financial
11  collapse.  The group was weathered the storm and
12  returned with an organization that is more agile
13  and refined.  The issues that we're discussing in
14  Exhibit No. 188, they were still present at this
15  time, right, as of 1/4/13?
16   A   Well, I believe that I was much more
17  agile after the blow up.  So there was a
18  thirty-year career.  And then there was a blow up
19  in '08 where I lost the three hundred and
20  thirty-five million dollars.  Because of the Palm
21  House, I might add.  Probably one of the reasons
22  why I want to get it up and going so badly as I
23  do.
24       So I didn't hide any of this from Joe,
25  my lender, at all.  It was very clear.  Everything

Page 691

1   was told to him.  I blew up in '08 and lost a lot
2   of money.  That's a hundred percent a fact.
3    Q   You're saying Joe was fully aware of
4   your financial condition, including the judgments
5   and the tax liens --
6    A   Absolutely.
7    Q   Did you have a sea of creditors
8   attacking, you know, your bank accounts or the
9   properties?  Is that why you didn't put the
10  properties in your name -- the property in your
11  name?
12   A   I had -- my wife didn't want me to be in
13  the newspapers again is why I didn't put the
14  property in my name.
15   Q   Why would you be in the newspaper if you
16  put the property in your name?
17   A   Because I just went through the '08, '09
18  blow up, and she was afraid of doing anything,
19  even to this day, in my name and going through it.
20  I mean, obviously, today in hindsight, it
21  backfired, but then I was trying to do the right
22  thing.  In retrospect, I never would've hired
23  Ryan.  I never would've dealt with Joe.  It's easy
24  to look back now and see my mistakes, but then I
25  was very excited about it, and he seemed like a

Page 692

1   good guy.  I trusted him.  There was a lot of
2   trust in there that's not in your documents, that
3   I really thought he was doing the right thing.  And
4   I'm one of those people that, you know, if you
5   shake my hand and you look me in the eye, I
6   believe you.
7    Q   To round this out and to be clear, was
8   there any active effort on your part or Joe
9   Walsh's part to conceal your prior history?
10   A   Oh, I think it's clear that Joe Walsh
11  was embarrassed about my history with the thing
12  that I just read a minute ago, but not from me.  I
13  had thirty years running at almost a hundred and
14  fifty-five IRR.  That's a very, very good IRR to
15  anybody out there in the world.
16       So, yes, I had the blow up and it's
17  embarrassing and it's hard.  But had I had a line
18  of credit or an investor behind me for a small
19  amount of money, I would've weathered that storm
20  and come out further ahead.
21   Q   Did Joe Walsh ever tell you that he was
22  trying to conceal anything related to his past?
23   A   He told me that he wanted Gary to help
24  him -- he hired Gary on a monthly retainer two,
25  three, four grand a month, some amount of money,

Page 693

1   to try to help him with his past.  I don't know
2   anymore than that.  I don't know if he was trying
3   to hide it, or what he was trying to do.
4       MS. SPRINGER-CHARLES:  Let's go off the
5   record -- never mind.
6       BY MS. SPRINGER-CHARLES:
7    Q   Did Ryan Black ever receive any fees for
8   selling the Palm House Hotel investment to
9   investors?
10   A   I don't know.  And I know he worked on
11  it.  He was going to go to Beijing, and he had a
12  group, and he was going to -- Mark made a deal
13  with him for some amount of money on the
14  commissions.  I remember that happening.  I don't
15  know if he ever raised any money or not.
16   Q   Who's David Levinson?  I think his name
17  has come up already today.
18   A   I believe he works either with or for
19  Kevin Wright.
20   Q   But you don't personally have a
21  relationship with him?
22   A   I'm sure I met him once or twice.  He
23  seemed like a nice guy.  I think he was fluent in
24  Chinese.  I think that was his story.
25       MS. SPRINGER-CHARLES:  Now we can go off

87 (Pages 690 to 693)

SEC_000850

**Page 694**

1  the record.
2      (A brief recess was taken.)
3      MS. SPRINGER-CHARLES:  Let's go back on
4  the record at 6:34 p.m. on February 13th, 2017.
5      BY MS. SPRINGER-CHARLES:
6      Q  Did you have any substantive discussions
7  with any member of the staff while we were off the
8  record?
9      A  No.
10      MS. IVORY:  I will ask you a couple of
11  questions surrounding travel over, I'll say, in
12  2014, 2015.  I identified, I guess, the charges
13  associated with travel from Exhibit 31.  It was
14  your transaction report from Quickbooks.  So I'll
15  just give you a month and year and a location, and
16  if you can, maybe tell me the purpose of trip and
17  who went with you.  And if you don't remember,
18  I'll try to pull the record, but just in -- you
19  know, in order to pry to save as much time as we
20  can.  I'll just use that.
21      So in February 2014, there was a trip to
22  London, and I think you may have traveled on
23  Virgin Air and stayed at the Mandarin.  Do you
24  remember that trip?
25      THE WITNESS:  Yes.

**Page 695**

1      MS. IVORY:  Can you tell me what your
2  trip was for?
3      THE WITNESS:  To meet with the designers
4  for the hotel.
5      MS. IVORY:  Do you know who exactly you
6  met with, or was it several people?
7      THE WITNESS:  It was several people, but
8  I know I her with Inga Moore, and I forgot the
9  guy's name, the head guy I dealt with.  I just
10  blanked on his name.  And their staff.
11      MS. IVORY:  And did you go by yourself,
12  or who traveled with you?
13      THE WITNESS:  My wife and I went and
14  attended those meetings.  And I think I testified
15  earlier, my daughters went, but I separated out
16  those expenditures.
17      BY MS. SPRINGER-CHARLES:
18      Q  What do you mean by you separated out
19  those expenditures?
20      A  I mean, exactly that.  The accountant
21  that the law firm hired to go through the numbers,
22  we made sure that was a due to, due from that went
23  against me for my draw.
24      Q  So you mean subsequent to Ryan Black
25  being removed as the managing member of the hotel?

**Page 696**

1  Is that when you did it?
2      A  I mean, like a year or two ago, whenever
3  they hired a lawyer.
4      Q  Okay.
5      MS. IVORY:  Okay.  The next trip, July
6  2014.  Now, this one was -- it looks like you went
7  from London to Naples to Paris to Nice.  It looks
8  like it was a European vacation or travel in July
9  2014.
10      THE WITNESS:  So London to --
11      MS. IVORY:  London to Naples to Paris to
12  Nice?
13      THE WITNESS:  So I didn't go to
14  Sardinia, and I didn't go to Capri.
15      MS. IVORY:  Well, that one is in --
16  maybe you can tell me that.  That's in August
17  2014, it looks like.
18      THE WITNESS:  Okay.  So I didn't mean to
19  skip ahead.  So I think we made a family vacation
20  out of the balance, I think, but I remember going
21  to Paris and -- did I go to Paris?
22      MS. IVORY:  You did.
23      THE WITNESS:  Good.  Yeah, I went to
24  Paris.  And I have all kinds of things that we
25  were looking at buying at auction -- not at

**Page 697**

1  auction, from the -- for the hotel.  If you look
2  at my email, you'll see all the pictures.  There's
3  probably a hundred pictures of things we
4  identified for ideas for the hotel.  But as far as
5  I was concerned, it was a family trip.
6      MS. IVORY:  Okay.  So ideas for the
7  hotel.
8      And so who all went on this trip?
9      THE WITNESS:  The same four.
10      MS. IVORY:  Okay.
11      BY MS. SPRINGER-CHARLES:
12      Q  What do you mean by you went to look for
13  ideas for the hotel?
14      A  Well, for design ideas.  They'll be
15  emails in my thing that'll show pictures of lights
16  and things we were trying to do for the club that
17  I talked to Inga about.  Then I would send a
18  chandelier to Inga, what do you think about this,
19  and that kind of thing.
20      Q  You needed to go overseas to be able to
21  do that?
22      A  No, but she was overseas, so it was a
23  natural, you've got deals you could get.  So I
24  didn't have to do it.  I'm not even telling you
25  today.  I think I didn't write that off, just for

88 (Pages 694 to 697)

SEC_000851

Page 698

1    record.  But I can tell you I went there and did
2    work on the hotel, but --
3         MS. IVORY:  Okay.  Okay.
4         Sardinia and Florence, Italy in August
5    2014?
6         THE WITNESS:  That was a hundred percent
7    for the hotel.
8         MS. IVORY:  Okay.
9    BY MS. SPRINGER-CHARLES:
10        Q   How so?
11        A   Because I went to Sardinia with Greg
12   Norman, and we -- there's a video.  I don't know
13   if you ever saw the video with Greg Norman
14   promoting the Palm House and the club in Sardinia.
15   Did you see it?
16        Q   I can't answer you.
17        A   Oh, sorry.  Well, there is a video.
18   Hopefully, you've got it.  It wasn't hidden.  And
19   he worked on the hotel with me.  And we had a golf
20   outing.  And we had the broker came over, and we
21   had meetings at the Rolls-Royce dealership to
22   promote the sale of the units and the club
23   memberships.
24        MS. IVORY:  Okay.  And who all went on
25   this trip?

Page 699

1         THE WITNESS:  Mia and I went.
2         MS. IVORY:  Okay.
3         Okay.  There's some domestic travel
4    January 2014, Chicago.  Maybe you've flown
5    Southwest Airlines?
6         THE WITNESS:  Mark lived in Chicago.  I
7    don't remember.
8         MS. IVORY:  Okay.
9         Los Angeles in March 2014?
10        THE WITNESS:  That wouldn't have been
11   for the hotel.
12        MS. IVORY:  Okay.
13        There were a couple of trips to New York
14   in March 2014 and May 2014.  I think one of them
15   you may have stayed at the Trump International
16   Hotel.
17        THE WITNESS:  Yes.  And the New York
18   trip -- I can't remember, but I could try to
19   figure it out.  I'll ask my wife.  But we met with
20   the guy that did all of the marketing materials,
21   Seventh Art.
22        MS. IVORY:  Okay.
23        THE WITNESS:  He did all of the pretty
24   pictures and the video and all that stuff.
25        MS. IVORY:  Okay.

Page 700

1         And was it just you and Mia?
2         THE WITNESS:  Just me and Mia, yes.
3         MS. IVORY:  Okay.
4         And there were several trips to Miami.  I
5    don't see a flight.  It's more just hotels, Bal
6    Harbor --
7         THE WITNESS:  That would have been a hundred
8    percent been my wife coming to Miami, staying at
9    different hotels, but for her job working, and I
10   did that, I remember, a hundred percent as a draw.
11        MS. IVORY:  Okay.  I think you've
12   covered all of them.
13        BY MS. SPRINGER-CHARLES:
14        Q   I'm showing you what's been previously
15   marked as Exhibit No. 160.  And my goal is just to
16   go through some of the line items to get some
17   clarification what they -- you know, for what they
18   were.
19        Let's turn to 4/24/14.  Let's look at
20   the last one.
21        MR. REINHART:  What page are we on?
22        MS. SPRINGER-CHARLES:  The second to
23   last full page.  It's Bates labeled
24   ROBERTMATTHEWS-004593.
25        BY MS. SPRINGER-CHARLES:

Page 701

1         Q   On 4/24/14, there's a transfer of fifty
2    thousand dollars.  It says, RD of Palm Beach, Inc.
3    Matthews Loan to RD of PB.  Do you see that?
4         A   I think it's a misprint.  I think it was
5    RB, Ryan Black.
6         Q   Okay.  Okay.  Are you sure?
7         A   Oh, no, because it says RB.  Sorry.
8         Q   RD of Palm Beach.
9         A   He got a fifty thousand dollar loan
10   once.  That's what I was thinking.
11        RD of Palm Beach.
12        Q   Is that associated with Les Evans in any
13   way?
14        A   It could be.  I don't know what it is.  I
15   don't recall it for me at all.
16        Q   4/24, the next one down, to CHR
17   Consulting Services.  There was a seventy-five
18   hundred dollar charge there.  What was that
19   related to?
20        A   I don't know, but probably a consultant
21   on the project.
22        And just to go back, I'm reading that
23   other one, it says, Matthews loan, I think that
24   was, I think, Les.  He borrowed some money once
25   upon a time, and he paid it back.  So I think

89 (Pages 698 to 701)

SEC_000852

Page 702

1  that's what that was.
2      Q   Okay.
3          The next one, the 4/24 to CHR, what
4  was that for?
5      A   How much is it?
6      Q   It's seventy-five hundred.
7      A   Oh, I don't know.  CHR Consulting
8  Services, probably some consultant.  I don't know.
9  I don't remember.
10         MS. SPRINGER-CHARLES:  I'm going to ask
11 the Court Reporter to mark a copy of this
12 composite exhibit as Exhibit No. 189.
13             (SEC Exhibit No. 189 was
14             marked for identification.)
15 BY MS. SPRINGER-CHARLES:
16     Q   I'm showing you what's been marked as
17 Exhibit No. 189.  Please let me know if this
18 refreshes your recollection as to what that charge
19 was for.
20     A   It's a proposal for an appraisal report.
21     Q   The email that's dated April 24th, 2014?
22     A   Yes.  It's from Frank.
23     Q   Was this related to -- this email, does
24 this refresh your recollection as to what the
25 seventy-five hundred dollar fee was on --

Page 703

1      A   Was it for HVS?
2      Q   -- 4/24.  It was for CHR.
3      A   Oh, CHR.  Yeah, HVS Consulting.  I think
4  of them as the name of their firm.  It's called
5  HVS.
6      Q   Okay.
7      A   So that's the one you asked me about the
8  first day, I believe, for the seventy-five hundred
9  dollars on the hotel that liked the Phase II land,
10 that we were going to do an EB-5 project on, and
11 that's to do -- I believe it's to do an appraisal
12 report on it.
13     Q   So was this for Clematis?
14     A   This was for Clematis.  This was for
15 Clematis.
16     Q   Did this have anything to do with the
17 hotel project?
18     A   No.
19     Q   And so is this seventy-five hundred
20 dollars on Exhibit 164 to pay for this appraisal
21 report associated with Clematis?
22     A   Yes.
23     Q   Okay.
24         There's on 6/24/14, back to Exhibit 160,
25 6/24/14, there's two hundred and fifty thousand

Page 704

1  wired out to Carlton Fields.  What was that for?
2      A   I think it was for me.
3      Q   Personal expense?
4      A   Well, not an expense, but on my draw.  I
5  think that -- I'm not sure.  It's either a loan
6  with Less or else it's the lawyers that Alan
7  represented me on for the deficiency on the Ft.
8  Lauderdale marina deal.  It's one of those two
9  things.
10         MR. REINHART:  So whatever it is, it's
11 unrelated to the Palm House Hotel?
12         THE WITNESS:  It's unrelated to the Palm
13 House Hotel.  I mean, it's related in a sense that
14 I could take it as a draw.
15         MR. REINHART:  That's what I wanted to
16 make clear for the Commission.  The payment to
17 Carlton Fields was not for services that Carlton
18 Fields had rendered related to the Palm House
19 Hotel?
20         THE WITNESS:  True.
21         MR. REINHART:  That's where she was
22 going.
23         THE WITNESS:  Sorry.
24 BY MS. SPRINGER-CHARLES:
25     Q   Look at the back page Bates labeled

Page 705

1  4591.
2          MR. REINHART:  Got it.
3 BY MS. SPRINGER-CHARLES:
4      Q   There is -- I just lost it.  10/30/14 to
5  McDonald Hopkins, what was that for?
6      A   The twenty grand?
7      Q   Yes.
8      A   Probably legal fees.
9      Q   Associated with the Palm House Hotel?
10     A   It could be, or it could've been legal
11 fees that weren't associated.  On 10/30/14.  I'd have
12 to see the bill, but it could be for the Palm
13 House or it could've been that I said, oh, can you
14 do it for me, and I had a draw.
15     Q   But you're not sure?
16     A   I don't know, but McDonald Hopkins did a
17 lot of work for the hotel and for me, so --
18     Q   Right under that, there's ten thousand
19 dollars that was sent to NJL Investment.  Do you
20 know what that is?
21     A   That would've been to Joe -- I mean,
22 that would've been to Nicky.
23     Q   For what?
24     A   Nicky's deal in his accounting will be
25 ten grand towards the hotel.

Page 706

1    Q   And that was for services rendered to
2  the hotel?
3    A   Yeah.  I don't think I lent him any
4  money or anything.  I'm ninety-nine percent sure
5  it's going to be for services.
6    Q   On this page, there's 10/31/14, there's
7  ten thousand dollars to International Yacht
8  Collection, and if we look at the prior page,
9  4594, there's one hundred thousand dollars to
10  International Yacht Collection.  Were those
11  towards the renovation of the yacht?
12    A   Yes.
13    Q   And did you or Jade direct Les Evans to
14  transfer those funds?
15    A   Yes.
16    Q   Let's talk about the cars.  There was a
17  Maserati, correct?
18    A   True.
19    Q   Whose Maserati was it?
20    A   Well, as I told you last time, I bought
21  a Maserati for the hotel with hotel money, and
22  then Joe canceled the title and said that it was
23  issued by mistake.  I went to court.  I think I
24  maybe spent fifteen thousand dollars on the
25  Maserati to defend that and show the court that

Page 707

1  here's the wire from 160.  Here's the bill of sale
2  that he gives me for the Maserati.  And the way I
3  found out it was in my name, was they got one of
4  those things on the toll when you get a --
5    MS. IVORY:  Sunpass.
6    THE WITNESS:  When you get one of those
7  tolls because you went through the wrong thing and
8  they charge you back.  And it came back to me, and
9  I read it, and it said Maserati, Robert V.
10  Matthews.  And pretend it was twenty bucks.  I
11  don't know how much it was.  But I got a bill, and
12  I went off the wall.  I go, what's that Maserati
13  doing in my name?
14    So I sent back this stuff, and I have an
15  email trail of this.  You'll see it there with
16  Jade.  We sent back the stuff to Sisi, who worked
17  for Joe, and said, hey, this isn't my car, it
18  never was supposed to be my car, fix it and put it
19  in the right name.  And that's when Joe said, no.
20  He issued the bill of sale, and it was really his
21  car.  So the car today is in my garage
22  unregistered and uninsured, and I'm still fighting
23  that it belongs to the hotel.
24    Q   Was that Mia's car?
25    A   Yeah.  Mia was going to -- that was

Page 708

1  going to be her car.  The manager got the BMW.  Mia
2  got the Maserati.  And I had the Rolls.  I don't
3  think I -- I don't know if they paid for the Rolls
4  or not.  They were supposed to.  I don't know if
5  they did.
6    Q   Why was Mia getting a car?
7    A   Because Mia was like the number two
8  person.  She was doing all the club, and she was
9  doing the design.  She was very integral for the
10  project.  I mean, especially the design.
11    Q   Did you use funds from 160 Royal Palm's
12  account to purchase the Maserati, correct?
13    A   Yes.  True.
14    Q   And Joe knew that those funds came from
15  160 Royal Palm, correct?
16    A   He knew that it came from 160.  And then
17  he denied it and said it was his.  True.
18    MS. IVORY:  And was Mia on the payroll
19  as an employee?
20    THE WITNESS:  We had her down for one
21  fifty with her draw.  So when you saw those hotels
22  earlier in Miami, when I went through with the
23  accountant, she still had money -- she was ahead
24  of what she used on the draw.  In other words, she
25  still had money due to her.  So I think we stuck

Page 709

1  her in for like one fifty.
2    BY MS. SPRINGER-CHARLES:
3    Q   Let's talk about the Aston Martin.
4    A   That was just -- I think there was an
5  Aston Martin for like three weeks, and Joe sold
6  cars, and that became the Maserati.
7    Q   What do you mean by that?  Did you trade
8  that in for the Maserati?
9    A   Yeah.  I think we had the car.  I don't
10  remember.  There was something about the car that
11  wasn't good, and he said, oh, let's do the other
12  car.  So we just traded it.
13    Q   I'm showing you what's been previously
14  marked as Exhibit No. 29.
15    A   Jaguar.
16    Q   Attached to you -- you received -- you
17  were blind copied on this email on Exhibit 29,
18  correct?
19    A   Yes.
20    Q   Also attached to that email, it's a
21  composite exhibit, is a wire for sixty-five
22  thousand dollars in March of 2014?
23    A   Correct.
24    Q   Did you pay Joe Walsh sixty-five
25  thousand dollars for the Maserati?

SEC_000854

Page 710

```
 1        A  Or for the Aston.
 2        Q  Oh, the Aston Martin.  I'm sorry.
 3        A  Yeah.  We bought an Aston Martin, and
 4   then traded it in, I think, for the Maserati.
 5   Maybe it was a ten thousand dollar difference or
 6   something.
 7        Q  And where did the funds come from for
 8   that?
 9        A  From the hotel.
10        Q  And whose car was the Aston Martin?
11        A  That was going to be Mia's car.
12        Q  Why did you trade it in for the
13   Maserati?
14        A  I don't remember.  There was something
15   about the car.  I don't remember what it was.  I
16   mean, stock, something didn't go well.  I don't
17   remember.
18        Q  Joe was aware that those funds came from
19   160 Royal Palm?
20        A  Absolutely.
21        Q  Did he believe that you had any other
22   funds, other than EB-5 funds in 160 Royal Palm's
23   bank account?
24        A  Did Joe believe?
25        Q  Uh-huh.
```

Page 711

```
 1        A  Oh, I don't know what Joe believed.
 2        Q  So the sixty-five thousand, did he know
 3   where you got those funds from?
 4        A  Of course, yeah.
 5        Q  How?
 6        A  Well, because I -- he sold me the car.
 7   He had a company called Connect Auto.  And I said
 8   I want to get a call for Mia for the hotel.  And I
 9   kept my old Rolls.  And so he, I think, said,
10   well, try the Aston.  He might've dropped it off
11   and said, try it.  Joe was like a car guy.  But
12   there was something wrong with that car, and I
13   don't remember what.  So then that's when we got
14   the other car.
15        MS. IVORY:  So what about the Mercedes
16   G63?
17        THE WITNESS:  The Mercedes G63.
18        MS. IVORY:  Yes.
19        THE WITNESS:  The Mercedes G63 would've
20   been the car, I believe.  It that like an SUV car?
21        MS. IVORY:  Yes, I believe so.
22        THE WITNESS:  Yeah.  I don't know.  I
23   think Mia had a Mercedes SUV at one point, but I
24   don't know.  I don't remember buying one.  But
25   we -- oh, oh, oh, oh, oh, yes, yes, the white one?
```

Page 712

```
 1        MS. IVORY:  Yes.
 2        THE WITNESS:  With the red seats.  Yes,
 3   yes, yes, yes, yes, yes.  I think I bought that
 4   in -- I think that was -- I don't think I ran it
 5   through the hotel.  I think that was a draw one.
 6   Because I think something happened with the
 7   Maserati, and then we bought the other one.  We
 8   couldn't figure out the Maserati.  We couldn't put
 9   it on the road.  Do you have when I bought the
10   Mercedes?  Because that would be the answer.
11        MS. IVORY:  October 2014.
12        THE WITNESS:  Okay.  And then the
13   Maserati, I lost within whatever date you have
14   there.
15        MS. IVORY:  So wait.  The Maserati is in
16   your garage unregistered, no?
17        THE WITNESS:  True.
18        MS. IVORY:  Okay.
19        So this is October 2014, and it says
20   Mercedes Benz Orlando?
21        THE WITNESS:  Yes.  That's the G wagon.
22   That was my wife's car.  I sold it like three
23   months ago.
24        BY MS. SPRINGER-CHARLES:
25        Q  So she had two cars that were
```

Page 713

```
 1   financed -- funded by Palm House, LLC?
 2        A  No, because one of them, you couldn't
 3   use.  We couldn't use the other car.  He said it
 4   was his car.  It's been sitting there for years in
 5   a garage in a lawsuit with him having to prove
 6   that we paid for it with the hotel.  He claimed it
 7   as his own car, that he issued this title by
 8   mistake.  It was a complete lie.
 9        Q  I'm just trying to understand.  There
10   were two cars purchased, right, from Joe, at least
11   two?  We're talking about the G wagon, the
12   Mercedes --
13        A  There was a BMW.  There was a --
14        Q  Maserati?
15        A  The first one before the Maserati.
16        Q  Aston Martin?
17        A  Right.  It went back, and she got the
18   Aston Martin.  And the G wagon wasn't purchased
19   through Joe.  It was purchased through Mercedes
20   Benz of Orlando.
21        Q  But both of Mia's cars were purchased
22   using funds from 160 Royal Palm's bank account,
23   correct?
24        A  Yeah.  The Maserati was purchased
25   through the hotel for the hotel for me to have a
```

SEC_000855

Page  714

1    company car.
2        Q   Okay.
3        A   The G wagon, I don't know.  I'd have
4    look at the account.  I don't know if I took it as
5    a draw item, or if I took it as, she has a car for
6    the hotel.  I don't remember.
7        MS. IVORY:  Just to give you the
8    timeline.  It looks like the Aston Martin was
9    purchased March 2014, and the Maserati was April
10   2014.
11       THE WITNESS:  There you go, a month
12   later.  The Aston Martin was turned in for the
13   Maserati a month later.
14       MS. IVORY:  Was the Maserati title to
15   Joe Walsh, or is it -- well, like who is it titled
16   to right now?
17       THE WITNESS:  Joe put it in his name.
18       MS. IVORY:  So it's still currently in
19   Joe's name?
20       THE WITNESS:  He gave me a title, and
21   then he signed an affidavit that said he
22   mistakenly -- it'll be in a email chain -- that he
23   mistakenly put it in 160's name.  He lied and said
24   it was his.
25       MS. IVORY:  Okay.  So it's still titled

Page  715

1    to him right now?
2        THE WITNESS:  Yeah.  I can't do anything
3    with it.  I'm not giving it to him, though.  I'm
4    still fighting because the company paid for it.
5    It's a company car.
6        MS. IVORY:  So there's no tag or
7    anything like on?
8        THE WITNESS:  You can't register it.  I
9    can't register it.
10       BY MS. SPRINGER-CHARLES:
11       Q   I'm showing you Exhibit 28.  Just show
12   me exactly, walk through -- you know, point the
13   emails or the documents that you'd like to show me
14   to explain what happened with the Maserati.
15       A   So I believe Jade is asking Sisi or
16   Helen for the bill of sale.  And then here's the
17   registration where it's in my name.
18       Q   Right.
19       A   So here's her saying, just want to
20   double check.  I had a plate called 3FL.  That was
21   my personal plate.  And she's saying, do you want
22   to put it under is 160 Royal Palm, LLC since the
23   car sold to 160 Royal Palm.  The plate can't be
24   transferred for some reason.  So she's saying
25   she's getting the registration docs.  Hi, Jade --

Page  716

1    then she says, Hi, Jade, I've enclosed the
2    documents.  Sign and mail the original signed copy
3    to me.  Then I can go to DMV and apply for a new
4    plate since the 3FL plate is under my personal
5    name.  Since I can't transfer it to the Maserati
6    and finish the application.  She needed a copy of
7    the driver's license.  So that's just talking
8    about the 3FL plate.
9        So then somebody scans the bill of sale.
10   And then Jade says, Dear Helen, please kindly
11   provide me with a Certificate of Title for the
12   Maserati.  As per the bill of sale, the
13   certificate should reflect 160 Royal Palm, LLC.
14   That's when I must've got a thing in the mail that
15   said it was in my name.
16       So Helen's saying for some reason she
17   can't do it under -- in the email chain.  And
18   then -- and then she's talking about the BMW that
19   we bought from Joe for the manager.  She's still
20   talking about this 3FL plate.  And saying it's
21   still under Bob's name.
22       MR. REINHART:  You're going the wrong
23   way.
24       THE WITNESS:  I'm going the wrong way?
25       MR. REINHART:  You're going back in

Page  717

1    time.
2        THE WITNESS:  Well, I can tell you on
3    the email chain that I saw, I'm positive that
4    Helen says at the end that where Sisi says, Joe
5    said to see him about it, he's not going to put
6    it.  There's an email that says that.
7        BY MS. SPRINGER-CHARLES:
8        Q   I saw that.
9        A   Oh, sorry.  Thank you.  There it is. Hi,
10   Jade, Joe wants me to hold the paperwork on this
11   title.  He says that you or Bob can contact him
12   directly if you have any questions.
13       So I mean, what happened was they put it
14   in my name by mistake.  I went off the wall, asked
15   them to put it over to 160.  And at the end,
16   before this, we tried to get it from Helen, and we
17   never get it from Helen.  So then finally, she
18   tells the truth, Joe is making me hold the
19   paperwork.
20       Then there's a lawsuit.  Joe then has an
21   affidavit in the lawsuit that says to the registry
22   of motor vehicles, that he's Connect Auto and that
23   the Maserati was mistakenly put into 160's name by
24   error, and that it's really Connect Auto's car.
25       Q   Look at the last email in Exhibit No.

93  (Pages  714  to  717)

Page 718

```
1    28, if you turn to the back.
2              MR. REINHART:  This one here on page --
3              BY MS. SPRINGER-CHARLES:
4         Q   It doesn't have a number.  But it's
5    October 29th, 2014 email.  You're not on this, but
6    Joe Walsh, Sr. forwards -- it's from Helen to Joe
7    Walsh, Sr., and Joe forwards that to Ryan Black.
8    It says, "Maserati bill of sale and title."
9              Did you ever get a copy of this bill of
10   sale from Connect Auto?
11        A   Yeah.
12        Q   You did.
13        A   Yeah.  I gave it to the lawyer.  He took
14   it to court.
15        Q   Okay.
16             And what's the outcome in these
17   certificates of titles and other documents? What's
18   the outcome of this?
19        A   Yeah.  So we got it into the bill of
20   sale finally in the right thing.  And then Joe
21   signs an affidavit and sends it to the registry
22   and says, oh, I put it in 160's name by mistake,
23   it's my car.  That's the outcome.  I wasted
24   fifteen thousand dollars trying to keep the title
25   to the ones where it belongs.
```

Page 719

```
1         Q   The Rolls-Royce, you had purchased that
2    before you received any funds from Joe Walsh?
3         A   Yes.
4         Q   With what money?
5         A   I don't know when I purchased it.  I'm
6    not going to say that because I don't remember
7    when I bought it.  It's a 2011.
8         Q   Who did you buy it from, from Joe?
9         A   No.  I bought that one on the west coast
10   of Florida.  I don't remember the dealer.
11             MS. IVORY:  But it was a dealer?
12             THE WITNESS:  Yes.
13             MS. IVORY:  Okay.
14             BY MS. SPRINGER-CHARLES:
15        Q   I'm showing you what's been previously
16   marked as Exhibit No. 30.
17             The only thing I want to ask you about
18   this is, at the back of this exhibit, you produced
19   a series of documents that appears to be -- it
20   seems like as if like they came out of a folder
21   that says Palm House, Rolls-Royce Porto Cervo.
22   What are these documents?
23        A   Oh, these are the documents for the
24   party that I mentioned we did at the Rolls-Royce
25   dealership in Porto Cervo in Sardinia.  And
```

Page 720

```
1    there's a video that I'm sure you've seen where
2    Greg Norman is talking about the Palm House.  And
3    these look like people that were interested in
4    purchasing units.
5         Q   This AIG Insurance, I've seen insurance
6    cards for insurance on various of the vehicles
7    through AIG.  What is that insurance?  Is it the
8    insurance of the property?  Just for example, if
9    we look at -- it's attached.  It's attached to a
10   10/3/14 email.  And it's Bates labeled 23566.
11        A   Is this it?
12        Q   I see insurance cards.
13        A   Yeah.  So that would've been insurance
14   cards for the cars.
15        Q   This AIG Insurance, was this the hotel's
16   insurance?
17        A   No.  They didn't do the hotel.  I
18   believe this is for the cars where they give you a
19   little thing you put in the car.
20        Q   So were all the cars insured through
21   AIG, your cars, Mia's cars, and Niklaus's cars?
22        A   I don't remember.  Probably, but I don't
23   remember.
24        Q   Okay.
25             There's some damage to the Rolls-Royce
```

Page 721

```
1    at some point, right?
2         A   Yes.
3         Q   The funds used to repair it came from
4    where?
5         A   I don't know, but if it same out of the
6    Palm House, it would've been a due to, due from.
7         Q   Why?
8         A   Why would it?  Oh, that's a good point.
9    It could've come out of the Palm House.  That was
10   my car.
11        Q   But it was your personal car?
12        A   Well, that was my car, but in my mind,
13   the Palm House paid -- I got a car for being the
14   chief, cook, and bottle washer.  So that could've
15   come out.  If it didn't, it should've.
16             MS. IVORY:  Then this goes, this
17   separate and distinct from the one that's
18   mentioned in the PPM, as far as an amenity of the
19   hotel?
20             THE WITNESS:  Oh, they wanted to use
21   this down the road as an amenity, and I'm doing
22   one, but I don't know if I ever would've given it
23   up.  I mean, if they wanted to have a ghost.
24             BY MS. SPRINGER-CHARLES:
25        Q   I'm showing you what's been previously
```

94  (Pages  718  to  721)

Page 722

1    marked as Exhibit No. 32.  It's an email that
2    discusses the Breakers annual dues.  What was the
3    business purpose of these dues?
4        A    I believe Joe agreed to pay a portion of
5    them.  Let me just look.
6        Oh, this is -- oh, yeah, this is
7    reimbursement.  So Joe paid part of the dues, and
8    I think the balance came out of the hotel.  Joe
9    put up various people at the Breakers, of which I
10   got a fifteen or twenty percent discount, and we
11   did a lot of entertaining over there.  And at
12   Trump Golf, bringing people there.  I told him I
13   wasn't going to pay it.  It wasn't my
14   responsibility.
15       So he paid part of it, and I believe the
16   other part came out of the hotel.  But I thought
17   that was his marketing crap, that he should pay
18   for it.
19       Q    The part that came out of the hotel,
20   what was the business purpose for that -- those
21   expenditures?
22       A    Well, anything with the clubs would
23   be -- because I'm going to do a club, and I'm
24   going to try to get members to join the club,
25   so --

Page 723

1        Q    But don't you think it would've been
2    important to get the hotel built first?
3        A    I wasn't worried about building the
4    hotel.  Paying ten thousand dollars in dues or
5    whatever it was for the hotel was for me a little
6    minuscule when you're going to go raise almost a
7    hundred million dollars for memberships.  It
8    wasn't even a question.  And we were promoting it
9    while this was happening.  People were coming
10   through the hotel and seeing it, other people on
11   the community.  So it had a lot of buzz going.  It
12   was going in the right direction.
13       MS. IVORY:  So was the intent to have
14   some people come from the Breakers or the other
15   clubs and join Palm House, as well?
16       THE WITNESS:  Oh, absolutely.
17   Memberships, just so you guys know, only
18   twenty-eight percent of the members actually use
19   the clubs.  So when I was a member of the Trump
20   Golf, I think I played golf twice in five years.
21   The dues are probably thirty grand.  But the
22   people, you went over, they had a dinner, a Sunday
23   thing.  You know, Bob Wright, the Former President
24   of NBC, and all these people were there.  Those
25   were the same people.  A lot of people belonged to

Page 724

1    seven clubs.  They be belonged to this, this,
2    this, this, this, and this.  So it wasn't unusual
3    to have those same people want to join a different
4    club.
5        BY MS. SPRINGER-CHARLES:
6        Q    The offering materials say that the
7    funds would be used for the acquisition,
8    development, and renovation of the hotel.  How are
9    the club memberships related to the acquisition,
10   development, or renovation of the hotel?
11       A    Well, I think from what I read on the
12   PPM, Joe put in all the benefits of the club
13   membership, that we would sell some and none of
14   the expenses.
15       Q    No.  I mean, your club memberships to
16   Mar-a-Lago, Club Colette, or --
17       MS. IVORY:  Breakers.
18       BY MS. SPRINGER-CHARLES:
19       Q    -- Breakers, how do those memberships go
20   to the acquisition, development, or renovation of
21   the hotel?
22       A    They wouldn't, but you can look at it
23   two ways.  One, the CEO has a club and pay for his
24   membership.  I'm the CEO of the company.  And,
25   two, the truth is that those were the people that

Page 725

1    we were going to use for to promote the hotel.
2    It's a really small community.  And you could pick
3    up lots of people that it would belong to those
4    clubs, and that's where you're going to get your
5    members from.  You're not going to like get new --
6    you'll get some new members, but most of them are
7    already those people that joined clubs that don't
8    use them that often that want to be a member of
9    the club.
10       Q    Does the same thing go for the Kravis
11   Center membership?
12       A    The Kravis Center membership was a
13   pledge of, I think, a hundred thousand dollars
14   from the Palm House, and they got an ad in the
15   Kravis membership.  This was part of the PR.
16       Q    It was part of PR?
17       A    It was part of the PR one hundred
18   percent.  I think I kicked in half of personal
19   money on that membership.
20       Q    How about donations to the American
21   Cancer Society?
22       A    Was it for an ad?  I don't know what it
23   is, but it could've been an ad for the --
24       Q    Bob and Mia Matthews donation on the
25   check memo line.

SEC_000858

Page 726

```
 1        A   Yeah.  It was the Cancer Society, we
 2   went to black ties and promoted Palm House.  And I
 3   thought that was for an ad, but I don't know.  I
 4   don't know if that was for an ad, or if that was
 5   just to go to the event.
 6        Q   What about the MSOA Foundation?  It says
 7   Bob and Mia Matthews, board dues.  Middle School
 8   of the Arts Foundation, Inc.
 9        A   Yeah.  That would've been just a
10   donation to the school.  That one would've been --
11   so when I went through with the accountant, that
12   one would've been -- the one for the school
13   would've been from me on a due to, due from.
14        Q   How about the Parent Child Center, Inc.?
15   In the memo it says, Palm House donation,
16   Chairman's club.  What is that?
17        A   I hosted a party at my house for the
18   Palm House.
19        Q   What do you mean?
20        A   Well, I host the party.  Can I just see
21   what it was?
22        Q   Sure.
23        A   Yeah.  And I think --
24        MR. REINHART:  For the record, that's
25   Exhibit 35?
```

Page 727

```
 1        MS. SPRINGER-CHARLES:  Exhibit 35.
 2        THE WITNESS:  Yeah.  So I hosted a
 3   party.  We did a cocktail party at the house.  And
 4   that was also a thousand dollars I gave them.
 5        BY MS. SPRINGER-CHARLES:
 6        Q   Also, I'm showing you Exhibit 36.
 7   There's an invoice attached to an email, a
 8   10/17/14 email.  This SJG Engineering, LLC?
 9        A   This looks like for sure a personal
10   item.  I know what it is.  Oh, Bill to Bob
11   Matthews -- yeah, that's a personal.  That
12   would've been a draw on me.
13        Q   Okay.
14        I'm showing you Exhibit 37.  It's an
15   email to you from Jade, "Please let me know if you
16   want New Haven Contracting to pay the Absolute
17   Plumbing invoice, two hundred eighty-nine dollars
18   and seventy-five cents for Bianca's toilet."
19        A   Yeah.  That would've been he kept these
20   separate.
21        Q   This was personal?
22        A   A hundred percent.  And he kept a list
23   of them.  You'll see one for HVAC, too.
24        Q   I'm showing you Exhibit 38.  I think a
25   copy of a document that was held in maybe a folder
```

Page 728

```
 1   that said, Joe's party, 5/13.  There's a partial
 2   invoice attached, as well.  Did you host the party
 3   for Joe Walsh?
 4        A   Yes, I did.  And I paid for it.  Yes.
 5        Q   Where did you get the funds to pay for
 6   it?
 7        A   That would've been a draw on me.  It
 8   wasn't a hotel expense.  It was my personal thing.
 9        Q   It was your personal bank account?
10        A   Yes.  It was his sixty-eight party.  He
11   was very grateful.  He sent me a very kind thank
12   you note.
13        Q   I'm showing you what's been marked as
14   Exhibit No. 39.  Can you tell me who Scott Diameit
15   is?
16        A   Yeah.  This was going to be for the
17   hotel, Rob Samuels.  You asked me about him last
18   time.  This was the Clematis deal.  Hey, Joe, call
19   me, RUB, Rob.
20        Q   How is Clematis related to the Palm
21   House?
22        A   It wasn't.  But we did a whole study and
23   all the work and hired appraisals and the whole
24   nine yards.
25        Q   So was this person requesting anything
```

Page 729

```
 1   related to Palm House?
 2        A   No.
 3        Q   Okay.
 4        Did you provide him with five hundred
 5   thousand dollars?
 6        A   If he asked for it, I would've probably
 7   given it to him.  I imagine there's wire, a check
 8   or something.
 9        Q   I'm showing you what's been marked as
10   Exhibit No. 42.  Can you tell me if this was
11   related to the hotel project?
12        A   Well, they were my accountants.  I don't
13   know if they did work.  Let me just see.
14        Yeah.  So they were my accountants, and
15   I don't know -- it this for thirty-five hundred?
16        Q   Thirty-five thousand.
17        A   Thirty-five thousand, yeah.  So it's
18   going to probably this one will be one of those
19   that says, see accountant.  Because probably part
20   of it is going to be for the work on the Palm
21   House and part of it is going to be for my
22   personal stuff.
23        Q   And so that's Exhibit 42 relating
24   Zackin?
25        A   Zackin.
```

SEC_000859

Page 730

1     Q   Z-A-C-K-I-N, Z-I-M-Y-S-E-K-I Sullivan,
2  LLC.
3          I'm showing you what's been previously
4  marked as Exhibit 43.
5          Can you tell us what this is about, and
6  if it's related to the hotel project?
7     A   Yes, it's related to the project.  It's
8  for a lien, it looks like a plumbing lien with a
9  release for the plumber on the Palm House.
10    Q   I'm showing you what's been previously
11 marked as Exhibit No. 44.
12         Have you seen this document before?
13    A   I don't know.  It looks like part of
14 Les's stuff, but I don't recognize it.
15    Q   You produced this document to us.
16    A   Okay.
17    Q   But my question on this is:  Do you see
18 the first line item, it says, "Loan from USREDA,
19 Joe Walsh," and I believe it corresponds to
20 thirty-six thousand, two hundred dollars?
21    A   Right.
22    Q   What does that number represent?
23    A   I mean, I don't know.  I have no idea.  I
24 thought -- I remember seeing the old one.  I
25 thought he put in more money than that in the

Page 731

1  beginning.
2          Does it tie out with Les's account?
3          MR. REINHART:  She doesn't answer
4  questions.
5          BY MS. SPRINGER-CHARLES:
6     Q   I'm asking you.
7     A   Oh, sorry.  I don't remember.  I don't
8  remember what it was.
9     Q   Does that represent how much you owe Joe
10 Walsh after he utilized some of the original funds
11 that he loaned you?
12    A   No.  I owe him a lot more than
13 thirty-six thousand.  Is this going to Joe
14 Walsh -- no, from USREDA to Joe Walsh.  I don't
15 remember what it is.  I just don't remember.  It
16 looks like Joe got a loan.
17    Q   I'm showing you what's been previously
18 marked as Exhibit No. 141.
19         Can you tell me on the second page on
20 December 19th, 2013, five hundred thousand dollars
21 was sent in to Les Evans's trust account from a
22 Koeppel Law Group, K-O-E-P-P-E-L, Koeppel, and the
23 beneficiary is re:  Bob Matthews.  What was that?
24    A   That was the five hundred thousand
25 dollars that Nicky used for the Lake Worth deal

Page 732

1  and was returned to Joel.  Joel Koeppel returned
2  the money.
3     Q   Can you explain that to me.
4     A   The last time I was here you showed me a
5  piece of paper with a cover page, and I think it
6  started out with minus five hundred thousand or
7  something, and that's what that is.
8          MR. REINHART:  Explain to her what the
9  Lake Worth deal is.
10         THE WITNESS:  So the Lake Worth deal was
11 another EB-5 deal that Joe wanted to do, and I
12 believe we had five hundred thousand dollars of
13 soft money up.  It means you get it back if you
14 don't get the deal.  And it was called Gulfstream
15 Hotel.  And somebody else got the deal, and Joe --
16 not Joe -- and this lawyer -- yeah, Joel Koeppel
17 is returning the money.
18         BY MS. SPRINGER-CHARLES:
19    Q   You had previously wired five hundred
20 thousand to Joel Koeppel?
21    A   I didn't.  I thought Nicky told me that
22 he did.
23    Q   From one of New Haven's accounts?
24    A   From his own account, yeah.  Yeah.
25    Q   Why did he wire the money from there?

Page 733

1     A   Because Joe told him to get the hotel,
2  and he worked on it with Joe to get the hotel.  And
3  so he sent him money.  And then we didn't get the
4  hotel, and then Joel returning the money back.
5     Q   Joe who?  Joe --
6     A   Joe Walsh.
7          MR. REINHART:  Clarifies your Joes.
8          THE WITNESS:  Sorry.  It was Walsh.
9          BY MS. SPRINGER-CHARLES:
10    Q   Joe Walsh told --
11    A   Nick Laudano.  Yes.
12    Q   -- Nick Laudano to go try get that hotel
13 deal?
14    A   Yes.
15    Q   And he wired him five hundred thousand
16 to be able to do that?
17    A   Yes, soft money.
18    Q   Of soft money that he would get back in
19 the event that the deal didn't close?
20    A   True.
21    Q   It didn't close, and then the funds were
22 returned?
23    A   True.
24    Q   Why were they returned to Les Evans's
25 trust account and not to Nick Laudano's account or

SEC_000860

Page 734

1    to Joe Walsh?
2         A   I don't remember.
3         Q   The five hundred thousand that Joe Walsh
4    provided to Nick Laudano to try to do that deal,
5    whose funds were those?
6         A   No.  I never said that Joe Walsh gave
7    Nick Laudano five hundred dollars (sic).  Joe
8    Walsh told Nick Laudano to get the hotel, we're
9    going to do an EB-5 project there.
10        Q   Well, I'm confused.  I thought you said
11   Joe Walsh provided Nick Laudano five hundred
12   thousand to be able to do the teal?
13        A   No.
14        Q   Okay.
15        A   Joe Walsh told Nick Laudano to take his
16   money -- Nick's money and try to get this building
17   to be an EB-5 project, and get it under agreement.
18        Q   To purchase the building using his own
19   personal money, Nick Laudano's personal money?
20        A   No.  Just to tie it up.  Joe was going
21   to -- it was always going to be reimbursed.  To
22   tie up the building with soft money.
23        Q   Where did the dollars come from to do
24   it?
25        A   Nicky took his and sent him five hundred

Page 735

1    thousand dollars.
2         Q   His personal money?
3         A   Yes.
4         Q   Okay.
5             When the five hundred thousand dollars
6    came back, why is it coming back to Les Evans's
7    trust account then?
8         A   Why is it coming -- I think Joe -- I
9    think the money was returned.  It shows up on
10   Nicky's thing that, that red five hundred, that
11   opening statement that you showed me, that's that
12   same five hundred thousand dollars.  So Nicky took
13   five hundred thousand dollars.  He wired it to
14   this lawyer, Joel.  The deal didn't happen, and
15   the money came back in.
16        Q   To Les Evans's trust account.  That's my
17   question.  Why is it coming back to Les Evans's
18   trust --
19        A   Because I don't think that money was
20   ever supposed to be Nicky's money -- I don't think
21   that was expense money for the hotel.  In other
22   words, I don't think that part of his -- his money
23   that he made.  I think that was supposed to go
24   back to the hotel.  That's what he told me, and
25   that's why he said he showed it up on the summary

Page 736

1    page, that in red said five hundred thousand
2    dollars.
3         Q   I'm not sure I'm clear.
4         A   So I'm not sure I'm clear.  I asked
5    Nicky about it, just so you know.  And this is
6    what he told me, he said, Bob, I took five hundred
7    thousand dollars, and I gave it for a deposit on
8    the Gulfstream hotel.  And then he shows it coming
9    back in.
10            MR. REINHART:  Who's he?
11            THE WITNESS:  Nicky.  It doesn't come
12   back into Nicky's account.  It goes back in --
13   because Nicky said -- I think Nicky said, that
14   wasn't part of my money that I was making, like it
15   wasn't supposed to come to me, and so he sent it
16   back.  That's all I know.  I don't really know
17   anymore.
18        Q   Okay.  So did he get the original five
19   hundred thousand dollars from Les Evans's trust
20   account?
21        A   Probably, yes.  Or it was his money that
22   he had to float.  I don't remember.  I don't think
23   he earned the money, and that's why he returned
24   it.  He's honest.  I trusted him.  I don't know.
25   But I believe you'll see in the papers from Nicky,

Page 737

1    five hundred thousand dollars in red, and I
2    believe that's what that is.
3             MS. IVORY:  Did Persona PR provide
4    services to the hotel?
5             THE WITNESS:  I don't know who they are.
6    Persona what?
7             MS. IVORY:  PR.
8             THE WITNESS:  We had a PR firm in
9    London.  I don't think that was the name.  There
10   was a PR firm for low money, maybe three or five
11   hundred dollars that my wife used for her.  That
12   would've been a draw.  But the real PR firm was
13   out of England.
14            MS. IVORY:  Okay.
15            MS. SPRINGER-CHARLES:  Let's mark it
16   so that we're clear.  We're going to mark a
17   copy of this email, dated 8/4/2014 as Exhibit
18   No. 190.
19            (SEC Exhibit No. 190 was
20            marked for identification.)
21   BY MS. SPRINGER-CHARLES:
22        Q   I'm showing you what's been marked as
23   Exhibit 190.
24            Does that refresh your recollection as
25   to what Persona PR is?

98 (Pages 734 to 737)

Page 738

1    A   Well, yeah.  This says Mia Matthews
2  right on it.
3    **Q   Okay.**
4    A   Yeah.  This is LA.  Our PR firm was in
5  London.  Yeah.  That would have been a due to, due
6  from, or that would've been on her draw on her one
7  fifty that she took.  It wouldn't been a due to,
8  due from.
9    **Q   You mentioned Ryan Black had gotten a**
10  **fifty thousand dollars loan; is that correct?**
11    A   Yes.
12    **Q   From whom?**
13    A   He -- I was in Europe.  He called me up
14  desperate.  There's an email trail that says it.
15  And he said, I need fifty thousand dollars right
16  away, can you help me out?  I don't remember what
17  it was for.
18    **Q   And did he pay it back?**
19    A   No.
20    **Q   He never paid it back?**
21    A   Nope.  The.
22       The PR firm was, I believe, Ian Sadler.
23       MS. SPRINGER-CHARLES:  I'll ask the
24  Court Reporter to mark a copy of this email and
25  its attachment as Exhibit No. 191.

Page 739

1       (SEC Exhibit No. 191 was
2       marked for identification.)
3  BY MS. SPRINGER-CHARLES:
4    **Q   I'm showing you what's been marked as**
5  **Exhibit No. 191.**
6       **Did you receive this email from your**
7  **brother, Gerry?**
8    A   Yes.
9    **Q   What is it?  What's attached to this**
10  **email?**
11    A   It looks like -- oh, it looks like any
12  money that went through his account.
13    **Q   What do you mean by that?**
14    A   Well, any money that went through his
15  account.  Like I owed my mom money, and so he
16  would've paid her, and then I would've owed him
17  the money.
18    **Q   When you say his account, what account**
19  **is that?**
20    A   I think he had an account called
21  Matthews Commercial Properties.
22    **Q   And so sometimes you transacted business**
23  **through that account?**
24    A   Yes.
25    **Q   Did you ever transact for the hotel, the**

Page 740

1  **Palm House Hotel through the account?**
2    A   Yeah.  The original loans that say
3  Matthews Commercial, there was an original loan in
4  the very beginning, around five hundred thousand
5  dollars, five fifty, that would've gone into this
6  account for my benefit.
7    **Q   I'm sorry.  What do you mean by the**
8  **original loan?**
9    A   With the Les Evans piece of paper.  If
10  you had that Les Evans account, you'd see it right
11  there.  Yes.
12    **Q   This is Exhibit 50.  We can just use**
13  **this as an example.**
14    A   Is there any way we could use the bigger
15  one.  So there, see, number two.
16    **Q   Okay.**
17    A   See the original stuff before we bought
18  the hotel, and he lent me money.  We talked about
19  it last time.  See Matthews Commercial Properties,
20  and it has a number, one fifty-two.  How much is
21  it?
22       MR. REINHART:  One fifty-two, five
23  hundred.
24       THE WITNESS:  Oh, one fifty-two, five
25  hundred.  So that money.

Page 741

1       BY MS. SPRINGER-CHARLES:
2    **Q   That money is what?**
3    A   That was my money that Joe lent me that
4  he sent to Gerry and -- because I didn't have an
5  account, and Joe's suing Gerry today claiming that
6  Gerry owes Joe the money.
7    **Q   My question, though, was any the**
8  **expenses that came out of the Matthews Commercial**
9  **Properties's account for the benefit of the Palm**
10  **House Hotel?**
11    A   Came out of it?
12    **Q   Out of it.**
13    A   Oh, I doubt it.  Gerry didn't have
14  really anything to do with the hotel.
15    **Q   So any expenses that he paid --**
16    A   Were for me.
17    **Q   Were for you personally?**
18    A   Yes.
19    **Q   Okay.**
20       All right.  Do you have any additional
21  information on any of the topics that we covered
22  in testimony today?
23    A   No.  Just the things that I told you I'd
24  follow-up with.
25    **Q   Okay.  Great.**

99  (Pages 738 to 741)

## Page 742

1    A   Those two things.
2    Q   Are there any subject areas or questions
3    that you thought the staff might ask about today,
4    but did not ask?
5    A   No.  I think you guys did a very
6    thorough job.
7    Q   Are you aware of any other information
8    that you think may be helpful to the SEC for
9    purposes of this investigation?
10    A   I think the only other thing I can think
11    of that would be relevant is that after I met with
12    you last time, I then met with the federal guys
13    again, Joe Curly and Keith Sutherland, and I put
14    an offer in writing to be responsible for Joe's
15    money up to forty-six five, which is what we
16    believe he raised, and give them a lien on the
17    membership interest.  It was what they were
18    supposed to have, not a second mortgage on the
19    property.
20          And I then met in Miami last week
21    with --
22          MR. REINHART:  Don't talk about that.
23    That's with the lawyer.  Those who are
24    representing you, as opposed to lawyers for other
25    people.  So just stick to the --

## Page 743

1          THE WITNESS:  I know, but I think it's
2    important.  I agreed to cooperate with them and
3    hire this guy Kirshner to cooperate -- to help
4    them get their EB-5 -- to get their green cards.
5    And there's a chance we could still win that and
6    get their green cards, which I'm really hoping to
7    have happen at the end.
8          And I met with an investor, and I
9    believe I'll be able to show the federal guys
10    within the next couple of weeks that I'll have the
11    money lined up to finish the hotel, and I plan on
12    going in an finishing the hotel.  And I hope you
13    guys support me.  And I hope you guys realize that
14    I'm as much of a victim in this as all of those
15    Chinese guys.  And it struck me very hard today
16    for what the position he put me in.  My personal
17    life is very upside down and very difficulty for
18    me and my family.  And I don't have any revenge
19    against him, but -- I still pray for him, but what
20    he did was not nice.  It was an evil thing that he
21    did.  And he mastermind this whole thing.  And he
22    knows very well -- all along he knew what he was
23    doing.  I can see today.
24          And that's really all I have to say.
25          MR. REINHART:  When you talk about the

## Page 744

1    federal guys, you mean the lawyers from Gunster
2    who filed a lawsuit in federal court?
3          THE WITNESS:  Yes.  I believe that they
4    will settle with me, and I've agreed to cooperate
5    with them if they want to go after Joe, which I
6    don't know if they want to waste their time.  But
7    I believe that I will have a path for these people
8    to get their money, even the money that I never
9    received from Mr. Walsh, because it's the right
10    thing to do.  And if they give my time to pay it
11    back -- I can't pay it back in a year, but if they
12    give me time, I'll get this project built, and,
13    hopefully, it has a happy ending, because I've
14    tried my heart out to have this thing work out.
15          And I want you to know that I was
16    responsible for the business part of the hotel.
17    I'm really good at that part.  I'm not trying to
18    be arrogant, but God gave me a gift for that part,
19    and I've done really well with before and afters.
20    And this was a before crappy two fixture bathroom
21    hotel to an after with a really great design with
22    real value.  I wanted this to be one of the best
23    EB-5 projects in the world.  It was in Palm Beach.
24    To me, how could it fail, you know.  It was so
25    great.

## Page 745

1          And I'm hoping some day -- I hope you
2    guys support me and realize that I didn't -- there
3    was no trickery.  I tried to keep everything
4    straight.  I tried to keep -- I wasn't perfect
5    with the due to, due froms.  Looking back today,
6    should I have read my agreements with the mortgage
7    and note?  Yes, I probably should've.  Did I?  No,
8    but I just didn't operate like that.  Through my
9    whole life I never operated like, and I did really
10    well by having other people deal, and have me
11    doing the sort of -- I don't want to say the
12    genius stuff, but I had all these people working
13    the designs and coming and going, and I'd walk
14    through every day to make sure every was right.
15    And I was very anal on getting this really --
16    delivering a great project.  And that part of it,
17    I've never let go, and I think it'll end up being
18    a success some day.  That's it.
19          BY MS. SPRINGER-CHARLES:
20    Q   Okay.
21          Did your accountant ever finish the
22    reconciliation of the funds that you received and
23    how they were disbursed?
24    A   I owe him five thousand dollars, plus a
25    ten thousand dollar advance.  I've asked the

100  (Pages 742 to 745)

Page 746

1 investor to help me with that. And I believe I
2 will be able get that money in the next couple of
3 weeks and finally have that done. And I'll be
4 happy to give it to you. It'll point out every
5 one of these things because I was very
6 conservative. If there was a question of the
7 expense was a personal expense, I just took it as
8 a draw. I had plenty of money in the deal to take
9 it as a draw. So there was no issue for me.
10      Q   Okay. We'd appreciate it, that when
11 that gets completed, you'll share that with us.
12      A   I will follow-up with you, and I think
13 you'll be very impressed.
14      Q   All right.
15          You talked earlier about speaking to
16 Tony Reitz and maybe Mark Payne, but other than
17 those individuals, did you speak with anyone else,
18 other than Counsel, regarding this investigation.
19      A   I told my little brother, yes. And I
20 told my wife.
21      Q   What did you and -- Gerry?
22      A   Yes.
23      Q   What did you talk about?
24      A   I told that I went in and you guys had a
25 bunch of questions, and I've been answering them.

Page 747

1 It wasn't really anything specific.
2      Q   Have you spoken with anyone, other than
3 your Counsel, regarding your appearance here
4 today?
5      A   Mark Payne, yes.
6      Q   And what did you tell him?
7      A   I told him -- he teased me about when
8 are you getting grilled or something, and I told
9 him.
10      Q   Did you tell him what you would be
11 telling me today?
12      A   No.
13      Q   Do you know anyone else -- I think we
14 talked about this last time, but other than the
15 individuals we talked about last time, do you know
16 anyone else who's been subpoenaed or has testified
17 in this investigation?
18      A   No.
19          MS. SPRINGER-CHARLES: We'd like to
20 remind you, Mr. Matthews, that this is a
21 confidential non-public investigation.
22          Do you wish to clarify any statement
23 you've made today?
24          THE WITNESS: No.
25          MS. SPRINGER-CHARLES: Do you wish to

Page 748

1 add anything to more completely respond to any
2 statements you've made today?
3          THE WITNESS: No.
4          MS. SPRINGER-CHARLES: Mr. Reinhart, do
5 you wish to ask Mr. Matthews any clarifying
6 questions?
7          MR. REINHART: No. You've been very
8 gracious to let me do that in the course of his
9 testimony, and I appreciate that, but I have no
10 further questions to clarify.
11          MS. SPRINGER-CHARLES: We have no
12 further questions at this time. We may wish to
13 call you in the future, and if that's the case,
14 we'll contact Mr. Reinhart. It may or may not
15 happen, but for now, we don't have any further
16 questions.
17          So we're off the record at 7:40 p.m. on
18 February 13th, 2017.
19          (Whereupon, at 7:40 p.m., the
20 examination was concluded.)
21               * * * * *
22
23
24
25

Page 749

1          PROOFREADER'S CERTIFICATE
2
3 In the Matter of:  PALM HOUSE, LLC
4 Witness:       Robert Viers Matthews
5 File Number:    FL-03930-A
6 Date:          Monday, February 13, 2017
7 Location:      Miami, Florida 33131
8
9          This is to certify that I, Donna S. Raya,
10 (the undersigned), do hereby swear and affirm that
11 the attached proceedings before the U.S. Securities
12 and Exchange Commission were held according to the
13 record and that this is the original, complete, true
14 and accurate transcript that has been compared to the
15 reporting or recording accomplished at the hearing.
16
17 (Proofreader's Name)        (Date)
18
19
20
21
22
23
24
25

SEC_000864

SEC_000865

**A**

**A-Z-B-E-K...**
631:19
**a.m** 349:15
353:3
403:15
**A1A** 537:15
**A4** 517:12
**AAE** 423:19
424:22
425:15
**able** 401:22
409:21
536:16
562:17
566:8 593:7
618:25
647:8
652:18
682:14
686:3
697:20
733:16
734:12
743:9 746:2
**above-noted**
631:5
**Absolute**
727:16
**absolutely**
358:16
389:14
390:3
392:25
414:16
434:23
435:6,18
441:7,13
457:2 465:2
486:19,20
514:15
525:12
526:1
532:19
534:24
552:23
560:12
562:5
567:13

570:3 597:8
614:16
616:16
638:16
643:1,10
644:5
664:19
679:3 691:6
710:20
723:16
**access** 631:2
687:10
**accessibility**
512:4,25
513:1,9
**accompany...**
458:14
**accomplish...**
681:16
749:15
**account**
512:12,16
588:15,16
592:8
593:10
594:19
599:17,20
600:1
621:18
622:10
624:12
626:14,14
626:19,21
629:17
640:6 641:2
649:15
674:10,10
708:12
710:23
713:22
714:4 728:9
731:2,21
732:24
733:25,25
735:7,16
736:12,20
739:12,15
739:18,18
739:20,23

740:1,6,10
741:5,9
**accountant**
350:5,6
354:6 508:4
509:8 540:6
543:15
695:20
708:23
726:11
729:19
745:21
**accountants**
440:19
729:12,14
**accounted**
644:1
**accounting**
705:24
**accounts**
598:22,23
598:23
691:8
732:23
**Accredited**
482:25
**accrue**
530:20
**accrued**
503:21
**accruing**
400:17
525:9 526:5
526:8,11
530:24
531:3
534:12,13
**accurate**
688:14
689:3,10
749:14
**accurately**
408:7 474:5
**acquire**
574:18
583:9 618:1
625:5
**acquired**
573:16

574:3,15
620:2
624:23
625:3
630:11
**acquires**
625:21
**acquisition**
388:11
471:17
543:10
546:9
550:22
577:17
681:23,25
683:15
724:7,9,20
**acre** 677:7
**Action** 364:2
**active** 692:8
**actress** 671:2
671:3
**actual** 354:17
364:15
435:4,19
436:10
451:7 468:4
471:17
479:5,11
486:10,16
531:15
541:2
546:20
**ad** 725:14,22
725:23
726:3,4
**Adam** 555:12
**add** 375:3
381:22
390:16
580:8,10
611:20
657:18
690:21
748:1
**added** 371:19
384:22
414:1 588:5
606:1 615:5

648:22
**Addendum**
659:9
**addendums**
507:3 599:9
599:13
**addition**
446:9
520:24
532:8
**additional**
741:20
**address**
388:22
628:18,20
628:21
**adjacent**
617:24
**adjourned**
353:12
**administra...**
565:3 566:4
566:22
567:17
571:5,24
627:24
**ADRs** 354:23
**advance**
494:12,17
520:23,25
522:7
745:25
**advanceme...**
498:9
**advances**
494:16
503:20,21
517:9
**advancing**
674:14
**advantage**
578:18
631:11
676:25
**adverse**
522:8,9,17
674:16
**advice**
535:15

**advisory**
364:1,7,12
364:15
373:4
559:19
560:8,13,14
560:19,21
560:24
**AE** 621:18
**affect** 562:20
**affidavit**
714:21
717:21
718:21
**affiliated**
479:18
643:12
673:5
**affirm** 749:10
**affirmatively**
513:8
**afford** 595:21
642:4,4
**afraid** 425:22
440:6,10,13
691:18
**afternoon**
614:20
**afters** 744:19
**agent** 459:22
459:22
460:5,13
465:23
479:11,18
531:10
673:17
**agents**
354:17
370:21
371:5
422:12,18
423:1 435:5
435:20
436:11
438:18
462:25
468:4
**agile** 687:6
690:12,17

**ago** 366:12
376:24
378:11,12
384:23
398:18
400:23
446:14,16
587:14
592:25
593:21
594:19
619:23
662:2,2
692:12
696:2
712:23
**agree** 360:12
360:13
364:20
365:5
499:13
547:7,9
554:4
604:25
608:8 610:4
647:22
662:25
**agreed**
360:15
363:24
365:1 383:2
499:2,11
500:18,21
502:19,20
562:15
722:4 743:2
744:4
**agreement**
371:21,21
382:15,16
432:15
436:25
437:3,5,6
460:2
480:21,24
482:8,21
483:5,8,12
484:14
486:10

490:6,9
492:7 494:1
495:12,13
500:8,12
501:1,6,7
501:10,14
501:18,19
501:21,21
501:24
502:4,16,23
502:24,25
504:15,16
505:6
506:14
517:8,11
520:25
521:19
522:14
524:15,19
524:21
525:6
530:12
555:4,6
564:25
565:4 566:3
566:4,17
589:19,24
590:17,17
590:23
591:3,3,5
596:14,20
596:21
597:19,22
598:8 601:2
617:6 630:5
638:13
643:3
646:15
648:11
674:1
734:17
**agreements**
506:21
565:7,21
566:2,12,16
566:18,25
745:6
**ahead** 390:25
506:1,2

512:9 564:3
573:25
581:10,11
581:19
613:16
616:25
692:20
696:19
708:23
**AIA** 421:4,5
426:24
472:12,16
472:25
473:18
475:9
545:10
546:25
547:1
633:12,13
633:15,17
633:18,24
640:24,24
643:7
644:17
**AIG** 720:5,7
720:15,21
**Air** 694:23
**Airlines**
699:5
**Alan** 704:6
**alarm** 421:25
**Alec** 560:4
**Alibi** 578:24
583:2
588:18
589:10
590:5
605:19
620:7,9,24
620:24
621:2,4,6
**Alibi's**
589:12
**allocating**
547:25
**allow** 511:23
**allowed**
550:16
683:15

687:10
**allowing**
388:11
549:8
**Alphabet**
579:5
**amenities**
572:18
574:14
581:14,23
611:6
**amenity**
611:21
721:18,21
**America**
429:4
512:15,17
512:18
**American**
447:10
582:16
725:20
**amount**
427:21
500:16,17
500:18
503:13
524:1
538:10
543:11
555:8 567:3
588:1 608:2
630:20
633:20
641:12
653:5
692:19,25
693:13
**amounts**
523:9 640:3
**anal** 745:15
**analysis**
410:6
416:10
516:11
**and/or** 521:5
**Angeles**
699:9
**angry** 359:2

**angst** 424:1
**animation**
359:9
**animations**
359:5
**annual**
402:18
509:2,7
590:23
722:2
**answer**
356:15
362:10
391:24
405:2
410:16
411:24
419:20
423:3 434:2
471:19
476:4
498:20
520:20
540:1,10,14
540:20
567:10
569:14
593:23
600:5
605:21
611:14
616:20
619:17
620:8 624:7
627:4,6,8
698:16
712:10
731:3
**answer's**
438:10
451:13,14
**answered**
411:22
462:2 469:8
525:18
**answering**
409:18
746:25
**answers**

474:8
542:14
655:4,13
**anybody**
361:14
364:21
365:2 438:8
440:2 442:6
457:13
616:15,15
653:13
692:15
**anymore**
519:12
570:7
595:21
610:8 693:2
736:17
**apartment**
514:7
515:13,14
**apparently**
396:20
454:2 680:6
**appear**
416:19
434:14
665:4
**appearance**
747:3
**APPEARA...**
350:1
**appears**
370:12,13
379:18
409:24
410:17
474:9 499:6
637:9
640:10
681:6,22
686:18
719:19
**applicable**
519:22
520:4
**application**
716:6
**applications**

488:7 538:2
**applies** 600:4
**apply** 615:14
716:3
**appraisal**
360:3,6,7,9
360:12,15
360:21
420:20,24
427:2
608:20
627:16
652:5,9,14
652:16,17
652:21
653:1 666:5
666:9,18,21
681:7
702:20
703:11,20
**appraisals**
354:25
427:14
728:23
**appreciate**
437:11
746:10
748:9
**appreciated**
618:8
**appropriate**
543:7
681:10
**approval**
417:2,3,10
417:15
418:15
477:18
478:8,16,17
478:18,19
518:22
664:1
665:13
671:21
673:23
**approvals**
394:16,20
395:23,25
396:2

517:19
518:12,13
672:1
**approved**
431:18
448:3 478:3
478:4 479:7
479:8
566:20
568:14
665:10,11
665:18
**approving**
444:16
**approxima...**
472:17
475:14
538:3
622:23
**APR** 615:14
**April** 466:14
466:14
496:9 640:6
702:21
714:9
**Arabic** 376:6
**architectural**
365:7
618:23
**area** 452:18
**areas** 676:21
742:2
**argue** 440:25
443:21
610:8
**argued**
440:22
**arguing**
513:15
**argument**
520:9 555:6
**argumenta...**
608:24
**arrested**
592:24
**arrogant**
485:15,15
744:18
**Art** 699:21

**article** 532:4
685:2
**articles** 352:5
531:9,13,23
684:8 685:1
685:16
**articulated**
614:24
**Arts** 726:8
**Arturo** 465:4
465:10,13
**ASAP** 408:13
**aside** 619:20
622:4
**asking**
357:21
365:2 368:2
384:25
385:8
389:12
392:3
394:15
395:23
417:20
428:14
445:5,10,12
464:1 469:6
469:23
470:6 474:6
475:13,21
486:13
506:4
510:18
511:1,8
515:22
520:11
525:1 539:7
562:25
588:19
598:2 632:1
649:5
715:15
731:6
**asks** 380:4
**Aspen** 675:9
675:14,20
676:13,14
676:15,18
676:22

**asserting**
525:10
**assessments**
523:1
**asset** 589:8,9
589:9
599:22
600:23,25
602:12,15
606:1,1
687:9
**assets** 505:8
506:7 507:9
517:23
522:10
590:2 599:6
601:5
605:16
646:11,12
674:16
687:11
**assist** 560:21
**associated**
355:24
360:19,24
374:23
395:15
421:18
423:18
441:5 465:3
508:19,24
510:11
561:25
582:2
631:24
670:12
694:13
701:12
703:21
705:9,11
**assume**
399:25
422:5
**assumed**
371:1 406:2
484:2
**assuming**
400:2 563:1
**assumption**

400:1
**assured**
567:4
**Aston** 709:3
709:5 710:1
710:2,3,10
711:10
713:16,18
714:8,12
**Atlantic**
665:12
**attach** 531:14
688:6
**attached**
367:18
378:23
399:18,19
405:4 410:1
411:5,13,14
420:8,15,24
421:3,16
434:4 458:1
468:2 483:1
483:6
485:10
494:18
499:7 507:3
531:11,14
531:24
544:19
553:6
555:16
556:14,20
557:1,2,12
557:16
585:22
599:9,14
611:1
613:17
614:21
628:15
654:10,19
657:2,15
658:11
664:21,22
665:2,5
681:17
683:4
709:16,20

720:9,9
727:7 728:2
739:9
749:11
**attaches**
379:5
444:22
500:7,8
652:21
**attaching**
450:25
659:21
**attachment**
366:25
396:6
475:18
476:10
528:23
536:19
537:2,3,4,7
537:11,19
537:21
539:10,17
539:18
543:4
630:18
738:25
**attachments**
432:4 472:7
473:6 476:8
537:1
**attacking**
691:8
**attempt**
613:17
**attend** 673:8
**attended**
695:14
**attention**
356:5
374:14
449:20
484:8
488:19
609:23
656:7
**attorney**
565:7,14
591:10

Page 753

598:5
**auction**
631:25
634:22,25
635:1
636:11,16
696:25
697:1
**auctioned**
632:6
**audited**
508:4
**August**
363:15
393:10,12
396:8 468:1
524:23
526:2
539:23
658:16,24
696:16
698:4
**authority**
436:8
517:22
**authorized**
511:22
606:25
**Auto** 711:7
717:22
718:10
**Auto's**
717:24
**automatica...**
590:19
**available**
354:3
577:21
616:10
**Avenue**
349:10
350:9
578:25
**average**
354:24
374:19
466:24
487:21
**avoid** 677:18

**aware** 355:22
356:16,20
372:4
422:10,15
422:21
434:13,17
434:21
488:11
525:9
527:13
528:10
529:5,17,20
533:3
571:15
654:24
673:20,25
691:3
710:18
742:7
**Awesome**
537:17

_____ B _____
**B** 522:5
544:9
**B-A-C-A-...**
529:8
**baby** 455:7
**Bacarella**
529:8
**backdate**
399:3,12,14
**backed** 493:4
**backfired**
691:21
**background**
371:7
613:20
**backstop**
571:12
**backup** 404:5
**backwards**
544:6
**bad** 417:13
417:19
685:16
**badly** 690:22
**Bahamas**
675:11

677:5,19
**Bal** 700:5
**balance**
494:16
503:19,21
538:9
544:11
594:25
600:23
601:3
614:25
615:4 623:1
623:8
696:20
722:8
**Baldwin**
560:4
**balloon**
623:21
**ballroom**
612:10
**bank** 356:7
437:5,6
483:15
505:10
506:12
509:22
512:12,12
512:15,16
512:17,18
552:11
588:15
598:23
663:10,11
663:15,17
688:25
691:8
710:23
713:22
728:9
**Banker**
506:15
**bankruptcy**
493:12
**bar** 461:16
**barely** 369:23
609:20
**Barts** 675:15
**based** 389:11

394:10
405:23
407:9 409:1
410:17
413:22
427:12
428:1
474:16
523:23
526:21
529:25
531:11,23
575:7
596:16
662:17,18
**basically**
536:3
**basing**
437:15
**basis** 439:9
469:5
473:12
509:7,7
543:14
573:21
590:23
**Bates** 377:5
399:21
420:23
421:2,17
425:4,10
433:13
458:18
464:7
473:23
480:22
499:25
500:2 537:4
562:7 563:2
572:15
617:11
637:2
652:24
700:23
704:25
720:10
**bathroom**
403:8
744:20

**battered**
687:4 690:9
690:10
**bcc'ed**
474:14
**bcc'ing**
499:23
**beach** 350:18
426:11
427:20
461:23
523:15
526:15
569:2 611:7
614:4 617:5
663:23
671:20
672:12
676:22
684:8 701:2
701:8,11
744:23
**Beach's**
663:25
**beautiful**
601:13
**beauty** 614:4
**beginning**
357:10,16
357:17
358:9
366:17
382:2
415:22
469:24
484:15
500:22,22
550:6
583:12
597:21
608:7
611:13,20
624:10,11
644:19
659:1 731:1
740:4
**behalf** 350:3
350:13
426:11

465:13
595:8 597:6
**Beijing**
673:11
693:11
**believed**
387:11
418:7,9,10
485:25
498:7
549:10
564:6,8
583:15
651:20
711:1
**bell** 391:6
654:5
**belong** 725:3
**belonged**
723:25
724:1
**belongs**
707:23
718:25
**Belushi** 579:6
**Bendita**
689:16
**beneficiary**
641:15
731:23
**benefit**
578:23
740:6 741:9
**benefits**
610:24
724:12
**Bennett**
669:11
**Benz** 712:20
713:20
**best** 450:17
520:20
525:19
582:16
744:22
**bet** 374:6
461:3,4,6
**better** 437:25
440:21

| | | | | | |
|---|---|---|---|---|---|
| 465:15 | 633:4,9,11 | 686:11 | 410:1 | 510:19 | 387:8 389:7 |
| 476:9 | 634:18 | 687:14,21 | 425:14,16 | 523:10 | 391:4 406:2 |
| 488:10 | 669:10,13 | 691:1 | 437:24 | **boom** 557:9,9 | 406:10 |
| 545:23 | 669:25 | **blind** 370:2 | 444:23 | 557:10 | 414:3,19 |
| 561:14 | 670:2,4 | 432:5 472:6 | 450:16 | **Bora** 447:2,2 | 415:5,19 |
| **betting** | 705:12 | 709:17 | 454:1 484:7 | **borrow** 356:7 | 419:19 |
| 636:19 | 707:1,11,20 | **bling** 364:1 | 488:3 490:9 | **borrowed** | 429:16 |
| **beyond** 561:8 | 715:16 | **blog** 685:3 | 491:12 | 383:21 | 430:19 |
| 602:17 | 716:9,12 | **blow** 587:18 | 495:21 | 384:2,4 | 440:24 |
| 681:16 | 718:8,9,19 | 591:22,24 | 507:15 | 471:10 | 441:18 |
| **Bianca's** | 727:10 | 592:19 | 511:18 | 553:22 | 442:10 |
| 727:18 | **billboard** | 595:19 | 532:2 | 625:1 | 469:22,25 |
| **bible** 484:4 | 670:16,18 | 599:23 | 536:19 | 645:17 | 470:15 |
| 564:9 | **billed** 356:13 | 659:17,17 | 608:19 | 701:24 | 527:4 |
| 603:21 | **bills** 634:13 | 686:10 | 613:2 614:2 | **borrower** | 539:14 |
| 642:16 | **bio** 370:13,14 | 688:22 | 614:20 | 494:14 | 553:17,19 |
| **bid** 448:2 | 687:14,18 | 689:8 | 617:17 | 503:18 | 554:25 |
| 636:16,18 | **bios** 370:11 | 690:17,18 | 631:4,6 | 505:5,8 | 564:7 |
| 637:10 | 370:25 | 691:18 | 634:14 | 506:6,8,24 | 573:14 |
| **big** 395:22 | 371:25 | 692:16 | 642:24 | 507:25 | 575:2,13 |
| 403:10 | 372:3 | **blown** 377:17 | 653:21 | 517:4,12,23 | 579:19 |
| 409:23 | 499:24 | **BMW** 514:7 | 680:24 | 522:12,25 | 592:21 |
| 416:17 | 500:7 | 708:1 | 681:1 684:7 | 523:3,9,24 | 601:8,12 |
| 430:20 | **bit** 375:3 | 713:13 | 684:13 | 598:18 | 608:20 |
| 431:21 | 418:3,3 | 716:18 | 717:11 | 599:4,10 | 610:4 |
| 437:24 | 471:8 | **BNF** 651:1 | 723:23 | **borrower's** | 616:17 |
| 438:2 448:5 | 500:15 | **board** 364:1 | 725:24 | 519:20 | 630:6 |
| 464:3 | 539:14 | 364:7,13,16 | 726:7 | 598:20 | 632:22 |
| 466:25 | 632:25 | 364:19,20 | 727:10 | **borrowing** | 645:16 |
| 487:16 | 642:11 | 365:1 373:4 | 731:23 | 356:6 | 647:25 |
| 491:10 | **black** 396:8 | 559:19 | 736:6 | 509:12 | 660:21 |
| 530:10 | 453:2 455:5 | 560:8,13,14 | **Bob's** 716:21 | **Botagan** | 662:18 |
| 533:6 567:9 | 460:25 | 560:19,21 | **body** 373:23 | 447:16 | 706:20 |
| 573:24 | 510:17 | 560:24 | **boiler** 521:19 | **Botticelli** | 710:3 712:3 |
| 579:21 | 528:10,21 | 595:18 | **bold** 474:17 | 639:2 | 712:7,9 |
| 582:15 | 529:5 | 646:13 | **bolded** 474:2 | **bottle** 721:14 | 716:19 |
| 589:16 | 582:18 | 726:7 | **Bonaventure** | **bottom** | 719:7,9 |
| 616:10 | 595:6 | **boats** 574:21 | 429:10 | 455:13 | 740:17 |
| 617:5,8 | 657:17 | 582:16 | 430:19 | 457:18 | **box** 563:2 |
| 627:21 | 693:7 | 589:16 | 431:5 | 465:11 | **BP** 410:8 |
| 637:16 | 695:24 | **Bob** 364:2 | 646:10 | 531:7 | **bragged** |
| 638:1 | 701:5 718:7 | 368:24 | **bond** 523:10 | 536:22 | 443:18 |
| **bigger** | 726:2 738:9 | 370:2 | **bonus** 369:14 | 544:18 | **brain** 551:1 |
| 740:14 | **Black's** 400:3 | 372:11 | 562:9 | 545:2 613:2 | 669:20 |
| **biggest** | **blanked** | 379:12 | **book** 575:1 | 614:25 | **brand** 579:7 |
| 436:17 | 695:10 | 380:11 | **booklet** | 641:15 | **branded** |
| **bill** 503:24,25 | **blew** 587:8 | 393:16 | 371:22,24 | **bought** | 672:15,21 |
| 559:20,25 | 591:18 | 396:6,8,9 | 379:5,7 | 355:14 | **branding** |
| 592:21 | 597:2 603:4 | 408:3 409:1 | **books** 510:12 | 382:2,15 | 560:21 |

Page 755

**Brazilian**
466:3,3
580:13
581:10
597:12
600:3
606:24
607:2
615:17
616:4
619:12
623:12
**break** 403:9
564:20,20
**breakdown**
476:11
666:21
**Breakers**
722:2,9
723:14
724:17,19
**breakfast**
502:18
**breaking**
428:7,8
**Breeze** 446:7
450:11,16
462:4,6,8
462:12,13
670:6 675:4
675:5,19
677:24
678:8
679:22
**Brickell**
349:10
350:9
**bridge**
357:18
501:3 550:9
663:3,5
667:21,23
668:18
**brief** 403:13
438:23
467:16
476:17
556:3 577:8
607:11

679:10
694:2
**briefly** 424:3
454:9
455:19
466:3
575:21
616:1 668:5
668:15
**bringing**
463:4
722:12
**brochure**
553:8,9
556:14
558:9,11,17
558:23,24
559:1,4,6
586:4 607:4
607:5
613:18,22
614:2,23
660:14
**brochures**
558:14
560:15,18
572:14
581:13
652:4
**broken**
642:20
**broker** 627:2
698:20
**brokerage**
628:13
**brother**
632:3
634:24
739:7
746:19
**brothers**
448:1
**brought**
441:16
466:7
483:14
501:3
545:18

**Bruce** 350:14
435:12
439:1
539:13
553:2
**Bs** 382:9
591:12
**bucks** 461:7
573:23
634:20
642:14,23
648:8
707:10
**budget**
441:17
487:20
492:1
545:23
546:3,20,21
546:23
547:6
577:24
583:8 584:3
640:24
**budgeted**
551:17
**buffer** 624:12
626:13
**build** 374:18
394:16,20
395:24
489:12
518:6,22
519:10
611:25
**building**
421:22,25
446:9 493:4
518:24
568:22,25
611:25
625:1 664:7
666:12,17
666:20,22
723:3
734:16,18
734:22
**building's**
664:13

**buildings**
450:13
**built** 535:21
612:2
675:25
723:2
744:12
**bunch** 637:23
746:25
**bus** 454:9
489:15
**business**
356:12
370:12,13
371:14
375:9
380:24
381:1,3,6
381:13
405:25
406:8
409:14,15
409:17
410:2,5,10
410:19
411:4,9
412:22
414:10
416:23
418:19,25
480:7,25
481:11,23
487:22
506:24
508:12,14
513:17
514:17
517:15,24
518:9
519:23
522:11
560:9,25
580:6
599:10
610:5 612:4
612:20,21
612:22
654:19,21
654:25

655:6,17
656:12
657:15,19
657:21,22
658:3,11
674:22
675:11
677:11
678:3
679:23
686:19,21
722:3,20
739:22
744:16
**businesses**
642:10
**businessman**
604:17
**Busto** 354:8
**buy** 368:10
382:12,15
382:20
392:5,9,16
392:21
393:9 395:2
395:5,8
406:3,14
407:22,23
407:24
429:2
431:22
469:16
539:23
543:13
544:21
549:24
552:15
555:5 573:5
573:7,11,14
573:18
574:9,21,25
575:6,12
579:24,24
580:24,25
581:10,11
581:15
589:1,1
593:8 602:3
603:11

604:4 607:3
607:7,7
616:4,16
629:7,8
630:13,14
631:9,16,17
632:8,12,15
632:24
641:25
676:5 682:3
682:15,17
719:8
**buy/sell**
524:21
**buyer** 430:24
**buyer's**
636:14
**buying** 383:6
402:4 470:2
549:18
630:1
634:19
636:5
653:22
696:25
711:24
**buzz** 723:11

———— C ————
**C** 351:1
352:1 353:1
537:3,11,11
537:13,19
537:21
539:17,18
540:11
543:4
**cabaret**
612:10
675:5
**CAD** 365:10
365:11
**calculate**
384:22
**calculations**
485:24
**call** 398:6
425:16,22
435:12

SEC_000871

449:7 454:6
512:8,9
576:14
586:20
618:14
711:8
728:18
748:13
**Callaway**
360:16,22
666:9
**called** 356:4
379:5
383:23
399:13
408:23
423:19
465:16
511:18
581:13
593:16,16
598:25
627:14
640:22
643:20
657:22
664:10
676:4 703:4
711:7
715:20
732:14
738:13
739:20
**calling**
363:17
**calls** 488:19
**Campbell**
426:18
**cancel** 534:8
**canceled**
533:18
706:22
**Cancer**
725:21
726:1
**capital**
381:14,17
414:24
615:4

**capitalizati...**
548:4
550:12
**Capri** 696:14
**captain**
582:14
**car** 505:24
513:19,20
514:6 515:6
515:9,9
707:17,18
707:21,21
707:24
708:1,6
709:9,10,12
710:10,11
710:15
711:6,11,12
711:14,20
711:20
712:22
713:3,4,7
714:1,5
715:5,23
717:24
718:23
720:19
721:10,11
721:12,13
**card** 511:21
511:24,25
513:14
**cards** 451:8
487:10,12
491:24
492:3
568:24
720:6,12,14
743:4,6
**care** 425:15
440:17,18
487:11
514:13,18
523:24
604:14
**cared** 490:19
**career** 483:25
491:6
514:10

686:10
687:22
690:18
**Caribbean**
675:10
677:4
**Carlton**
704:1,17,17
**carry** 548:1
681:8
**carrying**
547:19
**cars** 706:16
709:6
712:25
713:10,21
720:14,18
720:20,21
720:21,21
**Cartagena**
433:2 447:7
447:16
**cartoonville**
663:13
**Casa** 689:16
**case** 382:17
484:9 514:7
534:1
549:14
581:2
748:13
**cash** 383:17
383:19,25
384:5,19
495:1
523:10
548:25
549:18
553:21
573:10,17
653:12,14
**Casi** 448:15
**cater** 454:6
**caught**
644:15
**causing**
424:1
**Cayman**
620:9

**cc'ing** 372:11
396:7
614:19
**cc's** 617:15
**ceiling**
456:18
**celebrated**
675:6
**Celine**
669:12
**cellar** 611:7
**Center**
725:11,12
726:14
**Center's**
665:12
**Central**
429:3
**cents** 727:18
**CEO** 514:9
579:4
685:15
724:23,24
**ceremony**
463:14
**certain**
360:11
409:7
427:21
458:15
461:15
516:18
555:8
564:10
567:3
614:24
640:3 653:5
675:11
**certainly**
470:17
569:1
**certificate**
459:23
664:11
716:11,13
749:1
**certificates**
718:17
**certify** 749:9

**Cervo** 719:21
719:25
**cetera** 532:6
613:6 614:9
617:21
618:6
631:11
**chain** 374:2
376:15
380:11,19
393:16
472:5
675:11
677:5
714:22
716:17
717:3
**Chairman**
579:5
669:11
**Chairman's**
726:16
**Chamber**
426:14
**chance** 403:9
409:6
425:17
569:16,23
571:2 743:5
**chandelier**
697:18
**change**
383:14,20
392:2 393:5
402:11,24
413:18,20
471:9
498:11
504:3,4
522:8 538:1
538:3
543:18,19
544:14
546:12
551:13
553:24
569:11
578:10
594:22

609:25
613:20
644:14
683:9
**changed**
397:19
401:2
490:13,14
501:2 502:1
502:9
545:24
547:2
554:11
**changes**
396:1
441:17
522:9,17
569:4
571:17
614:23,24
674:16
681:17
**Chapter**
446:12
450:17,20
678:8
**characteriz...**
543:6,11
**characteriz...**
540:23
**characteriz...**
548:5
**charge** 402:8
437:9
441:14
443:2,9,12
443:13
499:9 523:5
573:4
600:20
701:18
702:18
707:8
**charges**
511:25
523:1 524:2
599:8
694:12
**charging**

Page 757

523:13
**CHARLES**
350:4
**chart** 553:10
**charter** 573:3
573:7,20
574:11
580:25
590:16,22
591:3,5
597:19,22
**chartered**
574:3
**chartering**
572:23
573:19
596:16
**chat** 684:16
**check** 373:20
382:11
385:3
404:14
549:2
623:14
715:20
725:25
729:7
**checked**
390:9
**checking**
521:24
**checklist**
636:14
671:20
**checks** 635:2
635:22
**Chicago**
699:4,6
**chief** 721:14
**Child** 726:14
**China** 422:23
673:9
**Chinese**
373:18
445:21
454:2
465:23
558:12,17
660:15
693:24

**743**:15
**chose** 616:21
**CHR** 701:16
702:3,7
703:2,3
**Chris** 613:12
613:24
**Christy**
613:14
**chronologi...**
425:4 464:6
**Church**
628:14
630:23
631:23
635:3,20
636:1,5
641:1,6,9
641:14
651:1,16
**Cielo** 448:15
**circuit**
640:19
**circumstan...**
565:20
566:6
**City** 394:1
429:5
431:21
526:6
534:18
663:25
671:20
**civil** 593:14
**claim** 414:2
504:20
593:2
**claimed**
713:6
**claiming**
595:9 741:5
**claims** 523:2
595:7
**clarification**
700:17
**clarified**
416:15,16
**clarifies**
681:4 733:7

**clarify**
365:15
386:15
387:6
389:12,17
392:23
416:13
419:14
424:12
426:3
428:22
429:15,24
439:2
442:14
478:20
483:22
484:20
524:18,20
584:25
587:13
605:5 670:2
747:22
748:10
**clarifying**
383:4
390:13
748:5
**classic** 561:4
**clauses** 494:1
**clean** 685:12
686:13
**cleaned**
684:9 686:2
686:6
**clear** 356:13
386:10
389:11
391:4,6
412:25
413:13,14
416:1 418:5
437:8
439:25
441:9
443:11,18
475:3 524:8
524:9,10
528:14
531:5

541:14,24
543:17
570:5 574:2
605:2 606:9
608:6
609:16
624:7,8
629:16
641:5
644:12
644:13
654:5
655:16
687:15
690:25
692:7,10
704:16
736:3,4
737:16
**clearly**
398:17
399:11
401:23
454:11
487:5 498:4
501:1
547:12
549:5
635:11
**Clematis**
703:13,14
703:15,21
728:18,20
**click** 374:2
375:16,20
375:21
376:23
380:1
636:14
**clicked** 377:1
380:8,23
661:25
**clicking**
380:5
**client** 367:18
531:10
**Cliff** 689:13
**Clinton**
559:21,25

669:14
**close** 363:12
375:7
391:22
392:11
406:19
469:17
508:3,25
600:7
617:18
682:24
733:19,21
**closed** 377:20
503:11
509:5 527:8
624:13
**closing** 375:5
375:6
395:10
506:16
512:5
525:21,25
**clothing**
672:13
**club** 404:5
409:19
417:5
461:17
462:9,10,11
572:24
574:13,14
574:16
575:15,17
575:18
578:16,18
578:19,21
578:21,25
579:2,7,9
579:11,13
580:4 582:2
582:6 586:4
586:11,16
586:17,18
586:19
589:14
596:17
604:16
610:24
611:5,12,16

611:19,21
615:11
617:21
618:5
655:13
669:5,6,14
669:23
670:1,4,6
670:13
675:1,6
676:25
677:1
697:16
698:14,22
708:8
722:23,24
724:4,9,12
724:15,16
724:23
725:9
726:16
**clubs** 675:7
675:18
676:1
722:22
723:15,19
724:1 725:4
725:7
**co-developed**
434:8
**co-developer**
432:24
433:6 434:3
434:5,11
449:8,16,17
449:18,21
449:25
**coast** 719:9
**Cocina**
502:18
**cocktail**
727:3
**code** 665:13
**coincide**
640:10
**coincidence**
550:18
**Cole** 579:6
675:6,19

724:16
**collapse**
687:5
690:11
**collateral**
485:10
505:4,15
506:21
597:13
598:11
599:1,6
602:7,9,11
602:18,20
606:2
**Collection**
621:23
706:8,10
**collectively**
598:25
**color** 446:11
**Colorado**
675:9
676:13
**colors** 582:18
**Columbia**
431:3
**columns**
461:14,14
**combining**
551:18
**come** 354:25
369:14
384:16
385:5
427:13
435:11,15
443:24
452:8
456:16,20
463:23
480:23
495:21
498:7
506:20
515:16
521:10
524:12
536:3
540:17

546:8 568:7
573:1 592:9
601:18
653:14
692:20
693:17
710:7 721:9
721:15
723:14
734:23
736:11,15
**comes** 383:12
547:5
563:10
601:23
626:20
**comfort**
569:21
**coming** 428:7
454:2
492:17,18
493:5 550:3
573:7
578:12
580:8
584:14
682:12
700:8 723:9
735:6,8,17
736:8
745:13
**commences**
527:24
**commencing**
527:2
**comment**
374:7
482:16
**commented**
402:12
**comments**
410:9 614:5
**Commerce**
426:14
**Commercial**
739:21
740:3,19
741:8
**commission**

349:1,9
350:3,7
353:8,9,14
354:9 627:2
628:7
704:16
749:12
**commissions**
693:14
**commit**
682:15,17
**commitment**
682:2
**common**
675:13
**communic...**
371:4
395:13
654:6
**communic...**
370:21
479:5 673:4
**community**
723:11
725:2
**companies**
404:7 514:9
514:11,11
687:4
690:10
**company**
354:22
360:8
366:11
423:19,25
546:8
582:13,23
582:24
583:1,4
588:24
589:16
602:25
621:5,6
631:24
637:10
711:7 714:1
715:4,5
724:24
**compare**

544:16
**compared**
546:20
749:14
**comparison**
538:25
**competitive**
578:17
**complained**
398:11
**complete**
371:24
437:10
439:23
512:2,23
526:17
577:21
595:25
596:4 598:7
653:9,11
661:14,15
664:14
713:8
749:13
**completed**
538:1,6,7
652:13
653:18
655:10
666:9
746:11
**completely**
355:8
540:18
748:1
**completion**
666:14
**compliance**
519:21
520:4 525:5
**complicated**
503:12
**composite**
361:17
373:12
376:16
396:4 403:3
419:25
423:10,16

445:19
453:13
481:8
527:22
536:10
558:15
610:10
629:1
631:22
680:10
687:24
702:12
709:21
**comprehen...**
410:13
**comprehen...**
408:6
**compressor**
532:13
**compromis...**
576:21
**conceal** 680:1
685:7 692:9
692:22
**concept**
499:12
**concerned**
697:5
**concluded**
748:20
**conclusion**
439:9
**condition**
392:22
522:6,11
674:17
688:20
691:4
**conditions**
520:23,24
521:1
**condo** 491:13
578:6 653:4
671:25
672:1
**condos**
671:23
672:7
**conduct**

517:14,23
518:9
519:22
**conducted**
427:2
**conducts**
506:24
599:10
**confidential**
657:22
747:21
**confirm**
418:17
620:7 640:2
**confirmed**
622:15
**confirming**
474:7
630:19
**confrontati...**
440:11
**confuse**
668:22
**confused**
411:7,10
608:15
636:24
734:10
**confusing**
418:13
682:10
**congratula...**
417:13
**connect**
617:8 711:7
717:22,24
718:10
**Connecticut**
484:6 629:2
**connection**
577:22
**connections**
671:20
**Conrad**
429:3
**consent**
524:1
**consents**
517:19

582:8 746:6
**consider**
391:19
469:10
**considered**
391:9
581:23
582:3 589:9
589:13
**considering**
400:20
470:9
**consistent**
480:19
**consisting**
560:9,25
**constitute**
521:6,7
**construct**
394:4 534:4
**construction**
354:21,22
355:11,16
356:10
366:11,13
366:18
368:3,19
381:20
385:22
388:17
391:5
404:10
409:20
413:17
417:8 435:8
442:1
443:20
452:21
457:6
463:24
467:5
469:20,20
470:3
480:15
482:1
487:20
492:1 509:1
529:1 540:8
540:12

543:19
544:12
546:4
548:18
551:21
575:10
576:19
577:23
633:9
639:25
656:4 663:7
**consultant**
417:6
701:20
702:8
**consulting**
404:7 624:2
701:17
702:7 703:3
**consuming**
519:24
**contact**
498:19
717:11
748:14
**contained**
436:9
520:24
**contains**
373:23
**contempor...**
581:9
616:13
**contempor...**
643:9
661:10
**content**
442:24
**contested**
523:6
**context**
657:18
682:23
**contiguous**
616:9 617:4
619:7
**continuation**
512:14
663:6

**continue**
534:4 566:8
567:1
575:10
596:12,17
**continues**
529:4
631:12
671:17
**continuing**
517:10
521:3
**continuous**
668:6,16
**contract**
421:4,5,7
442:2
533:11
538:12
546:12
**Contracting**
354:22
640:8
727:16
**contractor**
545:13
**control**
437:10
439:23
442:24
508:11
595:2
**controlled**
620:4
640:21
**controls**
443:10
**conventional**
653:10
**conversation**
419:7 426:5
426:7 437:7
478:8 609:9
609:10
630:19
**conversatio...**
406:23
439:5
**cook** 721:14

**cool** 555:25
**cooperate**
743:2,3
744:4
**coordinate**
512:5
**copied** 377:9
709:17
**copies** 426:23
477:2
**copy** 354:1
361:17,18
366:24
368:23
369:25
372:10
379:11
380:10
387:14
393:15
396:4 403:2
406:9
421:21
423:10
427:1 432:3
444:21
467:21,23
468:19
472:4,6
473:6 510:5
531:13
553:2,5
558:22
566:14
572:14
610:10
661:13
666:5,8
702:11
716:2,6
718:9
727:25
737:17
738:24
**copying**
370:3 432:5
**corner** 570:9
**corporate**
365:15

597:15
**corporation**
613:5 621:3
**corrected**
669:20
**correctly**
401:5
528:12
548:5
**correspond...**
529:14
**correspond...**
393:23
**corresponds**
730:19
**COs** 664:8,18
**cost** 355:18
355:20,21
356:10,13
356:18,19
356:19
368:3,10
388:2,19
389:20
391:5,6,19
392:6
404:10
406:24
407:6,10,10
409:20
413:11,11
413:18
457:8
469:10
475:6,23
538:18
546:3 547:8
547:19
548:19,20
549:23,23
549:24,25
550:23
551:21
552:2,16,17
573:4
590:25
650:1,3
653:9,11
656:4

681:23,25
683:17,21
**costs** 381:20
381:20
539:10
540:25
544:24
590:18,19
**could've**
358:4,5
361:13
365:8 368:2
368:8 380:3
383:9
395:17
449:11
451:25
452:1
462:12,16
471:1,3,8,9
472:20,22
481:25
482:15
499:10
513:10,11
513:12
559:15,16
564:6 575:3
583:6
593:11
599:24
602:15
676:7
705:10,13
721:9,14
725:23
**council** 535:6
535:8
**counsel**
507:14,17
746:18
747:3
**count** 382:21
382:23
410:7
415:21
492:20
542:18
543:14

554:9,11,25
555:3,7
681:19
**counted**
382:13
**counting**
392:14
470:1 554:6
**country**
673:10
**counts**
371:25
564:7
**couple**
376:23
378:11,12
398:18
401:3 448:1
452:8,9
466:1
472:21
487:13
535:18
544:9
593:21
642:25
673:2
694:10
699:13
743:10
746:2
**course** 354:3
457:5
514:21
711:4 748:8
**court** 361:17
366:24
368:23
369:25
372:10
379:11
380:10
387:14
393:15
396:4 403:2
419:25
423:10
429:6 432:3
444:21

453:13
468:19
472:4 477:7
527:22
531:13
593:1,14,14
593:17
594:13
595:1,5
610:10
623:1,8
680:10
702:11
706:23,25
718:14
738:24
744:2
**Courtyard**
449:3
**covenant**
492:13,15
492:21
493:1
**covenants**
492:6,8,9
492:11,23
493:17
**cover** 480:1
524:2
613:17
622:25
732:5
**coverage**
492:16
493:7
**covered**
568:18
700:12
741:21
**Craig** 639:4
**crap** 609:23
686:16
722:17
**crappy**
744:20
**crazy** 454:20
**create** 368:16
600:6 636:2
658:18

**created**
422:20
524:6 526:9
531:2
598:25
601:14
657:3 689:4
**creating**
422:15,19
435:3
654:25
656:1
657:10
658:10
**creation**
618:5
**credit** 692:18
**creditors**
691:7
**creeping**
428:6
**crew** 595:16
**cross** 400:1
401:24
440:17
**cross-collat...**
485:4 601:3
**cross-defau...**
485:4 601:4
**crossed** 400:3
400:6,10
**Crystal** 350:6
354:8
**curious**
551:16
**Curly** 742:13
**current**
634:18
644:18,19
663:20
**currently**
534:14
618:15
714:18
**curtain** 436:5
**curtains**
632:18

_____
**D**

**D** 353:1
519:20
522:24
**Dad** 531:9
**daily** 354:24
374:19
487:21
**damage**
519:13
720:25
**danced**
440:15
**dash** 617:16
**date** 349:12
363:7 399:1
400:18
405:3 406:3
406:5
472:18
496:5
497:11
518:3
522:12,14
523:16
526:5 527:7
530:14
533:17
535:12,13
539:9,19
540:5
546:20
615:8
658:23,23
677:11
682:22
712:13
749:6,17
**dated** 351:7,8
351:9,10,11
351:12,13
351:14,15
351:16,20
351:21,22
351:23,24
351:25
352:6,8,9
352:11
363:10
373:13,13

375:18
377:13
391:23
398:19,20
421:1
425:10
480:2,3
481:14
482:10
483:6
499:20
510:17
539:16
546:21
565:8,11
634:2
654:11,14
654:20
655:18,23
657:2,16,20
657:25
658:4,16
659:6
702:21
737:17
**dates** 394:5
469:13
533:8
620:22
656:7 664:3
681:10
**daughter**
559:24
577:3
**daughters**
559:23
695:15
**David** 355:2
355:23
366:25
367:7,17
368:24
370:2
371:13,16
379:12
380:11
381:7 382:3
382:18
387:17

388:25
390:9
393:16
396:6
404:13,22
406:9
408:20,25
409:8,10,13
409:25
418:21,22
418:22
419:7 423:4
425:14
436:3,23
440:14
443:3 445:4
458:13
459:1,10,11
459:12
472:5
473:24
474:10
482:17
488:1,3
499:22
541:2,9
554:18,21
608:16
609:14,24
617:12
654:25
686:23
693:16
**day** 367:21
392:22
400:16
407:16
449:1
467:25
483:9 492:2
495:11
518:25
523:14
532:9,21
533:2
534:21
540:14
544:10
592:7,7

596:25
642:21
665:23
691:19
703:8 745:1
745:14,18
**days** 464:19
503:17
535:3 638:5
638:5
**DD** 408:14
410:13
**de** 448:19
508:6,17
**dead** 377:2
**deadline**
529:1
535:16
**dealer** 719:10
719:11
**dealership**
698:21
719:25
**dealing**
397:20
399:10
505:24
603:12,13
603:15
604:17
**dealings**
439:20
**deals** 430:15
430:20
431:11
433:22
447:5
448:25
449:8,12,16
449:19
450:3 463:6
494:24
585:18
673:14,15
687:21
697:23
**dealt** 399:8
691:23
695:9

**Dear** 716:10
**debit** 511:21
511:24
513:14
**debt** 492:14
492:16
**December**
481:14
526:15
536:11
546:8,21
568:10
657:16,20
657:25
731:20
**decides** 619:1
**decimal**
532:13
**decision**
437:21
**decisions**
441:12
488:24
**Declaration**
518:19
**declare**
521:11
**decorate**
575:3
604:13
**decorated**
576:23
**deduct** 498:2
**deemed**
517:9
**default** 521:2
521:6,8,11
521:16
522:1
**defaulted**
601:4
**defend**
706:25
**deficiency**
646:3 704:7
**deficit** 690:1
**definitely**
499:2
557:20

588:3 598:6
**definition**
517:25
**defraud**
686:15,17
**defrauding**
585:13
**Delano**
433:18
448:19
**Delaware**
621:2
**delegated**
409:11
417:8
460:14
540:3,19
**delivered**
522:13
**delivering**
745:16
**delivery**
517:8
**Delta** 582:16
**demo** 383:15
**demolition**
681:15
**denial** 564:24
565:2 566:2
566:3,17
567:20
582:5
**denied**
518:15
519:8 520:2
526:6
567:15
708:17
**dental** 514:8
**dentist**
515:10
**deny** 686:7
**dependent**
575:9
**Depending**
648:7
**deposit**
374:13
383:14,19

542:17
588:17
598:22
623:11
736:7
**Derrico**
355:2,23
357:23
366:25
367:8,17,21
368:24
370:2
371:13,16
379:12
380:11
387:17
388:25
393:16,24
394:23
395:14
396:6
397:10
408:3 436:3
436:23
440:14
443:3 488:1
499:23
541:2,9
608:16
609:14
617:12
683:6
686:23
**describe**
461:19
537:18,19
670:24
671:1
**described**
544:1
**DESCRIP...**
351:6 352:3
**design** 435:9
441:17
461:11,18
487:20
613:25
697:14
708:9,10

744:21
**designer**
582:18
672:23
**designers**
545:19
592:22
695:3
**designing**
627:20
**designs** 614:5
745:13
**desire** 669:8
**desired**
560:22
**desperate**
738:14
**destination**
560:22
**detail** 436:13
**detailed**
368:8
**details** 410:4
618:7
687:17
**determine**
521:15
**determined**
522:10
**developed**
434:6
**developer**
390:17
415:1,16
416:5,22
434:10
449:10
475:23
490:25
498:2 505:2
506:11,13
506:20
536:18
539:1
540:24
543:1 547:8
553:12
562:23
563:4,10,15

564:11
607:24
615:3
627:23
662:13,19
662:22
672:14
686:11
**developer's**
419:16
**developers**
687:3 690:9
**development**
374:24
579:20
615:4 638:9
645:3 668:7
668:16
724:8,10,20
**developme...**
675:14
**Diameit**
728:14
**difference**
545:5 710:5
**different**
357:21
396:1,1
431:11
452:6
470:12
518:21
541:23
558:16
574:6,7,8
586:15
587:25
601:20
613:21
618:1
651:20
654:14
668:23
674:12
683:22
684:15
700:9 724:3
**differentiate**
683:7

differently
438:8
difficulty
743:17
diligence
521:24
528:19,24
dinner
723:22
Dion 669:12
direct 573:4
577:22
621:9,13,25
623:13
706:13
directing
621:10
direction
723:12
directly
397:21
399:11
404:14
569:25
576:10
717:12
director
397:8
disagreed
385:17
disagreeme...
386:17
disbursed
745:23
disclose
531:1 603:7
678:1,2,9
678:10
679:5
disclosed
491:2 507:2
514:17,23
523:20
530:21
599:13
604:9 678:6
678:13
679:2
disclosure

679:24
discount
496:18
497:5,21
502:22
722:10
discounted
402:20
653:12,14
discuss 381:7
404:23
408:16,21
424:6
452:11
454:21
459:19
460:8
461:25
462:6 467:7
467:10
498:14
523:19
528:8 533:3
572:22
628:5,7
684:13
discussed
387:24
423:23
452:25
456:24
467:4 477:4
525:4 527:6
527:7 533:2
571:24
682:8
discusses
722:2
discussing
437:14
465:6
690:13
discussion
425:25
456:3
462:15
476:9 477:1
498:15,21
499:1,3

500:13
530:2,8,16
535:24
610:21
611:2 620:6
639:22
674:23
discussions
403:17
413:22
416:4
468:15
476:23
496:8
498:24
529:22
530:24
556:8
570:11
572:10,19
577:13
607:15
679:16
694:6
distinct
721:17
distressed
687:9
distributed
442:17
distributing
438:12,17
Diversified
349:24
divert 586:1
Division
350:8 353:7
DMV 716:3
DOC 573:4
docs 371:22
399:21
400:10
488:8,15
511:21
512:6
715:25
documenta...
361:6,8
508:16

616:7,13
639:12
documenting
633:2
doing 363:9
371:1
375:24
376:1
378:17
385:21
390:11
402:20
412:12
422:22
440:23
447:11
448:25
449:3
457:15
461:16,17
462:9,10
463:5 470:2
484:12
485:20
486:21
489:10,18
490:23
496:15
498:25
521:24
535:19
546:14
566:8 569:8
578:3
580:15
582:17
590:16
610:6 641:9
641:22
644:14
671:12
672:18
673:14
676:16
684:6
687:13
688:18
691:18
692:3

707:13
708:8,9
721:21
743:23
745:11
dollar 381:24
387:8
390:20
392:17
400:16
415:1 421:9
470:7
492:19
518:25
523:13
525:10
532:8,21
533:2 566:4
566:18
588:17
601:14
602:12,13
610:4 627:1
627:23
628:6
641:21
645:4
647:16
649:14
653:17
665:23
701:9,18
702:25
710:5
745:25
domain
526:22
domestic
699:3
Donald 458:4
458:5,11
578:20
Donald's
578:16
donation
725:24
726:10,15
donations
725:20

Donna 749:9
door 452:19
Doris 619:14
Doris's
619:14
double
715:20
doubt 369:22
375:21
568:19
741:13
downtown
429:9
dozen 430:6
draft 409:13
410:2
412:19
480:8,11
630:16
drafted
371:17
drafting
354:15
415:13,13
435:16
436:1 442:7
569:5
657:19
659:11
drafts 570:1
draw 439:22
695:23
700:10
704:4,14
705:14
708:21,24
712:5 714:5
727:12
728:7
737:12
738:6 746:8
746:9
drawing
365:7
439:21
drawings
614:9
drew 547:23
Drive 350:16

**driver's**
716:7
**Dropbox**
371:18
**dropped**
711:10
**drywall**
421:24
**Dubai** 673:9
**due** 490:18
490:22,24
493:9,13
503:6,8
505:21,23
521:24
528:19,24
532:10
581:6,7
626:10,10
639:18,19
643:23,24
669:5
671:18,19
695:22,22
708:25
721:6,6
726:13,13
738:5,5,7,8
745:5,5
**dues** 722:2,3
722:7 723:4
723:21
726:7
**duly** 353:22

**E**
E 350:14
351:1 352:1
353:1,1
468:10,10
679:11,11
679:11
**earlier** 355:6
372:23
398:20
406:18
422:10
467:20
476:7

477:16
478:2
554:16
576:18
587:17
595:15
626:13
661:3 664:9
664:16
695:15
708:22
746:15
**early** 355:3
454:3 533:6
685:12
**earn** 433:25
**earned**
644:11
672:6
736:23
**easier** 481:1
**easily** 472:22
**east** 664:8
**easy** 551:2
604:20
691:23
**EB-5** 355:9
355:10
356:4
357:16
362:20
370:23
374:11
382:5,22
388:6,7,12
388:13
414:24
415:24
422:12
440:23
441:4,5
442:7,7
443:9,16,17
444:4,6
451:9
454:13
462:21,25
463:1,9,10
484:16

543:18
549:8,9,21
550:8,14
551:4,19
552:11
555:12
563:3
580:17
582:2 583:9
583:11,17
583:18,20
584:11,18
584:19
586:6,14
606:3 610:6
619:2,5
624:14,16
624:23
625:25
626:3
629:24
661:24,24
663:7
667:20
673:11,15
682:1
683:16
703:10
710:22
732:11
734:9,17
743:4
744:23
**Echelon**
366:9,12,17
**Eco-Luxury**
447:19
**economic**
368:16
410:6
481:12,24
658:15
**economically**
617:8
**economics**
552:14,15
**Ed** 359:21
**edification**
434:20

**educated**
384:24
407:3,9
687:8
**effect** 517:16
518:11
**efficient**
610:19
**Effie** 453:7,8
457:18
458:8,20,21
459:19
460:21
462:23
465:22
**effort** 627:15
680:1 685:7
692:8
**egress** 664:13
**eight** 383:1
383:14,20
383:23
392:14
446:3,4,16
471:6,7,9
471:13,14
487:21
490:12
491:14
517:18
534:16
542:18
547:1,12
553:22
594:20
627:1 628:6
632:11,12
637:17
641:2,8,20
646:16
648:10,12
648:13,16
648:17
650:23
651:14
653:10
683:22
**eight-five**
473:16

**eight-six**
446:5
**eighteen**
355:17
386:13
388:16
413:18
421:9
472:18
535:14
543:18
545:1,11
553:23
653:12
683:21
**eighty** 623:3
682:3
**eighty-five**
475:5
**eighty-nine**
727:17
**Eitel** 613:12
613:24
**either** 359:20
389:16
391:1 403:3
403:24
408:22
433:6
453:14
459:1 509:2
528:6 550:8
552:10
564:22
569:25
586:13
587:22
588:2
594:11,13
598:4 620:3
622:6 643:8
675:3
693:18
704:5
**Elaborate**
524:9
**elapsed**
546:22
**electrical**

421:24
664:10
**elevator**
532:6
**eleven** 516:17
520:22
667:19
**eligibilities**
508:7
**eligibility**
508:18
**emailed**
390:7,10
404:13
408:22
**emails** 351:17
351:18,19
352:4,7
373:12,15
376:25
377:1,22,23
380:19
390:9,11
396:16
403:3,23
406:5 409:5
420:1,7,8
420:11,12
422:2
423:20,24
425:3
444:22
453:14,14
457:25
476:7 488:1
499:16,22
510:9
527:23
528:5,12,14
536:11
556:15
558:3
564:23
571:19
581:12,19
610:11
629:2,3,5
637:25
658:8

680:11
688:6
697:15
715:13
**embarrassed**
692:11
**embarrassi...**
692:17
**embellished**
561:7
**embellishing**
450:1
**emotional**
638:6
**employee**
708:19
**employees**
488:23
519:25
**employment**
508:6,7,17
508:18
519:24
**empty** 568:22
568:25
**enclosed**
716:1
**encompass**
392:4
**encumbran...**
599:8
**ended** 401:4
434:10
446:12
447:11
448:25
450:17
558:21
617:3
642:21,22
**Enforcement**
350:8 353:7
**engaged**
517:15
518:10
**engineer**
582:14
**Engineering**
366:13

727:8
**England**
737:13
**English**
376:7
445:22
453:7
454:23
558:18
**ensure** 506:9
507:4 508:8
522:16
663:6 678:5
678:12
**ensures** 615:5
**ensuring**
681:25
**enter** 646:14
**entered**
501:6
504:14
566:25
**enters** 353:24
354:11
368:21
482:23
**entertainer**
670:25
**entertaining**
722:11
**entertainm...**
511:24
**enthusiastic**
455:7
**entire** 518:2
584:15,17
690:7
**entirety**
482:4
**entities** 490:7
512:13
585:11
597:16
**entitled**
349:14
514:2,4
516:2,7
536:19
653:24

**entity** 507:1
511:3,5,6,7
511:8
512:15,17
542:2,3,7
599:12
601:20
620:9,14
640:21,21
**entity's**
604:23
**entrepreneur**
431:13
**environment**
520:1
**envisioning**
613:19
**equal** 564:13
**equipment**
413:19
**equity** 381:24
382:13
383:25
390:17
414:2 415:1
415:16
416:5,22
419:15,16
536:18
539:2
540:24
543:1 547:8
548:21
549:3,20
553:12
562:23
563:4,10,15
564:11
607:24
615:1,3
662:15
667:25
668:5,12
683:11
**Eric** 354:8
579:3
669:11,25
670:5
685:14,15

**error** 717:24
**escrow** 437:2
437:5,6
483:11
592:8 593:9
594:9,12
595:1,1
622:10
673:23
674:1,2,4,7
674:9,10
**especially**
708:10
**ESQ** 350:4
350:14
**essentially**
371:13
402:2
678:23
**estate** 442:1
631:12
**estimate**
546:19
**et** 532:6
613:6 614:9
617:21
618:6
631:11
**Europe**
738:13
**European**
696:8
**Evans** 368:13
410:6
481:16
529:14
553:7
556:23,24
557:12
565:6,13
583:19
586:18
623:13
629:14
630:17
658:15,17
701:12
706:13
740:9,10

**Evans's**
619:22
621:18
640:6
649:15
731:21
733:24
735:6,16,17
736:19
**event** 458:10
460:19,23
460:24,25
521:2,2,6
521:15
522:1 726:5
733:19
**events** 521:8
**everybody**
436:18
440:10,15
461:10
496:2
535:22
552:4
568:24
570:8
**Everybody's**
567:7
**evidence**
404:3
526:22
581:8,9
621:9
667:14
**evil** 743:20
**exact** 530:14
544:13
**exactly**
356:25
431:10
477:4 495:3
540:18
585:8
590:15,21
590:24
633:20
688:12
695:5,20
715:12

**examination**
351:3
353:11
354:3,12
748:20
**examined**
353:22
**example**
360:12
382:12
431:16
437:23
450:11
492:14
493:25
505:4
516:25
560:17
574:12
578:4,13
652:6
674:24
720:8
740:13
**excerpt**
479:24
640:5
**exchange**
349:1,9
350:3,7
353:8
614:14
749:12
**exchanged**
619:13
**excited** 435:8
467:13
479:13
487:14
691:25
**exclamation**
478:13
533:21
**exclusive**
459:21
460:5 618:5
669:5
**execute** 505:5
565:13

executed
398:15
460:2
467:23
488:2 494:1
629:14
647:6
executions
659:12
exercise
500:16
exercised
646:18
exhibits
351:6 352:3
479:22
621:10
existed
395:20
existent
598:24
expand 439:7
616:20
expect
402:10
410:7
expectation
552:7,19
expected
550:12
592:6,9
expecting
550:22
expenditure
538:18
expenditures
643:8
644:10
695:16,19
722:21
expense
704:3,4
728:8
735:21
746:7,7
expenses
515:14,15
516:13
599:25

622:25
724:14
741:8,15
experience
485:9
492:22
560:10
561:1
experienced
492:11
expert 484:17
489:19
expertise
491:16
expiration
494:16
503:20
explain 382:7
474:25
532:3
541:10
605:12
715:14
732:3,8
explained
389:7
681:24
explanation
568:11
exposure
687:7
Express
512:1
extended
677:20
extension
394:3
490:18
518:17
519:6
526:16
extensions
394:6,12
526:7
extent 591:14
extolling
681:1
682:20
extra 414:2

492:20
493:7
535:19
600:15
extras 643:15
eye 692:5
eyes 440:8

——————
F
——————
F 468:10
537:2,4,7
537:10
fabricated
667:17
faces 613:15
facet 439:21
facilitate
669:8
facilities
572:18
675:3
facility
675:10
677:4
fact 354:20
367:20
374:25
387:6
395:11
417:2
437:15
447:22
448:5 449:9
462:20,24
463:2
482:17
504:19
505:21
525:9 592:5
592:11
596:13
617:6 631:8
643:17
646:1 661:8
672:8
679:21,24
682:5
685:13
691:2

factory
673:14
factually
587:21
fail 744:24
failure
450:14
492:24
526:16
fair 543:11
faith 523:7
fake 660:5
674:1
falls 665:13
false 424:4
560:12
664:14
familiar
492:6
family 696:19
697:5
743:18
famous 669:7
669:13,17
669:19
670:24
671:6
fancy 544:12
545:18
546:7
far 414:22
422:7
522:20,21
537:22
538:8 602:6
614:5 618:9
630:9
644:21
673:1 697:4
721:18
Farsi 375:22
558:18,19
660:25
661:6,7
favor 505:5
593:6
favorite
615:23
feasibility

408:11
February
349:12
353:3
403:15
405:5
438:25
467:18
468:12
526:12,21
527:3,25
529:1 556:5
577:10
607:13
679:13
694:4,21
748:18
749:6
federal
436:19
483:13
593:1,4
688:10
742:12
743:9 744:1
744:2
fee 486:3
565:3 566:4
627:21,23
627:24
628:13
650:8
702:25
feel 494:19
618:14
feels 542:15
653:23
661:17
fees 539:11
566:22
567:18
571:5 573:7
585:17
593:12
624:2,3
635:5,11,13
640:12,16
640:22
641:18,18

641:21,22
643:15
648:19
649:2
651:19
693:7 705:8
705:11
feet 646:22
647:2,3
648:4,6
felt 433:24
626:20
FF&E
413:18
543:19
544:9 546:5
683:18
fiances 372:1
Fields 704:1
704:17,18
fifteen
360:14
433:22
706:24
718:24
722:10
fifty 405:20
532:12
550:25
575:18
596:10
629:13,20
629:24
637:21
645:17
677:7 701:1
701:9
703:25
708:21
709:1 738:7
738:10,15
740:5
fifty-eight
568:1
fifty-five
692:14
fifty-seven
563:9,13
fifty-two

740:20,22
740:24
**fighting**
595:2
707:22
715:4
**figure** 385:21
503:16
505:21
548:13
630:14
639:3
699:19
712:8
**figures** 368:3
562:2
**figuring**
506:1
**file** 349:4
371:7
479:24
526:18
643:14
749:5
**filed** 394:14
488:7
526:14
744:2
**files** 512:3,24
**filing** 521:9
**filled** 511:18
618:13
**final** 371:23
371:25
444:15
493:25
570:2
**finalize** 361:6
362:18
371:14
410:8
**finalized**
527:12
**finally** 417:17
685:5
717:17
718:20
746:3
**finals** 421:22

**finance**
596:23
615:3
**financed**
713:1
**finances**
380:4
385:19,22
536:24
**financial**
508:4,23
509:2,25
510:5,18
522:11,12
646:7
674:17
685:9 687:4
687:9 688:7
688:12,20
690:7,10
691:4
**financials**
508:1
509:10
**financing**
431:17
448:2 501:4
536:24
550:9 563:5
563:11,16
563:16
596:22
611:3,10,23
612:1,2
663:11,15
663:17
667:21
668:18
**find** 410:10
412:17
417:15
430:22
534:7 544:7
546:11
584:13
608:9,13
639:15
643:6 686:3
**fine** 400:16

428:15
459:18
519:1,15
520:2,8
523:14,25
524:11,12
524:16
526:20
527:2,14,14
529:21,23
532:9,18,22
533:2,5,19
534:3,5,11
534:13,19
534:20
555:2
620:19
644:23
665:23
**fined** 526:19
**fines** 394:24
395:9,11,16
395:20
526:5,7
527:24
528:7,11
530:2,3,4,8
530:9,11,20
530:23
531:3 532:5
532:9,15
535:17,20
**finish** 368:11
435:21
463:21
464:20
518:18
535:4 538:9
544:11
545:12
716:6
743:11
745:21
**finished**
434:7,9
575:14
627:17
**finishes**
467:6

**finishing**
663:21
743:12
**fire** 421:24
**fireproofed**
664:13
**firm** 552:20
618:23
695:21
703:4 737:8
737:10,12
738:4,22
**first** 355:10
363:9
376:14,18
376:20
379:18
381:1 388:5
388:8,11,14
394:8
399:23
400:5
401:22,23
404:2
405:10
417:14,17
417:24,25
420:14
446:3
453:25
456:7
462:10
472:5
473:22
479:23,25
479:25
480:7
483:10,11
483:20
484:14
490:11,12
492:4
494:11,12
494:17
526:25
527:1 530:1
532:25
543:18
544:18

545:10
549:6,9,11
549:14
550:5
552:11
566:9
570:22
578:9 579:4
586:20
605:14
608:3
610:19
612:2
613:13,17
614:2
615:12
616:11
629:6
630:18
633:3
639:16
640:5
654:15
656:18
658:7
677:11
680:18
682:1
683:15
684:7 685:4
685:14
686:22
688:8,10
703:8
713:15
723:2
730:18
**fiscal** 508:3
**fit** 632:17
**five-year**
494:11
**fix** 410:23
631:10
707:18
**fixture**
744:20
**fixtures**
413:19
598:22

**FL-03930-A**
349:4 749:5
**Flagler**
350:16
**Flagship**
620:17,23
**flew** 578:4
**flexibility**
672:11
**flight** 700:5
**flip** 446:3
457:22
480:2
481:10
553:9
632:25
646:21
647:8
**flipped** 537:9
**flipping**
428:13
480:21
558:10
**float** 736:22
**floor** 452:18
456:7,11,12
456:13,14
456:15
551:14
**Florence**
698:4
**Florida**
349:11
350:10,18
353:5 631:1
671:3
719:10
749:7
**flow** 573:10
573:17
653:12,14
**flown** 699:4
**fluent** 693:23
**focus** 386:15
**focused**
480:15
487:23
**focusing**
488:23

719:20
727:25
**follow-up**
438:2 444:2
465:9
524:25
741:24
746:12
**followed**
480:1
**following**
363:25
393:11
521:1
614:23
**follows**
353:23
503:22
**font** 474:2
**fool** 497:5
**fooling** 535:7
**foot** 491:14
572:16
**force** 517:16
518:11
**foreclose**
493:18,20
**foreclosure**
407:21
415:7
492:23
543:14
608:3,4
638:7
689:15
**foreign**
376:10
**forgot** 454:10
496:22
695:8
**form** 508:6
508:17,22
523:10
613:4
638:12
**forma** 420:16
**Formal** 354:1
354:2
**formed**

620:11
638:9
**former** 535:8
723:23
**forms** 508:7
508:18
**forte** 374:21
402:15
457:16
**forth** 581:14
599:9
**forty** 547:23
565:2 566:3
566:18
571:9,13
578:10
652:14
687:21
**forty-eight**
414:10
666:10
**forty-five**
535:3 641:3
641:8,21
648:13,14
648:17,17
650:23
**forty-six**
498:7 502:7
577:25
603:25
604:3
742:15
**forty-two**
498:8
**forward**
433:4,20
488:21
520:7 605:3
630:17
637:14
639:20
**forwarded**
396:18,21
397:1,15,23
398:4,8
399:8
444:23
467:21,21

467:22
488:16
497:15
531:8 637:6
**forwarding**
387:16
528:20
650:1
680:19
**forwards**
532:1 614:1
614:7
637:12
639:9 684:4
684:15
718:6,7
**fought**
449:12
**found** 420:25
423:18
472:25
478:18
500:10
546:25
666:10
667:11
707:3
**Foundation**
726:6,8
**founder**
579:4
**founding**
675:6
**four** 377:19
390:22,24
401:4,9,14
413:2
416:24
445:5
446:16
447:2
451:19,24
452:2
466:24
471:14
475:8
484:17
486:3
489:14

490:14,15
494:8 495:4
496:14
498:10,10
502:10,10
502:11
503:1,16
517:3
524:13
544:10
547:21,21
547:22,23
558:16
578:9 589:4
600:14
601:9,10,14
602:12,12
602:15
626:10
648:23,23
649:23,23
650:14
668:22
675:2
683:22
692:25
697:9
**fourteen**
399:20
671:15
683:4
**fourth**
376:20
658:3
**frame** 375:3
409:20
428:22
**frames**
463:17
**framing**
421:24
**Frank** 359:21
360:5,6
391:2
428:17
431:12
432:18,21
432:21,24
433:21

434:8 447:3
447:13,14
448:12,23
449:15,24
450:1,25
451:3
548:19
702:22
**fraud** 586:1
**freak** 437:10
439:23
**freaking**
642:21
**free** 562:10
562:18
615:11
618:14
**French** 447:2
**frequented**
560:23
**friend** 373:2
447:22
452:16
629:11
644:20
**friends**
630:25
631:3
**froms** 745:5
**front** 411:25
452:19
454:20
479:21
495:1
556:13
657:14
Ft 429:3
596:5 704:7
**fuel** 511:24
**full** 463:23
503:13
517:16
518:10
618:3,4
675:10
677:4
680:23
682:24
687:2

700:23
**fully** 517:10
592:6,8
691:3
**fully-execu...**
467:25
**function**
452:20
456:17,17
529:3
**fund** 588:16
**funded** 503:7
503:9
591:17
595:22
713:1
**funding**
463:1,9,10
567:1
568:13
579:14
591:18
663:5,7
**funds** 371:2
385:1
414:22
418:23
431:18,24
452:24
456:25
457:4,6,11
467:8
486:25
514:25
521:16
535:4 536:4
543:8,9
544:16
547:9 549:1
550:14
573:1
580:23
584:11,14
584:17,18
584:18,19
586:1,14,24
596:8 597:5
599:19
606:11

607:1,22
608:1 609:2
612:4,18,20
619:13,20
619:22
621:11,14
621:25
625:24,25
626:15
629:16
640:18,20
643:7 644:7
644:8 668:4
668:11
673:22
674:6,14
706:14
708:11,14
710:7,18,22
710:22
711:3
713:22
719:2 721:3
724:7 728:5
731:10
733:21
734:5
745:22
**furnished**
669:7
**furniture**
413:19
632:7,16,18
642:19
**furnitures**
598:21
**further**
353:23
675:1
692:20
748:10,12
748:15
**future** 598:20
653:20
669:4
748:13

──── **G** ────
**G** 353:1

538:5
679:11
712:21
713:11,18
714:3
**G-A-N-E-S-...**
429:8
**G63** 711:16
711:17,19
**gain** 496:24
**Galapagos**
429:4 431:3
433:3
447:19
448:4,6
**Galdencio**
350:5
353:24
354:6
419:14,23
436:14
437:11
438:3
439:12
441:3,9
442:5,14
443:6,15
492:5,10,22
493:16
496:23,25
548:3,14,21
549:7,19
550:10,21
551:3,9,16
552:7,19
561:17
575:25
576:3,5,9
576:13,17
576:25
577:4,16
579:8,14
586:22
587:6,16
588:4,8,11
597:5
607:19
608:9,22
609:16

616:18
**game** 579:21
611:7
**Ganesvort**
429:5
**Gao** 372:22
**garage**
707:21
712:16
713:5
**Gary** 684:18
684:22,24
685:11,22
686:12
692:23,24
**gas** 513:16
514:5,8
515:3,6,10
**gate** 613:19
**general** 427:5
437:12
**generally**
457:12
466:23
467:3
515:24
516:2
663:22
**genius**
745:12
**gentleman**
496:21
643:2,18
**gentlemen**
431:20
**germane**
571:9
**Gerry** 636:21
636:23,24
637:4,7
739:7 741:4
741:5,6,13
746:21
**getting** 402:8
484:13
486:3 488:2
491:25
526:19
546:15

575:16
617:22
627:15,22
644:14
648:24
708:6
715:25
745:15
747:8
**ghost** 721:23
**gift** 744:18
**girl** 458:3
**gist** 357:5
**give** 355:2
364:11
394:3 403:9
423:5,7
506:12,15
506:16
509:1 510:9
512:23
513:8 514:3
519:17,18
535:12
540:9
546:19
555:9
561:10
569:15
570:6
571:19
578:23
580:9
584:22,23
593:19
610:20
615:13
618:7,14
633:5
687:17
694:15
714:7
720:18
742:16
744:10,12
746:4
**given** 359:12
365:8 427:4
433:23

444:13
508:21
517:25
518:20
520:2 524:1
559:15
578:17
596:24
658:21
721:22
729:7
**gives** 682:23
707:2
**giving** 447:4
521:5 715:3
**Glenn** 382:15
382:21
387:9
388:10
391:9,19
392:17
393:4 395:9
407:19
415:7
419:12
446:18
471:2,2,3,3
471:12
474:4 475:7
475:15,18
511:4
518:16,23
519:2 524:8
524:15,20
524:22
529:11
530:12
542:9
549:14,16
551:1 555:5
555:8 603:3
603:4 605:7
605:9,10,14
624:16
625:22
627:18
668:20
**Glenn's**
512:14

533:17
668:21
**glowing**
532:4
**goal** 618:2
700:15
**God** 744:18
**goes** 441:3
459:9
475:17,19
527:10
536:25
577:16
593:17
601:20
721:16
736:12
**Goetz** 359:18
**gold** 576:15
**golden**
576:15
**golf** 578:20
578:21
584:21
698:19
722:12
723:20,20
**gonna** 356:10
**good** 374:20
375:13
390:10
393:3,6
417:13,14
417:16
418:11,12
418:13,13
425:14
430:11
431:15
457:16
478:16
487:20,20
487:23
488:24
491:15,23
501:21
505:20
510:9 523:6
549:25

Page 769

557:10
571:21,22
576:23
579:25
599:5
614:20
617:17
632:23
638:3 642:8
668:25
671:12
681:12,14
682:4 685:1
692:1,14
696:23
709:11
721:8
744:17
**Google** 579:4
669:11
685:14,15
685:25
**Googled**
686:16
**Googling**
684:7
685:17
**Gordon**
426:18
**gotten** 414:15
540:12
545:13
566:14
659:16
738:9
**governed**
560:8,24
**government**
523:13
**governmen...**
517:22
523:1
**Governor**
394:6
**grab** 628:23
**gracious**
748:8
**grand** 544:9
546:5,6

593:22
632:11,14
633:14,22
634:15
642:25
675:5
692:25
705:6,25
723:21
**grant** 526:16
598:17
**granted**
394:12
**grants**
598:18
**grapevine**
584:20
**grateful**
728:11
**Gray** 426:18
**great** 429:22
489:12
568:18
569:2 580:3
580:3
604:16
614:10,15
614:17
648:21
671:2
741:25
744:21,25
745:16
**green** 448:4
451:8
487:10,12
491:24
492:3
558:22,24
559:1
568:24
572:14
652:4
675:22
676:4,11
743:4,6
**Greg** 433:9
433:12
448:5,23

578:4,13
698:11,13
720:2
**grilled** 747:8
**gross** 578:7
**group** 354:25
423:19
452:6
465:22
466:25
595:7,9
618:25
638:9 687:5
690:11
693:12
731:22
**group's**
425:15
**guarantee**
384:8
571:11,12
645:10,14
**guaranteed**
645:7
**guarantees**
571:10
**guess** 357:21
384:14,23
384:24
388:15
391:20
406:21
407:3,9
428:10
435:1 443:3
443:3,4
455:20
459:21
466:8 469:5
469:21
474:20
475:19
485:3 489:1
490:1
494:12
509:4
514:17
518:3
536:23

539:20
542:17,23
546:8
548:24
568:3 575:3
581:21,22
583:4
588:17
589:17
590:11
591:13
592:2,15,18
595:11
596:7,12
599:19
616:11
626:12
647:5,6
648:21
677:3,12
687:16,23
694:12
**guessed**
388:18
392:1
406:15
470:17
474:4,5
548:17
**guessing**
393:3
469:21
534:16
551:1 596:9
**guesstimate**
469:8
470:25,25
**guest** 628:15
628:15
**Gulfstream**
732:14
736:8
**Gunster**
744:1
**gut** 595:25
596:4
**guy** 358:5
402:7

415:24
431:19
440:4,16
447:22
455:20
459:13,16
464:10,12
485:17
489:19
497:3 540:8
540:8,12
548:18
564:4 593:8
593:18
604:18
613:25
639:25
684:25
692:1
693:23
695:9
699:20
711:11
743:3
**guy's** 695:9
**guys** 405:16
451:8 489:9
513:19
514:8 535:5
544:20
609:21
643:21
673:13
677:16
723:17
742:5,12
743:9,13,13
743:15
744:1 745:2
746:24

─── **H** ───
**H-E-M-P-...**
684:5
**hacked** 513:5
**half** 383:24
430:6
460:14
464:20

469:16
472:22
496:16
503:15
557:3 589:4
600:14
601:9,9,10
601:11,14
603:23
604:3,4
611:10,24
632:24
725:18
**halfway**
505:22
537:5
**Hampton**
675:15
**hand** 415:24
477:25
484:3 553:2
564:9
603:21
692:5
**handed**
403:22
445:3
**Handler**
442:19
**handling**
639:22
**hands-on**
441:12
**handshake**
645:19
**Hang** 411:16
**Hank** 427:8
**happen**
395:12
454:8 466:9
498:23
509:5 522:6
534:23
567:5,6
586:8,11
596:4 630:7
677:22
735:14
743:7

748:15
**happened**
361:13
363:19
398:9,23,24
399:15
436:24
437:20
519:14
534:11
551:10,12
581:1
591:23
592:15,18
592:20
600:18
614:14
632:3 651:5
676:6,8
686:8 712:6
715:14
717:13
**happening**
424:5
693:14
723:9
**happens**
465:12
599:23
**happily**
428:14
**happy** 670:19
744:13
746:4
**Harbor** 700:6
**hard** 355:20
356:18
391:5
538:18
544:24
546:3
548:18
549:24
552:16
668:22
683:17,21
692:17
743:15
**HAULOU-...**

563:2 652:7
**HAULOU-...**
562:7
572:15
**Haven**
354:22
640:8
649:15
727:16
**Haven's**
732:23
**Hawker**
572:16,23
573:3
**HBA** 426:17
441:18
592:22
**HBC** 664:9
**HBS** 354:25
**he'll** 415:25
**head** 356:12
375:24
389:9 452:1
489:9
490:16
596:3 623:6
678:19
695:9
**heading**
500:14
520:23
660:25
**health** 513:18
514:8
515:10
516:8
519:25
**hear** 356:16
640:25
**heard** 361:11
506:22
568:11
584:20
585:4,7,9
585:10
587:22
603:25
604:1
656:11

661:6
682:17
**hearing**
349:14
588:2
749:15
**heart** 492:3
564:8
744:14
**held** 673:23
674:4,7
727:25
749:12
**Helen** 715:16
716:10
717:4,16,17
718:6
**Helen's**
716:16
**help** 380:7
414:10
424:22
425:23
430:11
431:12
451:4
453:11
469:4
473:11
476:8,13
477:3 536:6
536:16
539:13
542:21
592:17
605:5
618:11
629:7,12
630:13
634:19
635:3 637:1
638:2
639:24
644:17
655:3,12
681:19
685:11,12
685:22
692:23

693:1
738:16
743:3 746:1
**helped**
431:23
433:8
449:10
580:7
645:24
656:23
**helpful** 643:4
742:8
**helping**
578:14
643:1
**helps** 363:11
441:2
542:21
658:1
**Hempen**
684:5,19
**Henry**
442:19
**hereto** 507:3
599:9,14
**hey** 398:7
399:13
485:21
488:20
495:21
497:4
509:13
540:13
551:24,25
552:14,15
554:13
580:22
613:13
632:22
636:4
642:24
648:6 684:6
685:15
707:17
728:18
**Hi** 408:3
410:1 488:3
617:17
681:6

715:25
716:1 717:9
**hid** 680:4,6
**hidden**
698:18
**hide** 686:7
688:12
690:24
693:3
**HIG** 359:15
624:3,4
**high** 357:18
358:5,10
387:11
407:24
463:6
532:14
619:1
673:13
689:23
690:2
**high-end**
579:7
**higher**
381:23
413:6
**highlight**
615:5
**highly** 375:21
**Hilfiger**
672:13,15
672:19,20
672:21
**Hill** 628:14
630:23
631:24
635:3,20
636:1,5
641:1,6,9
641:14
651:1,16
**Hillary**
559:20,25
**hindsight**
691:20
**hire** 417:6
546:1 743:3
**hired** 354:25

360:5,6
385:25
404:6
442:12
454:6
544:11
582:14,14
686:12
691:22
692:24
695:21
696:3
728:23
**historical**
510:18
**historically**
446:11
**history** 376:1
544:7
655:13
686:4,9
692:9,11
**hold** 390:23
412:5
458:21
545:14
555:8
636:23
717:10,18
**holding**
629:15
**hole** 551:20
**home** 461:1
613:16
**honest**
736:24
**honestly**
635:9
**honeymoon**
580:9
**Hong** 626:18
**honorable**
604:18
**hook** 571:9
**hope** 366:10
595:5
743:12,13
745:1
**hopefully**

408:4
618:12
684:13
698:18
744:13
**hoping** 536:6
536:15
618:8 743:6
745:1
**Hopkins**
350:15
705:5,16
**hospitality**
354:24
431:14
432:23
**host** 726:20
728:2
**hosted**
726:17
727:2
**hotel's**
673:21
720:15
**hotels** 430:10
430:12,13
430:14,21
431:1
432:25
675:13,24
700:5,9
708:21
**hour** 428:6
**hourly**
573:20
**houses**
660:21
**huge** 578:11
**hundreds**
430:20
**husband**
458:9,22
460:21
462:23
**HVAC**
727:23
**HVS** 408:11
427:2 703:1
703:3,5

**Hyatt** 429:10
447:7
**hypothetical**
443:8
**hypothetic...**
498:22

**I**

**I-526** 477:18
479:7 488:7
488:13
489:5
564:24
565:2 566:2
566:3,16
656:23
673:24
**I-9** 508:6,17
**Ian** 738:22
**Iberia** 688:25
**idea** 376:4
384:18
407:13
427:25
438:19
458:25
479:9 499:9
514:20
564:4
566:13
579:1 580:3
580:4
604:17
614:8
629:24
632:8
646:21,23
646:24,25
660:3 677:2
677:2
730:23
**ideas** 697:4,6
697:13,14
**identificati...**
361:23
367:3 369:2
370:5
372:14
379:15

380:14
387:19
393:19
396:12
403:6 420:4
423:13
432:8 445:1
453:17
468:23
472:10
477:12
528:2
531:18
536:14
610:14
680:14
688:2
702:14
737:20
739:2
**identified**
351:6 352:3
430:10
694:12
697:4
**idiots** 414:17
**ignored**
438:1
482:18
**II** 363:4,6
580:12
581:5 586:9
611:21
613:9
615:21
617:17,20
618:21
619:5,10
703:9
**image** 562:3
613:20
**imagine**
381:9
493:20
566:14
568:5
620:18
729:7
**imagined**

545:20
**immediately**
418:4
505:25
532:7 540:3
593:13
**imperative**
680:24
**important**
400:20
404:21
460:6 461:5
480:17
486:9,15
489:6,9
492:2 493:9
493:17
505:2 533:7
661:18
666:11
678:16,20
678:25
723:2 743:2
**imposed**
394:24
530:20
532:5,9,14
**impressed**
746:13
**impression**
504:1
684:11
**improveme...**
622:1,5
**in-house**
442:12
**in-person**
435:14
**inaccurate**
410:11
**inception**
518:2
**include**
543:25
670:21
675:8 676:2
**included**
370:15
372:5 488:9

516:14
537:2
580:12
589:23
608:11
609:2
**includes**
675:1
**including**
392:6
519:23
539:22
572:20
599:6
640:21
672:13
691:4
**inclusion**
426:12
559:6
**income** 493:5
604:15
**income-pro...**
493:2
**incorrect**
418:20
609:5
**increasing**
606:2
**incumbent**
506:20
**incurred**
391:19
540:25
640:13
**India** 357:13
**Indias** 448:19
**indicate**
571:14
**individual**
358:10
453:6
575:23
**individuals**
360:23
370:8 458:2
458:16,23
463:7
466:16,21

561:24
562:2
669:22
670:13
672:12
746:17
747:15
**Industries**
669:10
**industry**
431:14
**info** 651:1
680:24
**information**
355:22
356:20
357:22,25
358:21
365:14
368:15
370:20
371:4
395:14
406:1 409:8
409:25
410:12
417:1,20
422:21,25
423:5,18
424:4
426:17
434:12,13
434:14
437:22
450:2,8
451:2
471:22
481:18
509:18
564:1
570:21
613:8
636:11
637:6,14
641:15
658:17
670:19
679:5 688:7
741:21

**informed**
394:2
630:24
**informs**
631:5
**infuse** 575:9
**infused** 384:1
**Inga** 695:8
697:17,18
**initial** 406:8
465:22
620:16
622:4
652:15
687:1
**initials** 400:2
400:3
**inject** 489:18
**Inn** 675:22
676:4,11
**inside** 614:4
**insolvent**
493:12
**inspect**
510:12
**inspiration**
461:12,17
462:9
**Institute**
677:6,16
**instructed**
423:3
**instructing**
639:13
**instructions**
638:15,18
**insurance**
513:18
515:6,7,9
515:10
516:8
619:23
660:8 720:5
720:5,6,7,8
720:12,13
720:15,16
**insured**
720:20
**integral**

578:2 708:9
**intend**
563:25
**intended**
495:18
563:24
564:2,3,4
567:14
574:3
**intent** 588:22
590:10
592:2
630:10
632:19
686:5,6
723:13
**intention**
602:4 633:1
**intentions**
633:3
**interact**
440:15
**interactions**
444:13
**interest**
389:24,25
397:19
401:3,15,16
402:21
431:8
483:21
484:24,25
487:2,6,8
490:10,22
490:23
491:8 493:8
494:7,15,21
494:24
495:14,17
495:18,22
496:9,11
497:20
499:12,14
500:13,16
500:25
502:2,8,13
502:15
503:4,8,19
503:22

504:2,15,20
504:21,22
505:7 506:7
506:14
547:18,22
547:22
548:1
585:19
598:17,19
598:21
599:7
620:23
625:22
672:12
742:17
**interested**
631:1 720:3
**interesting**
407:17,19
**interfere**
489:21
**International**
621:18,19
699:15
706:7,10
**interpreting**
671:11
**intervention**
507:1
599:12
**introduce**
380:6 428:2
453:10
476:7,12
477:8
581:18,19
687:24
**introduced**
462:17
463:3
499:19
631:4
645:24,25
**invaluable**
449:25
**inventory**
598:22
**invest** 444:10
462:20

**invested**
386:19,20
486:25
608:2
662:14
667:15
**investigation**
354:2 742:9
746:18
747:17,21
**investing**
462:25
585:23
**investment**
493:2
553:11
563:3,9,10
566:21
567:18
585:13
647:1,25
652:15
661:15,16
666:10
668:5,12
673:11
681:21
693:8
705:19
**investments**
580:22
640:22
**investor**
356:8 358:8
417:18,19
452:15,24
456:25
465:3 467:7
479:11,17
479:18,24
482:25
483:3
487:18
549:1
551:23
562:10,10
580:16
586:14
603:10,19

603:24
618:25
673:22
692:18
743:8 746:1
**investor's**
566:19
**investors**
354:18,25
356:1,21
357:8,15,19
358:2 361:9
370:21
371:5 388:7
406:1
422:12,18
423:1
434:15,18
434:22
435:5,14,20
436:11
438:18
444:5,7,10
451:7,9,17
451:23
452:6,12
453:23,24
454:13,21
456:6
462:21
465:23
466:4,23
468:4
477:18
479:5,7
486:9,14,15
486:18,20
488:8 491:2
494:19
495:16
499:8 504:7
504:10
514:23
523:21
527:13
554:15
563:25
567:14,21
567:22

568:1,13
585:13
597:14
603:5,8,13
604:2,8
606:3
611:11
615:6,13
616:1
617:19,23
618:13
619:5
673:11
678:4,6,10
678:11,13
678:21
686:3,15,17
690:6 693:9
**investors'**
489:5
603:15
**invited**
463:14
**invoice** 727:7
727:17
728:2
**involved**
435:25
436:4,13
438:12
439:19,20
441:12
442:6 445:5
449:6
654:23
**involvement**
354:14,19
441:10
446:7 447:1
448:16
450:3
**involving**
639:21
**IOTA** 621:18
**IRR** 692:14
692:14
**island** 675:10
675:21
677:4,8,9

Page  773

**islands** 620:9
675:11
677:5
**issue** 386:4
405:7
417:18
423:23
424:6
425:25
431:20
465:18
533:6,7
579:23
583:22
746:9
**issued** 511:21
513:14
623:11
706:23
707:20
713:7
**issuer** 508:19
510:4,12
**issues** 493:15
528:18,19
528:24
529:15
685:8
690:13
**it'll** 476:8
633:12
660:11
714:22
745:17
746:4
**Italy** 698:4
**item** 437:10
444:19
515:3
549:20
553:11
573:13,24
634:16
714:5
727:10
730:18
**items** 461:15
512:20
514:18

515:1 574:2
578:13
612:10
700:16
**IYC** 621:20
621:21
622:11

**J**
**J** 350:5
**Jack** 495:8
584:21
**Jade** 409:7
409:11
417:6 423:3
425:13
426:10
427:1 432:4
432:12
434:12
449:14,23
450:8,22,24
472:5
474:11,17
475:10
486:4
496:16
502:17
510:23
511:15
512:11
513:10,11
540:9
565:16,17
565:17
570:1 591:6
614:18
615:24
617:15
621:9,10,13
621:24
623:12,13
631:25
634:22
635:9,21
636:4,10
638:9,11,14
638:15,24
638:24,25

638:25
641:7,7
688:20,24
689:1,10
706:13
707:16
715:15,25
716:1,10
717:10
727:15
**Jaguar**
709:15
**January**
353:12
398:20,22
398:25
399:1,14
463:19
536:12
570:10,17
699:4
**Jennifer**
372:22
373:7
**jet** 572:16,23
573:3,15,18
573:19,20
578:19
581:1,22
612:7,13
**Jim** 579:6
**job** 371:25
374:17,18
393:3 410:7
488:25
489:10,10
489:11,12
491:4,23
576:24
579:25
604:11
618:4
671:12
681:19
700:9 742:6
**jobs** 409:21
**Joe's** 429:19
584:6
618:25

686:14
714:19
728:1 741:5
742:14
**joedirect@...**
361:20
**Joel** 732:1,1
732:16,20
733:4
735:14
**Joes** 733:7
**jog** 363:8
**John** 361:19
387:15
396:9 427:2
453:25
455:10
659:20
684:4
**join** 454:5
578:21
722:24
723:15
724:3
**joined** 354:7
725:7
**joining** 354:7
**Joseph** 379:1
**JP** 493:4
**Jr** 372:12
531:8
**judge** 593:5
594:22
**judgment**
689:22
**judgments**
691:4
**July** 518:15
696:5,8
**June** 620:11
629:4
650:25
655:23
657:2 675:4

**K**
**K** 481:15
571:9,13
658:15

**K-A-R-I-N...**
631:19
**K-O-E-P-P...**
731:22
**Karina**
631:19
**keep** 375:17
407:1 480:6
480:21
534:20
537:7
572:13
591:18
592:1 597:3
601:19
636:7
677:18
718:24
745:3,4
**Keith** 437:1
645:11,12
645:14,15
645:17,19
645:23,23
647:18,19
647:20,20
742:13
**Kennedy**
560:3,4
**kept** 381:22
591:18
638:1 711:9
727:19,22
**Kevin** 418:20
422:9,11
423:4 424:1
424:14,20
425:14,16
425:21
426:10,11
432:4,13,15
434:12
440:12
444:23
445:4
449:14,23
450:9,22,24
451:2
457:18

458:13
459:1,2,3,4
459:10,15
459:17
460:4,15
466:6,7
467:21,21
468:20
469:6
470:13
472:6
474:13
477:9,21
478:4,6,7,9
478:18
479:4,14
533:14
564:12
565:22
566:7,10
567:1 569:7
570:1,5
681:18
693:19
**Kevin's**
434:20
571:7
**kick** 552:3
626:4
**kicked**
725:18
**kicking** 685:5
**kid** 564:21
**kind** 356:7
432:1
454:20
507:2
530:10
599:13
601:25
673:13
697:19
728:11
**kindly**
716:10
**kinds** 488:24
696:24
**Kirshner**
743:3

**knew** 356:2
356:22
357:7,13
358:3
364:12
370:20,22
373:2
385:22
387:9
394:23,25
395:6,16
400:6 401:2
402:13
406:25
419:17
422:24
431:13
433:12
437:2
440:19
441:16
443:20
457:5,6
479:15
485:20
490:16,19
490:21,22
491:8,10,11
491:18,20
494:9,23
495:1,2,3,4
495:6,25
496:1,10,13
496:15
497:6,6
524:10
527:15,18
529:24
530:5,5,6
530:13,15
535:19
547:2 552:4
554:5
557:23
564:3
574:23
576:22
587:17
624:10,25

631:1 636:8
645:12,12
645:22,23
656:23
672:23
678:7
708:14,16
743:22
**knowledge**
522:23
533:4
561:25
687:10
**knowledge...**
439:10,13
**known** 357:1
470:11
673:6
685:13
**knows** 564:6
743:22
**Koch** 669:10
669:10
670:4
**Koeppel**
731:22,22
732:1,16,20
**Kong** 626:18
**Kravis**
725:10,12
725:15

———— L ————
**LA** 738:4
**label** 433:13
**labeled** 377:5
399:21
420:23
421:2 425:4
425:10
458:19
464:7
480:22
562:7 563:2
572:15
617:11
637:2
652:24
700:23

704:25
720:10
**labor** 519:24
523:2
**lady** 454:6
**Lake** 731:25
732:9,10
**Lancet** 427:2
**land** 389:1
581:15
586:12
615:8 616:9
617:6
660:11
666:22
667:1
676:15
688:11
703:9
**language**
375:22,23
376:5,10
558:13
560:7 561:3
630:18
674:25
**lapse** 521:4
**large** 428:13
465:22
626:1
661:13
**largely**
671:18,19
**Lastly** 466:14
**late** 518:24
**Laudano**
404:12
631:24
640:20
643:12,13
688:9
733:11,12
734:4,7,8
734:11,15
**Laudano's**
733:25
734:19
**Lauderdale**
429:3 596:5

704:8
**laugh** 484:7
**laughed**
682:18
**law** 695:21
731:22
**lawsuit**
394:13
436:19
483:13
521:9
567:25
568:4 593:1
593:4,13
619:16
713:5
717:20,21
744:2
**lawsuits**
533:16
596:21
**lawyer**
442:12
443:5
485:16
588:24
589:15
593:16
600:8,11
602:24
696:3
718:13
732:16
735:14
742:23
**lawyers**
437:1
440:18
484:6 512:5
704:6
742:24
744:1
**laying** 560:16
614:21
**lead** 448:23
671:3
**leaders** 560:9
560:25
**leads** 671:4

**learn** 374:17
**learned** 527:1
564:10,12
**lease** 517:14
518:8 573:5
596:14
597:22
**leased** 590:12
618:3
**leave** 551:20
**leaves** 367:10
476:18
616:18
**left** 456:21
463:20
493:14
558:9 594:4
643:21
**left-hand**
537:23
**legal** 371:17
374:23
517:20
519:21
520:4
593:11
689:22
705:8,10
**lender** 505:5
505:7 506:7
509:12
517:5
522:10,13
523:7,8,11
523:25
524:7
598:19
623:18
645:12
690:25
**lending**
491:18
493:1 552:4
603:14
678:21
**lent** 706:3
740:18
741:3
**Les** 565:6,13

565:16
583:19
619:22
621:17,25
623:13
630:17
640:6
649:15
701:12,24
706:13
731:21
733:24
735:6,16,17
736:19
740:9,10
**Les's** 674:10
730:14
731:2
**let's** 356:17
375:15
376:18
380:6
403:11
413:14
420:19
421:1
438:21
446:3
453:10,21
455:9
457:17
459:5
465:21
466:2
467:14
473:3
476:15,19
480:25
493:24
494:6,13
498:11
499:16
508:13
511:13
516:16,24
520:22
522:24
528:7,14,17
531:6

533:12
535:7,23
541:13
555:14
556:1 565:8
572:6,13
581:18
591:20
598:15
607:9,12
612:8
613:16
617:10
630:15
631:21
635:4 636:9
640:19
645:15
649:12
652:6 654:9
655:22
662:6 666:4
667:9
674:23
679:8
680:22
681:2,2,3
682:21
683:3,7
687:23
693:4 694:3
700:19,19
706:16
709:3,11
737:15
**letter** 409:14
410:2,4
424:15,15
432:17,18
434:4,14
449:15,20
449:24
450:25
480:1
565:25
570:2,21
571:4,16,19
571:24
629:14

631:18
682:2
**letterhead**
437:4,7
**letters** 437:24
438:2 569:5
569:6,11
570:21
680:25
682:19
**Leuenberger**
450:6
**level** 459:7
515:3
545:21
569:21
**levies** 523:2
**Levinson**
423:4
458:13
472:6
474:10
693:16
**liabilities**
522:11
523:6
**liability**
600:6,15,16
600:23
601:1,15
602:13
619:23
**LIBOR**
490:11
**license** 716:7
**licenses**
517:19
**lie** 713:8
**lied** 417:4
714:23
**lien** 394:23
400:13
523:5 525:9
525:11,21
532:16,19
532:22
688:11
730:8,8
742:16

**liens** 400:14
400:17
599:7
689:22
691:5
**life** 483:23
484:23
506:22
514:21
682:17
743:17
745:9
**lifetime** 617:9
**light** 542:15
**lights** 545:22
697:15
**liked** 615:22
703:9
**limitations**
517:13
518:8
519:23
**limited** 356:6
388:6,12
444:9,10
468:6
480:20,24
482:8,20
505:10
549:9 583:2
590:6 620:9
620:17,24
682:1,5
683:16
**line** 382:8,9
515:1,3
516:11
538:2
548:21,22
549:20
553:11
573:13
634:15
692:17
700:16
725:25
730:18
**lined** 743:11
**lines** 389:20

**link** 374:3
375:22
377:7 380:1
380:23
631:25
634:22
635:1
**LinkedIn**
447:22
**links** 373:23
375:16,20
377:19,19
377:19
531:8,11,14
531:24
684:7,14,15
**list** 364:1,3,4
364:8,9,18
364:19,23
377:25
378:2,4
528:18,24
529:7,9,10
611:21
669:3,6
727:22
**listed** 432:25
433:1 434:4
543:2
662:22
669:22
**Listen** 416:6
479:16
486:12,13
501:17
**listings**
665:14
**literally**
443:25
**little** 375:3,5
389:10
411:10
439:7
448:16
459:17
470:12
471:8
500:15
538:7

539:14
542:15
617:2,20
632:3,25
636:24
642:11
682:10
720:19
723:5
746:19
**live** 507:5
**lived** 699:6
**living** 432:1
**LLC** 349:5
350:15
366:3,3
402:3 490:3
490:5,5
494:14
504:14
505:17
506:6,10
511:19,20
512:13
588:18
589:2,10
597:7,14,17
600:7,17
601:18
602:20
605:19
606:2
620:24
621:2,6
625:12,14
638:9,13
639:5,7
657:18
713:1
715:22
716:13
727:8 730:2
749:3
**LLLP** 354:16
355:25
395:15
477:17
479:6 490:6
508:1,8,24

583:11
603:10
670:12
**LLP** 490:4
660:4
**load** 454:10
489:15
**loaded**
371:18
**loaned**
731:11
**loans** 374:23
483:23,24
506:2 510:1
517:10
640:15
740:2
**lobby** 453:3,4
455:4 456:8
456:9,16
457:7 529:3
582:19
**located** 353:4
598:24
**location**
694:15
749:7
**locations**
675:8 676:2
**log** 636:10,15
**logical** 383:3
428:7,8
471:19
555:11
649:23
**logically**
444:1
**logo** 439:21
439:22
**London**
441:18
544:12
545:19
546:1
694:22
696:7,10,11
737:9 738:5
**long** 366:12
446:14

493:14
596:18
685:22
**longer** 386:20
569:15
658:22
**looked**
360:10
377:15
401:11,12
401:15,15
404:19
437:3
455:24
456:22
481:25
483:20
490:15
499:17
518:14
531:9
538:16
557:4,10
560:17
574:21
614:17
650:11
654:8 661:2
661:22,25
677:17,19
686:16
**looking**
357:17
375:24
376:11,19
377:14,16
398:18
401:8
408:13
409:5,17,25
412:4,12,25
413:1 451:8
456:7
459:24
463:4,5
464:5
504:13,16
514:16
518:14

537:6 539:8
541:3,15,23
541:25
555:17,21
555:25
556:12,14
557:2,8,19
562:24
572:13
589:22
602:6
604:21
606:6
607:21
633:23,24
648:18
651:22
652:20
664:24
676:17,20
677:17
683:6,23
684:3
696:25
745:5
**looks** 367:13
390:18
409:7 421:4
421:22,23
427:6 445:4
459:3,12,17
461:16
463:18
473:24
474:17
478:5
511:13
512:11
531:7 537:6
537:7,14
539:9 541:2
542:10,14
544:24
547:25
553:8
570:10
614:10
629:13
630:17

636:10
638:8
664:16
683:5 685:3
688:10
696:6,7,17
714:8 727:9
730:8,13
731:16
739:11,11
**Los** 699:9
**lose** 543:13
**losing** 642:21
642:22
685:8
**loss** 531:10
**lost** 382:14
386:21
415:6
450:14
485:5 540:3
570:8 632:5
638:7
645:21,22
677:23
678:23
679:25
690:19
691:1 705:4
712:13
**lot** 385:6
402:16
429:4 438:1
441:17
447:21
463:4
476:14
501:2
547:16
562:21,22
562:22,24
575:24
580:7,24
599:25
604:15,16
626:5 628:1
628:4 642:9
642:17
658:22

677:8 691:1
692:1
705:17
722:11
723:11,25
731:12
**lots** 390:11
488:23,23
617:4 725:3
**lovely** 601:13
671:1
**low** 491:9
676:24
690:3,4
737:10
**lower** 459:7
628:14
630:23
631:23
635:3,20
636:1,5
641:1,6,9
641:14
651:1,16
**LP** 371:21
**luminaries**
669:9
**lunch** 367:19
367:21
435:11
451:6 454:7
**luncheon**
468:8
**lying** 673:18
_____
**M**
**M-A-A-S-S**
591:11
**M-E-Z-Z**
472:1
**Maass** 590:7
591:10
**mad** 464:11
464:12,12
464:13,22
464:23
534:7
545:22
**maid** 618:4

**mail** 716:2,14
**maintain**
523:9
**majority**
626:1
**making**
402:1,19
495:25
513:19
517:8
535:13
570:18
642:8
643:23
717:18
736:14
**malarkey**
593:3
**malicious**
389:6
**man** 436:4
**management**
370:19
371:25
441:10
499:24
627:24
684:24
686:19
**manager**
402:7 450:6
514:6 576:8
708:1
716:19
**managers'**
515:15
**managing**
397:8,17
438:4 576:6
576:7 583:4
588:19
657:17
695:25
**Mandarin**
694:23
**mania** 489:20
**manufactu...**
514:11
**map** 613:9

**maps** 426:10
**Mar-a-Lago**
458:10
460:25
578:16
724:16
**marble** 453:2
455:6
582:19
**March** 396:5
396:20
398:10
533:13
568:11
571:5
655:18
699:9,14
709:22
714:9
**Marcus**
361:19
370:3
387:15
396:9
436:21,22
453:25
455:10
478:10,14
478:15,25
488:3 495:6
557:22
559:8
630:16
642:1,2
659:20
684:4,4,6
684:15
**marina** 704:8
**Marisa** 529:8
**maritime**
591:10
**mark** 359:6
361:4,17
362:12
366:24
368:23
369:25
372:10
379:11

| | | | | | |
|---|---|---|---|---|---|
| 380:10 | 747:5 | 728:13 | 712:15 | 392:9 395:6 | 738:1 |
| 387:14 | **Mark's** | 729:9 730:4 | 713:14,15 | 440:25 | 739:21 |
| 393:15 | 561:14 | 730:11 | 713:24 | 468:15 | 740:3,19 |
| 396:4,7 | 570:18 | 731:18 | 714:9,13,14 | 504:3 | 741:8 |
| 403:2 | **marked** | 737:20,22 | 715:14 | 514:20 | 747:20 |
| 417:24 | 353:15 | 739:2,4 | 716:5,12 | 602:10 | 748:5 749:4 |
| 418:12 | 361:23,25 | **market** | 717:23 | 631:8 749:3 | **Matthews'** |
| 419:25 | 367:3,5 | 427:10 | 718:8 | **mattered** | 690:10 |
| 423:10 | 369:2,4 | 430:22 | **master** 440:3 | 395:7 | **McDonald** |
| 432:3 | 370:5 | 431:23 | 597:22 | **Matthew's** | 350:15 |
| 440:13 | 372:14,16 | 631:12 | **mastermind** | 432:23 | 705:5,16 |
| 444:21 | 373:10 | **marketable** | 743:21 | 668:5,12 | **meals** 511:24 |
| 453:13 | 376:13 | 599:5 | **match** 582:17 | 671:19 | **mean** 355:5 |
| 465:13,14 | 378:19 | **marketing** | 582:19 | 687:4 | 357:1 |
| 465:16 | 379:15,17 | 354:16 | **matched** | **Matthews** | 362:14 |
| 467:24 | 380:14,16 | 371:20,22 | 446:9,10 | 349:7 351:4 | 366:2 368:1 |
| 468:19 | 387:19,21 | 415:14 | **material** | 353:12,16 | 370:25 |
| 472:4 478:3 | 393:19,21 | 422:11 | 510:21 | 353:20 | 378:12 |
| 478:13 | 396:12,14 | 434:18 | 519:21 | 354:14 | 390:21 |
| 496:2 | 403:6,22 | 435:4 436:2 | 520:3 522:8 | 368:25 | 391:1 |
| 497:22,22 | 420:4,9 | 436:9 | 522:9,17 | 370:2 | 394:24 |
| 497:23,25 | 423:13,15 | 438:13 | 674:15 | 372:11 | 402:13 |
| 499:23 | 432:8 445:1 | 562:4 | **materials** | 379:12 | 411:2,20 |
| 527:22 | 453:17,19 | 572:21 | 354:16 | 380:11 | 412:9 |
| 531:13,16 | 468:23,25 | 578:3 580:1 | 415:14,14 | 393:16 | 425:20 |
| 536:2,10 | 472:10 | 619:4 | 435:4 436:2 | 396:7,8,10 | 428:23 |
| 561:14 | 473:4 | 673:22 | 436:10 | 403:19 | 431:12 |
| 570:11,14 | 477:12,14 | 678:4 | 438:13,18 | 424:21 | 433:8,19 |
| 570:16,20 | 510:16 | 699:20 | 441:4 442:7 | 432:5 439:7 | 441:19,21 |
| 571:6,14,17 | 528:2,4 | 722:17 | 442:8 468:3 | 444:24 | 442:15 |
| 571:17 | 531:18,20 | **Marler** | 486:24 | 468:14 | 449:11 |
| 587:22 | 536:14 | 645:11 | 494:19 | 472:7 | 450:21 |
| 588:2 | 541:13 | **Marra** 593:5 | 499:7 | 476:22 | 455:23 |
| 606:13,15 | 553:1 | **Marriott** | 530:21 | 477:9 492:5 | 465:14 |
| 606:18,19 | 564:19 | 449:2 | 554:14 | 556:7 572:9 | 467:22 |
| 610:10 | 610:14,16 | **Mars** 448:19 | 562:4,4 | 577:12 | 470:24 |
| 616:15 | 628:25 | **Martin** 709:3 | 572:21 | 595:8 | 482:14 |
| 629:6,10,11 | 640:2 | 709:5 710:2 | 580:21 | 607:17,19 | 493:10 |
| 629:17,25 | 657:13 | 710:3,10 | 618:21 | 608:23 | 497:15 |
| 631:15 | 659:8,19 | 713:16,18 | 619:4,5,10 | 610:17 | 503:10 |
| 660:3 | 660:14,24 | 714:8,12 | 670:22 | 614:20 | 505:24 |
| 680:10,19 | 661:20 | **Maserati** | 673:21,22 | 631:4 675:2 | 514:20 |
| 681:6 | 680:14,16 | 706:17,19 | 678:5 | 684:8 701:3 | 515:13,17 |
| 693:12 | 688:2,4 | 706:21,25 | 699:20 | 701:23 | 515:18 |
| 699:6 | 700:15 | 707:2,9,12 | 724:6 | 707:10 | 520:9 |
| 702:11 | 702:14,16 | 708:2,12 | **math** 648:21 | 725:24 | 534:24 |
| 737:15,16 | 709:14 | 709:6,8,25 | **matter** 349:3 | 726:7 | 542:15 |
| 738:24 | 719:16 | 710:4,13 | 349:14 | 727:11 | 543:15 |
| 746:16 | 722:1 | 712:7,8,13 | 354:2,6 | 731:23 | 544:5 |

SEC_000893

545:20
548:25
549:25
550:17
559:11
561:8 564:8
566:5,24
576:21
583:17
584:5
600:22
633:8
635:11
642:11,20
644:18
647:12
655:17
667:2
676:19
677:15,20
686:5
691:20
695:18,20
695:24
696:2,18
697:12
704:13
705:21
708:10
709:7
710:16
717:13
721:23
724:15
726:19
730:23
739:13
740:7 744:1
**meaning**
443:15
512:3,24
**means**
407:18
479:14
517:18,18
547:13
663:23,24
732:13
**meant** 429:19

429:21
612:9,10
**measured**
500:18
**mechanical**
421:25
**Medici**
623:19
**medium**
615:11
**meet** 362:12
368:13
381:7
404:22
408:8,10
451:16
453:6 458:8
458:11
535:15
695:3
**meeting**
361:3
362:14,22
363:19
408:4,20
409:1
431:25
436:18,25
437:8 454:8
455:22
458:1
466:21
491:25
506:10
507:22
508:9
618:17
681:18
684:12
**meetings**
435:14
452:11
467:3
695:14
698:21
**member**
353:6
397:17
468:16

572:10,18
583:4
588:19
620:16
657:17
670:4,5,6
675:7 694:7
695:25
723:19
725:8
**members**
364:13,19
364:20
403:18
476:23
535:6,8
556:8 573:4
577:13
607:16
669:4,25
675:12
679:18
722:24
723:18
725:5,6
**membership**
409:19
575:18
578:19
579:2
615:11
625:12,14
625:22
675:1
724:13,24
725:11,12
725:15,19
742:17
**membershi...**
409:22
417:5
579:12,13
582:6
655:13
698:23
723:7,17
724:9,15,19
**memo** 635:21
635:22

650:25
725:25
726:15
**memory**
363:8
445:14
453:22
466:20
477:4
531:23
561:15
658:25
685:6
**memos**
635:19,22
636:3
651:17
**mentally**
407:1
**mention**
462:24
463:9
**mentioned**
359:14
370:8
372:23
430:16
437:1 451:6
460:18
467:11
559:3
581:22
586:22
595:15
661:3
679:22,23
719:24
721:18
738:9
**Mercedes**
711:15,17
711:19,23
712:10,20
713:12,19
**mess** 642:21
**message**
444:23
**met** 363:23
389:16

390:5
404:24
408:16,18
408:22
409:3 433:3
433:8,19
447:8,11
448:11,17
448:22
451:6
453:23
466:18,23
487:13,14
502:16
505:17
535:6
609:11
659:1
673:12,16
673:17
676:16,19
677:15
693:22
695:6,8
699:19
742:11,12
742:20
743:8
**meticulous**
595:25
**mezz** 471:10
472:1
**mezzanine**
472:2
**Mia** 559:21
590:5 621:1
645:8,10,12
645:22
646:4,5,8
646:12,14
670:16,18
670:24
699:1 700:1
700:2
707:25
708:1,6,7
708:18
711:8,23
725:24

726:7 738:1
**Mia's** 588:20
588:23
596:7 603:1
707:24
710:11
713:21
720:21
**Miami**
349:11
350:10
353:4,5
700:4,8
708:22
742:20
749:7
**Michael**
368:13
481:15
553:7
586:18
658:15
**micromana...**
436:6 437:9
**micromana...**
436:17
**middle**
636:15
726:7
**might've**
359:21
404:13
412:11
425:21
464:16
470:13
649:2
711:10
**millions**
406:24
407:1
430:20
543:5
**mind** 388:19
395:7,22
403:7
408:15
409:23
440:2,3,3

485:13
491:20,21
492:25
497:6 498:6
498:13
515:11
516:6
526:23
548:2
549:10
555:7
574:24
583:19
601:19
607:5 610:5
624:14
693:5
721:12
**mine** 373:2
487:22
**minus** 653:9
732:6
**minuscule**
487:6 723:6
**minute**
398:16
423:17
464:14
692:12
**minutes**
428:10,11
**minutiae**
375:13
**Mirabia**
623:17
**Miranda**
359:21
**mislead**
563:24,25
**misleading**
653:25
654:4
665:15,16
**misprint**
701:4
**misreprese...**
553:13,20
554:10
**missing**

358:24
475:9
639:11
668:24
**mistake**
706:23
713:8
717:14
718:22
**mistaken**
526:12
**mistakenly**
714:22,23
717:23
**mistakes**
691:24
**misunderst...**
651:10
**mix** 584:18
**MJL** 640:22
645:2
**model** 456:22
461:13,15
467:6
632:17
**mogul** 672:13
**mom** 739:15
**Monday**
349:12
408:9 749:6
**monetary**
519:13
**monies** 640:3
**month**
472:22
573:23
593:21
645:19
692:25
694:15
714:11,13
**monthly**
402:18
493:14
494:15,21
494:23
495:5,17,18
495:25
496:20

497:2 503:2
503:3,4,19
692:24
**months**
376:24
378:11,12
398:18,20
400:23
406:18
463:21
469:16
470:19
488:16,19
535:14,19
539:15
546:14
618:24
619:23
627:19
645:20
653:12
662:2
712:23
**Moore** 695:8
**Morgan**
493:4
**morning**
409:2
416:20
425:14
684:16
**mortgage**
355:10
388:5,8,11
388:14
400:21
401:22,23
506:17
543:18
545:10
549:6,9,11
549:15
551:3,4,5
551:13,19
552:11,12
578:9,11
599:7 603:3
615:12,13
622:16

623:18,22
629:8
645:12
659:22
660:6
668:20,21
683:15
742:18
745:6
**mortgages**
689:19
**motor** 717:22
**mountain**
675:22
676:4,11,16
676:17
**mouth** 443:8
**move** 477:7
535:24
586:23
587:19
605:3
618:11
652:3
**moved**
545:21
**moving**
515:14,15
**MSOA** 726:6
**multi-billio...**
669:10
**multiply**
562:22
**must've**
379:25
396:23
459:22
460:5,6
461:2 478:7
639:18
673:6
716:14

---
**N**
---
N 351:1,1
352:1,1
353:1
468:10,10
468:10

679:11,11
679:11
**NAICS**
665:12
**naively**
568:25
**name** 353:5
359:19
360:9
361:11
366:3
376:17
424:21
431:22
447:9 453:7
453:8
496:22
506:25,25
507:7,10
578:24
579:1
582:25
588:21,23
589:12,24
599:11,11
599:20,21
599:25
603:1
604:23
605:22
691:10,11
691:14,16
691:19
693:16
695:9,10
703:4 707:3
707:13,19
714:17,19
714:23
715:17
716:5,15,21
717:14,23
718:22
737:9
749:17
**named** 361:4
361:14
362:13
**names** 430:7

562:3 669:3
669:6
**Nantucket**
446:7
450:23
579:3 675:4
675:15,20
676:22
687:17
689:14
**Naples** 696:7
696:11
**nasty** 685:24
686:1
**Natalie** 579:6
675:6,19
**natural**
697:23
**nature**
437:13
486:5 532:4
669:5
**navigating**
687:8
**NBC** 723:24
**near** 642:12
**necessary**
368:16
517:20
**need** 381:18
408:5
421:21
428:1,15
489:9 531:9
532:2,6
534:22
564:20,20
564:21
580:20
599:2
609:18
613:4 614:9
615:6,7
738:15
**needed**
356:22
361:7,8
371:6 397:3
409:8

410:12
523:20
566:8
585:16
586:16,17
638:25
639:7 646:5
655:7
697:20
716:6
**needles**
440:16
**needs** 371:25
469:7
473:19
522:6
616:21
681:8
**negative**
684:8
**negotiate**
430:12
431:19
495:2 520:8
529:12
**negotiated**
519:15
676:5
**negotiating**
431:25
**negotiator**
431:15
**net** 357:18
358:5,10
463:6 593:9
594:5
600:25,25
602:13,13
619:1
673:13
680:25
690:1
**new** 354:22
360:6,9
374:17
392:13,16
410:6 429:5
431:21
454:5

535:12
538:22
564:21
569:18
580:20,21
580:22
594:22
618:12
640:8
649:15
680:24
685:3,18,20
699:13,17
716:3 725:5
725:6
727:16
732:23
**news** 417:13
417:14,14
417:16,19
418:12,12
418:13,13
**newspaper**
691:15
**newspapers**
691:13
**nice** 367:17
580:8,10
693:23
696:7,12
743:20
**nick** 404:11
404:11
409:7
518:24
575:9
631:24
632:2
637:10
638:15
639:9 640:3
640:20
643:12,12
688:8
733:11,12
733:25
734:4,7,8
734:11,15
734:19

**Nick's** 734:16
**Nicklaus's**
495:8
**Nicky** 404:9
404:11
406:25
409:11
417:8 422:6
441:15,15
508:10,16
540:4 632:6
632:8
633:13
634:8,10
635:3
636:19
638:2,12,14
638:24
639:5,7,24
640:15
641:8,22
642:7,8,13
642:16,24
643:14,20
643:21
644:7 645:7
645:23
646:6,15
647:6,10,24
647:25
648:4,6
649:9
705:22
731:25
732:21
734:25
735:12
736:5,11,13
736:13,25
**Nicky's** 634:1
638:2
705:24
735:10,20
736:12
**Niklaus**
450:6
**Niklaus's**
584:22
720:21

**nine** 516:17
516:24
547:12
637:19
649:10
728:24
**nineteen**
690:2
**ninety** 386:9
390:19
464:19
627:17
653:15,21
653:23
666:16,19
667:2,4,6
**ninety-five**
637:20
**ninety-nine**
706:4
**ninety-one**
389:19
413:11,21
413:23
414:13
418:18,23
419:8 536:4
536:5 547:5
553:10
563:14
607:22
662:12
**ninety-six**
497:24
**NJL** 638:9
705:19
**nods** 623:6
**noise** 400:15
532:10
**non-profit**
677:18
**non-public**
747:21
**nonrecourse**
602:1
**noon** 428:6
**Nope** 738:21
**Norman**
433:10

448:5,23
578:4
698:12,13
720:2
**northeast**
631:2
**northern**
631:1
**note** 506:17
571:7,7
614:23
623:21
629:18
630:1,6
632:4
666:11
671:8
728:12
745:7
**notebook**
606:14
**noted** 630:22
641:1
**notes** 533:8
561:15
606:13,14
630:22
**notice** 349:15
416:21
428:13
458:15
521:5 523:7
**notify** 525:20
526:4
**November**
361:19
363:10
454:3
478:21
529:23
538:14,19
538:23
539:22
592:24
645:2
680:12
**Novembers**
592:25
**number**

355:11,12
363:4
365:10
383:11,15
387:1,3,11
388:16
390:24
391:22
392:1,2
406:13
407:24
410:21
413:5,6,9
414:15
415:16,19
415:20
416:19
419:9,11,15
419:21
421:9,17
425:6,8
433:13,15
470:8 472:8
472:14
475:11
476:3 481:2
494:13
499:14
500:1
511:14,17
517:3 535:9
536:23
538:1
545:13
547:6,12,14
548:2
563:16
564:14,15
582:9 608:1
610:4
615:11,23
643:24
650:14
652:23
667:14
674:25
687:11
708:7 718:4
730:22

Page 781

740:15,20
749:5
**numbers**
354:21,23
355:1 356:9
356:17,18
357:3 377:9
377:10
388:20
389:21,23
390:17
409:8
427:13
480:14
481:6 482:1
496:17
499:13
502:1
514:24
544:10
545:6
548:15,17
562:20
573:24
580:6
651:14
652:5
656:10,10
668:23
681:9,9
683:23,24
695:21
**numeral**
363:4,6
617:16

_____
**O**
**O** 351:1
352:1 353:1
468:10,10
468:10
679:11
**oath** 353:17
**object** 609:4
**obligation**
505:17
506:10
523:24
589:6

598:17
600:14
**obligations**
507:22
508:9 523:3
**observed**
438:4
**obtain** 397:2
397:16
512:6
**obtained**
431:8
517:21
667:25
**obtaining**
659:11
**obvious**
581:16
**obviously**
617:25
647:4
691:20
**occasions**
382:1
439:24
451:16,24
**occupancy**
354:23
356:11
359:25
374:19
385:24
656:6
664:11
**occurred**
521:2,3,16
**ocean** 461:22
**October**
361:5,5
463:13
510:17
528:11
529:3
558:22
584:16
595:19
712:11,19
718:5
**odd** 386:9

**offense**
385:18
**offer** 631:7
742:14
**offering**
354:16
358:14
363:9 372:5
411:8
415:13,14
435:3 436:1
436:9
438:13
439:10,11
444:15
468:2
486:23
494:19
499:7
507:24
523:21
527:11,12
530:21
531:1,2,5
562:1,4
580:14,16
580:21,21
618:4,20
619:4,9
630:20
651:23
662:21
670:22
673:21
680:2 724:6
**offerings**
585:20
**office** 353:5
451:3 493:4
559:13
**officer** 353:9
**officers** 354:9
**offices** 353:4
**official** 434:7
**officially**
437:3
**officials**
671:20
**offshore**

582:13,23
582:24
588:24
589:15
600:9
601:20
602:25
620:17
621:5,6
**oil** 673:14
**old** 360:7,11
360:15,21
447:17
461:15
511:3,7,8
543:14
554:6
608:20
632:4 638:4
638:6 681:7
681:11
685:21
711:9
730:24
**once** 375:22
376:11
414:17
435:11
452:3,5
482:18
502:18
530:23
562:19
573:9
574:10
617:9
624:23
630:11
638:5
652:13
655:10
656:10
661:3,22,25
673:12
693:22
701:10,24
**one's** 433:9
658:22
660:7

**ones** 428:20
430:18,20
487:13
612:9 656:3
665:4
718:25
**ongoing**
493:2
574:10,12
**online** 661:25
**open** 463:13
519:18
533:19
573:21
663:20
664:1 675:3
675:19
**opened**
562:19
661:2
**opening**
463:14,16
464:3,19
533:17
664:3 675:5
735:11
**opens** 675:4
**operate**
426:21
517:14
518:8 574:9
582:11
745:8
**operated**
745:9
**operating**
408:12
573:4
**operation's**
674:16
**operational**
573:10
574:4,19
**operations**
389:25
547:13
**operator**
582:21
**opined**

360:11
**opinion**
437:15
489:18
**opportunity**
617:9
**opposed**
596:11
742:24
**option**
646:14,17
647:5
**oral** 382:14
442:2
**orally** 485:21
**order** 360:5
362:19
425:4 464:6
480:25
534:23
594:14
607:1
647:15
694:19
**Orders** 354:2
**ordinary**
508:12
**Orenstein**
428:17
432:18
**ORG** 650:25
**organization**
444:16
687:6,8
690:12
**original**
374:13
407:12
418:19
419:19
421:8
461:11
501:2
518:18
524:14,14
524:19
538:17
570:3
611:24

639:4
646:23
670:6 716:2
731:10
736:18
740:2,3,8
740:17
749:13
**originally**
360:6
429:16
446:10
513:12
550:3
553:17,19
579:3 610:7
632:23
681:22
**Orlando**
712:20
713:20
**out-of-poc...**
469:11
**outcome**
718:16,18
718:23
**outer** 443:25
**outing**
698:20
**outline** 355:3
355:5
**outside**
357:14
385:25
442:12
597:15
631:10
**outstanding**
665:22
689:19
**overlooked**
643:6
**overseas**
697:20,22
**owe** 383:22
535:6 589:5
633:5,19
731:9,12
745:24

**owed** 539:6
539:11
632:10,14
633:15,22
634:1
739:15,16
**owes** 741:6
**owned**
365:17
391:20
518:16
539:9,15
542:2,4,4,7
582:22,23
590:5
592:12
597:16
600:8 601:8
620:4 621:4
621:6
625:16
673:13
677:7,9
**owner** 582:20
**owners** 532:5
**ownership**
365:15
405:7,11
431:8 434:7
517:22
600:9 621:2
675:14
**owning**
430:13,14
448:13
592:3 621:1
**owns** 625:8
625:11,14

---
**P**
---
**P** 353:1
**p.m** 377:14
438:25
467:18
468:8,12
556:5 572:4
577:10
607:13
679:13

694:4
748:17,19
**package**
480:18,20
488:13
499:22
537:3
585:14
586:5
**packages**
488:9
**page** 376:20
376:20
377:2,4,8,9
390:21,24
399:20,20
399:21
408:5
412:11,17
412:20,22
413:1,2
414:9,12,21
416:24,24
420:23,25
446:5
455:15,16
473:22
481:2,5
483:20
494:8
516:24
517:18
520:22
522:24
536:19,25
543:22,23
544:19
557:3 562:6
562:6,24
563:1
572:15
636:15
637:2,2
640:5
641:13
652:6,24
666:10
667:23
671:17

674:25
680:18
683:4,5
685:4
700:21,23
704:25
706:6,8
718:2
731:19
732:5 736:1
**pages** 349:8
371:19
446:4,4
475:9
484:17
516:17
685:14
**paid** 402:8
407:19
415:8
484:13
501:4
503:24
504:21
514:7 516:7
517:10
534:18
548:25
551:12
590:19
593:11
594:6 597:6
597:9
632:11
633:9,14
637:21
644:14
645:18
648:11
701:25
708:3 713:6
715:4
721:13
722:7,15
728:4
738:20
739:16
741:15
**paint** 446:11

**painted**
595:25
**Palm's**
708:11
710:22
713:22
**pan** 615:9
686:21
**Panama**
448:15
**pants** 545:18
546:7
**paper** 411:21
473:19
549:17
551:8
552:12
589:3 633:2
732:5 740:9
**papers** 369:7
415:9
736:25
**paperwork**
511:19
575:16
617:22
717:10,19
**paragraph**
473:23
474:22
475:14
687:2
**parcels**
617:25
**Parent**
726:14
**parenthesis**
363:1 517:6
**Paris** 696:7
696:11,21
696:21,24
**part** 401:19
404:18,21
404:21
413:14
480:15
488:12
490:19
491:24

570:11
571:15
578:14
584:2 586:5
586:20
596:24
597:1
611:12,19
612:11,15
617:7
647:17
669:14,23
670:13
671:19
687:1
688:22
692:8,9
722:7,15,16
722:19
725:15,16
725:17
729:19,21
730:13
735:22
736:14
744:16,17
744:18
745:16
**partial** 728:1
**participate**
435:2,16
569:5 657:9
657:19
658:1,5
**participated**
619:3
658:25
**particular**
515:19,21
**particularly**
647:12
**partner**
682:5
**partners**
388:6,12
448:1 549:9
682:1
683:16
**partnership**

356:6 444:9
444:10
468:6
480:21,24
482:8,20
505:11
**parts** 508:15
672:7
**party** 613:14
719:24
726:17,20
727:3,3
728:1,2,10
**pass** 590:20
**passed**
481:10
537:9
**passionate**
450:12
462:13
467:12
**path** 744:7
**pathetic**
660:22
**pay** 356:5
374:13
392:18
407:20
449:20
488:18
490:20
491:19
492:24
493:14
497:4
499:12
500:25
504:22
505:20,22
506:1,2
519:1 520:7
522:25
535:11
567:3
569:24
573:7
593:22
597:9
609:22

646:2 647:2
656:7
703:20
709:24
722:4,13,17
724:23
727:16
728:5
738:18
744:10,11
**payable**
592:22
**paying**
402:20
513:16,19
515:15
723:4
**payment**
494:13
497:2
513:19
623:14
649:14
704:16
**payments**
402:18
494:15,21
494:24
495:5,10,17
495:18,25
496:21
497:2 503:5
503:8,19
515:9
601:17
623:18
**Payne** 355:23
357:23
359:6 360:4
360:19,23
361:4,19
362:12
370:3
387:15
396:7,9
417:24
453:25
455:10
465:13

467:24
499:24
536:2
570:11
571:6,15
606:18,19
629:17,25
630:16
659:21
680:19
684:4
746:16
747:5
**payroll**
643:19
708:18
**PB** 597:6
599:20
701:3
**PDF** 553:6
556:14,19
557:15
**Peachtree**
510:20
**peaked**
672:11
**peek** 473:9
**peer** 362:19
**pending**
477:1
673:23
**people** 364:5
364:6,6,11
364:18,23
364:24
365:3
369:15
373:2,3
375:11
385:25
391:2
431:25
433:9 435:7
443:19
447:8
448:11,18
452:21
453:1
454:25

461:6 467:1
489:14
493:13
497:23
501:10
544:12
562:22
575:21
579:7,12
588:3
615:22
676:16,20
676:23
678:20
680:25
682:20
685:13
687:13
692:4 695:6
695:7 720:3
722:9,12
723:9,10,14
723:22,24
723:25,25
724:3,25
725:3,7
742:25
744:7
745:10,12
**people's**
660:20
**percent**
390:4,14
401:9
412:10
414:8
415:17
416:16
419:10
433:23,23
441:8
443:14
447:5
478:25
484:13
486:19
487:7
491:22,23
492:20

493:7 495:4
499:1
500:17,25
501:4
502:10,11
503:1,16
504:1 526:3
544:2
547:21,24
551:14,15
553:16,17
563:9,14
564:15,16
566:10,11
567:7
576:22
580:2
589:12
603:21
604:25
615:14
627:11
637:21
644:17
646:25
650:19
652:15
660:18
662:25
666:1
670:23
676:23
679:3 691:2
698:6 700:8
700:10
706:4
722:10
723:18
725:18
727:22
**percentage**
433:25
564:10,13
**perfect** 745:4
**perfectly**
632:17
**period**
475:24
479:12

532:15
538:13,14
539:19,22
547:20
**perk** 515:5
515:11
**perks** 514:13
514:14,18
515:23
516:1
**permanent**
664:8,12,17
665:21,25
**permit** 519:9
519:10
533:18
**permits**
426:24
517:12,17
517:19,25
518:5
527:24
**Perry** 677:6
677:16
**person**
364:25
372:23
389:15
390:6
404:24
408:18,23
416:17
436:7
437:16
452:15
454:24
460:12
609:9,12
619:1
638:23
643:19,20
708:8
728:25
**Persona**
737:3,6,25
**personal**
357:11
384:8,19
385:9

574:24
583:13,20
584:10,18
587:4
588:10
596:8 603:3
624:9,11,12
626:2,7,15
626:21
638:17,19
638:21
704:3
715:21
716:4
721:11
725:18
727:9,11,21
728:8,9
729:22
734:19,19
735:2
743:16
746:7
**personally**
384:6 438:3
451:23
501:12
595:13
596:15
620:3
621:24
693:20
741:17
**perspective**
354:17
521:23
580:1
653:20
**pertaining**
519:24
**petition**
479:8
566:19
661:24
673:24
**petitions**
489:5
567:15
568:13

**petrified**
440:12
**PG'ed** 553:22
**PH2** 362:20
362:23
363:1,2,17
364:1 365:6
**phase** 580:12
581:5 586:9
586:11,11
586:20,21
611:21
612:15
613:9
615:21
617:16,20
618:13,21
619:5,10
703:9
**phone** 390:12
404:25
408:19
416:17
479:1 609:9
643:20
**photo** 559:10
559:10
**photos** 562:2
**Photoshop...**
561:19
**PHR** 613:4
613:17
614:3
**physically**
442:15
461:20
612:11
**piano** 558:4
559:9,11
**pick** 390:11
535:13
607:20
725:2
**picked**
643:20
**picture** 365:5
365:8 453:3
456:8,9
458:4,5,12

458:18,24
459:5,10
462:17
560:1
670:15
**pictures**
359:5,7,9
379:7
454:19
457:23
458:2,15
557:23
558:3,6
559:3,5,13
559:15,16
559:20
561:10,18
561:18,21
572:16,20
572:22
660:21
697:2,3,15
699:24
**piece** 411:21
431:4
433:21,24
447:4
449:11,12
473:19
630:22
645:16
676:15
732:5 740:9
**pieces** 422:21
619:7
**pins** 440:16
**pizza** 642:9
**PKF** 404:6
408:10
427:8 582:7
**place** 349:9
394:16,20
518:5,13
522:1
**placed**
357:25
400:14,17
479:21
507:10

530:23
590:12
597:14
**places** 524:13
673:20
**placing**
604:22
**plan** 369:15
370:12,13
371:14
380:24
381:2,3,6
381:13
406:8
409:14,15
409:18
410:3,5,10
410:19
411:4,11
412:23
414:10
416:23,25
418:19,25
464:4 480:7
480:25
481:11,23
494:20
514:17
535:3 580:6
591:23
612:21,25
613:10
619:7 631:9
654:19,21
654:25
655:6,18
656:12
657:15,20
657:21
658:3,11
674:22
677:12
678:3
679:23
686:19
743:11
**plane** 574:11
**planning**
495:25

675:3,7
676:2
**plans** 360:18
365:10,11
405:25
529:2
546:15
612:4,20,22
613:5
617:21
618:1,8,9
675:12,14
**plate** 521:19
715:20,21
715:23
716:4,4,8
716:20
**play** 404:4
431:10
464:24
**played**
723:20
**plays** 671:4
**please** 420:7
465:10,12
510:19
528:8 577:4
608:23
613:3,7,18
614:6,7,20
614:22
652:4 688:5
702:17
716:10
727:15
**pleasure**
596:2
**pledge** 549:9
599:7
725:13
**plenty** 746:8
**plug** 547:12
547:14
548:2
**plugged**
548:20
564:15
**plumber**
730:9

**plumbing**
421:25
664:10
727:17
730:8
**plus** 392:15
406:24
407:6,10
466:25
471:14
489:19
490:11
554:6
555:10
642:9
648:12,13
648:14,22
649:10
682:3
745:24
**pointed**
386:17
649:13
**pointing**
412:20
**points** 356:12
533:21
635:12
688:8
**political**
560:9,25
562:2
**polo** 630:25
631:3
**Polynesian**
447:2
**pool** 456:10
631:10
**pop** 440:9
**portfolio**
661:16
666:11
**portion**
384:13,17
385:12
400:4 622:8
622:9 722:4
**portions**
671:22

Page 785

| | | | | | |
|---|---|---|---|---|---|
| **Porto** 719:21 | **PPD** 656:22 | 585:18 | **President** | 355:20 | 674:3,14 |
| 719:25 | **PPM** 357:2 | **prepared** | 462:18 | 360:16,22 | 683:23 |
| **position** | 358:13 | 408:7 | 590:7,9 | 381:19 | 692:9 706:8 |
| 605:15 | 370:14 | 481:15 | 620:14 | 387:8 388:3 | **priority** |
| 606:3 | 371:14,24 | 509:3 | 669:13 | 391:9,14 | 682:1 |
| 617:18 | 379:6 480:2 | 528:25 | 723:23 | 404:19 | **privacy** |
| 668:7,16 | 480:3,3 | 529:11 | **press** 442:11 | 405:12,18 | 669:7 |
| 743:16 | 482:13,16 | 546:23 | 442:16 | 406:13 | **private** 356:8 |
| **positive** | 483:6 578:1 | 548:4,5,6 | **pretend** | 413:17 | 550:8 |
| 555:1 | 604:7 | 548:11 | 707:10 | 414:18 | 551:23 |
| 573:10 | 609:23 | 549:22 | **pretty** 356:12 | 415:8,19 | 618:5 |
| 717:3 | 654:10,12 | 550:11 | 379:7 393:3 | 419:11 | 667:25 |
| **posted** 685:2 | 654:12,20 | 579:10 | 393:5 | 440:23 | 675:21 |
| **potential** | 655:23 | 658:15 | 406:18 | 460:14 | **privileges** |
| 364:5,6,12 | 656:9 657:2 | **preparing** | 415:4 | 529:12 | 611:8 |
| 364:19,23 | 657:3 679:1 | 434:22 | 467:12 | 544:8 546:4 | **pro** 420:16 |
| 365:2 373:1 | 679:7 | 442:16 | 485:5,14 | 548:17 | **proactively** |
| 373:3 | 686:20,20 | 656:9 | 487:5 | 650:4,8,17 | 509:24 |
| 394:23 | 721:18 | **prepay** | 554:22 | 666:9 676:8 | **probably** |
| 395:20 | 724:12 | 495:22 | 682:18 | **prices** 360:13 | 360:20,20 |
| 435:5,19 | **PR** 725:15,16 | **prepayment** | 685:13 | 608:16 | 362:4 |
| 436:10 | 725:17 | 496:3 | 689:7 | 614:9 | 363:16 |
| 438:18 | 737:3,7,8 | 498:25 | 699:23 | **primarily** | 366:2,4 |
| 451:7 | 737:10,12 | **preselling** | **previous** | 445:21 | 367:9,22,22 |
| 454:13 | 737:25 | 578:5 | 535:24 | **principal** | 368:18 |
| 462:25 | 738:4,22 | **present** | 538:2 | 430:12 | 377:18,25 |
| 465:1,3 | **pray** 743:19 | 402:20 | **previously** | 566:21 | 378:4 |
| 466:3 468:3 | **pre-payment** | 486:4 | 353:15,22 | 567:17 | 379:20,21 |
| 479:5,11 | 494:25 | 496:18 | 373:9 | 570:22 | 391:2 |
| 526:4 527:2 | 496:16 | 498:25 | 376:12 | **principals** | 396:25 |
| 527:14 | **precedent** | 502:17 | 378:18 | 433:4 | 397:1 |
| 528:10 | 521:1 | 536:7 | 437:14 | **printed** 398:2 | 398:10,21 |
| 529:21 | **prelim** 613:5 | 598:20 | 476:5 480:7 | **prints** 529:2 | 410:20 |
| 530:17,20 | **preliminary** | 666:12,17 | 499:18 | 618:22 | 421:8,8 |
| 617:22 | 427:13 | 668:6,16 | 510:15 | **prior** 383:6 | 422:6 427:3 |
| 677:14 | 613:8 | 690:14 | 553:1 | 427:14 | 430:6 |
| **potentially** | 672:19 | **presentation** | 564:18 | 444:22 | 449:12 |
| 462:20 | **prepaid** | 422:17 | 640:1 | 446:17,20 | 451:18 |
| **Potomac** | 485:23 | 681:17 | 660:13,23 | 480:19 | 453:3 459:8 |
| 383:23 | 487:2 | 683:3,4,10 | 661:19 | 497:11 | 462:8 |
| 385:14,15 | 495:14 | **presentatio...** | 700:14 | 500:20 | 464:18 |
| **power** 565:7 | 496:8,11 | 422:22,25 | 709:13 | 521:9,16 | 466:18 |
| 565:14 | 497:20 | 445:21 | 719:15 | 523:7 | 472:12 |
| **powerful** | 499:12,14 | **presented** | 721:25 | 587:15,17 | 473:1 |
| 680:25 | 500:13,16 | 681:10 | 730:3,10 | 587:18 | 479:13 |
| 682:20 | 502:12,15 | **presently** | 731:17 | 608:3 | 480:11 |
| **PowerPoint** | 502:21 | 517:15 | 732:19 | 616:19 | 495:23 |
| 422:17 | 504:2,15,19 | 518:10 | **price** 355:12 | 658:11 | 512:8 |
| 445:20 | 504:21 | 681:10 | 355:13,14 | 662:23 | 548:19 |

SEC_000901

553:25
565:15
575:5
608:12
609:6 618:3
634:25
635:7 636:4
636:6,7
638:10
642:13
690:21
697:3
701:20
702:8 705:8
720:22
723:21
729:6,18,19
736:21
745:7
**problem**
553:3 644:9
**problems**
381:12
**proceed**
636:16
663:25
**proceeding**
353:10
354:4,10
**proceedings**
749:11
**proceeds**
503:23
514:19
516:12,13
585:21,23
593:9 594:5
**process** 436:1
438:7,16
444:4
479:15
618:11
687:9
**produce**
364:1,3
365:5
597:24
604:15
**produced**

359:15
363:25
687:7
719:18
730:15
**product**
444:4
456:22
**production**
609:4
**professional**
443:19
**profile** 690:7
**profit** 407:11
555:9 594:1
594:3
596:15
647:2
**profits**
648:19
672:6
**program**
422:13
506:3 562:9
**progress**
359:7,8
**project**
355:20
357:12
362:20
365:12
366:15
370:23
371:18
381:18,25
382:5 383:2
383:8,22
384:1,5
386:6,7,19
387:4
388:19,21
391:10
417:21
422:12
443:10,16
443:17
445:6
448:20
455:7 462:7

463:21
465:6 467:4
469:11
505:20
534:4 535:5
536:23
540:25
550:18,23
551:25
569:18,24
570:7
577:20
579:19
580:18
581:24
582:2 583:9
583:11
586:1 587:8
587:18
594:13
614:25
615:2,6
617:19
619:2 627:7
627:13
634:21
662:11,12
663:7,19,24
665:10,11
665:19
667:20
671:16
676:10
678:8
687:17,20
701:21
703:10,17
708:10
729:11
730:6,7
734:9,17
744:12
745:16
**project's**
552:1
**projected**
586:18,19
**projection**
359:24

360:1
491:12
545:25
578:6
**projections**
408:13
613:6
618:10,15
**projects**
374:24
428:18
430:9
432:25
434:3
461:25
585:24
586:24
587:19
663:21
665:13
671:21
677:14
744:23
**promise**
417:23
418:1
545:10
651:2
**promissory**
505:6
**promote**
561:9
673:10
698:22
725:1
**promoted**
726:2
**promoting**
698:14
723:8
**proof** 431:24
535:4
546:25
**Proofreade...**
749:1,17
**prop** 575:23
578:15
**proper** 498:3
664:13

**properties**
485:11
523:4,6
599:5
689:20
691:9,10
739:21
740:19
**Properties's**
741:9
**property**
388:5
391:20
392:21
400:13,15
400:18
493:2
517:14
518:9
519:22
525:11,22
525:25
539:23
598:21
604:22
607:4,7,8
617:1
619:12,13
619:14
620:2,3
624:24
629:3 630:3
630:22,23
630:25
631:2,5,10
631:17
632:2,13,15
632:22
639:10
645:5,16,21
646:16,23
647:3,7,11
647:24
648:7 651:3
651:19
652:13,14
679:25
681:21
682:2,3

689:15
691:10,14
691:16
720:8
742:19
**proposal**
358:7
702:20
**propose**
387:1,3
**protected**
530:12
682:5
**proud** 686:8
**prove** 713:5
**provide**
359:5 360:3
365:14
368:15
410:12
420:20
426:10
427:1
449:14
450:8
495:14
505:7 506:6
507:25
508:6,22
509:6,13,14
510:21
511:10
512:20,25
513:2 559:5
561:11
644:3
656:10
658:17
670:15
716:11
729:4 737:3
**provided**
354:17
355:23,25
356:17,18
356:19
357:23
359:14
361:9 368:6

368:8,17
398:3 399:4
409:7
421:10
426:17,23
432:10
434:12
449:23
468:3
473:24
508:16
514:24
523:21
530:1
543:23
572:24
643:11
656:9 666:8
669:4 683:5
686:22
687:12
734:4,11
**provides**
615:5
**providing**
357:7
422:24
509:18
**provision**
507:5,6,13
522:16
525:5
**provisions**
507:21
517:1 521:4
**prudent**
606:6
**pry** 694:19
**public** 394:13
518:14
519:25
526:22
**publish**
442:15
**publishing**
442:7,11
**puff** 432:22
432:22
**puke** 559:1

**pull** 497:12
497:12
694:18
**pulling**
454:19
**purchase**
355:12,13
355:14,20
363:13
381:19
387:8 388:3
391:9,14
404:18
405:12,18
406:13
410:21
412:13
413:16
414:17
415:8,18
419:11
430:25
440:23
543:17
544:8 546:4
548:17
589:19,23
606:12
607:2
608:16
615:8 616:8
616:12,21
617:25
619:13
621:14
623:12
624:16
629:17
631:23
632:2
637:24
640:11
646:15,15
649:17,20
650:4,8,17
651:9,11,19
662:17
708:12
734:18

**purchased**
405:22,24
541:1
615:20
631:8
633:25
634:3
681:22
682:11
713:10,18
713:19,21
713:24
714:9 719:1
719:5
**purchaser**
590:2
**purchases**
430:11
573:2
**purchasing**
639:10
720:4
**purporting**
540:18
**purports**
539:21
566:19
**purpose**
694:16
722:3,20
**purposes**
353:9
354:10
618:5 742:9
**pursuant**
349:15
353:14
517:20
518:18
521:3
**pursued**
631:9
**purview**
488:22
489:17
**push** 463:22
**pushed**
433:24
**puts** 382:18

470:7
**putting** 387:4
431:17
443:7
563:25
574:25
608:16
627:18
660:20
680:6

**Q**
**QB** 512:3,4,7
512:24,25
513:1
**quarterback**
439:25
**quarterly**
402:18
495:5 509:2
**questionna...**
367:19,21
378:24
379:3 483:1
483:3
**questions**
386:16
409:18
411:22
423:4,8
428:14
471:4,25
474:7,19
536:20
540:10
555:15
694:11
717:12
731:4 742:2
746:25
748:6,10,12
748:16
**quick** 393:8
403:8
472:12
557:9 577:3
681:8
**Quickbooks**
510:19

513:9
694:14
**quickly** 408:7
557:4
**quit** 535:7
**quotes**
371:20

**R**
**R** 353:1
468:10
**raise** 356:2,3
370:18
371:2,3
386:4 444:6
444:9
484:15
485:17
500:15,18
500:24
502:6,7
550:4,7,19
552:8
568:16
604:7 615:2
662:11
723:6
**raised** 550:14
551:18
566:9,10
611:11
663:8
693:15
742:16
**raising**
357:13,17
357:24
374:20
485:14
489:13
578:18
580:4
678:18
**ran** 643:21
712:4
**range** 672:6
**rate** 397:19
401:3,15,16
483:21

484:24
487:6
490:10,22
490:23
491:9 493:8
494:7
496:18
497:21
502:2,22
**rates** 354:23
354:24
356:11
360:1,13
374:19
385:23
427:20
487:21
**Raya** 749:9
**RB** 400:2
701:5,7
**RD** 701:2,3,8
701:11
**re-read** 424:3
**reached**
502:15
**reacquire**
647:24
**reacquired**
446:23
**read** 362:5
374:8,22
375:1 379:6
381:1,3,5
398:7
400:11,24
401:18,20
401:23
402:11
404:17,20
411:17
412:1,6,6,9
412:10,10
417:12
432:19
433:14
437:24,25
457:25
464:14
469:13

476:3
480:11,13
480:14
481:16,19
481:24
482:2,4,5
482:13
483:2,7,25
484:2,4,6,8
484:10,21
484:22
485:12,16
486:5,23
487:3 489:2
489:6
490:10
491:6,8
520:6,9,12
520:14,17
522:8
523:12
542:1
565:24,25
568:5 571:7
599:2 606:7
610:20
612:21
614:11
652:22
654:20
655:11,17
669:16
680:3
692:12
707:9
724:11
745:6
**reading**
375:4,13
402:14
455:12
485:16
492:11
509:16
520:19
526:21
528:12
532:14
569:22

608:19,24
608:25
701:22
**reads** 520:12
**ready** 617:22
618:12
**reaffirmed**
587:10
388:20
390:3
405:18
427:16,16
442:1
472:11
509:22
514:21
561:18,20
577:3 596:1
597:16
598:21
631:12
737:12
744:22
**realize**
743:13
745:2
**realized**
405:11
505:23
**really** 354:19
355:7 356:4
357:2
370:16
379:8
382:19
386:7
390:10
402:9,22
425:2
427:22
430:21
431:14
433:25
438:20
440:14
442:13,20
449:5,19
451:4 471:1

475:3 479:2
485:18,25
487:11,12
487:17,19
487:20
488:24
491:7 498:6
505:20
513:20
524:16
526:10
535:21
543:8,17
552:12
555:12
565:25
569:2 570:4
571:21
580:8
598:13
626:4
637:16
638:2 639:5
644:18
649:9,9
653:23
686:15
692:3
707:20
717:24
725:2
736:16
741:14
743:6,24
744:17,19
744:21
745:9,15
747:1
**Realty**
383:23
**reason**
367:24
378:1
379:22
390:19
471:22
533:9 534:8
556:16
579:23

588:23
590:1,4
715:24
716:16
**reasonable**
374:15
378:15
408:8 575:6
575:12
**reasoning**
427:18
**reasons**
690:21
**recall** 361:10
361:13
380:7
390:13
425:24
426:6
427:24
451:4
455:22
458:1
462:14
464:1 465:1
465:19
466:16
471:1
477:19
482:10
510:25,25
513:25
530:7 558:5
561:12,13
622:7
701:15
**recalled**
353:21
**receive** 367:7
367:12
369:6
373:15
374:24
376:14
377:23
378:2,20
379:23
396:16
420:12

423:20
469:2
528:13
562:10
605:4,10
667:20
693:7 739:6
**received**
362:11
378:4,23
380:18
400:7 403:4
403:24
404:2
409:15
416:21
417:17,19
420:2,6
453:15
457:4,11
477:18,20
528:6 553:1
553:5 558:7
559:19
564:23
588:9
618:18
624:4,22
654:24
659:23,25
664:7
671:21
680:20
709:16
719:2 744:9
745:22
**receiver**
593:20,20
594:13,20
596:20
622:25
623:2
**receives**
571:9
**recess** 403:13
438:23
467:16
468:9
476:17

556:3 572:4
577:8
607:11
679:10
694:2
**reciprocal**
676:24
**reciprocity**
675:2,13
**recognize**
458:20
482:15
730:14
**recollect**
473:11
**recollecting**
609:17
**recollection**
380:22
425:18
470:15
525:20
658:2
702:18,24
737:24
**recommen...**
570:19
**reconcile**
475:20
**reconciliati...**
414:13
473:24
474:22
745:22
**record** 353:3
353:25
354:5
394:10,14
403:8,12,15
403:19
405:23
407:4
412:25
429:23
438:22,25
439:6 451:6
467:15,18
468:7,12,16
476:16,20

476:24
512:7 514:4
518:14
524:9
530:19
539:24
541:14
545:15
556:2,5,9
557:7
561:11,17
572:3,7,11
577:7,10,14
599:2 606:8
607:10,13
607:17
624:8 671:8
674:13
679:9,13,19
693:5 694:1
694:4,8,18
698:1
726:24
748:17
749:13
**record's**
524:10
541:24
574:2
649:13
**recording**
749:15
**records**
510:13
545:11
595:5 640:9
643:5
660:12
688:11
**red** 712:2
735:10
736:1 737:1
**redecorate**
573:12
**redeem**
562:17
**redo** 447:18
450:13
**redundant**

538:7
**refer** 614:21
**reference**
530:4
555:21
**referring**
377:4
433:13
545:16
630:24
668:19
**refers** 663:12
663:13
**refinance**
569:24
571:1,3
**refined** 687:7
690:13
**reflect** 354:1
354:5
606:10
716:13
**reflective**
689:7
**refresh**
380:22
408:15
425:17
445:14
453:22
477:3
658:24
685:6
702:24
737:24
**refreshes**
702:18
**refund**
432:15
564:24
565:3 566:2
566:4,17,18
568:8
571:24
**refunded**
567:20,21
567:24
568:2,3
**refunding**

566:21
**regarding**
417:20
488:5 532:6
576:19
672:14
746:18
747:3
**regardless**
392:17
419:6
**regards**
629:17
**Regency**
429:10
447:7
**regional**
353:4
665:12
**Regions**
588:15
641:2,12
**register**
715:8,9
**registration**
715:17,25
**registry**
717:21
718:21
**regret** 562:25
**rehab** 582:15
591:19
595:25
596:1,4
638:2
**rehabilitate**
645:4
**reimbursed**
581:6 592:7
734:21
**reimburse...**
512:1 722:7
**reimpose**
535:16
**Reitz** 436:19
483:14
584:12
746:16
**related**

423:17
430:8
477:20,24
488:1
527:23
528:6
529:14
532:16
533:1
564:24
570:22
571:5
576:10
610:11
618:21
629:2
631:22
637:24
638:19
639:10
644:10
685:8
688:25
692:22
701:19
702:23
704:13,18
724:9
728:20
729:1,11
730:6,7
**relates** 363:6
374:1 571:4
**relating**
729:23
**relation**
597:17
**relationship**
631:6
645:14
693:21
**release** 730:9
**relevant**
379:8
412:17
599:1
613:23
679:3
742:11

**relied** 484:11
484:12,18
**rely** 484:9
**remain**
353:17
**remaining**
601:3 615:3
615:12
622:25
683:17
**remembers**
561:16
**remind**
747:20
**remote** 512:3
512:24
513:1,8
**remove**
424:23
**removed**
657:17
695:25
**rendered**
704:18
706:1
**renderings**
359:6,11,13
**renovate**
645:4
**renovation**
441:11,12
441:14
649:17,20
706:11
724:8,10,20
**renovations**
441:16
640:11
**renowned**
559:19
560:19
**rent** 356:14
385:23
656:5
**rents** 523:2
**repaid**
503:22
**repair** 721:3
**repay** 567:14

568:13
622:20
**repaying**
402:5
**repeat** 419:5
**rephrase**
588:14
**report** 408:11
408:11
531:13
553:7
556:23,24
557:12
586:19
641:13
658:15
666:5,9
694:14
702:20
703:12,21
**Reporter**
361:17
366:24
368:23
369:25
372:10
379:11
380:10
387:14
393:15
396:4 403:2
419:25
423:10
429:7 432:3
444:21
453:13
468:19
472:4 477:7
527:22
610:10
680:10
702:11
738:24
**reporting**
349:24
749:15
**reports** 508:6
508:17
**represent**

386:5 442:6
442:23
563:19
579:15
664:17
730:22
731:9
**representat...**
441:6 443:7
479:10
555:13
604:24
627:10
**representat...**
402:1
504:24
506:5
516:18
517:3,7
599:3
**represented**
415:3,5
584:15
599:4 609:1
675:24
704:7
**representing**
411:12
505:3
529:24
554:8 643:9
742:24
**represents**
475:2 517:5
652:16
**repurchase**
631:23
**repurchased**
446:22
**repurchasing**
446:17
**reputation**
684:24
685:19
686:14
**request** 404:3
518:17
522:2 526:7
643:7

**requested**
409:24
410:1,18
523:8
**requesting**
512:21
728:25
**required**
517:12,17
517:25
**requirement**
517:21
**requireme...**
519:21
520:4
**requiring**
423:6
**research**
684:6
**resend**
511:20
**reserve**
598:22,23
**reserves**
523:9 524:1
**residences**
362:24
363:3,6
580:24
581:13
610:12,21
611:2,16,17
613:4
614:22
615:1,18
617:20
618:3
**residual**
447:5
**Resort**
447:20
**respond**
369:18
404:23
408:6
410:14
417:1 445:7
470:6
608:10,11

614:6,10
655:5 748:1
**responded**
369:23
478:10
608:14
613:7
**responding**
405:1 655:2
**responds**
614:1
**response**
369:21
373:19
404:4
408:21
409:14
410:2,3,4,8
410:13
411:11
417:17
437:23,23
445:9 474:1
609:3,18
656:22,24
671:17
674:13
**responses**
428:1
474:17
609:21
**responsibil...**
384:7
722:14
**responsible**
395:10
402:5
437:16
438:17
439:13
742:14
744:16
**rest** 385:19
404:20
490:21
550:2 651:5
664:12
**restate**
550:10

**restaurant**
456:10,12
529:4 618:6
**restrictions**
517:13
518:7
**resume**
450:16
**resuming**
353:11
**retainage**
538:10,12
**retainer**
686:12
692:24
**retrospect**
635:7
691:22
**return** 397:4
487:1
571:10,13
615:6
**returned**
687:6
690:12
**returning**
732:17
733:4
**revealed**
528:19,25
**revenge**
743:18
**revenue**
368:3,18
568:23
569:1 578:7
604:16
**revenues**
582:1,4
**review**
354:15
374:3 378:6
378:10,13
394:10
398:7 403:9

405:23
409:6 411:9
427:2 509:9
614:6,8
640:9
657:23
673:8
**reviewed**
380:24
508:4
**reviewing**
435:16
536:6,15
**RFE** 404:4
404:15,16
404:23
408:6,21
410:3
411:11
415:10
417:1,19
437:24
654:24
655:2,5
**RFK** 404:6
**rich** 669:7
**rid** 660:5
685:21
**ride** 454:4,5
454:16
**ridiculous**
365:4
513:18
**right-hand**
638:23
**rights** 388:12
598:20
683:16
**rising** 631:12
**risk** 567:7,9
568:15
601:5
**road** 505:25
689:13
712:9
721:21
**Rob** 728:17
728:19
**Robb** 590:7

591:7,9,10
591:11
**Robert** 349:7
351:4
353:12,20
424:21
707:9 749:4
**ROBERT...**
700:24
**Robin** 359:18
359:20
**role** 404:3
430:8
431:10
447:24
448:9,20
656:1
658:10
659:11
**roll** 645:20
**rolled** 534:6
**Rolls** 708:2,3
711:9
**Rolls-Royce**
572:17,24
573:5,15,22
612:7,12
698:21
719:1,21,24
720:25
**Roman** 363:4
363:5
617:16
**roof** 631:11
**room** 353:24
354:11
360:14
367:10
368:21
452:20
456:17,18
476:18
482:23
529:3
545:22
546:17
611:7
616:18
**rooms** 385:23

Page 791

656:5
**round** 692:7
**rounding**
543:5
**Royal** 476:5
495:8
507:10
510:7,13,19
511:3,4,6
511:20
518:16
526:14
532:10
542:3 554:7
566:20
567:12,21
568:7 569:1
588:16
590:3,13
597:17
625:14,22
662:23,24
708:11,15
710:19,22
713:22
715:22,23
716:13
**RUB** 728:19
**rugs** 642:20
**rule** 576:15
**ruled** 593:6
**rules** 576:15
**run** 496:17
544:10
**running**
395:9 440:1
442:15
486:4
491:25
526:20
534:19,21
692:13
**runway**
677:20
**Russian**
455:20
**rvmatt22@...**
361:20
367:1

387:16
468:20
**Ryan** 364:5
364:10,24
364:25
396:8,18
397:3,15
398:12,14
399:17,25
399:25
400:3,8
401:20
402:13
467:22,22
488:16,21
505:13,13
510:16,18
510:22
511:18
512:20,25
513:13,21
528:9,21
529:5,11,16
530:5 565:6
592:21
593:2
657:16
691:23
693:7
695:24
701:5 718:7
738:9
**Ryan's**
372:23
397:2
_____
**S**
**S** 351:1 352:1
353:1
468:10,10
468:10
679:11,11
679:11
749:9
**S-T-O-W-E**
675:9
**Sadler**
738:22
**safe** 494:3

**safety** 519:25
**sale** 430:22
430:23
589:19,24
594:2 617:3
617:4 626:3
655:14
672:7
698:22
707:1,20
715:16
716:9,12
718:8,10,20
**sales** 460:13
574:14
575:16
578:7 579:2
579:8,10
586:16,17
586:18,19
614:3
**salesman**
505:24
**samples**
456:18
**Samuels**
728:17
**Sardinia**
578:5
696:14
698:4,11,14
719:25
**sat** 384:21
396:23
**satisfaction**
505:9 506:8
659:22
**satisfactory**
523:10
**satisfy** 524:7
**save** 694:19
**saw** 355:19
371:12
375:22
380:1
381:12
386:8 399:7
400:11
404:15

406:8 415:9
416:9,14,24
418:2,25,25
419:3,6
440:14
449:14
462:17
467:20,23
472:16
480:7,8
483:9,11,13
483:19,21
487:25
495:11,12
525:17
554:1,12
556:17
558:12,22
558:24,25
560:15,20
561:2 634:7
647:16
654:23
656:19
658:7
698:13
708:21
717:3,8
**saying**
364:25
366:6,9,10
371:10
377:15
382:4
394:19
410:18
413:10
426:4,5
437:12
441:11
475:4,5,6,7
497:10,23
509:24
510:2
513:16
529:25
535:5
539:13,20
540:24

542:6 551:9
580:22
581:10
592:17
601:2 604:8
605:3 633:4
649:3 650:7
653:6 691:3
715:19,21
715:24
716:16,20
**Scalley** 427:8
**scans** 716:9
**scared** 506:3
**scenarios**
653:2
**schedule**
537:22
**schematics**
360:18
**Schmidt**
579:4
669:11
670:5
685:15
**school** 726:7
726:10,12
**Scott** 728:14
**scream**
440:10
**screamed**
614:16
**sea** 691:7
**season** 445:5
663:22,23
664:1
676:24
**seasons** 447:2
**seats** 712:2
**SEC** 353:5
361:22
367:2 369:1
370:4
372:13
379:14
380:13
387:18
393:18
396:11

403:5 420:3
423:12
432:7
444:25
453:16
468:22
472:9
477:11
528:1
531:17
536:13
610:13
680:13
688:1
702:13
737:19
739:1 742:8
**SEC-MR-...**
617:11
**SEC-MR-...**
652:25
**second** 362:5
375:18
376:15
394:9,11
452:18
454:3
456:11,12
473:23
474:22
475:13
476:16
494:7 519:6
522:25
528:13,17
545:14
556:2 571:4
571:7 572:2
577:5
578:10
587:13
615:13
637:2
641:11
645:11
654:10
660:5
680:22
687:2

700:22
731:19
742:18
**secondary**
491:20
**secret** 678:7
678:9
**secretaries**
638:20
**secretary**
638:22
**secrets** 527:6
**section**
412:13
511:22
521:4
538:17
**sections**
410:4
**secure** 563:9
597:13
598:11
**secured**
598:18
**Securities**
349:1,9
350:3,7
353:8
749:11
**security**
505:6,7,8
505:12
506:7,8,14
506:21
598:17,19
599:7 615:5
**seeing** 376:5
376:10
400:5
418:18
455:25
482:9,11
558:5
723:10
730:24
**seek** 662:11
**seeking** 463:1
463:10
519:2,3,3

615:2
**seen** 362:2
416:19
445:23,25
480:3
483:16
517:2
529:25
530:1
555:19,22
557:17,20
578:1
589:24
598:3
612:23
619:3 658:8
659:4,6,13
659:15
660:17
661:1,14,21
662:4,8
681:15
720:1,5
730:12
**segue** 535:23
**seized** 599:24
**seldom**
390:10
**self-perfor...**
642:12
**self-publis...**
442:10
**sell** 362:19
387:10
409:21
415:25
419:12
491:13,14
551:7
575:23
582:7,8
589:3 593:7
617:1
642:23
647:11
648:6,8
671:22
672:24
724:13

**seller** 551:5
622:16,20
**seller's**
601:21
**selling** 431:19
575:18
579:11,13
693:8
**semi-annual**
508:2
**semiannual**
509:6
**seminars**
673:9,18
**send** 359:8
360:18,22
369:13,23
370:7
372:18
373:15,19
396:16
397:7
408:10
420:12
421:15
423:20
432:12
437:21
450:22,24
482:17
488:6
497:24
498:1,10,10
499:21
522:3
528:13
571:18
608:12,14
609:6 613:9
634:12
635:17
636:4,17
637:23
639:13
697:17
**sending**
360:25
397:5 422:2
511:15

521:16
528:20
579:22
584:10,11
624:9 633:4
634:22
637:25
**sends** 454:1
467:24
571:6 607:4
613:12
614:19
630:16
631:25
636:10
718:21
**sense** 382:10
383:3
407:17
414:4,5,7
415:22
416:1 444:1
471:8
485:19
489:17
493:22
526:23
543:15
550:20
555:11
575:24
635:6,10
649:24
704:13
**Senses**
426:20
**sent** 355:9
372:3
373:22
380:18
382:19
391:3 398:9
398:11,14
398:19
399:2,17
403:3,24
410:8 420:1
420:6
425:16

453:15
465:10
478:3,5,10
478:12
479:1
482:15
497:15
499:7
502:17
503:15,24
503:25
505:12
510:24
521:19,25
527:13
528:6 529:9
556:18
564:22
565:22
610:22,23
629:4
631:18
632:4
633:10
636:6,21,23
636:24
637:4
643:11,22
658:20
664:15
670:17
678:3 688:8
688:20,25
689:1,11
705:19
707:14,16
728:11
731:21
733:3
734:25
736:15
741:4
**sentence**
522:25
523:12
663:24
668:11
671:18
**separate**

436:18
533:18
578:20
580:14,15
582:3,13
589:2
600:17
611:9,23
612:1
613:19
628:18
650:23
721:17
727:20
**separated**
695:15,18
**separately**
586:13
619:9
**September**
680:11
**series** 403:23
445:20
528:5
536:11
629:2
719:19
**serve** 597:13
598:11
**server** 513:5
**service**
492:14,17
492:19
590:12
618:3
**services**
349:24
618:4 635:5
635:14
701:17
702:8
704:17
706:1,5
737:4
**set** 363:9
366:2 444:8
484:16
511:4
512:11

524:11,13
526:20
559:13,14
560:13
573:9
580:22
582:12
599:8
601:19
602:24
618:16,22
619:20
622:4 639:4
685:3
**setting**
560:13
**settle** 744:4
**settled** 570:1
**seven** 388:17
388:18
405:20
413:19
475:6,8
491:19
543:19
544:10
593:22
594:20
596:10
615:14
623:3 645:3
647:16
651:4
653:16
690:2 724:1
**seven-year**
490:17
**seventeen**
689:23
**Seventh**
699:21
**seventy** 566:9
**seventy-five**
491:22
551:14
615:2,7,10
701:17
702:6,25
703:8,19

727:18
**seventy-nine**
617:18
**seventy-sev...**
551:12
**severe** 375:3
**shake** 692:5
**shakes**
415:24
**share** 422:17
624:3
746:11
**shared**
356:21
358:1 406:9
409:13
434:15
570:20
571:23
**shares** 625:12
625:14
**sharing**
406:1
**she'd** 636:8
**sheet** 539:16
544:17,17
545:1,7
548:3
550:11,12
550:12
600:23
610:21
611:3
**sheets** 596:23
**shells** 545:20
**Shelly-Ann**
350:4 353:6
**shenanigans**
593:6
**short** 389:21
389:22
409:21
479:12
572:4
593:23
599:15
640:19
**shortly** 410:7
428:9 451:5

523:16
634:5
**shots** 614:4
**should've**
644:19
721:15
745:7
**show** 388:2
396:14
422:16,16
422:17
441:23,24
445:19,22
452:19,20
453:1,3
455:4 456:8
456:9,17,19
456:21
457:14,15
477:3
489:15
499:18
529:11
539:14
549:22
560:16
575:22,23
640:1
661:12
697:15
706:25
715:11,13
743:9
**showed**
359:24
413:25
456:11
504:11
586:3 634:9
634:15
643:14
651:8 664:9
732:4
735:11,25
**showing**
361:25
367:5 369:4
372:16
373:9

376:12
378:18
379:17
380:16
387:21
393:21
420:9
423:15
453:19
468:25
477:14
510:15
528:4
531:20
535:4
552:25
556:16,17
564:18
610:16
628:25
633:19
644:6
651:15
657:13
658:3 659:8
659:19
660:13,23
661:19
680:16
688:4
700:14
702:16
709:13
715:11
719:15
721:25
727:6,14,24
728:13
729:9 730:3
730:10
731:17
737:22
739:4
**shown** 358:5
435:4,19
436:10
**shows** 473:20
475:18
476:11

538:18,18
538:23
539:24
633:19
681:11,14
682:4 735:9
736:8
**sic** 553:11
653:17
734:7
**sick** 686:16
**side** 487:22
487:23
488:25
537:23
**sign** 365:1
375:6,6
397:3 398:7
399:5,6,12
484:2
505:11
506:13,19
565:7,23
571:20
590:7,9
602:21,22
646:8 716:2
**sign-off**
664:9
**sign-offs**
421:23
664:15
**signaled**
458:11
**signatory**
371:19,22
371:24
379:5,7
**signature**
397:2,11,16
460:4 488:6
**signed**
382:16
384:6
397:12
432:16
437:3
467:23
488:9 495:3

495:13
500:9,23
501:10,10
501:19,22
505:13
546:13
555:5,6
566:7 590:1
590:5
596:19
600:13
601:2
646:19
647:13,13
669:22
714:21
716:2
**signer** 671:10
**signers**
669:17,19
**signify**
548:22
**signs** 718:21
**similar** 656:3
679:24
683:5
**simple**
485:14
535:2 614:2
644:25
681:17
682:2
**simply** 681:9
**singer** 670:24
671:6,9
**singers**
669:13
**single** 437:10
444:18
**Sisi** 707:16
715:15
717:4
**sit** 412:15
426:6
489:24
**site** 380:25
425:15
613:10
619:6

sits 461:21,22
sitting 471:18
542:12
713:4
situation
427:22
496:12
six 355:19
406:18
432:25
452:1
547:24
551:14
619:23
632:12
637:11
641:20
642:13,23
645:19,20
647:7
648:12,22
649:19
650:18
651:3 662:2
666:4
sixteen 446:5
593:18
669:2,3
Sixth 426:20
sixty 386:11
sixty-eight
728:10
sixty-five
709:21,24
711:2
sixty-seven
562:25
sixty-tow
550:5
sixty-two
388:2,20
413:12,15
413:16
416:10
484:16
500:24
549:2 550:6
550:7,13,18
550:19

551:17,18
552:1,8,21
609:25
681:23
682:11
683:11,14
684:2
size 615:12
SJG 727:8
skim 556:25
skimmed
375:2
556:23
skip 517:6
613:16
696:19
slap 535:10
slash 675:15
683:17
sleep 638:4
slide 422:16
422:16,17
slightly
357:21
674:11
slowly 391:13
small 692:18
725:2
smart 389:7
401:24
415:23
442:3
smile 660:19
smiles 613:15
Society
725:21
726:1
soft 355:18
355:21
356:19
381:20
388:19
391:5
548:20
549:25
552:17
683:17
732:13
733:17,18

734:22
software
514:11
sold 575:19
591:16,21
592:17
593:24
622:14,19
632:19
642:16
653:5 709:5
711:6
712:22
715:23
solely 506:25
599:10
solicited
631:7
solid 644:13
solve 390:12
534:25
somebody
359:8
396:25
398:11
399:2
424:16
442:24
451:21
455:19
456:1
459:22
460:1 466:7
484:1,1
505:10
509:8
525:17
546:1 551:7
568:5
587:22
596:2 617:7
656:12
673:16
682:15
716:9
732:15
Somebody's
580:8
someday

632:19
646:22
647:3
son 495:9
532:2
584:22
song 669:12
soon 684:13
sooner 488:8
sorry 358:24
376:22
382:7 406:3
411:9
418:22
425:5
429:18
433:14
438:11
455:14
465:20
473:6
477:23
480:23
496:22
502:10
507:18
515:22
519:4 541:1
541:4,4
563:18,23
569:20
595:12
600:12
606:16,21
637:17
668:9,10
670:3
698:17
701:7
704:23
710:2 717:9
731:7 733:8
740:7
sort 358:14
402:10
422:16
570:8
745:11
sound 369:20

562:21
sounds 368:1
source 385:1
414:22
536:4 543:8
547:9
548:14
608:1 609:2
668:1,2
sources 536:2
536:3
549:20
607:23
683:14
South 350:16
640:9
665:12
671:3
675:15
Southwest
699:5
spa 426:21
426:22
459:9 529:4
611:7 612:9
spa's 459:7
space 443:25
span 484:8
680:11
Spanish
447:10
speak 425:1
465:10,13
488:3
746:17
speaking
437:12
532:4,5
543:4
746:15
special
671:21
specially
508:13
specific 413:9
416:3,7
431:11
466:20
506:4 530:7

585:21
590:1
626:14,19
747:1
specifically
360:25
381:17
387:6 390:5
405:2
413:10,12
415:12
416:18
436:24
441:4 448:7
454:25
463:8
502:16
515:17
525:17
527:20
554:16
566:6
573:13
574:13
607:6
609:25
612:17
615:24
633:21
634:8
specified
521:5
522:18
specs 614:22
speculating
442:21
Spell 429:6
spelled 671:9
spend 470:3
540:8
583:22
642:5
647:10
662:7
spending
579:16
584:1
spent 392:17
407:2 469:7

Page 795

469:20,23
470:1,1,14
470:18,20
471:3,12,13
471:14,16
472:17,22
473:20
474:4 475:4
475:6,7,10
475:15,19
475:20,24
476:4
489:14
538:19,24
540:5,13
542:7,9,13
542:18
543:10
555:10
583:23
588:5
591:25
649:9 651:3
677:21
706:24
**spoke** 418:20
425:14,18
435:2
439:24
447:10
454:23
475:22
485:2,3
533:7,9
535:8
537:15
650:13
**spoken** 747:2
**spots** 685:4
**spreadsheet**
537:8
**SPRINGER**
350:4
**sprinkle**
421:25
**Square**
670:16,18
**Sr** 424:7
531:8 532:1

533:1
570:23
684:11
718:6,7
**St** 675:14
**stab** 614:2
**stabilized**
653:6 672:9
**stack** 381:14
381:17
403:10
428:13
479:21
651:22
**staff** 353:7
354:6
403:18
439:5
468:16
476:24
556:9
572:11
577:14
595:16
607:16
679:18
694:7
695:10
742:3
**stage** 669:12
**stages** 675:3
675:7 676:1
**staircase**
456:16
**stamped**
537:4
**stand** 596:20
**start** 397:13
408:13
452:17
455:12
456:7
526:20
547:17
575:15
579:11,13
613:22
614:10
617:21

632:1
**started**
357:19
405:24
433:9 434:9
490:11
505:24,25
526:11
530:23
546:13,15
575:16
578:5 579:3
582:15
591:4
592:16
597:21
598:1,4
732:6
**starting**
420:14
536:11
**starts** 475:14
479:23
671:18
**startup**
389:25
547:12
**state** 593:14
**stated** 508:5
630:22
673:22
**statement**
427:5 508:2
509:25
518:1,20
559:18
560:11
563:12
567:11
662:16
664:4,14
665:15
669:15
680:23,23
688:13,20
735:11
747:22
**statements**
436:8 508:5

508:23
509:2 510:5
518:1
522:13
620:8
675:16
748:2
**States** 349:1
463:5
487:15
671:7
**stating**
545:15
**stationary**
424:17
483:15
571:20
**stay** 369:15
562:11,18
595:18
**stayed**
595:20
644:20
694:23
699:15
**staying** 700:8
**steal** 602:3
**stems** 533:16
536:18
**step** 479:15
591:14
**steps** 574:1
**stern** 459:3
**stick** 516:16
528:25
555:14
742:25
**stickler**
427:17
**stickums**
375:5
**stock** 615:4
710:16
**stole** 593:18
642:20
**stolen** 593:3
**stomach**
594:24
**stop** 534:19

665:23
666:1
**stopped**
519:11
584:10
624:9
**stored** 538:6
**stories**
685:18,20
685:21
**storm** 687:5
690:11
692:19
**story** 514:3
552:4
693:24
**Stowe** 675:8
675:22
676:2,11,12
**straight**
745:4
**Straub**
382:15
386:21
387:9
388:10
391:9 393:4
394:2 407:5
407:7 415:7
446:18
519:17
524:15,20
524:22
530:12
605:8,9,10
624:16
625:22
627:18
**Straub's**
394:13
526:7 551:1
606:2
668:20
**streamline**
428:3,15
**strong**
520:10
671:19
**struck** 743:15

**structure**
365:15,18
597:15
**Stuart** 361:4
361:11,14
362:13,15
**stuck** 381:24
660:4
708:25
**study** 368:16
408:11
427:10
481:12,24
582:7
728:22
**stuff** 369:23
373:18
374:8,14
438:1 487:4
517:6 558:3
634:1 639:1
662:23
668:25
685:24
686:1
699:24
707:14,16
729:22
730:14
740:17
745:12
**stupid** 450:21
496:20
604:19
**stupidest**
682:16
**subject**
520:25
599:6
617:16
742:2
**submission**
488:9,13
**submit**
639:11
**submitted**
489:4 529:2
**submitting**
405:25

SEC_000911

410:3
**subordinat...**
598:19
**subparagr...**
433:16
**subpoena**
353:14
**subpoenaed**
747:16
**subs** 446:12
**subscription**
371:23
483:5,7
**subsequent**
625:23
695:24
**subsequently**
496:10
502:6
**subsidiaries**
674:18
**substantial**
687:10
**substantially**
545:24
**substantive**
403:17
439:5
468:15
476:23
556:8
572:10
577:13
607:15
679:15
694:6
**succeed**
446:24
535:19
**success**
745:18
**successful**
430:15
569:3
629:25
630:6
686:10
**successfully**
430:25

**sue** 504:21
**sugar** 613:22
**suggest** 454:4
**suggested**
569:4
**suing** 741:5
**suit** 526:14
526:18
**Suite** 349:10
350:9,17
**Sullivan**
730:1
**summary**
547:4
735:25
**summer**
677:1
**summertime**
676:25
**Sunday**
723:22
**Sunpass**
707:5
**Supplemen...**
354:1
**supplied**
420:17
656:4,4
**supplies**
523:2
**supply**
573:22
**supplying**
579:17
**support**
638:3
743:13
745:2
**supported**
634:19
**supporting**
408:12
410:12
**suppose**
424:10
534:7
**supposed**
388:14,15
490:18

491:4
533:17
548:25
564:14
567:5 573:1
580:13
597:9 603:2
603:24
611:9,12
615:18,20
707:18
708:4
735:20,23
736:15
742:18
**supposedly**
389:22
585:18
**sure** 356:15
359:12
360:20
361:1 362:6
365:11
367:14
373:7
376:17,19
389:17
398:23,24
399:13,14
401:10,12
401:14,15
404:8
409:10
410:20
414:11
415:4
427:11
450:24
458:16
459:17
460:25
461:2
465:25
469:14
474:6
484:24
487:21
491:23
493:6

505:17,19
507:21
521:25
524:11
525:2 527:9
530:11,18
533:11
535:18
541:21,24
554:22
568:16
570:14
581:16
589:18
600:9
608:13
609:17
619:15
626:7
634:24
641:7
651:24
674:13,15
686:25
693:22
695:22
701:6 704:5
705:15
706:4 720:1
726:22
727:9 736:3
736:4
745:14
**surprised**
400:9 561:5
649:9
**surrounding**
416:4
536:23
565:21
694:11
**survive** 517:7
**Sutherland**
742:13
**SUV** 711:20
711:23
**swear** 749:10
**switch** 585:8
**sworn** 353:22

**system**
388:13

**T**
**T** 351:1,1
352:1,1
468:10
**tab** 636:15
**tables** 537:6
**tag** 715:6
**take** 356:17
358:6 362:5
373:11
397:25
398:7
410:24
420:10,10
423:16
425:15
431:4
456:21
461:1,7
464:7,14,20
466:15
473:3,10,25
498:9
499:16
514:12
523:24
528:7
536:24
547:21
551:4,8,19
552:12
593:19
600:19
601:22,24
603:8 604:3
610:20
631:11
638:15
645:3
646:21
660:7 682:6
682:7 688:5
704:14
734:15
746:8
**taken** 403:13

438:23
467:16
468:9
476:17
514:18
556:3 558:4
572:5 577:8
577:20
607:11
674:18
679:10
685:4 694:2
**takes** 538:23
561:15
575:4
**talk** 359:1
390:2 418:2
418:3 422:9
435:10,13
453:2 494:2
502:18
507:16
539:10
554:18,20
554:23,25
591:20
612:8 618:9
628:24
646:17,20
672:18,24
706:16
709:3
742:22
743:25
746:23
**talked** 378:25
389:16
402:19
408:18
422:10
435:8
441:23
454:24
455:2 460:9
462:12
470:13
480:6
485:20
499:3,12

525:16
527:19
530:9,22
533:5
554:17,19
554:21,22
557:22
560:12
579:12,21
580:15,17
584:12
590:16,16
591:5,6
598:5,6
607:24
610:1,2
628:11,12
665:21
672:8 673:2
697:17
740:18
746:15
747:14,15
**talking**
367:18
387:25
388:25
398:21
404:18
407:5 419:1
424:13
443:22
447:3 478:2
496:15
497:22
524:20
539:3 557:7
566:15
577:18
608:17
609:24
628:9 650:4
653:13
673:6
679:21
681:5
713:11
716:7,18,20
720:2

**talks** 521:7
663:22
672:14
**tall** 459:13
**target** 676:21
**targets**
676:18
**tax** 431:20
688:10
689:22
691:5
**taxes** 523:1
677:19
**teal** 734:12
**team** 439:25
**teased** 747:7
**technically**
434:11
498:1
625:11
**Teddy** 560:2
560:4
**tell** 358:8
371:9
373:24
380:18
381:17
387:23,24
397:3 398:6
412:9,16
413:7 420:6
420:7 421:5
432:12
436:24
438:8 440:5
445:25
452:23
462:18,23
463:9,12
466:15
470:16
477:19
495:7
497:21
504:9
513:23,23
513:25
527:7 537:3
548:23

565:20
576:16,18
577:2
587:25
603:8 604:2
604:5 607:7
616:12
627:5 629:4
632:22
634:6
637:15
642:15
649:8
652:18
654:2
659:10
664:4
669:24
670:11,21
676:3 679:4
679:6 682:8
692:21
694:16
695:1
696:16
698:1 717:2
728:14
729:10
730:5
731:19
747:6,10
**telling** 373:17
448:17
459:8 495:6
497:22
498:1 514:1
576:9,12
608:17,20
697:24
747:11
**tells** 607:3
717:18
**temper**
489:20
**temporary**
664:11
**ten** 360:14
382:12,23
382:25,25

383:13,17
383:19
384:23
407:22
409:22
415:8
433:23
463:21
516:17
542:16
553:21
582:8
621:16
622:24
627:19
643:25
666:13
667:3,4,8
667:10,14
671:5,5,5
705:18,25
706:7 710:5
723:4
745:25
**tend** 375:10
**tenth** 567:7
676:23
**term** 492:6
493:8
494:10,11
502:8
596:22
**terminated**
517:11
**terms** 402:6
437:12
486:10,16
494:6 501:1
**testified**
353:22
402:2
477:16
494:20
520:17
575:8
576:17
586:7,10
587:17
607:25

609:8
612:14
695:14
747:16
**testify** 605:13
605:13
616:15
665:5
**testifying**
595:6
**testimony**
353:13
480:19
483:12
501:8,9
575:8
596:16
741:22
748:9
**text** 563:8
**thank** 386:2
393:7,13
410:11
419:23
421:20
428:4
469:18
500:4 512:9
516:22
537:16
606:4 717:9
728:11
**thanks**
408:14
577:5
613:14
642:25
**theory**
415:20
608:7
**they'd** 506:18
519:16
**thick** 389:10
546:15,16
546:16
568:4
661:17
**thing** 357:12
359:10

374:10,18
395:22
402:23
406:16
409:23
411:8 414:2
417:22
436:6
439:23
440:7,20,20
450:17
451:1
473:14
478:17
480:13,16
486:1
491:10
492:2
495:13
544:7
548:13
550:1 551:2
552:18
561:9
562:24
574:10,12
577:17
587:3,8
589:17
619:6,8
634:11
635:11
638:6 642:6
644:16
657:24
661:24
662:3
665:22
678:19
682:16
685:18,20
691:22
692:3,11
697:15,19
707:7
716:14
718:20
719:17
720:19

723:23
725:10
728:8
735:10
742:10
743:20,21
744:10,14
**things** 360:11
360:14
376:25
381:21
385:24
426:13
430:22
443:24
444:1
450:13
460:9 492:8
493:9,11
501:11
506:18
514:13,25
518:22
545:20,24
546:2
558:21
573:16
576:18,21
608:18
612:1,5
638:21
644:23
685:23
687:23
696:24
697:3,16
704:9 707:4
741:23
742:1 746:5
**thinking**
366:16
395:8
400:19,22
470:19
487:17
489:13
491:3
498:22
531:4 559:2

568:25
569:17
579:22
604:17
626:6
701:10
**thinks** 685:5
**third** 359:10
376:20
456:14,15
536:19
655:23
656:19
657:1
**thirteen**
389:21,22
**thirties**
387:11
407:25
**thirty** 391:15
428:11
503:17
566:11
653:16
686:9
692:13
723:21
**thirty-eight**
537:25
547:1
**thirty-five**
355:15
485:8 603:9
689:18
690:20
729:15,16
729:17
**thirty-four**
653:10
**thirty-nine**
414:25
502:5 563:3
577:25
603:9,23
604:3
611:10,24
**thirty-one**
615:11,23
**thirty-seven**

388:3
391:16,17
392:1,2,4
392:10,13
392:15,19
393:4,5
405:20
413:17
457:8
543:17
549:21
550:16,23
551:7
564:14,16
627:15
652:10
653:7,22
654:1,3
666:7 672:5
681:24
683:16
**thirty-six**
355:15
405:20
730:20
731:13
**thirty-year**
690:18
**thorough**
742:6
**thousand**
400:16
457:8
497:25
518:25
523:13
525:10
532:8,21
533:2
535:10,11
550:25
553:11
565:3 566:3
566:18
575:19
578:22
592:23
594:21
621:17

622:3,24
623:3
637:20
640:8 641:3
641:8,21
643:25
645:18
648:13,14
648:15
649:14
650:24
652:11
665:23
666:1,7
670:23
701:2,9
703:25
705:18
706:7,9,24
709:22,25
710:5 711:2
718:24
723:4
725:13
727:4 729:5
729:16,17
730:20
731:13,20
731:24
732:6,12,20
733:15
734:3,12
735:1,5,12
735:13
736:1,7,19
737:1
738:10,15
740:4
745:24,25
**three** 365:10
377:18,22
377:23
381:21
441:24
451:19,24
452:1
466:24
470:18
471:14

476:4 485:5
485:7 487:8
488:16,19
489:14
500:17,25
511:14,17
512:2
524:13
542:7
558:16
578:22
589:5 594:7
594:16,19
594:21
617:4,24
618:2
622:23
624:25
625:4
627:18
629:13,15
629:20,23
630:21
634:20
638:5 642:3
645:17
659:2
663:20
665:21
683:22
684:7,15
685:4
686:13
690:19
692:25
709:5
712:22
737:10
**threw** 471:7
535:9
**tie** 460:25
472:13
473:2 475:8
475:10
476:2 611:5
640:23
731:2
734:20,22
**tied** 643:7

**ties** 726:2
**till** 584:12
592:1
**Tim** 354:5
496:23,25
497:1
**Tim's** 505:1
**timeline**
368:9 404:9
463:25,25
714:8
**times** 397:19
401:3 423:3
439:19
441:22,24
447:9
451:19
452:2
453:23
466:24
547:21
670:16,18
677:16
**timing**
577:17
**TIMOTHY**
350:5
**title** 554:11
598:20
660:7
706:22
713:7
714:14,20
716:11
717:11
718:8,24
**titled** 480:23
482:8 548:4
588:18
659:9
714:15,25
**titles** 599:5
718:17
**today** 353:11
353:13
354:8
367:18
371:9
384:11

Page 799

| | | | | | |
|---|---|---|---|---|---|
| 412:15 | 478:7,14,18 | 672:19,20 | 519:4 520:2 | 715:24 | 698:25 |
| 417:2 | 479:1,14 | 672:21 | 523:15 | **transfers** | 699:18 |
| 425:24 | 484:25 | **tomorrow** | 525:10 | 624:21 | **trips** 699:13 |
| 426:6 428:3 | 486:24 | 581:15 | 526:15 | 625:23 | 700:4 |
| 452:17 | 487:3,5,10 | 681:18 | 528:25 | **translated** | **trouble** |
| 453:5 | 495:16 | 684:6 686:7 | 532:18 | 455:1,2 | 576:25 |
| 463:21 | 496:2 504:7 | **ton** 532:12 | 535:3,8 | **translation** | 577:19 |
| 471:18 | 504:8,10 | **Toney** 584:12 | **track** 407:1 | 376:7 | **troubles** |
| 472:17 | 507:17 | **Tony** 436:19 | 636:8 | **transparency** | 685:9 |
| 489:25 | 513:21 | 436:21,25 | **trade** 506:25 | 512:2,23 | **true** 393:25 |
| 520:12 | 554:24 | 483:14 | 507:7 | 513:6 | 464:18 |
| 534:25 | 559:8 | 587:1,2,22 | 599:11 | **trash** 378:5 | 478:21 |
| 542:12 | 568:23 | 587:23 | 709:7 | **travel** 694:11 | 518:1,20 |
| 544:6,10 | 573:14 | 588:2 | 710:12 | 694:13 | 523:18 |
| 546:16 | 575:25 | 669:11 | **traded** 570:1 | 696:8 699:3 | 533:20,24 |
| 562:24 | 578:1 587:1 | 746:16 | 709:12 | **traveled** | 534:1,9,10 |
| 564:17 | 587:2,2,3,6 | **top** 414:12,21 | 710:4 | 694:22 | 544:22 |
| 585:3 613:8 | 587:7,10,23 | 425:13 | **trail** 707:15 | 695:12 | 545:3 |
| 624:6,18 | 588:3,24 | 446:5 | 738:14 | **Trick** 563:23 | 550:24 |
| 627:25 | 589:15 | 452:18 | **transact** | **trickery** | 560:11 |
| 628:1,1,4 | 600:8,11 | 456:13 | 739:25 | 745:3 | 562:14 |
| 659:5 685:3 | 606:10,14 | 474:14 | **transacted** | **tried** 376:24 | 563:12,20 |
| 685:25 | 608:6,19 | 548:22 | 739:22 | 377:17 | 563:21,23 |
| 691:20 | 616:6,8,16 | 607:21 | **transaction** | 384:22 | 566:24 |
| 693:17 | 617:20 | 671:4,5,5 | 515:19,21 | 430:22 | 567:11,11 |
| 697:25 | 632:6,16 | **topics** 741:21 | 623:19 | 438:1,2 | 570:13 |
| 707:21 | 634:25,25 | **total** 418:23 | 694:14 | 446:24 | 574:5,17 |
| 741:5,22 | 636:6 | 421:6 | **transcript** | 447:22 | 620:10,13 |
| 742:3 | 638:14 | 471:16 | 749:14 | 450:13 | 620:15,18 |
| 743:15,23 | 649:23 | 534:15 | **transfer** | 491:9 | 625:6 |
| 745:5 747:4 | 670:17 | 538:5,18 | 512:19 | 503:15 | 629:15,22 |
| 747:11,23 | 674:1,6,8 | 544:25 | 620:23 | 593:2 602:3 | 631:14 |
| 748:2 | 691:1 | 545:1 549:1 | 621:11,13 | 634:19 | 648:20 |
| **toilet** 727:18 | 692:23 | 553:11 | 621:25 | 639:6 655:3 | 650:15 |
| **told** 356:3 | 706:20 | 607:22 | 630:11 | 655:3,12 | 662:16,21 |
| 368:9 | 722:12 | 615:7 | 701:1 | 685:1 686:7 | 663:1,2,2,8 |
| 381:16 | 732:21 | 662:12 | 706:14 | 717:16 | 664:2,5 |
| 382:1 390:3 | 733:1,10 | 672:4 | 716:5 | 744:14 | 666:15 |
| 394:5 | 734:8,15 | 683:14,21 | **transferred** | 745:3,4 | 668:2,3,8 |
| 395:18 | 735:24 | **totally** 400:9 | 606:11 | **trigger** | 668:17 |
| 399:2,11 | 736:6 | 484:18 | 607:1 | 492:23 | 669:15 |
| 414:6 | 741:23 | 506:22 | 619:21 | 493:18 | 671:24 |
| 415:12,17 | 746:19,20 | **totals** 414:13 | 621:17 | **trip** 458:14 | 672:2,10,17 |
| 417:10 | 746:24 | **touch** 601:25 | 622:24 | 459:20 | 675:16 |
| 449:17 | 747:7,8 | **tour** 453:5 | 624:2 | 460:8 | 704:20 |
| 463:15 | **toll** 707:4 | 454:15 | 635:13,13 | 694:16,21 | 706:18 |
| 464:17,21 | **tolls** 707:7 | 455:8 | 640:3,8,19 | 694:24 | 708:13,17 |
| 464:23 | **Tommy** | **town** 448:22 | 640:20 | 695:2 696:5 | 712:17 |
| 477:16 | 672:13,15 | 518:15 | 644:7 | 697:5,8 | 733:20,23 |

749:13
**true-up**
650:13,15
**trued** 632:9
**Truitt** 684:22
684:24
**truly** 642:18
**Trump** 458:5
462:18
699:15
722:12
723:19
**trust** 375:10
402:16
436:25
629:16
640:6
649:15
692:2
731:21
733:25
735:7,16,18
736:19
**trusted**
634:13
692:1
736:24
**truth** 464:21
464:23
717:18
724:25
**try** 374:17
385:21
417:6 423:7
425:23
427:7
430:23
431:15
443:21
495:2,9
496:3
497:12,12
506:2
529:11,11
540:9 550:7
561:9
576:18
587:13
629:7 660:5

685:7,12,17
685:24
686:13
693:1
694:18
699:18
711:10,11
722:24
733:12
734:4,16
**trying** 369:14
371:13
381:22
382:17
386:15
389:5 393:2
395:24
400:12
407:1 414:2
428:2 429:2
430:11
431:22,24
432:19,22
432:22
447:25
448:2
450:19
451:4
475:20
476:1,2
488:24
505:21
512:11,19
520:20
540:21
541:10
542:21
550:4
564:13
569:13
578:22
592:1 601:6
602:16
617:25
629:8,12
630:13
631:15,16
632:21
635:25

636:7 638:3
639:3,24
640:10
675:18
677:3,12
683:7
685:22
691:21
692:22
693:2,3
697:16
713:9
718:24
744:17
**turn** 398:13
399:19
414:9
465:21
494:4
520:22
536:18
658:14
669:2
671:14,16
700:19
718:1
**turned**
594:23
714:12
**turning**
672:14
**twelve**
382:25
471:2,13
474:4
475:14
516:17
522:24
542:10
639:13,19
**twenty**
391:11
419:12
428:10,10
461:6
466:25
469:8,9,21
470:1,7,9
470:17

471:20
473:12,12
473:15
475:5 493:7
538:3,19
592:23
705:6
707:10
722:10
**twenty-eight**
723:18
**twenty-five**
454:2 461:6
467:1
491:22
544:25
573:23
628:2
683:18
**twenty-nine**
387:7,10
389:2,8
392:15
405:16
407:23
414:3,18
544:21
563:5,17
608:21
610:3 663:5
663:16
667:24
668:19
**twenty-seven**
386:12
578:9
668:21
**twenty-two**
381:15,24
382:18
383:7,12
384:13
386:5,18
390:16
414:1 415:1
415:2,15
416:4,21
473:25
474:23

475:1,21,23
536:17
538:24
539:2,3,5
540:23
543:2,3,3,5
543:7,9
544:1 547:7
552:3
553:12
554:17
563:4,13,22
607:24
608:10
609:1 615:8
662:14
667:15
**twice** 693:22
723:20
**two-year**
490:18
518:17
519:6
**tying** 372:19
**type** 456:3
**typical**
452:14
456:23
491:5
**typically**
374:22
375:8 423:7
509:11,19
515:8 538:9
538:11
**typing**
548:12
**typo** 469:19
669:20
684:10

————————
**U**
**U.S** 353:5
749:11
**UCC-1**
506:18
**ugly** 559:1
**Uh-huh**
383:5

651:16
710:25
**ultimate**
436:8 486:1
501:7 504:6
**ultimately**
592:17
594:17
596:13
**unaudited**
508:2
**unbelievable**
489:20
**unbolded**
474:19
**undersigned**
749:10
**understand**
353:16
355:8,8
371:10
382:6 386:3
386:14
388:13
390:21
391:12
405:15
427:22
439:17
441:25
442:1
450:10
469:5
487:25
489:23
496:21
497:1
536:17
539:12
540:18,22
591:1
592:18
595:24
598:13
600:21
602:5,16
605:6
608:22
617:24

618:2
627:25
635:25
648:16
677:3
682:12
713:9
**understan...**
392:12
543:20
577:1,19
586:23,25
647:23
**understood**
358:15
**underwater**
646:8,9,9
**undeveloped**
687:11
**Unfortunat...**
450:12
674:24
**unheard**
506:22
551:8
**uninsured**
707:22
**unit** 532:13
615:12,15
**United** 349:1
671:7
**units** 421:22
421:23
456:14
575:24
578:6 653:5
698:22
720:4
**unpaid**
503:21
523:4
**unregistered**
707:22
712:16
**unrelated**
704:11,12
**unsecured**
388:15
**unusual**

484:5,21
508:25
517:13
518:7 575:1
724:2
**up-scale**
545:19
**up-to-date**
417:20
**update** 409:1
410:7 655:5
655:7 681:9
**updated**
409:14
410:2,5
411:11
531:2
654:25
656:9,9
**upfront**
402:21
495:10
497:4 527:5
**upset** 381:23
405:14
424:11,14
464:15
**upside**
743:17
**uptown**
429:9
**USCIS** 404:3
405:25
415:9
488:14
489:5
665:10,11
**use** 370:18
387:2
389:19
405:11
415:15
422:25
506:25
516:13
518:19
536:5
544:16
547:9 562:3

575:22,22
580:23,25
593:10
599:11
604:9 610:3
612:3
632:16
642:19
662:12
694:20
708:11
713:3,3
721:20
723:18
725:1,8
740:12,14
**uses** 536:2,3
549:1
550:22
585:21
607:22
612:17,20
**USREDA**
437:4
730:18
731:14
**usually** 439:4
555:20
570:14
687:13
**utilize** 606:11
606:25
**utilized**
731:10

_____
**V**
_____
**V** 679:11
707:9
**vacancy**
656:6
**vacation**
696:8,19
**valid** 660:10
**valuation**
427:8 667:1
672:4,9
**value** 391:18
402:20
427:14,24

496:19
502:17
537:22
652:16
653:15,17
653:20,23
681:21
744:22
**valued**
498:25
**values** 486:4
652:14
666:5
**various**
555:19
653:2 675:7
676:1 688:8
720:6 722:9
**vehicles**
717:22
720:6
**Venti** 465:4
**ventures**
675:2
**verification**
508:7,18
**verified**
436:20
**verify** 681:19
**Vermont**
675:9,22
676:9,10,11
676:12
**version**
429:19
467:25
483:3 559:4
560:20,20
655:23
661:15
686:20,21
**versions**
371:23
517:2
555:19
558:16
**versus** 666:22
666:22
**Vicky** 560:5

**victim** 743:14
**video** 377:7
698:12,13
698:17
699:24
720:1
**videos** 426:11
**Viers** 349:7
351:4
353:20
749:4
**view** 362:19
512:4,25
513:1,9
**violate**
507:13
**violates**
604:23
**violation**
400:15
**violations**
400:15
532:10
**violent** 440:8
**Virgin**
694:23
**virtually**
617:3
**virtues** 681:1
682:20
**visit** 466:4
**visited**
439:18
**visiting**
465:24
466:16
**Vivian**
619:14,14
**vouch** 646:7
**vouching**
646:6
_____
**W**
_____
**wagon**
712:21
713:11,18
714:3
**wait** 462:22
481:21

712:15
**waiting** 410:5
**waivers**
517:20
**walk** 375:7
435:6
451:21
452:9,17,18
454:10
456:14,17
456:20,23
466:8
489:14,15
494:6
628:24
715:12
745:13
**walk-throu...**
452:14
454:25
456:6
464:15
**walked**
409:11
441:22
451:18,23
454:18
466:19
504:11
**walking**
452:2
454:19
455:25
**wall** 545:21
707:12
717:14
**Walsh's**
603:18,20
692:9
**Wang** 615:9
**want** 356:8
356:15
374:11,17
382:9
390:19
395:25
401:25
402:6
440:11

471:22
484:20
485:12,22
492:3
495:21,22
498:5
506:18
511:21
512:9
513:13
514:22
533:19
534:21
535:21,25
536:7
541:21
562:25
570:5 574:1
588:25
589:6
593:19
600:6,10,16
601:16
602:21,22
609:16
616:20
624:8
626:12
627:5
630:12
635:1
644:12
646:1 665:5
669:7
674:12
685:19
686:2
690:22
691:12
711:8
715:19,21
719:17
724:3 725:8
727:16
744:5,6,15
745:11
**wanted** 357:3
364:11,23
370:18

371:1 386:5
386:18
390:16
399:9
401:21,22
408:8
410:20
417:5,7
424:15,22
425:22
432:15
433:3
437:21,22
439:7 440:7
440:17
452:9,15
455:19
458:11
459:21
460:13,16
461:10
462:11
464:24
487:8,9,12
487:18
494:25
495:1
497:16
499:10
502:14
504:2 519:5
530:18
544:15
566:7 575:3
590:7 593:8
604:11,13
604:14
610:3
612:24
636:18
646:12
647:18,19
647:20,21
675:23
676:23
687:14
690:7
692:23
704:15

721:20,23
732:11
744:22
**wants** 511:25
512:2,3,24
717:10
**Warrantee**
517:4
**warrantees**
517:7 599:4
604:24
**warranties**
504:25
**warrants**
517:5
**washer**
721:14
**waste** 744:6
**wasted**
718:23
**watch** 636:18
**way** 416:8
432:16
435:3
439:21
444:17
450:20
457:3
485:22
488:6 498:3
503:12
504:3
505:22
509:13
518:23
520:10,12
521:22
522:7
530:11
532:3
533:10,22
537:9 542:1
545:19
549:4 564:3
583:15,19
596:15
610:19
630:14
633:22

642:1 643:8
651:4 657:9
674:12,24
681:25
684:9
685:23
689:8
701:13
707:2
716:23,24
740:14
**ways** 434:25
435:1
504:23
506:1
724:23
**we'll** 366:3
373:20
418:3
429:23
435:13
482:7
535:23
571:11
615:10
628:23
682:7
748:14
**we're** 353:2
353:11
395:8
403:14
415:21
464:18
468:11
474:7
475:20
477:2
485:22
493:24
497:20
504:13
518:24
519:17
535:17
541:5 543:4
554:24
555:2 556:4
570:6

580:23,23
580:24,25
603:8
655:16
690:13
713:11
734:8
737:16,16
748:17
**we've** 413:13
416:19
434:25
488:20
562:23
672:8
**wealthy**
560:23
667:25
**weathered**
687:5
690:11
692:19
**website**
423:18
424:1,24
661:22,23
**week** 369:16
436:19
437:8 454:3
456:6
562:11,21
578:14
587:11
673:25
742:20
**week's**
562:18
**weekend**
580:10
**weekends**
627:19
**weeks** 378:9
594:19
673:2 709:5
743:10
746:3
**weight** 681:8
**weird** 375:23
376:5

**welcome**
500:5
**went** 362:4
367:14,14
367:19
376:24
378:5
379:24
385:19
406:16
408:4
413:23
426:14
428:12
431:2,23
433:4,5,20
437:19,20
441:17
444:18
448:6,6
450:20
454:17
458:9,10
461:13
490:14
493:12
496:17
497:3
519:16
530:11
533:10
539:18
544:11
545:19
546:4,4,5
553:24
557:9 558:2
585:15,16
592:21
593:1,4,14
593:17,21
594:8,17,18
596:2
599:16,18
599:19
601:17
602:23
634:7,12
642:10

Page 803

649:3,8,14
649:16
678:8
689:15
691:17
694:17
695:13,15
695:22
696:6,23
697:8,12
698:1,11,24
699:1
706:23
707:7,12
708:22
713:17
717:14
723:22
726:2,11
739:12,14
746:24
**weren't**
388:14
394:2
430:21,23
440:25
491:1 526:5
526:8
531:14
561:18
568:14
573:18
590:20
597:9 626:7
705:11
**west** 350:18
664:8 719:9
**Weston**
429:10
**when's**
490:24
**wherewithal**
646:8
**white** 453:2
455:6
582:18
711:25
**whoops**
544:8

**widow** 677:8
**wife** 559:21
583:5
588:19
589:14
591:17
592:9
595:23
646:1 671:1
688:7
691:12
695:13
699:19
700:8
737:11
746:20
**wife's** 712:22
**willing**
511:23
**win** 441:1
743:5
**windfall**
578:11
**window**
490:17
**wine** 611:7
**wings** 664:8
**winner**
637:10
**wire** 626:23
641:2,8,11
641:13
707:1
709:21
729:7
732:25
**wired** 704:1
732:19
733:15
735:13
**wires** 640:25
650:11,22
650:23
**wish** 747:22
747:25
748:5,12
**won** 593:13
637:15
671:2

**wonder**
391:22
**wonderful**
613:14
**wording**
569:11
570:12,15
**words** 441:15
443:7
588:13
708:24
735:22
**work** 428:17
429:4
439:22
443:23
489:12
514:8 519:9
519:11
537:22
538:1
541:13
546:14
568:17
570:8 571:2
590:11
614:8
618:20
631:10
641:22
642:12
660:7,11,12
675:22
677:13,15
681:15
698:2
705:17
728:23
729:13,20
744:14
**worked**
359:20
429:2 434:6
440:2
441:15
442:19
448:11
453:8 462:1
575:4

638:24,25
675:21
677:8,10
684:25,25
693:10
698:19
707:16
733:2
**workers**
508:10,11
**working**
406:13
410:11
434:9
449:19
452:21
485:24
619:4
640:13
675:20
700:9
745:12
**works** 437:13
438:19,20
509:11
693:18
**world** 436:17
489:22,23
490:2,7
493:1
559:19
560:23
630:25
663:14
669:13,17
669:19
692:15
744:23
**worldwide**
560:10,18
561:1
**worried**
485:18
490:20
491:1
574:23
723:3
**worry** 402:9
490:24

579:15
**worrying**
524:16
**worse** 570:4
**worth** 357:18
358:5,10
449:13
463:6
578:25
602:14
619:1 653:7
666:12
673:13
731:25
732:9,10
**wouldn't**
395:7,21
399:11
424:23
449:7,9
450:10,15
475:11
484:7
490:24
492:19
493:21
505:2
514:12
519:14
540:6
548:18
549:14
561:8
574:15,18
574:19
576:19
580:20
585:25
602:10
635:5
644:20
647:6,7
665:25
678:1,14,20
686:3
699:10
724:22
738:7
**wrap** 620:6

**Wright** 422:9
424:20
432:5
444:23
457:18
458:13
468:21
472:6 477:9
564:12
681:18
693:19
723:23
**wrist** 535:11
**write** 424:15
532:3
623:13
635:5,9
636:2
674:24
697:25
**writes** 425:13
457:18
474:13
**writeup**
686:18,21
687:1,2
**writing** 385:3
398:1
608:25
609:3
632:21
648:5 661:3
742:14
**written**
382:16
523:7 524:1
609:18,21
635:22
636:1 661:5
**wrong**
419:11
427:7
465:17
478:4,10,12
601:17,21
602:23
669:17
671:9 707:7
711:12

716:22,24
**wrote** 424:16
424:16,21
474:14
511:22
549:2 635:2
635:10

**X**

X 552:16
**X-amount**
493:5
590:23
**XIAYAN-0...**
458:19
**XIAYAN-0...**
459:6

**Y**

Y 552:16
**yacht** 572:16
580:13
581:11
582:11,21
583:9
589:20
590:2,11
595:16
596:13,17
599:18
606:12
612:7,13,14
620:7
621:14,19
621:19
622:16,19
706:7,10,11
**yacht's**
622:14
**yard** 596:5
**yards** 728:24
**year** 363:15
393:11
446:15
463:20
464:20
468:1
487:19
491:15
496:10

518:18
534:7
547:24
558:2 575:5
582:8 587:9
601:22,23
662:2 671:3
682:3,24
686:13
694:15
696:2
744:11
**yearly** 562:11
**years** 384:23
444:14
446:16
490:17
491:11,19
494:17
495:4
496:15
497:3
503:20
508:3
547:25
592:13,25
627:18
659:2
678:23
682:15,18
686:9,13
687:3 690:8
692:13
713:4
723:20
**yelled** 396:25
**yellow** 375:5
**yesterday**
408:4 488:4
630:19
**York** 429:5
431:21
699:13,17
**young** 452:9
**Yu** 432:4
472:5

**Z**

Z 552:17

**Z-A-C-H**
684:5
**Z-A-C-K-I...**
730:1
**Z-I-M-Y-S...**
730:1
**Zach** 684:5
684:18
**Zackin**
729:24,25
**zero** 419:22
487:7,7
490:12
600:25,25
602:14
641:19

**0**

003678 405:2
06 382:3,11
389:8
414:18
415:5,19
429:16
470:15
542:3 564:7
608:17,21
662:17
07 628:3
08 360:8
686:10,11
689:7
690:19
691:1,17
09 691:17

**1**

1/14 560:10
1/14/2013
372:10
1/14/2014
432:3 565:8
565:9
1/17/2014
457:17
1/2/2013
373:14
375:18
1/3/14 351:21
351:24

444:21
477:5
634:23
1/3/2014
472:4
631:25
636:9
1/4/13 351:11
351:12
677:12
690:15
1/4/14 351:20
1/4/2013
379:11
677:23
1/8/13 352:9
1/8/2013
688:9
1:36 468:12
10/17/14
727:8
10/24/13
351:22
454:1
10/3/14
720:10
10/30/14
705:4,11
10/31/14
706:6
101 689:16
10872 425:4
425:10
10th 657:16
657:20,25
11 689:13
11/1/13
476:10
11/12/13
351:25
477:8
11/13/12
421:1
11/15/12
475:4
11/15/2012
11/16/2013

531:6
11/17/13
351:23
11/17/2013
468:20
11/2/12 351:7
11/2/2012
363:7
11/20/2012
377:13
553:5
556:20
11/22/13
688:19
11/24/12
483:7
11/25/12
11/25/2012
368:23
370:1
499:21
11/30/2012
482:10
496:6
499:20
518:4
11/6/12 351:8
11/6/2012
366:24
11/6/2013
511:13
630:23
631:23
635:20
636:1,5
641:1,6,9
641:14
649:3,6,17
649:21
651:1,16
12 475:19
12/10/13
688:24
12/11/2013
613:1
12/13 352:6

12/18/12
351:15
393:15
12/2/12
351:14
12/2/2012
387:14
480:2,4
12/23/2013
614:18
12/27/2013
689:9
12/3/13 455:9
12/4/2012
373:13
374:1
12/9 618:23
12/9/2013
610:21
12:06 438:25
12:38 467:18
12:42 468:8
12371 464:7
13 349:12
749:6
13th 353:3
403:15
438:25
467:18
468:12
510:17
556:5
577:10
607:13
650:24
679:13
694:4
748:18
140 630:15
141 731:18
142 353:15
149 580:12
581:10
597:12
600:3
606:24
607:2
615:17
616:4

Page 805

623:12
**14th** 529:1
**15** 659:7
**150** 635:3
**155** 619:12
**15th** 538:14
538:20
**160** 476:5
507:10
510:7,13,19
511:3,4,6,6
511:19
518:15
526:14
532:10
542:3 554:7
566:20
567:12,21
568:7
588:16
590:2,13
593:10,11
597:15,17
625:11,14
625:22
626:23
640:15
662:23,24
700:15
703:24
707:1
708:11,15
708:16
710:19,22
713:22
715:22,23
716:13
717:15
**160's** 625:16
714:23
717:23
718:22
**164** 351:7
361:18,21
361:22
362:1
703:20
**165** 351:8
367:1,2,6

**166** 351:9
368:25
369:1,5
371:15
**167** 351:10
370:1,4
**168** 351:11
372:12,13
372:17
665:2
**169** 351:12
379:13,14
379:18
**16th** 529:23
**170** 351:13
380:12,13
380:17
**171** 351:14
387:17,18
387:22
536:1 539:1
540:22
541:1,6,8
542:24
543:22
544:17
545:7
607:20
**172** 351:15
393:17,18
393:22
**173** 351:16
396:10,11
396:15
488:4
**174** 351:17
403:4,5,23
408:3 409:6
**175** 351:18
420:2,3,10
421:13
652:21
**176** 351:19
423:11,12
423:16,21
**177** 351:20
432:6,7,11
434:4
449:23

**178** 351:21
444:24,25
445:3
**179** 351:22
453:14,16
453:20
459:24
464:5
**180** 351:23
468:21,22
469:1
**1800** 349:10
350:9
**181** 351:24
472:8,9
473:4 477:5
541:7,19
**182** 351:25
477:10,11
477:15,23
477:25
**183** 352:4
527:25
528:1,5,9
**184** 352:5
531:16,17
531:21
533:13
**185** 352:6
536:9,12,13
**1852** 446:8
**186** 352:7
610:12,13
610:17
617:11
**18680** 473:23
**187** 352:8
680:12,13
680:17
**188** 352:9
687:25
688:1,5
690:14
**189** 352:10
702:12,13
702:17
**1892** 446:10
**18th** 405:5
481:14

620:11
**190** 352:11
737:18,19
737:23
**191** 352:12
738:25
739:1,5
**1930s** 578:25
**19th** 675:4
731:20

— **2** —

**2** 363:4
**2/1/14** 636:22
637:9
**2/14/13**
351:13
**2/14/2013**
380:10
**2/20/14** 408:2
**2/21** 408:25
**2/23/2014**
639:9
**2/3** 638:8
**2/4** 638:8
**2:32** 377:13
**2007** 518:19
**2008** 675:4
**2009** 475:19
**2011** 429:24
430:1
446:20
719:7
**2012** 361:5
361:19
363:11
394:14
421:7
481:14
518:12,15
526:15
528:11
529:3 530:8
538:14,20
539:22
546:8
558:21
584:15
680:11,12

**2013** 363:15
393:12
396:5,7,9
400:18
475:7,20
478:21
510:17
524:23
526:2,11,12
526:21
527:3,25
529:1,23
536:11
538:23
539:24
568:11
629:4
663:22
664:1
731:20
**2014** 463:13
463:19
466:14,15
533:13
536:12
558:22
568:12
570:11
571:6
584:16
620:12
640:6 645:2
650:25,25
655:18,24
657:2,16,20
657:25
664:1
694:12,21
696:6,9,17
698:5 699:4
699:9,14,14
702:21
709:22
712:11,19
714:9,10
718:5
**2015** 658:16
658:24
694:12

**2017** 349:12
353:3,13
403:15
438:25
467:18
468:12
556:5
577:10
607:13
679:13
694:4
748:18
749:6
**202** 349:25
**2103** 475:7
**21st** 466:14
**22nd** 396:20
529:3
**23** 621:10
**23566** 720:10
**24** 621:10
**24th** 533:13
568:10,12
702:21
**25** 631:21
649:25
**25th** 571:6
**26** 640:2
641:19
644:8
648:18,19
649:12
**26th** 396:5
**27th** 526:15
**28** 715:11
718:1
**28th** 396:9
**29** 709:14,17
**29th** 718:5
**2nd** 361:19
546:8,21
655:24
657:2

— **3** —

**3/11/14** 464:5
**3/14/2014**
465:21
**3/15/14**

409:25
411:13
**3/15/2014**
411:6
**3/17/14**
654:11,14
**3/18/2014**
466:2
**3/24/14** 425:3
**3/24/2014**
425:10
**3/25/2014**
565:11
**3/26/13**
351:16
**3/5/14** 654:20
**3:27** 556:5
**3:52** 572:4
**3:56** 577:10
**30** 719:16
**300** 350:17
**305** 350:11
**30th** 393:12
**31** 694:13
**31st** 353:13
**32** 722:1
**33131** 349:11
350:10
749:7
**33401** 350:18
**34** 508:6,17
**349** 349:8
**35** 726:25
727:1
**354** 351:4
**36** 727:6
**361** 351:7
**367** 351:8
**3678** 407:16
**369** 351:9
**37** 727:14
**370** 351:10
**372** 351:11
**379** 351:12
**38** 727:24
**380** 351:13
**38596** 537:4
**387** 351:14
**39** 728:14

**393** 351:15
**396** 351:16
**3FL** 715:20
716:4,8,20
**3rd** 396:7,21
538:23

———————
**4**
**4** 510:16
511:14
**4/10** 640:7
**4/24** 701:16
702:3 703:2
**4/24/14**
700:19
701:1
**4:33** 607:13
**403** 351:17
**42** 729:10,23
**420** 351:18
**42089** 421:20
**423** 351:19
**42315** 377:5
**42834** 500:3
**42954** 421:2
**43** 730:4
**432** 351:20
**44** 730:11
**445** 351:21
**453** 351:22
**4591** 705:1
**4594** 706:9
**467-9200**
349:25
**468** 351:23
**472** 351:24
**472-2970**
350:19
**47362** 399:22
**477** 351:25

———————
**5**
**5/13** 728:1
**5/9/2014**
617:10
**50** 740:12
**505** 350:16
**526** 417:14
417:25
418:14

432:14
478:3,8,16
478:17,18
478:19
479:14
489:24
567:4
665:19
**528** 352:4
**53** 479:23
483:6 494:4
494:5
516:25
651:25
654:13
674:23
**531** 352:5
**536** 352:6
**53924** 390:24
545:16
**54** 651:25
654:9,10
**5413** 637:3
**55** 655:22
657:3
**55497** 420:24
**56** 657:14,15
658:12
**561** 350:19
**57** 658:4
**58** 658:14
**5A** 536:23
538:17
**5th** 655:18

———————
**6**
**6** 433:16
**6/24/14**
703:24,25
**6/26/16**
659:21
**6/6/2014**
641:11
**6:01** 679:13
**6:34** 694:4
**61** 659:9,15
**610** 352:7
**62** 373:10,16
375:16

**63** 376:13
553:1
555:14
556:12,15
556:16,19
559:5
**64** 378:19
**66** 661:20
662:4
**67** 555:20,22
555:24
558:15
560:16,20
562:6
572:13
652:4
**68** 662:6
664:25
665:1
**680** 352:8
**688** 352:9
**69** 445:18
450:4
**6900** 433:16
**6th** 650:25

———————
**7**
**7** 446:12
450:17,20
678:8
**7/3** 421:14
**7:40** 748:17
748:19
**70** 660:14
**702** 352:10
**71** 660:24
**72** 425:7
**737** 352:11
**739** 352:12
**750** 349:8
**7918** 588:15
**7th** 658:16,24

———————
**8**
**8** 521:4
**8/4/14** 352:11
**8/4/2014**
737:17
**8/7/2015**
658:4

**80** 499:18,19
**801** 349:10
350:9
**88** 629:1
**8th** 398:14
399:19
400:18
570:10,17

———————
**9**
**9** 564:19,22
**9/12** 352:8
**9/18/12** 684:3
**9:51** 349:15
353:3
**96** 659:20
**982-6300**
350:11
**9th** 570:10,17

SEC_000923